IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY SMITH,

   Plaintiff,

v.             Case No.:  2:06-cv-966-ID-SRW

HYUNDAI MOTOR
MANUFACTURING ALABAMA, LLC,

   Defendant.

<u>DEFENDANT'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT</u>

Timothy A. Palmer
J. Trent Scofield
Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART
One Federal Place, Suite 1000
1819 5th Avenue North
Birmingham, Alabama 35203
(205) 328-1900 Telephone
(205) 328-6000 Facsimile

Attorneys for Defendant
Hyundai Motor Manufacturing
Alabama, LLC

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................... 2

   A.   Smith's Employment with HMMA ........................................................................ 2

   B.   Smith Requests to Receive a Vacation Day........................................................... 4

   C.   Smith Has an Incident with His Team Leader ....................................................... 5

   D.   Another Co-Worker Complains against Smith ....................................................... 7

   E.   Smith's Employment Is Terminated ...................................................................... 9

   F.   Smith's Alleged Comparator Evidence ................................................................ 11

        1.   Joshua Groves ............................................................................................. 11

        2.   Scott Weddington ....................................................................................... 12

   G.   This Was Not the First Time Smith Engaged in Volatile Behavior in the Workplace.. 12

III.    ARGUMENT .............................................................................................................. 14

   A.   Plaintiff's Termination Claim Must Be Dismissed.............................................. 14

        1.   Plaintiff Cannot Prove Prima Facie Case of Race Discrimination ....................... 15

        2.   Plaintiff Cannot Challenge HMMA's Reason for his Discharge ......................... 18

   B.   Plaintiff's Hostile Work Environment Claim Fails As a Matter of Law ........................ 21

        1.   The Alleged Conduct Was Not Based on Any Protected Characteristic ............. 22

        2.   The Alleged Harassment Was Not Sufficiently Severe or Pervasive ................. 23

        3.   HMMA is Entitled to Prevail on Its Faragher Defense ........................................ 24

   C.   Plaintiff's Retaliation Claim Fails as a Matter of Law .................................................. 25

i

1.    Plaintiff Did Not Engage in Protected Activity ..................................................... 26

2.    Plaintiff Cannot Prove a Causal Connection Between His Complaint and His

Discharge ............................................................................................................... 27

3.    Plaintiff Cannot Dispute the Legitimate, Non-Retaliatory Reasons for His

Discharge ............................................................................................................... 28

IV.    CONCLUSION ................................................................................................................ 29

# I.    INTRODUCTION

Plaintiff, Larry Smith, is a former production employee of defendant, Hyundai Motor Manufacturing Alabama, LLC ("HMMA").  Smith was discharged in December of 2005, after two co-workers lodged complaints against him within a matter of days. Both employees accused him of engaging in agitated and threatening behavior.  Further, when Smith's supervisor attempted to speak with him regarding these incidents, he became enraged and insubordinate and had to be escorted from HMMA's plant by security personnel.  Based on these incidents, HMMA discharged Smith. Smith now claims he was discharged because of his race, African American, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  He also asserts claims for retaliation and a racially hostile work environment under Title VII.

Smith cannot prove a prima facie case for his race discrimination claim because he cannot prove that he was treated differently than others outside his protected class who engaged in similar misconduct. He cannot point to any persons outside his protected class who displayed multiple incidents of threatening behavior and insubordination within only a number of days and were not discharged.  Even if he could prove a prima facie case of discrimination, he cannot dispute HMMA's legitimate, non-discriminatory reasons for its actions (*i.e.,* his unprofessional and insubordinate behavior).

Smith has not offered any evidence that he was subjected to any racially harassing behavior. To the contrary, it was Smith who was accused of directing abusive behavior at his co-workers, including calling one of his African-American co-workers a "nappy head nigger."  Further, it is undisputed that his single complaint to HMMA's Team Relations Department (which did not involve any claim of discrimination) was resolved to his satisfaction.  Plaintiff cannot prove a hostile

work environment claim because: (1) he has not shown that any conduct was directed at him because of his race; (2) the conduct about which he complains was not sufficiently severe or pervasive to affect the terms and conditions of his employment; and (3) HMMA is entitled to prevail upon its affirmative defense as established in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998).

Smith cannot prove his retaliation claim because he has failed to show that he opposed any conduct made unlawful under Title VII. Although he made a vague complaint that he was being "harassed," he cannot demonstrate a causal connection between that complaint and his termination because he has no evidence that the persons who made the decision to discharge his employment were motivated by retaliatory animus. Also, the incidents that led to Smith's termination occurred prior to his complaint, which further negates any inference of a causal connection. Finally, as with his race claim, Smith cannot dispute HMMA's stated reasons for his discharge. HMMA is entitled to summary judgment on all claims.

## II. STATEMENT OF FACTS[1]

### A. Smith's Employment with HMMA

On Monday, April 11, 2005, Larry Smith (African-American) began working for HMMA as a production team member[2] in the Pre-Delivery Inspection ("PDI") light repair department. (Smith Depo., at 88:14-19, 105:22-107:9, Ex. 13) (Weddington Depo., at 9:9-15) Smith's work involved "flushing and gapping" the right side doors on the vehicles (*i.e.,* using a rubber hammer and a striker

---

[1] For purposes of this motion and supporting brief only, HMMA accepts the facts viewed in the light most favorable to Plaintiff as required under Fed. R. Civ. P. 56.

[2] At HMMA, employees are referred to as "team members."

2

to make the door flush with the rest of the car).   (Smith Depo., at  107:10-108:12, 110:1-111:23).

Smith had been trained to do several jobs on the production line and does not complain that he was

sometimes assigned to perform different tasks. (Smith Depo., at  123:21-126:6).

After he was hired, Smith was trained on HMMA's policies.   (Smith Depo., at 130:11-

131:4). Specifically, HMMA disseminates an anti-harassment policy to all its employees, which

provides that harassment on the basis of race will not be tolerated, and which provides avenues of

complaint for team members who feel that they have been harassed.   (Clevenger Decl., ¶ 9, Ex. 6).

Smith admits that he was trained on the company's anti-discrimination policies and understood that

he was to report to Team Relations Department or "or any member of management" with any

problems that he had. (Smith Depo., at  130:11-131:4).

The Team Leader in Smith's area was Reggie Johnson (African-American). (Smith Depo., at

88:20-89:22, 113:2-4).   A Team Leader is not a supervisor or a member of management, but is

responsible for directing the activities and job assignments for the team members in their area.

(Weddington Depo., at 13:9-14).  Prior to November of 2006, Smith had no problems working with

Team Leader Reggie Johnson.  (Smith Depo., at  113:2-21).

Scott Weddington (Caucasian) is the Production Manager in the General Assembly

Department.   (Weddington Depo., at 7:12-17) (Smith Depo., at 89:2-10). There were three

classifications of employees (Team Leader, Group Leader, Assistant Manager) between Smith and

Weddington. (Smith Depo., at  128:27-129:4) (Weddington Depo., at 10:15-12:20).  Smith had not

had any interaction with Weddington prior to the incidents that led to his termination in November

of 2005. (Smith Depo., at  129:14-130:10).  Smith had never heard Weddington make any racially

derogatory remarks. (Smith Depo., at  118:3-119:19).  Further, Smith does not contend that any

discriminatory or harassing actions occurred prior to the incidents that began on November 22, 2005, which led to his termination. (Smith Depo., at 253:1-21).

**B.    Smith Requests to Receive a Vacation Day**

In late October/early November 2006, Smith made a request of Team Leader Reggie Johnson to utilize a vacation day on November 17, 2006, and Johnson approved his request. (Smith Depo., at 131:5-12). When November 17th approached, Smith noticed that his name had not been placed on the calendar for vacation on that day. (Smith Depo., at 131:13-18). Smith was unable to locate Johnson, so he spoke to Team Relations Representative[3] Marcus Hannah (African-American) about the matter. (Smith Depo., at 131:18-132:5, 174:2-3) (Weddington Depo., at 21:11-13). Marcus Hannah found Johnson who said Smith was not on the calendar because Smith did not fill out the proper paperwork to obtain the vacation day. (Smith Depo., at 132:7-10). Smith said he was confused as to under what circumstances he should complete the paperwork. (Smith Depo., at 132:10-16). Group Leader Michael Lashley (Caucasian) eventually became involved in the conversation and approved the vacation day for Smith. (Smith Depo., at 89:4-17, 132:21-133:19, 151:13-23).

Smith's complaint (regarding the vacation day) to Hannah was his only complaint to Team Relations during the time he worked at HMMA. (Smith Depo., at 129:23-131:19, 133:20-134:3).

---

[3] HMMA's Team Relations Department, which is part of HMMA's Human Resources Division, interprets and implements company policy as well as assist Team Members and management on resolving policy issues.

Smith acknowledges that his complaint regarding the vacation day was resolved to his satisfaction. (Smith Depo., at 167:4-168:4).

**C.    Smith Has an Incident with His Team Leader**

On November 22, 2005, Team Leader Reggie Johnson complained to Scott Weddington about an incident involving Smith. (Smith Depo., at 147:3-18). Johnson asked Smith to repair a tail light on one of the vehicles on the assembly line. (Smith Depo., at 152:4-18). Smith said that he did not have the proper tools to perform the repair, and Johnson said that he would get Smith the necessary tools. (Smith Depo., at 152:19-22). Johnson brought Smith a Phillips screwdriver but Smith claims that he also needed a ratchet and a socket to complete the task. (Smith Depo., at 152:23-153:18).

For some reason, Smith then became enraged and began yelling at Johnson and invading his personal space. (Johnson Decl., ¶ 3). Johnson called Weddington (by radio) three times in a matter of minutes, and, in the third call, said "this guy, Larry, looks like he's about to put his hands on me. I need you to get down here now." (Weddington Depo., at 22:5-24:2) (Johnson Decl., ¶ 4).

Weddington immediately raced to the other side of the plant where Johnson and Smith were located. (Smith Depo., at 159:12-23)(Weddington Depo., at 24:3-9). When he arrived, he saw Smith was only a few inches from Johnson's face, while Johnson was trying to back away. (Weddington Depo., at 24:10-15). Weddington saw that there was a potential for a physical altercation, so he asked Smith to go into the PDI office that was directly next door. (Weddington Depo., at 25:4-11) (Smith Depo., at 156:10-23). Weddington was concerned that there might be a physical altercation because Johnson told him that Smith was about to "put his hands on [him]" and he saw Smith in Johnson's personal space. (Weddington Depo., at 25:12-17).

Weddington talked to Johnson, team member Gary Myers (Caucasian), and team member Karl Tyus (African-American) before meeting with Smith. (Weddington Depo., at 28:10-29:2). Johnson told Weddington that Smith had lost his temper, was yelling at him, appeared to want to physically harm him, and had called him a "nappy-head nigger." (Smith Depo., at 147:3-23) (Clevenger Decl., ¶¶ 1, 5, Exs. 1, 4)(Johnson Decl., ¶ 3). Myers told Weddington that Smith was visibly upset and he was invading Johnson's personal space but he definitely said that Johnson was backing away and Smith was walking toward him. (Weddington Depo., at 29:3-21). Tyus saw essentially the same thing as Myers and said that he had heard Johnson use the phrase "nappy head" and he observed Johnson trying to retreat, but Smith was not letting him do so. (Weddington Depo., at 29:22-30:6).

Team Relations Representative Hannah and PDI Assistant Manager Maggie Prestridge (Caucasian) joined in the meeting with Smith in the PDI office. (Smith Depo., at 161:5-21, 171:11-21) (Weddington Depo., at 21:1-22:4, 26:15-27:1). Smith denied that he raised his voice to Johnson, used any inappropriate words or did anything disrespectful during their discussion. (Smith Depo., at 155:2-156:9). Smith told Weddington that he felt Johnson was lying. (Smith Depo., at 164:13-165:3). At the time, Smith did not offer any explanation as to why he thought Johnson would lie about him but now contends in this lawsuit that Johnson was upset with him because Smith had gone to Team Relations regarding the November 17, 2005 vacation day request. (Smith Depo., at 165:4-168:8, 178:1-16).

Weddington advised Smith that the company had a zero tolerance for talking in an aggressive manner to co-workers, or name-calling. (Smith Depo., at 161:12-21) (Weddington Depo., at 27:2-21). Smith responded disrespectfully by saying "if this company had expressed zero tolerance when

you stole that car – those car parts, you never would be here to talk to me today." (Smith Depo., at 162:3-14) (Weddington Depo., at 27:22-28:9). Smith previously learned that Weddington had been the subject of a company internal investigation regarding scrap parts being installed on Weddington's company vehicle. (Smith Depo., at 162:3-21). Smith says he made this personal attack on Weddington regarding the vehicle part situation because he felt that Weddington thought he was perfect and had never done anything wrong. (Smith Depo., at 163:20-164:22).

No disciplinary action was taken against Smith as a result Reggie Johnson's complaint. (Smith Depo., at 148:1-18). During their meeting, Smith advised that he no longer wanted to report to Johnson. Specifically, Smith said that he did not want to work for Johnson because he had seen him be disrespectful to four other co-workers (both African-American and Caucasian). (Smith Depo., at 174:14-175:8). Smith had heard several team workers (Caucasian and African-American) complain to him that Johnson was not giving them the proper tools to do their job. (Smith Depo., at 175:9-177:23). It was agreed that Smith would work in the Paint Department until after the Thanksgiving holidays, then they would find an open position for him away from Johnson. (Smith Depo., at 148;4-9, 173:2-174:9) (Weddington Depo., at 30:7-31:1).

**D.    Another Co-Worker Complains Against Smith**

Smith worked in the Paint Department until he returned after Thanksgiving break.[4] (Weddington Depo., at 31:1-6) (Smith Depo., at 180:5-15). When Smith reported to work after the Thanksgiving holidays, Weddington told Smith that he was going to move him to the Trim Line 3 work area, so that Smith would no longer report to Johnson. (Smith Depo., at 180:16-181:13, 184:9-

---

[4] Most of HMMA's production team members, including Smith, were not required to work during Thanksgiving break (*i.e.,* November 24, 2005-November 27, 2005).

7

23).  Weddington asked Smith to get his work gear and other personal items in order to move to the new position.  (Smith Depo., at 181:14-17).

On the way to get his personal items, Smith claims that Team Member Lisa Chumney (Caucasian) approached him and said, "Larry, what are they getting ready to do to you?" (Smith Depo., at 181:16-22).  Smith contends another production team member (*i.e.,* Larry Nichols) had previously told him that Chumney stated her opinion that Smith should be fired over the altercation with Johnson, and Smith confronted her: "I heard what you said about me that I should be fired." (Smith Depo., at 182:1-13, 187:6-188:23).  Chumney denied making such a comment, and Smith responded that he believed the co-worker. (Smith Depo., at 181:17-182:13) (Chumney Decl., ¶ 3). Smith stepped toward Chumney in an intimidating manner when he made the confronting statement. (Chumney Decl., ¶ 3).  Smith's actions upset Chumney and made her cry. (Chumney Decl., ¶ 3)(Clevenger Decl., ¶ 3).  Chumney reported the incident to Group Leader Michael Campbell (African-American) and Reggie Johnson, and told them that Smith had stepped toward her in an intimidating manner. (Weddington Depo., at 47:10-48:15)(Chumney Decl., ¶ 4, Ex. 1).  Chumney reported to both men that she felt physically threatened by Smith.  (Chumney Decl., ¶ 4).

Smith was thereafter called into Weddington's office, and Marcus Hannah and Team Relations Specialist  Karin Carter (Caucasian) were there as well. (Smith Depo., at 183:2-184:6) (Hannah Decl., ¶ 5).  Weddington started to ask Smith about the incident with Lisa Chumney. (Smith Depo., at 183:2-19).  Weddington told Smith that Chumney claimed that Smith had made a threatening move toward her and that she had complained about his actions. (Smith Depo., at 183:4-13) (Weddington Depo., at 48:11-15).

Smith then became belligerent in the meeting and began verbally attacking Weddington. (Hannah Decl., ¶ 5) (Clevenger Decl., ¶ 3, Exs. 2-5). Weddington, Hannah, and Carter said that Smith made several attacks against Weddington, including claiming that Weddington had "Satan running through his body." (Hannah Decl., ¶ 5)(Clevenger Decl., ¶ 3, Ex. 2-4). It became clear to Weddington, Hannah and Carter that Smith had lost his temper and that the meeting was not being productive. (Hannah Decl., ¶ 5)(Clevenger Decl., ¶ 3, Ex. 3). Weddington called security personnel to escort Smith out of the building before the situation further escalated. (Hannah Decl., ¶ 5)(Smith Depo., at 201:1-23).

Smith does not contend that either the Reggie Johnson incident or the Lisa Chumney incident had anything to do with his race. (Smith Depo., at 235:20-237:18). He believes that Chumney was retaliating against him because he would not give her information about his personal situation. (Smith Depo., at 120:3-121:11, 237:8-15). He claims Reggie Johnson reported him because Smith had previously gone to Team Relations concerning the vacation day. (Smith Depo., at 237:17-18).

### E.    Smith's Employment is Terminated

HMMA's Team Relations Department oversees investigations that involve serious misconduct in violation of HMMA policies, which can lead to disciplinary action, up to and including termination. (Smith Depo., at 140:3-141:14) (Weddington Depo., at 42:12-15). On November 29, 2005, Team Relations Manager Audie Swegman (Caucasian) and Team Relations Assistant Manager Rob Clevenger (Caucasian) telephoned Smith and asked him to report to the plant to meet with them. (Smith Depo., at 202:16). They met with Smith to get his side of the story as part of their investigation. (Clevenger Dec., ¶ 4). Smith did not have any interaction with Clevenger or Swegman prior to this meeting. (Smith Depo., at 134:4-136:15). Smith was given the

opportunity to go through the incidents and give his side of the story. (Smith Depo., at 205:1-4)(Clevenger Decl., ¶ 4).

Smith admitted to having disputes with Chumney and Johnson, but claimed his two co-workers were lying against him. (Clevenger Decl., ¶ 4). Smith denied that he was confrontational during his meetings with Weddington, but this was clearly contrary to the reports of Weddington, Hannah, Prestridge, and Carter. (Clevenger Decl., ¶ 5, Exs. 1-5). Swegman and Clevenger advised Smith that they had to submit their findings to HMMA's Termination Committee, which would make a determination as to whether his actions constituted serious misconduct and whether termination was warranted. (Smith Depo., at 140:7-141:1)(Weddington Depo., at 36:13-20).

The five-member Termination Committee reviewed the evidence gathered during the investigation, and determined that Smith should be discharged because there were three incidents of Smith losing his temper and acting unprofessionally and insubordinate in a short period of time. (Clevenger Decl., ¶¶ 6-7). Swegman telephoned Smith, and advised that the committee had met and decided to terminate Smith's employment. (Smith Depo., at 207:14-209:2). Smith also received a letter dated December 6, 2005, from Employment Department Manager Wendy Warner (Caucasian) advising him that he was being discharged over the November 22 and November 28 incidents because the Termination Committee had determined that his behavior violated HMMA's serious misconduct policy and also constituted insubordination. (Smith Depo., at 210:12-19, Ex. 17).

After learning his employment at HMMA had been terminated, Smith complained to Human Resources Director Greg Kimble (African-American) that the termination decision was unfair. (Smith Depo., at 211:5-213:4)(Clevenger Decl., ¶ 10). Kimble reviewed the findings of the

committee and concluded that the termination decision was appropriate. (Smith Depo., at 223:8-15) (Clevenger Decl., ¶ 10, Ex. 7).

**F.    Smith's Alleged Comparator Evidence**

**1.    Joshua Groves**

Smith claims that Team Member Joshua Groves (Caucasian), who was a "parts runner" in the PDI Department, also engaged in insubordinate and disrespectful behavior but was not terminated. (Smith Depo., at 89:23-90:23, 141:19-142:18) (Groves Depo., at 20:4-5). Smith claims that Joshua Groves told Reggie Johnson to "kiss his ass" but was not discharged. (Smith Depo., at 142:19-143:13). Contrary to Smith's bold and unsubstantiated allegation, both Groves and Johnson deny that this incident ever happened, and both testified that Groves was never disrespectful to Johnson. (Groves Depo., at 12:9-19, 28:2-11) (Johnson Decl., ¶ 5). Further, unlike the November 22, 2005 situation with Smith, Johnson never reported that Groves engaged in any physically threatening or insubordinate behavior. (Groves Depo., at 28:8-11)(Weddington Depo., at 17:22-19:1).

Smith also contends that Joshua Groves and another Team Member (*i.e.,* Michael Harris) engaged in a fight at work, but only received a three day suspension. (Smith Depo., at 2469-19). Smith has no personal knowledge of this incident, but claims that Groves made an inadmissible, out-of-court hearsay statement to him about this supposed incident.  (Smith Depo., at 239:21-23). Groves testified under oath during his deposition that he and Michael Harris had a verbal argument at work, but Groves strongly denies that it was anything more than a mild disagreement. (Groves Depo., at  9:9-10:11). Importantly, Groves did not report the incident to HMMA management or claim that Harris had physically threatened him, like Chumney and Johnson had claimed against Smith. (Groves Depo., at 10:9-11, 11:3-11) (Weddington Depo., at 18:21-23, 41:1-42:22).

Groves denied that he was suspended for this supposed physical altercation that simply did not happen. (Groves Depo., at 18:20-19:10). Groves was suspended while working at HMMA, but it was for *attendance* problems. (Groves Depo., at 19:2-14). Groves was eventually terminated from HMMA because of his poor attendance record. (Groves Depo., at 30) (Weddington Depo., at 41:1-21).

### 2.    Scott Weddington

Smith also points to Scott Weddington as a comparator. Smith feels it was discriminatory that Weddington was not discharged as a result of an internal investigation regarding the installation of upgrade parts on his company-issued automobile. (Smith Depo., at 238:18-299:20).

In September of 2005, Weddington was suspended for three weeks, lost the use of his company car for one year, and was issued a written warning at the completion of a company investigation because he had been accused of placing upgraded scrap parts on his company car. (Weddington Depo., at 38:17-40:18)(Swegman Decl., ¶¶ 3-5). During the investigation, Weddington's supervisor corroborated Weddington's claim that he had given him permission to obtain and install the parts. (Swegman Decl., ¶¶ 3-4). Weddington was not discharged as a result of the investigation because it was determined that his supervisor had given him permission to make the parts upgrades. (Swegman Decl., ¶ 5). (Weddington Depo., at 39:2-7). There have been no allegations presented to Team Relations that Weddington has ever engaged in physically threatening or insubordinate behavior similar to those reported against Smith. (Swegman Decl., ¶ 6).

### G.    This Was Not the First Time Smith Engaged in Volatile Behavior in the Workplace

Smith was previously terminated from Russell Corporation in Wetumpka, Alabama. (Smith Depo., at 17:13-18:21). The personnel change of status form during the time Plaintiff worked at

Russell states that at the time of Smith's termination, "the supervisors were on their way to call security when the employee [Smith] pushed one of the supervisors from behind and began making threats to the effect that he was going to kill the supervisor for terminating him." (Smith Depo., at 19:2-22:6, Ex. 2). Smith denies this misconduct and claims the documents are fabricated. (Smith Depo., at 22:15-23).

After leaving Russell Corporation, Smith next went to work for TrenTech. (Smith Depo., at 25:22-26:2). In a statement by TrenTech employee Kenny Bernette relating to an incident over a disagreement over time records, Bernette claimed that Smith told him to "fuck off," shot him "the bird," challenged the virtue of his wife, and called him "white trash." (Smith Depo., at 35:8-36:20, Ex. 4). Smith has no explanation as to why these documents were contained in his TrenTech personnel file and says that they are fabricated. (Smith Depo., at 36:21-39:19).

Smith next worked for Rheem Manufacturing Company. (Smith Depo., at 44:7-14). Smith signed a personnel report that advised he was being suspended for half a day from Rheem for disrespectful language to a fellow employee including yelling, shooting "the bird," and other inappropriate behavior. (Smith Depo., at 51:19-52:17, Ex. 5). Smith denies that he engaged in any inappropriate conduct while at Rheem. (Smith Depo., at 51:19-52:14).

Smith also denies that he lost his temper at HMMA, and also denies that he engaged in any insubordinate or unprofessional behavior. (Smith Depo., at 100:18-101:4, 147:7-23, 155:2-156:9, 191:7-192:21,197:8-198:18, 200:14-19). He also claims that persons at HMMA (like those at Russell Corporation, TrenTech, and Rheem Manufacturing Company) are lying against him and that statements taken during those investigations were fabricated. (Smith Depo., at 162:3-9, 165:4-166:17, 188:15-23, 197:21-198:14, 215:15-217:15, 242:7-244:23). Smith acknowledged at his

deposition that he has now had situations with four separate employers where he has been accused of inappropriate behavior and now contends that someone fabricated documents that were contained in his personnel file at each employer. (Smith Depo., at 220:12-221:15).

Now, make it five. After leaving HMMA, Smith worked for CRH North America, Inc. (Smith Depo., at 53:21-54:16). Smith filed an EEOC Charge against CRH alleging that he was discriminated against on the basis of his race. Documents produced by CRH show that, once again, Smith engaged in volatile behavior in the workplace. (Exhibit J, D00400-440: Documents produced by CRH). Smith was described as "very upset and hostile" when his supervisors attempted to discuss with him areas that he needed to improve his performance in March of 2007. (Id.). In a later meeting with Human Resources, he "became argumentative and hostile" and the decision was made to ask "for his badge because [the Human Resources Representative] became concerned for him to come back into the facility that evening due to his hostility." (Ex. J, D00403-404). Smith was discharged for his poor performance and his "hostile reaction when he was corrected." (Id.).

### III.    ARGUMENT

## A.    Plaintiff's Termination Claim Must Be Dismissed

As explained below, Plaintiff cannot establish a prima facie case of discrimination for his termination claim because he cannot point to any similarly situated, Caucasian co-workers who were treated differently. Further, Smith cannot dispute HMMA's proffered reason for his termination. It is undisputed that two team members reported that Smith engaged in physically threatening behavior and that the persons who met with Smith regarding these incidents reported that he again lost his temper and was insubordinate. HMMA relied in good faith on the complaints and reports of those

persons when it discharged him. There is no evidence that any of these employees were motivated by racial bias.

### 1.    Plaintiff Cannot Prove Prima Facie Case of Race Discrimination

Smith does not have any direct evidence of discrimination. Therefore, he must prove his claims through the circumstantial evidentiary model created in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). To prove a prima facie case of race discrimination, Plaintiff must prove he was: (1) a member of the protected class; (2) qualified for the position; (3) subjected to adverse employment action; and (4) replaced by a person outside the protected class or suffered from disparate treatment because of membership in the protected class. <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1024-25 (11th Cir. 2000); <u>Armstrong v. Flowers Hosp., Inc.</u>, 33 F.3d 1308, 1313-14 (11th Cir. 1994). After the Plaintiff proves a prima facie case of discrimination, the Defendant need only to produce evidence that there is a legitimate, non-discriminatory reason for the challenged employment action. <u>See</u> <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802; <u>Chapman</u>, 229 F.3d at 1024-25; <u>Armstrong</u>, 33 F.3d at 1313-14. The presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the Plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action. <u>Chapman</u>, 229 F.3d at 1024-25.

To establish a prima facie case, Plaintiff must come forward with evidence that he was treated differently than others outside the protected class. <u>See</u> <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1369 (11th Cir. 1999)(affirming grant of summary judgment for employer and noting that employee could not establish a prima facie case because he failed to point to any persons outside the protected

class who were treated more favorably than her). Smith has failed in this regard.  The Eleventh

Circuit has stated the following about comparator evidence:

> In determining whether employees are similarly situated for purposes
> of establishing a prima facie case, it is necessary to consider whether
> the employees are involved in or accused of the same or similar
> conduct and are disciplined in different ways.  The most important
> factors in the disciplinary context are the nature of the offenses
> committed and the nature of the punishments imposed.  We require
> that the quantity and quality of the comparator's misconduct be
> **nearly identical** to prevent courts from second-guessing employers'
> reasonable decisions and confusing apples with oranges. Exact
> correlation is neither likely nor necessary, but the cases must be fair
> congeners. In other words, apples should be compared to apples.

Mannica v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999)(citations and quotations

omitted)(emphasis added).  Plaintiff points to two comparators, neither of whom are similarly

situated to him.  First, Smith compares himself to Team Member Joshua Groves.  Smith claims that

Groves, like he, was disrespectful to Team Leader Johnson.

Both Groves and Johnson denied any such conduct occurred, and it is undisputed that

Johnson never reported any alleged misconduct by Groves. (Groves Depo., at 12:9-19,

28:2011)(Johnson Decl., ¶ 5). As such, even if Groves did act disrespectfully to Johnson, HMMA

management was completely unaware of the conduct.  Therefore, this situation is not comparable to

Smith's situation. Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir.

2001)(holding that plaintiff is required to show the comparator's misconduct is nearly identical to

the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and

confusing apples with oranges"), cert. denied, 534 U.S. 967 (2001);  Vickers v. Federal Express

Corp., 132 F. Supp. 2d 1371, 1380 (S.D. Ala. 2000)("[d]isparate discipline cannot be shown without

first showing that the employer was aware of the comparator's misconduct."); St. Hilaire v. The Pep

Boys, 73 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999)(holding in order to show that the employer treated comparators more favorably than the plaintiff, there must be evidence that the employer was actually aware that the comparators were engaging in conduct similar to plaintiff's at the time plaintiff was fired).

It is also undisputed that Smith received no discipline as a result of the November 22, 2005 incident with Johnson. (Smith Depo., at 148:1-18). It was only after he engaged in a second incident with team member Lisa Chumney less than a week later, and twice lost his temper with his supervisors that he was subjected to disciplinary action. Thus, the "quantity" of his misconduct was dissimilar, and the repetitive nature of his behavior distinguishes his situation from the supposed misconduct of Groves. See Jordan v. City of Gary, 396 F.3d 825, 834 (7th Cir. 2005)(finding that the plaintiff and a co-worker were not similarly situated because "[t]he record establishes that [the plaintiff] had an extensive track record of repeated and ongoing disciplinary problems prior to [the employer's] decision to appoint [the co-worker] as supervisor, while [the co-worker] did not"). Cooper v. Southern Co., 390 F.3d 695, 741 (11th Cir. 2004) (Title VII claimant's earlier placement in discipline program factor considered in concluding proposed comparators not similarly situated), cert. denied, 546 U.S. 960 (2005).

Smith also contends that Groves made a hearsay comment to him that he had been suspended for three days for fighting with co-employee Michael Harris. Groves testified under oath during his deposition, however, that there was no such physical altercation and no suspension. (Groves Depo., at 9:9-10:11). There is no record evidence to support Smith's accusations and certainly no evidence that Weddington or Team Relations were made aware of this alleged altercation. (Groves Depo., at 10:9-11, 11:3-11) (Weddington Depo., at 18:21-23, 41:1-42:22). Plaintiff's anecdotal testimony

17

regarding this supposed incident is not admissible evidence, particularly given that Groves denied

under oath that it ever occurred.  See Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653,

659 (11th Cir. 1998)(rejecting plaintiff's "anecdotal testimony" about alleged comparators where

"witnesses who testified regarding these other incidents had no personal knowledge").  Again, even

if Plaintiff was able to offer admissible evidence that this altercation occurred, which he cannot, he

still has no evidence that HMMA management was aware of it.

Plaintiff's other purported comparator (i.e., Scott Weddington) also is not similarly situated.

Weddington was never accused of insubordination or of engaging in behavior that caused his co-

workers to feel threatened.  (Swegman Decl., ¶ 6).  Thus, Weddington did not engage in misconduct

of the "same or similar conduct" to Smith.  Further, it is undisputed that Weddington's supervisor

gave him permission to take the action that he did.  (Swegman Decl., ¶ 5).  No one at HMMA gave

Smith permission to threaten his co-workers or to be insubordinate to a member of management.

Thus, the "quality" of Smith's misconduct was different than that of Weddington.

In addition, Weddington is clearly not a proper comparator because Weddington and Smith

held different jobs.  See Hanley v. Sports Authority, 143 F. Supp. 2d 1351, 1359 (S.D. Fla.

2000)(holding that co-employee in a different position than plaintiff was not an appropriate

comparator for race-based disparate treatment claim), citing Holifield v.Reno, 115 F.3d 1555, 1562

(11th Cir. 1997).

### 2. Plaintiff Cannot Challenge HMMA's Reason for his Discharge

Even if Smith could establish a prima facie case of discrimination, Smith's violation of

HMMA's policy constitutes a legitimate non-discriminatory and non-retaliatory reason for his

discharge.  An employer may legitimately discharge an employee who displays volatile behavior or

18

who seeks to engage in adversarial and antagonistic behavior with his co-workers.  See Herron v. DaimlerChrysler Corp., 388 F.3d 293, 301 (7th Cir. 2004) (holding that "volatile behavior and poor attitude" was a legitimate, nondiscriminatory reason for termination, and that the plaintiff could offer no evidence to prove that reason was pretext for unlawful discrimination).  Indeed, an employee can be discharged for antagonistic behavior that involves opposition to discriminatory behavior (which did not occur here).  See Rollins v. Florida Dept. of Law Enforcement, 868 F.2d. 397, 399-401 (11th Cir. 1989)(Court balanced "the purpose of (Title VII) and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation, and a generally productive work environment," and held that the plaintiff's numerous prior complaints fell outside the protection of Title VII's anti-retaliation provision because, among other things, of the "insubordinate and antagonistic manner" by which the plaintiff expressed her opposition to her employer's conduct).

Clearly, insubordination, belligerent and disrespectful behavior, and physically threatening co-workers constitute legitimate, non-discriminatory reasons to terminate an employee.  See Ashe v. Aronov Homes, Inc., 354 F. Supp. 2d 1251, 1259 (M.D. Ala. 2004)(holding failure to follow instructions and insubordination are legitimate, nondiscriminatory considerations); Garcia-Cabrera v. Cohen, 81 F. Supp. 2d 1272, 1281 (M.D. Ala. 2000)(holding "[i]t is beyond question that an inability to get along with co-workers and demonstrate caustic or rude behavior is a legitimate, non-discriminatory reason for an employment decision."); Laosebikan v. Coca-Cola Co., 167 Fed. Appx. 758, 764, 2006 WL 224167, *4 (11th Cir. Jan. 31, 2006)(holding that threatening a supervisor is a legitimate, nondiscriminatory reason for discharging an employee)(unpublished).

It is undisputed that HMMA's management was first alerted to the situation by complaints reported by Smith's co-workers. There is no suggestion that Reggie Johnson or Lisa Chumney reported Smith based upon some discriminatory motive, and HMMA was entitled to rely upon what those team members reported. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)("That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.")(citations omitted).

The relevant inquiry is whether HMMA management had a good faith belief that Smith violated its work rules when it discharged him, not whether Smith actually violated the work rules. The Eleventh Circuit has discussed this critical distinction in the case of Elrod v. Sears, Roebuck & Co., 939 F.2d 1466 (11th Cir. 1991). In Elrod, the plaintiff contended that the employer's stated reason for termination (*i.e.,* Elrod's alleged sexual harassment of another employee) was pretextual and that he was actually discharged because of his age in violation of the ADEA. Id. 939 F.2d at 1470. Just as here, Elrod focused his evidence on his general denial of the alleged misconduct, and he sought to prove that the co-workers who implicated him were mistaken. But the Eleventh Circuit made clear that such efforts missed the point:

> We must make an important distinction before proceeding any further. Much of Elrod's proof at trial centered around whether Elrod was in fact guilty of the . . . allegations leveled at him by his former co-workers. We can assume for purposes of this opinion that the complaining employees interviewed by [the employer] were lying through their teeth. The inquiry . . . is limited to whether [the employer] *believed* that Elrod was guilty . . ., and if so, whether this belief was the reason behind Elrod's discharge.

Elrod, 939 F.2d at 1470 (emphasis in original).

As a matter of law, HMMA management was entitled to rely upon what Smith's fellow employees told them. See Jones v. Gerwins, 874 F.2d 1534, 1540 (11th Cir. 1989)("The law is clear

20

that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation."). Plaintiff's belated attempts to now contend that Chumney and Johnson lied for some unspecified desire to "get him" will not create a genuine issue of material fact.

Finally, plaintiff has not presented any evidence that HMMA applied this work rule in a discriminatory manner. Smith has failed to present any evidence that HMMA applied this work rule differently to Caucasians and African-Americans. HMMA is entitled to summary judgment on plaintiff's discharge claim.

**B.    Plaintiff's Hostile Work Environment Claim Fails As a Matter of Law**

Plaintiff asserts a claim for his alleged racially hostile work environment in the Complaint. (Doc. 1, at ¶ 15). It is unclear what behavior Plaintiff contends constitutes harassment. Smith testified that he was not subject to any racially derogatory comments by Johnson, Chumney, Weddington, or anyone else at HMMA. (113:17-114:2, 235:20-238:14). Indeed, Smith is the only person in this case who is alleged to have made racially derogatory remarks. (Johnson Decl., ¶ 3).

To establish a claim of "hostile work environment" harassment, Smith must prove that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the employee's protected characteristic; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to intervene. See Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982). As discussed in detail below, there is no evidence that any of the actions in this case were directed at Smith because of his race. Further, the incidents about which he complains are not

sufficiently severe or pervasive to affect his terms and conditions of employment. Finally, his claim must fail because he made no attempt to complain about any supposed discriminatory behavior.

### 1.    The Alleged Conduct Was Not Based on Any Protected Characteristic

Smith must produce evidence that the alleged harassment was based on the protected characteristic at issue to survive summary judgment. In Gupta v. Florida Board of Regents, 212 F.3d 571 (11th Cir. 2000), cert. denied, 531 U.S. 1076 (2001), the Eleventh Circuit held in a sexual harassment suit that "the statements and conduct must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met. Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or the offended party (the plaintiff), are not counted." Gupta, 212 F.3d at 583. There is no evidence that Reggie Johnson or Lisa Chumney complained about Smith's misconduct because he is black. Even Smith did not testify that such complaints were motivated by racial animus. (Smith Depo., at 113:17-114:2). Smith testified that Johnson dealt with all employees in the department (white and black) in the same manner. (Smith Depo., at 174:14-175:8). Smith contends Chumney complained against him because he did not answer her question about what he felt was his personal business. (Smith Depo., at 199:12-23). Further, there is no evidence to suggest that Weddington forwarded their complaints to Team Relations because Smith is black. The Supreme Court has made clear that "Title VII does not prohibit all verbal or physical harassment in the workplace" and that Title VII is not a "general civility code." Oncale v. Sundowner Outdoor Services, 523 U.S. 75, 80 (1998). Smith has failed to present evidence that the conduct about which he claims was directed at him because of his race.

### 2.    The Alleged Harassment Was Not Sufficiently Severe or Pervasive

To give rise to a claim under Title VII, the harassment must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile and abusive. Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999), cert. denied, 529 U.S. 1068 (2000). This "is the element that tests the mettle of . . . harassment claims." Gupta, 212 F.3d at 583. The Supreme Court has directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998).

Plaintiff may contend that Weddington raised his voice or seemed upset during their meeting. It does not constitute harassment that Plaintiff's supervisors attempted to speak with him about complaints made by his co-workers. See Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir.)("Conversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress."), cert. denied, 525 U.S. 963 (1998). Nonetheless, Plaintiff's allegations would be far less egregious to those of the plaintiff in Ottman v. City of Independence, Missouri, 341 F.3d 751 (8th Cir. 2003), who alleged that the harasser had "belittled the work of Ottman and other females, but had not belittled the work of male employees," had belittled women's abilities, and spoken condescendingly to the plaintiff "as if she were a child." 341 F.3d at 760. The Eighth Circuit Court of Appeals reversed the district court's denial of summary judgment and concluded that, "while certainly patronizing and unprofessional,"

the conduct was not sufficiently severe or pervasive so as to give rise to a discrimination claim.  Id.

The same result is required here.

### 3.    HMMA is Entitled to Prevail on Its **Faragher** Defense

Even if Smith could establish a prima facie case on his hostile work environment claim,

HMMA can establish the affirmative defense described by the Supreme Court in  Faragher v. City of

Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998).

Under Faragher and Ellerth, the employer is not liable for the hostile environment created by one of

its supervisors if the employer proves: (1) that it exercised reasonable care to prevent and correct

promptly any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of

the preventative or corrective opportunities provided by the employer or otherwise failed to avoid

harm.  Ellerth, 524 U.S. at 765.  If an employer has effectively promulgated a workable anti-

harassment policy, then it has met its burden under the first element of the Faragher/Ellerth defense.

 See Faragher, 524 U.S. at 807-08 (formal harassment policy with sensible complaint procedure

satisfies employer's duty of care); Shaw v. Autozone, Inc., 180 F.3d 806, 811 (7th Cir. 1999)

("[w]hile not required as a matter of law, . . . the existence of an appropriate anti-harassment policy

will often satisfy this first prong"), cert. denied, 528 U.S. 1076 (2000);  Madray v. Publix

Supermarkets, Inc., 208 F.3d 1290, 1297-98 (11th Cir. 2000) (employer meets its burden by proving

dissemination of workable anti-harassment policy with "multiple avenues" for lodging complaint),

cert. denied, 531 U.S. 926 (2000).

HMMA disseminates an anti-harassment policy to all its employees which provide that

harassment on the basis of race will not be tolerated, and which provides avenues of complaint for

team members who feel that they have been harassed.  (Clevenger Decl., ¶ 9, Ex. 6). Smith was

24

aware that he had avenues of complaint available to him, but did not use them. (Smith Depo., at 130-34). Once an employer creates an effective anti-harassment policy, then "it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).

Where an employee fails to make a complaint, despite being afforded procedures to do so, the plaintiff's hostile work environment claim must fail. See Faragher, 524 U.S. at 807-08 (where evidence shows "an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [affirmative] defense"); Madray, 208 F.3d at 1302 (dismissing hostile work environment claims for plaintiff's failure to utilize employer's complaint procedures). To the extent that Plaintiff contends that his vague comments to Clevenger and Swegman that he was being harassed by Weddington constitute a complaint of discrimination, it is undisputed that Team Relations conducted a complete and thorough investigation of the situation and found that no inappropriate action had been taken by Weddington. (Clevenger Decl., ¶ 5). Further, Human Resources Director Greg Kimble (African-American) also reviewed the termination and determined the correct decision had been made. (Clevenger Decl., ¶ 10, Ex. 7). Therefore, Plaintiff's harassment claim must fail as a matter of law.

## C.    Plaintiff's Retaliation Claim Fails as a Matter of Law

Plaintiff claims that he was somehow retaliated against because he was terminated after he vaguely claimed that he was being "harassed" by Weddington. (Smith Depo., at 198:3-199:11). To establish a prima facie case of retaliation, Smith must show:  (1) he engaged in statutorily protected

expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. See, e.g., Weaver v. Casa Gallardo, 922 F.2d 1515, 1524 (11th Cir. 1991). Smith cannot establish the first or third required elements of his prima facie case.

### 1.    Plaintiff Did Not Engage in Protected Activity

Title VII contains two different types of protected activity, known as the "opposition clause" and the "participation clause." Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Likewise, "under the participation clause," an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Id. Plaintiff did not file his EEOC Charge until after his termination, so the participation clause is inapplicable. He cannot prove his claim under the "opposition clause" because he only made vague complaints while working at HMMA and he did not oppose conduct that could reasonably be considered as violating Title VII.

Plaintiff claimed that he said that he was being "harassed" by Weddington during his meeting with Team Relations. (Smith Depo., at 198:3-199:11). Smith's vague assertion that he was being "harassed" by Weddington does not constitute protected expression. See e.g., Durkin v. City of Chicago, 341 F.3d 606, 614-15 (7th Cir. 2003)( employee's repeated complaints, which were "vague and concerned subject matters other than harassment," and did not adhere to the "formal channels of the City's complaint mechanism," were not statutorily protected activity. ); Woods v. Illinois Dep't of Transp., 2005 U.S. Dist. LEXIS 32708, No. 03 CV 4098 JPG, 2005 WL 1691107, at *4 (S.D. Ill. May 31, 2005) (holding that informal complaint was not protected activity where

26

plaintiff "did not complain of race discrimination or any other practice made unlawful by Title VII"); Schulz v. Varian Med. Sys., Inc., 315 F. Supp. 2d 923, 937 (N.D. Ill. 2004) (finding that plaintiff's complaints were "too generic to rise to the level of statutorily-protected activity"); Drago v. Aetna Plywood, Inc., 968 F. Supp. 1251, 1255-56 (N.D. Ill. 1997) (finding that plaintiff's complaints did not constitute statutorily protected expression where she did not explicitly report sexual harassment or other activity that violated Title VII); cf. Jones-Walsh, 2005 U.S. Dist. LEXIS 23089, 2005 WL 2293671, at *5 (holding that plaintiff's informal complaints could constitute protected activity where the complaints "unambiguously related to harassment in the workplace").

### 2. Plaintiff Cannot Prove a Causal Connection Between His Complaint and His Discharge

Even if Plaintiff could show that he engaged in protected activity, he cannot prove a causal connection between any complaint and his discharge. First, it is undisputed that the investigation was undertaken as a result of complaints made by Johnson and Chumney, and that it was these incidents that ultimately led to Smith's termination. Thus, the incidents that led to his termination occurred before Smith made any complaint. This compels the conclusion that Smith was not being retaliated against. See Morgan v. Hilti, 108 F.3d 1319, 1324 (10th Cir. 1997) (plaintiff's argument that his termination was retaliatory was rejected because the court noted that the termination decision "simply completed the . . . process already set in motion" before the specific incidents of protected activity occurred).

The anti-discrimination laws do not allow Smith to create a retaliation claim by making complaints only in response to learning that his job is in jeopardy. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.)("Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating

27

the employer's rules or disrupting the workplace."), cert. denied, 528 U.S. 818 (1999); Mason v. Huttig Sash & Door Co. Ret. Plan for Salaried Employees, 26 Fed. Appx. 531, 535 (6th Cir. 2004)(plaintiff could not show causal connection between his complaint and discharge where he had already been notified that his job was in jeopardy before making any complaints)(unpublished).

Finally, Plaintiff has no evidence that the members of the Termination Committee that voted to terminate his employment had any knowledge of any supposed complaints of discrimination. At a minimum, Smith has the burden to prove that members of the Termination Committee knew that he had engaged in protected activity. Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997)("In a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression. . . ."). Absent some evidence that the committee was aware of any complaints by Smith, his retaliation claim must be dismissed. See, e.g., Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000)("A decision maker cannot have been motivated to retaliate by something unknown to him."), cert. denied, 532 U.S. 1937 (2001).

### 3.    Plaintiff Cannot Dispute the Legitimate, Non-Retaliatory Reasons for His Discharge

HMMA has offered legitimate, non-retaliatory reasons for Smith's discharge. He engaged in multiple incidents of volatile behavior and insubordination. As discussed supra at pages 19-22, Plaintiff has failed to offer any evidence to suggest that HMMA's stated reasons for its actions are a pretext for discrimination or retaliation. For all of these reasons, Plaintiff's retaliation claims must be dismissed.

## IV.    CONCLUSION

For all the foregoing reasons, HMMA is entitled to summary judgment on all of the Plaintiff's claims.  Defendant respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award the Defendant its costs and attorneys' fees in defending against this case.

/s/  Brian R. Bostick
TIMOTHY A. PALMER (PAL009)
J. TRENT SCOFIELD (SCO024)
BRIAN R. BOSTICK (BOS015)
**OGLETREE, DEAKINS, NASH,**
 **SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 328-1900
brian.bostick@odnss.com
Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of November, 2007, I electronically filed the foregoing Defendant's Brief in Support of Its Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Kathryn Dickey, Janice Spears-Turk.

/s/ Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com