**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **LARRY SMITH,** | |
| **Plaintiff,** | |
| **v.** | |
| | **Case No.:  2:06-cv-966-ID-SRW** |
| **HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC,** | |
| **Defendant.** | |

**DEFENDANT'S EVIDENTIARY SUBMISSION IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Hyundai Motor Manufacturing Alabama, LLC (hereinafter "HMMA") and submits this Evidentiary Submission in Support of Its Motion for Summary Judgment.  Defendant relies upon the following evidence:

| | |
|---|---|
| Exhibit A | Deposition of Plaintiff Larry Smith, Part I (taken May 22, 2007) and Exhibits Thereto |
| Exhibit B | Deposition of Plaintiff Larry Smith, Part II (taken May 23, 2007) |
| Exhibit C | Deposition of Scott Weddington |
| Exhibit D | Deposition of Joshua Groves |
| Exhibit E | Declaration of Rob Clevenger and Exhibits Thereto |
| Exhibit F | Declaration of Marcus Hannah and Exhibits Thereto |
| Exhibit G | Declaration of Reggie Johnson |
| Exhibit H | Declaration of Audie Swegman |
| Exhibit I | Declaration of Lisa Chumney and Exhibit Thereto |
| Exhibit J | Documents from CRH North America, Inc. |

WHEREFORE, Defendant respectfully requests that this Court grant its Motion for Summary Judgment, dismiss the Plaintiff's claims with prejudice, and award the Defendant its costs in defending against this action.

/s/  Brian R. Bostick
TIMOTHY A. PALMER (PAL009)
J. TRENT SCOFIELD (SCO024)
BRIAN R. BOSTICK (BOS015)
**OGLETREE, DEAKINS, NASH,**
 **SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, AL 35203
(205) 328-1900
brian.bostick@odnss.com
Attorneys for Defendants Hyundai Motor
Manufacturing Alabama, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of November, 2007, I electronically filed the foregoing Defendant's Evidentiary Submission in Support of Its Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Kathryn Dickey, Janice Spears-Turk.

/s/ Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com

# Exhibit A

In The Matter Of:

**LARRY SMITH**
v.
**HYUNDAI MOTOR MANUFACTURING, INC.**

**NO. 2:06-CV-966-ID-SRW**

---

**LARRY SMITH**
**May 22, 2007**

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:06-CV-966-ID-SRW

LARRY SMITH,
    Plaintiff,
vs.

HYUNDAI MOTOR MANUFACTURING, INC.,
    Defendants.

DEPOSITION
OF
LARRY SMITH
May 22, 2007

REPORTED BY: Gail B. Pritchett
    Certified Realtime Reporter,
    Registered Professional
    Reporter and Notary Public

---

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Ms. Kathryn Dickey
    Attorney at Law
    Law Offices of Kathryn Dickey
    322 Alabama Street
    Montgomery, Alabama 36104

FOR THE DEFENDANT:
    Mr. Brian R. Bostick
    Attorney at Law
    Ogletree, Deakins, Nash,
      Smoak & Stewart, P.C.
    One Federal Place
    Suite 1000
    1819 Fifth Avenue North
    Birmingham, Alabama 35203

OTHERS PRESENT:
    Ms. Paula Cocker
    Mr. Chris Smith
    Mr. Scott Weddington

---

**Page 2**

S T I P U L A T I O N

IT IS STIPULATED AND AGREED, by and between the parties, through their respective counsel, that the deposition of LARRY SMITH may be taken before Gail B. Pritchett, Commissioner, Certified Realtime Reporter, Registered Professional Reporter and Notary Public;

That the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions;

That it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

---

**Page 4**

I N D E X

PAGE:
EXAMINATION BY MR. BOSTICK    7

E X H I B I T S

PAGE:
Defendant's Exhibit 1    13
Defendant's Exhibit 2    18
Defendant's Exhibit 3    24
Defendant's Exhibit 4    38
Defendant's Exhibit 5    48
Defendant's Exhibit 6    57
Defendant's Exhibit 7    63
Defendant's Exhibit 8    66
Defendant's Exhibit 9    69
Defendant's Exhibit 10    71
Defendant's Exhibit 11    92
Defendant's Exhibit 12    101
Defendant's Exhibit 13    105
Defendant's Exhibit 14    121

---

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 5 to 8)

Page 5

E X H I B I T S

PAGE:

| | |
|---|---|
| Defendant's Exhibit 15 | 137 |
| Defendant's Exhibit 16 | 137 |
| Defendant's Exhibit 17 | 210 |
| Defendant's Exhibit 18 | 211 |
| Defendant's Exhibit 19 | 213 |
| Defendant's Exhibit 20 | 222 |
| Defendant's Exhibit 21 | 223 |
| Defendant's Exhibit 22 | 245 |
| Defendant's Exhibit 23 | 249 |

Page 6

I, Gail B. Pritchett, a
Certified Realtime Reporter and Registered
Professional Reporter of Birmingham,
Alabama, and a Notary Public for the State
of Alabama at Large, acting as
Commissioner, certify that on this date,
as provided by the Federal Rules of Civil
Procedure of the United States District
Court, and the foregoing stipulation of
counsel, there came before me at the
Alabama State Bar, Lange Simpson
Conference Room, 415 Dexter Avenue,
Montgomery, Alabama, on May 22, 2007,
commencing at 9:08 a.m., LARRY SMITH,
witness in the above cause, for oral
examination, whereupon the following
proceedings were had:

LARRY SMITH,
being first duly sworn, was examined and
testified as follows:

THE COURT REPORTER:  Usual

Page 7

stipulations?
        MR. BOSTICK:  That's fine.
        MS. DICKEY:  Yes.

EXAMINATION BY MR. BOSTICK:
    Q.    Can you state your full name
for me?
    A.    Larry Darnell Smith.
    Q.    And what is your current
address?
    A.    5675 Valley Brook Lane,
Montgomery, Alabama.
    Q.    How long have you lived at
that address?
    A.    Since 2002.
    Q.    Okay.  And are you married?
    A.    Yes, I am.
    Q.    And what's your wife's name?
    A.    Kim Germany Smith.
    Q.    And how long have y'all been
married?
    A.    Thirteen years.
    Q.    Okay.  Do you have any

Page 8

children?
    A.    Three.
    Q.    Are any of them over eighteen
years of age?
    A.    No.
    Q.    Okay.  What are their names?
    A.    ▮▮▮▮▮▮▮▮ Smith, ▮▮▮▮▮▮▮
Smith and ▮▮▮▮▮ Smith.
    Q.    Is your wife employed?
    A.    Yes, she is right now.
    Q.    Okay.  Where does she work?
    A.    She works at East Chase.  She
is assistant store manager of The
Children's Place.
    Q.    Is the name of the store
Children's Place?
    A.    Right.  It's a clothing store
for children.
    Q.    And do you have any relatives
in the Montgomery area that are over
eighteen years of age?
    A.    No, not on my side.  Not on my
side of my family, no.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 9 to 12)

Page 9

1    Q.    Does your wife have any
2    relatives in Montgomery that are over --
3    A.    Yes.
4    Q.    And who would be her
5    relatives?
6    A.    She has a sister, her mother,
7    several aunts.  Do you want me to name
8    each one of them?
9    Q.    Well, one of the issues is
10   like when we go -- if we try your case, we
11   will select a jury.  I guess the question
12   is can you kind of give me a listing of
13   like your friends and family members that,
14   you know -- well, let me ask the question
15   who is in your cell phone that I would --
16   if you were there, they would be like hey,
17   there is one of my good friends, Mr.
18   Smith?  Does that make sense?
19   A.    I don't have a lot of friends,
20   except my church members.  And that's
21   basically about it.
22   Q.    What church do you go to?
23   A.    Beulah Baptist on Rosa Parks.

Page 10

1    Q.    Okay.  Any close friends
2    outside the membership of the church?
3    A.    Yes.  Wayne Burch.
4    Q.    Does he live in Montgomery?
5    A.    Yes, he does.
6    Q.    Okay.  Who else?
7    A.    My neighbors, couple of my
8    neighbors.  That's about it.
9    Q.    And the district that we are
10   in would go, I guess, over to, for
11   example, Opelika.  It wouldn't go as far
12   south as Mobile.
13   A.    Just the Montgomery area.
14   Q.    Okay.  Are you taking any
15   medications as we sit here today?
16   A.    Yes, I take Hyzaar for high
17   blood pressure.
18   Q.    Okay.  When were you first
19   prescribed that?
20   A.    I was diagnosed at Pri-Med in
21   I think 2002.  But then I had to follow up
22   to make sure, so I went to -- I go to
23   Renal Associates now.  I was diagnosed

Page 11

1    with hypertension.
2    Q.    Okay.  And have you been
3    taking some form of medication for high
4    blood pressure since 2002?
5    A.    Yes, Hyzaar.
6    Q.    Have you given a deposition
7    before?
8    A.    Never.
9    Q.    Okay.  Well, you do understand
10   that the questions I am asking you today,
11   you have been sworn in to tell the truth?
12   A.    Yes.
13   Q.    And that that's testimony that
14   if it is not true, you can be subject to
15   perjury?
16   A.    I understand.
17   Q.    Okay.  And you understand that
18   you brought a lawsuit against Hyundai?
19   A.    Yes.
20   Q.    Okay.  And that I am an
21   attorney representing Hyundai in defending
22   against your claims?
23   A.    Exactly.

Page 12

1    Q.    So I'm here to ask you about
2    questions relating to those claims in your
3    lawsuit.
4    A.    I understand.
5    Q.    When I ask you a question,
6    just kind of the rules of deposition, if
7    you don't understand my question or it's
8    unclear, I want you to feel free to ask me
9    if I need to rephrase it.  But if you do
10   answer the question, I'm going to assume
11   you understood it and felt like you could
12   answer it clearly.  Is that fair?
13   A.    That's fair.
14   Q.    Okay.  If you need a break,
15   that's fine, if you need to get up, do
16   anything.  I would ask that if I do have a
17   question that's on the table to you, that
18   you answer the question before we take a
19   break.
20   A.    Okay.
21   Q.    And you might want to wait
22   until I get to the end of my question,
23   because sometimes I may not be asking

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 13 to 16)

Page 13

1  exactly what you think I am, and your
2  attorney may want to have the opportunity
3  to object to it as well. And that's the
4  general rules. Is that fair?
5       A.   That's fair.
6       Q.   Okay. I wanted to first kind
7  of get a little bit of a time line of
8  where you have worked over time.
9            (Whereupon, Defendant's
10           Exhibit 1 was marked for
11           identification.)
12      Q.   I have marked this as Exhibit
13  1. Can you identify this for me?
14      A.   Yes. These are my past
15  employers.
16      Q.   Is this a resume that you
17  prepared at some point?
18      A.   Yes.
19      Q.   Okay. It looks like it has
20  Walker Personnel in Prattville, Alabama.
21           Do you know what -- does that
22  ring any bells?
23      A.   Wait a minute, I don't see

Page 14

1  Walker Personnel on here.
2       Q.   It's a stamp in the upper
3  left-hand corner.
4       A.   Oh. Yes, yes. I mean, I
5  don't know why this is stamped on here.
6       Q.   I believe this is a document
7  we got pursuant to a subpoena we sent
8  there. Did you send an application to
9  Walker Personnel?
10      A.   Yes.
11      Q.   Did you work through them at
12  some point?
13      A.   Yes, that's exactly right.
14      Q.   Okay. So you graduated from
15  Sylacauga High School in 1983?
16      A.   No, I have a GED.
17      Q.   Okay. What year did you get
18  your GED?
19      A.   2004, right before I went to
20  Hyundai. I had to have it in order to get
21  employed out there. So I took the test in
22  Montgomery.
23      Q.   And what year did you leave

Page 15

1  high school?
2       A.   In eleventh grade.
3       Q.   Okay. Did you go to work --
4  did you leave work -- leave to go to work
5  for Russell Corporation?
6       A.   I worked to Avondale Mills --
7  wait a minute. My first job was -- it was
8  either Parker Fertilizer or Avondale Mill,
9  my first place of employment. I don't
10  know which one it was first.
11      Q.   Okay. What type of work did
12  you do there?
13      A.   I was stacking fertilizer at
14  the fertilizer company. And then when I
15  worked at Avondale, I was putting cotton
16  into the machines to make cloth.
17      Q.   Okay. How did you come to get
18  a job at Russell Corporation?
19      A.   I applied for it and
20  interviewed for it and got hired.
21      Q.   What was the job you had
22  there?
23      A.   Forklift driver, stenciler.

Page 16

1       Q.   Did you have proper licensing
2  for operating the forklift?
3       A.   I had to get it -- had to get
4  certified.
5       Q.   What license did you have to
6  get?
7       A.   Forklift license.
8       Q.   Okay. Do you have CDL
9  license --
10      A.   No.
11      Q.   -- or any other licenses?
12      A.   Uh-uh.
13      Q.   Okay. Looks like you worked
14  at Russell Corporation about nine years?
15      A.   Yeah, I worked there a long
16  time, off and on, because they would lay
17  us off and then we would come back.
18      Q.   Did you hold essentially the
19  same position throughout the time you were
20  there or did you --
21      A.   No, different positions.
22      Q.   Okay. Tell me kind of your
23  progression there.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 17

1    A.   Well, when I first started out
2  I was a stenciler.  And then the plant
3  shut down and I went to Alexander City and
4  I worked there as a stenciler.  Then I
5  became a warehouseman where I pulled
6  orders.  And then I worked again at the
7  plant -- I worked the fourth time as a
8  forklift operator.
9    Q.   Okay.  What were you making at
10 the time you left Russell Corporation?
11   A.   I don't know, seven dollars
12 and something an hour.
13   Q.   Okay.  And then why did you
14 leave Russell Corporation?
15   A.   Well, I was terminated from
16 the one in Wetumpka.
17   Q.   Okay.
18   A.   Yeah.
19   Q.   Why were you terminated?
20   A.   I think I came in late to
21 work.
22   Q.   Do you know who terminated
23 you?

Page 18

1    A.   My supervisor.
2    Q.   And did you have any kind of
3  disagreement back at the time with that
4  supervisor?
5    A.   Not that I recall.  All I know
6  is I was late, you know, a lot, so --
7    Q.   Who was your supervisor at
8  that time?
9    A.   I don't remember his name.  I
10 don't remember his name.
11   Q.   Does the name Ken Fuller ring
12 any bells?
13   A.   That's Trentech.
14   Q.   It is?
15   A.   Yeah.  He was my manager.
16   Q.   Did you during this time when
17 they notified you of your termination make
18 any threats to kill your supervisor?
19   A.   Talking about at Russell?
20   Q.   Yes.
21   A.   No.
22        (Whereupon, Defendant's
23        Exhibit 2 was marked for

Page 19

1        identification.)
2    Q.   Have you ever seen the
3  document I have marked as Exhibit 2
4  before?
5    A.   No, I have never seen this
6  before.
7    Q.   Is that your Social Security
8  number under the personal data paragraph
9  B, section B?
10   A.   Yes, it is.
11   Q.   And is that approximately when
12 you started working, in April of '85
13 listed in C?
14   A.   I started working for Russell
15 I think in '84.
16   Q.   Did you work as a stenciler?
17   A.   Yes, I did.
18   Q.   Do you recognize any of these
19 initials down below in section F?
20   A.   Sure don't.
21   Q.   Do you recall reaching step
22 four of the company's absentee policy?
23   A.   I know I was late a lot often

Page 20

1  because I was going out and I was
2  partying.
3    Q.   This says you were terminated
4  by a plant review committee.  Do you
5  remember if that was the case?
6    A.   I don't recall.
7    Q.   Okay.  Who do you recall -- it
8  says, "At approximately 4 a.m. this date,
9  prior to the review committee hearing, the
10 employee was advised by his supervisors of
11 the fact that he was subject to
12 termination for absenteeism pending the
13 decision of the plant review committee."
14        Do you remember any
15 conversations about that?
16   A.   All I know is he called me in
17 the office and told me I was terminated
18 for being late.
19   Q.   Who told you that?
20   A.   I think Greg Tuck.
21   Q.   How do you spell his last
22 name?
23   A.   T-u-c-k.

Page 21

1    Q.   Okay.  And what did you say?
2    A.   I didn't say anything.  I was
3  late.  I was constantly late because I was
4  wild and partying, so --
5    Q.   I mean, this says, "Employee
6  went into a rage, stormed out of the
7  office and onto the production floor."
8      Do you admit that you did that?
9    A.   I didn't do that.
10    Q.   You did not?
11    A.   No.
12    Q.   It says, "At this time the
13  supervisors were on their way to call
14  security when the employee pushed one of
15  the supervisors from behind and began
16  making threats to the effect that he was
17  going to kill the supervisor for
18  terminating him."
19    A.   Never heard this before in my
20  life.
21    Q.   Okay.  You deny that this
22  happened?
23    A.   I deny that this happened.

Page 22

1    Q.   Okay.  Do you have any idea
2  why a termination document in your
3  personnel file from Russell would reflect
4  this incident as having occurred?
5    A.   I have no idea why it would
6  reflect that.
7    Q.   Did you make any complaints of
8  discrimination during the time you were at
9  Russell?
10    A.   No, I did not.
11    Q.   Okay.  I mean, did any of your
12  supervisors have it in for you or have
13  some reason to --
14    A.   No.
15    Q.   -- to -- but your testimony
16  would be that the statements here in
17  Exhibit 2 are not true, is that correct?
18    A.   Are not true.
19    Q.   Okay.  And it's also your
20  testimony that when you were advised of
21  your termination, you didn't go into a
22  rage?
23    A.   No.

Page 23

1    Q.   Okay.  Is it your testimony
2  you just silently walked out of the plant?
3    A.   They terminated me and told me
4  I was terminated, at the beginning of the
5  shift, because I came in late.
6    Q.   Is there anybody that you know
7  of that worked with you at Russell who
8  could confirm your story that you didn't
9  engage in a rage or threaten to kill or
10  push your supervisor?
11    A.   No one that I know of.
12    Q.   Okay.  When you came in to
13  work that day, you said you had been
14  missing a lot of work because you were
15  partying.  Did you come into work under
16  the influence that day?
17    A.   No.
18    Q.   Okay.  Had you come into work
19  under the influence?
20    A.   No, uh-uh.
21    Q.   Okay.  Was there anything that
22  was going on with you that day that would
23  affect your ability to recall what

Page 24

1  happened correctly?
2    A.   No.
3    Q.   Okay.  Were there times that
4  you would have to -- when you worked at
5  Russell where you would have to interact
6  with some type of an inspector?
7    A.   No.
8    Q.   Maybe quality control or
9  something like that?
10    A.   No.
11      (Whereupon, Defendant's
12      Exhibit 3 was marked for
13      identification.)
14    Q.   This is a document that was in
15  the records from Russell Corporation.
16  I'll represent this is in your personnel
17  file.  It has this notation here about
18  three-fourths of the way down in writing,
19  it says, "4/4/86, verbal, employee got
20  into argument with an inspector, cautioned
21  and allowed apology between" -- and I
22  don't know what else.
23      Do you recall anything about

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 25 to 28)

Page 25

1  this incident?
2      A.  I see something on here that
3  says 4/5 incidence.  And it says late.  I
4  don't see what you are reading.
5      Q.  I'm looking to the --
6      A.  Oh, I see it now.
7      Q.  Okay.  Do you see that?  And
8  "verbal" is on the line before, so I don't
9  know if that relates to the 4/4 --
10      A.  I don't recall this at all.
11      Q.  Do you recall ever getting
12  into an argument with some type of
13  inspector?
14      A.  No.
15      Q.  Okay.  Who would have been
16  your supervisor in April of '86?
17      A.  I don't recall.  I have had
18  several supervisors when I was employed,
19  because, like I said, it was four
20  different occasions when I worked there.
21  All I remember is Greg Tuck.
22      Q.  Okay.  So then after Russell
23  Corporation, what's your next job?

Page 26

1      A.  I think I'm with Trentech
2  then.
3      Q.  And so your resume, I assume
4  -- I guess the first question, is there
5  anything on this resume that's not correct
6  that you want to revise at this time?
7      A.  No, everything on there is
8  correct.
9      Q.  Okay.  Are there any employers
10  that you worked for in this frame of, you
11  know, '84 to '06 that you left off of the
12  resume?
13      A.  No.
14      Q.  Okay.
15      A.  Not that I'm aware of.
16      Q.  Okay.  And I guess -- I have
17  seen where it looks like you have gone to
18  some temp agencies --
19      A.  Uh-huh.
20      Q.  -- and gone temp to perm with
21  companies through them.
22      For example, Trentech, is that
23  how you got on with them?

Page 27

1      A.  Yes.
2      Q.  Okay.  Who was the temp
3  agency --
4      A.  I don't remember.
5      Q.  -- or employment agency?
6      A.  I don't remember.
7      Q.  Okay.  What was your job title
8  at Trentech?
9      A.  I was assistant warehouse
10  manager.
11      Q.  And what were your job duties
12  there?
13      A.  Ship truck -- ship packages
14  via truck line, UPS, FedEx; receive
15  products; keep up inventory control; and
16  supply the ladies with what they needed --
17  with supplies they needed when they came
18  out.
19      Q.  What does Trentech produce?
20      A.  They produce computerized
21  cabinets that go inside the prison
22  systems.
23      Q.  Okay.  Where was the Russell

Page 28

1  Corporation facility located that you
2  worked at?
3      A.  I worked in Sylacauga,
4  Alexander City and Wetumpka.
5      Q.  Where were you living at that
6  time?
7      A.  I lived in Sylacauga when I
8  worked at Alex City and at Sylacauga.  And
9  I lived in Montgomery when I worked at
10  Wetumpka.
11      Q.  Okay.  And so where is
12  Trentech located?
13      A.  It's here in Montgomery on Old
14  Hanville Road.
15      Q.  Okay.  And did you move back
16  to Montgomery when you worked there?
17      A.  I was already in Montgomery.
18      Q.  Okay.  Who was your supervisor
19  during the time you worked at Trentech?
20      A.  Ken Fuller was my supervisor
21  when I was assistant warehouse manager.
22  But I was put into fabrication, and Conrad
23  Smith became my supervisor.  And also --

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 29

1  let me back up.  Ken Fuller was my
2  original supervisor, and he brought in
3  another man named Kenny Burnett who I
4  trained who became my supervisor.
5      Q.   When did you leave Trentech?
6      A.   In 1998.
7      Q.   And what were you making at
8  the time you left there?
9      A.   I don't recall.  About eight
10  twenty-five an hour, eight dollars an
11  hour, something like that.
12      Q.   Did you have benefits through
13  them?
14      A.   I think so for myself.  I
15  don't know.  I don't know if I had family
16  or what.  I don't know if I could afford
17  the family plan or not then.
18      Q.   Okay.  Did you leave Trentech
19  voluntarily or --
20      A.   Yes, I did.
21      Q.   Okay.  Why did you choose to
22  leave Trentech?
23      A.   Because I was seeking more

Page 30

1  money and more income.  And Rheem
2  Manufacturing had an ad in the newspaper
3  and I applied for it.  It was paying nine
4  fifty an hour.  And I applied and
5  interviewed and I got the position.
6      Q.   Okay.  Do you recall when was
7  your last day at Trentech?
8      A.   8 -- I think it was -- I know
9  it was in August of '98 when I left.  I
10  don't know the exact date.
11      Q.   Okay.  Why does August of '98
12  stand out to you?
13      A.   Because that's when I left.
14      Q.   Better memory than mine.  Do
15  you remember having a disagreement with
16  Kenny Burnett --
17      A.   I certainly do.
18      Q.   Okay.  Tell me about that.
19      A.   He drew a picture of three Ku
20  Klux Klan members, and a man was in a
21  well, and he said that man in the well was
22  me.  And I took it as a threat.  And it
23  offended me.  And me and him got into a

Page 31

1  verbal altercation.  And as far as I
2  remember, I was given disciplinary action
3  for that, because what he did offended me.
4  It was discriminatory and racial.
5      Q.   Okay.  Now, did Kenny
6  Burnett -- what was his position?
7      A.   He was the new manager that
8  they brought in that I trained.  I applied
9  for the position and they didn't give it
10  to me, they brought him in.  And I trained
11  him.
12      Q.   Okay.  And he was warehouse
13  manager?
14      A.   Yes, he was.
15      Q.   Okay.  So did you report to
16  him?
17      A.   I reported to him.
18      Q.   Okay.  And do you know what
19  the qualifications were for the position?
20      A.   Yeah.  You had to have
21  shipping and receiving experience, which I
22  had on hand from training, from being
23  trained.

Page 32

1      Q.   What was the reason told to
2  you as to why you didn't get the position?
3      A.   They wanted someone with more
4  experience.
5      Q.   Did he have more experience
6  than you?
7      A.   Yes, he did.
8      Q.   Okay.  Had you been --
9      A.   As far as I remember, he had
10  more experience.  He said he did, so I
11  believed him.  They hired him, so --
12      Q.   Was there an issue with you in
13  filling out time sheets that was brought
14  up?
15      A.   I can't recall.
16      Q.   Did you ever admit that you
17  had been insubordinate to Kenny and made
18  some insulting remarks to him?
19      A.   No.
20      Q.   You would deny that?
21      A.   Yes, I would.
22      Q.   Okay.  And is it your
23  testimony that you brought up this

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 33

1  complaint about the KKK drawing prior to
2  some type of disciplinary action being
3  discussed against you?
4      A.   I don't remember.  I don't
5  remember.  All I know is I told Ken Fuller
6  about it.  He is the manager.
7      Q.   Did you have a copy of the
8  drawing that you gave to somebody?
9      A.   Yes, I did.
10     Q.   Tell me about that.
11     A.   I took the drawing to Ken
12 Fuller, the manager, and I showed it to
13 him.  And I told him that this was wrong
14 and I asked him would he do something
15 about it.  And I asked him why, you know
16 -- I didn't know why this guy was treating
17 me this way.  And I told him it was racial
18 and discriminatory and that it was wrong.
19 And that's all I remember right now.  I
20 don't know if he gave him disciplinary
21 action for that or what.
22     But I did seek an attorney for
23 that incident, but the people -- my

Page 34

1  coworkers, they asked me to drop it.  And
2  because of them, I dropped it.
3      Q.   When you were having this
4  discussion with Ken Fuller, were you
5  saying that you would file a lawsuit if
6  you needed to?
7      A.   Yes, because he didn't do
8  anything to Ken Fuller about him drawing
9  that racial drawing and giving it to me.
10 And it was a threat.  That was a threat,
11 like he was going to throw me in the well
12 and kill me, and so that was a threat.
13     Q.   Do you still have a copy of
14 the drawing?
15     A.   No, I don't have it.  After I
16 dropped the -- I dropped the case and I
17 let it go because of my coworkers asked me
18 to.  Because they said that -- my
19 coworkers, the black people that worked in
20 the plant, they said Larry, if you do
21 that, it's going to make an uproaring and
22 our jobs might be on the line, would you
23 please forgive?  And that's what I did.

Page 35

1      As a matter of fact, when I
2  left my job, I even gave Ken Fuller my
3  golf clubs, the one that drew the racial
4  discrimination picture of the Ku Klux
5  Klan.  I even gave him my golf clubs
6  before I left and went to Rheem.  That's
7  how much I forgave.
8      Q.   Kenny Burnett?
9      A.   Yes.
10     Q.   So do you deny shooting Mr.
11 Burnett the bird and telling him to fuck
12 off?
13     A.   I deny.
14     Q.   You say that never happened?
15     A.   Never happened.
16     Q.   Okay.  Did you call him white
17 trash?
18     A.   No, I did not.
19     Q.   Would that be a racist
20 statement for you to call someone white
21 trash?
22     A.   I don't know.  I didn't call
23 him that.

Page 36

1      Q.   Okay.  Did you ever attack the
2  integrity of his wife?
3      A.   I never met his wife.  No, no.
4      Q.   That's not answering my
5  question.  You said --
6      A.   No, I did not attack --
7      Q.   Did you attack --
8      A.   No, I did not attack his
9  integrity.
10     Q.   Okay.  Do you know why Kenny
11 Burnett would say in his statement in your
12 personnel file that you told him to fuck
13 off, that you called him white trash, that
14 you attacked the integrity of his wife,
15 and that you were insubordinate and
16 threatening to him?
17     A.   No.
18     Q.   Okay.  Would he have any
19 reason to have an ax to grind with you?
20     A.   Not that I'm aware of.
21     Q.   Okay.  So we just have
22 incident number two where someone has put
23 something in your personnel file that's

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 37

1  not correct, is that your testimony?
2      A.   Yes, that's my testimony.
3      Q.   I mean, do you have any
4  explanation for why there is a statement
5  detailing during the time you were at
6  Trentech you engaging in insubordinate and
7  belligerent behavior?
8      A.   No explanation.
9      Q.   Okay.  Do you recall getting a
10  write-up during the time you were there
11  for --
12      A.   I don't recall.  All I know is
13  we had -- I had to write a statement of
14  what Kenny Burnett did to me, and I
15  presented the statement.  I don't know
16  what disciplinary action he received for
17  what he did, I don't know.
18      Q.   Do you recall being
19  reprimanded in approximately January of
20  '98 for being insubordinate and insulting
21  in your language to your immediate
22  supervisor Kenny Burnett?
23      A.   I may have been reprimanded,

Page 38

1  but I don't remember, I may have.
2      Q.   It was over a disagreement
3  concerning your time sheet.  Do you recall
4  what the disagreement was?
5      A.   I don't recall that, but it
6  may have happened.
7          (Whereupon, Defendant's
8          Exhibit 4 was marked for
9          identification.)
10      Q.   I will show you what I have
11  marked as Exhibit 4.  Just look on the
12  page -- you see in the bottom right-hand
13  corner there are little numberings?  Look
14  on the page with the number 91 at the
15  bottom right, do you see down here?
16      A.   91?
17      Q.   Yes.
18      A.   Mine is kind of cut off.
19      Q.   Oh, is it?
20      A.   Yeah.
21      Q.   Okay.  This one right here.
22  It's a memo dated 1/15/98, it has a
23  signature line with an X.

Page 39

1          Is that your signature there?
2      A.   Yes, it is.
3      Q.   Okay.  Do you recall receiving
4  this document?
5      A.   Let me read it.  (Reviewing
6  document.)  Yes, I recall signing this.
7      Q.   What do you recall about the
8  disagreement regarding the time sheet?
9  Does this refresh your recollection any?
10      A.   Yeah, he fabricated a
11  statement that said that I was -- that I
12  didn't fill my time sheet out right.  And
13  therefore, I asked Ken Fuller would he
14  just transfer me into the fabrication
15  department, and he requested -- and he
16  went ahead and fulfilled me.  Because me
17  and him -- you know, he was lying on me,
18  you know.  So I had to -- I asked could I
19  be transferred and it was granted.
20      Q.   Was that a demotion to the
21  position that you were moved to?
22      A.   No, it wasn't a demotion.  My
23  pay remained the same.

Page 40

1      Q.   Okay.  And have you ever seen
2  this handwritten statement that's after
3  the page we just looked at signed by Kenny
4  Burnett?
5      A.   No.
6      Q.   Is it your testimony that you
7  gave a handwritten statement during that
8  same time frame?
9      A.   I don't recall.  I gave a
10  statement to Ken Fuller.  I don't know if
11  I wrote it, but I gave him a statement.
12      Q.   Have you ever seen -- looking
13  at the first -- this typewritten statement
14  that's three pages long beginning -- I'm
15  sorry, two pages, and it looks like it was
16  from Ken Fuller?
17      A.   Have I ever seen this before?
18      Q.   Yes.
19      A.   Let me see.  (Reviewing
20  document.)  No, I have never seen this
21  before.
22      Q.   Were you --
23      A.   I'm not aware of seeing this

Tyler Eaton Morgan Nichols & Pritchett, Inc.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 41

1  before.  I can't remember it.
2      Q.   Okay.  He says -- I'm looking
3  on this January 13th of '98.  He says that
4  there was a confrontation between you and
5  Kenny Burnett, and then he says he advised
6  Kenny to terminate Larry for
7  insubordination.
8          Do you know -- did Ken Fuller
9  or anyone else tell you that Ken Fuller
10  had advised that you should be terminated?
11      A.   No.
12      Q.   Do you know Elaine Truelove or
13  Conrad Smith?
14      A.   Yes, I know both of them.
15      Q.   What are their races?
16      A.   Elaine is a white female, and
17  Conrad is a black male.
18      Q.   Okay.  What were their
19  positions?
20      A.   Conrad was the superintendent
21  over fabrication.  And Elaine was a
22  supervisor over the ladies in the front
23  part of the building.  She was like a

Page 42

1  supervisor.
2      Q.   I'm just looking down on the
3  third paragraph on this first page.  The
4  second sentence says -- this is Ken Fuller
5  saying he went to speak to you in the
6  plant, and he says, "Larry admitted that
7  there had been a disagreement over his
8  time sheet and that he had been
9  insubordinate and made insulting remarks
10  to Kenny."
11      A.   Where are you?
12      Q.   I'm sorry.  Look on this first
13  page.  It's about right here.  See the
14  sentence that starts Larry admitted?  Do
15  you see that sentence?
16      A.   Who is making this statement?
17      Q.   This is Ken Fuller's
18  statement.
19      A.   (Reviewing document.)
20      Q.   Do you see the sentence I am
21  talking about?
22      A.   Yeah, I never -- uh-uh.
23      Q.   I mean, did you admit to Ken

Page 43

1  Fuller back --
2      A.   No.
3      Q.   Let me finish my question,
4  because I may be going differently.
5          Did you admit to Ken Fuller
6  back at the time that you had been
7  insubordinate to Mr. Burnett?
8      A.   No.
9      Q.   Did you admit to him that you
10  had made insulting remarks to him?
11      A.   No.
12      Q.   Do you know why Mr. Fuller
13  would have put that in his statement?
14      A.   I have no idea.
15      Q.   Did Mr. Fuller have any ax to
16  grind with you, to your knowledge?
17      A.   Could you repeat the question,
18  please?
19      Q.   Yes.  Did you and Mr. Fuller
20  get along prior to this time?
21      A.   I didn't have any problems out
22  of him, not that I recall.
23      Q.   Did he ever make any

Page 44

1  statements to you that you thought were
2  racist or --
3      A.   No.  Only thing I can remember
4  him saying was he said he wished he had
5  gave me the supervisor position instead of
6  him.
7      Q.   So you leave Trentech and then
8  start working for Rheem?
9      A.   Yes.
10      Q.   What was your position with
11  Rheem?
12      A.   I was an assembler, forklift
13  driver, sometimes I would be a leadman on
14  the line --
15      Q.   Okay.
16      A.   -- when people were out.
17      Q.   What was your pay when you
18  started working there?
19      A.   About nine fifty an hour.
20      Q.   And what was it at the time
21  you left?
22      A.   Thirteen thirty-three.
23      Q.   And what benefits did you get

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 45

1  there?
2      A.    Blue Cross Blue Shield,
3  vision, started out with a fifteen dollar
4  copay, four dollars a week.
5      Q.    Okay.  Was that individual
6  coverage or did you --
7      A.    Family.
8      Q.    Okay.  Any other benefits
9  there?
10     A.    What else did they have?  They
11 had a pension plan, employee pension plan
12 automatically, 401-K.  What else did they
13 have?  And that's about all I can remember
14 right now.
15     Q.    When was your last day to work
16 at Rheem?
17     A.    4/11/04 -- wait a minute,
18 4/11/05.
19     Q.    Okay.  And then when was your
20 first day to start working for Hyundai?
21     A.    Wait a minute.  I left -- I
22 started at Hyundai 4/11/05.  I left Rheem
23 that Friday, I believe, which was the 8th,

Page 46

1  I think, 4/8.  So there were no gaps
2  between me leaving Rheem and going to
3  Hyundai.
4      Q.    Okay.  Who was your supervisor
5  during the time you worked at Rheem?
6      A.    Guy we called Little Joe.
7  Little Joe was my supervisor, and then I
8  had -- my next supervisor was Joe Stenson.
9  And then after that it was Norman Lewis.
10     Q.    Was there somebody named Bobby
11 Jones that was a supervisor there?
12     A.    Never worked for anybody named
13 Bobby Jones.
14     Q.    Or Billy Jones maybe?
15     A.    Yeah, Billy Jones was the
16 superintendent.
17     Q.    Okay.  Where would he be in
18 your line of supervision?
19     A.    He is the plant manager.
20     Q.    Okay.  Did you ever have any
21 warnings or reprimands at -- during the
22 time you were at Rheem --
23     A.    Yes.

Page 47

1      Q.    -- for insubordinate behavior?
2      A.    It wasn't insubordinate
3  behavior.  I left the line, the line kept
4  running, and the tanks fell off of the
5  line.  Because I don't have a switch to
6  turn the line off on my side of the line.
7  The lady on the other side is supposed to
8  turn the line off.  And I went to break,
9  and when I came back, the tanks were all
10 over the floor.  And they suspended me for
11 it, they said I was damaging the property,
12 I had destroyed some tanks, the tanks
13 rolled off the line.  And after that they
14 put a switch on my side of the line so I
15 could stop the line myself.
16     Q.    Okay.  Who was the person who
17 notified you that you were being
18 suspended?
19     A.    It was --
20     Q.    Billy Jones?
21     A.    Uh-huh.
22     Q.    Okay.  Who was your immediate
23 supervisor at that time?

Page 48

1      A.    Joe Stenson.
2      Q.    Okay.  How long were you
3  suspended for?
4      A.    Three days.
5      Q.    Did you lose your temper
6  during that incident?
7      A.    No, I did not.
8      Q.    Did you use disrespectful
9  language to any of your fellow employees?
10     A.    No, I did not.
11     Q.    Did you shoot someone the
12 bird?
13     A.    No, I did not.
14     Q.    Any other inappropriate
15 behavior?
16     A.    No.
17           (Whereupon, Defendant's
18           Exhibit 5 was marked for
19           identification.)
20     Q.    I will show you what I have
21 marked as Exhibit 5.  Have you seen this
22 document I have marked as Exhibit 5
23 before?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 49

1     A.    I don't recall seeing it,
2  but --
3     Q.    Is that your signature down at
4  the bottom of the form?
5     A.    Yes, it is.
6     Q.    And this is showing the
7  suspension, and it says a
8  one-and-a-half-day suspension.
9         Is this the same incident or
10  are we talking about different --
11     A.    Same.
12     Q.    Were there any other incidents
13  other than this where you were suspended?
14     A.    This is the only thing.
15     Q.    Okay.  Do you -- what is a
16  2140?  I'm looking at the --
17     A.    That's the size of the hot
18  water heater.
19     Q.    Okay.  Did you throw a 2140 on
20  the ground, causing it to be scraped?
21     A.    No.
22     Q.    Did you leave the line early
23  before break buzzer?

Page 50

1     A.    No.
2     Q.    Okay.  Didn't you tell me a
3  second ago that you didn't have some way
4  to stop the line?
5     A.    Right.
6     Q.    I mean, how is that not
7  leaving the line early?
8     A.    Well, see, the lady on the
9  other side of the line, she has the stop
10  button.  So when the break buzzer goes
11  off, she didn't stop the line.  The tanks
12  therefore kept running and they rolled
13  over onto the floor.  And they accused me
14  of damaging the hot water heaters.  And I
15  told them I have no control over stopping
16  the line, she is supposed to stop the
17  line.  And there was a disagreement on
18  that.  And that was basically it.
19     Q.    Who was the disagreement
20  between?
21     A.    I don't remember.
22     Q.    Was it you and someone?
23     A.    It might have been Billy Joe,

Page 51

1  I don't remember.  I know there was a
2  disagreement, because they tried to make
3  it be my responsibility for the tanks
4  falling off the line, and it wasn't my
5  responsibility.  I have no control on
6  stopping the line.
7     Q.    Do you have gaps in your
8  memory from times when you lost your
9  temper?
10     A.    No.
11     Q.    Have you ever had a family
12  member tell you that you have got a
13  temper?
14     A.    No.
15     Q.    Have you ever had anyone tell
16  you that you have got anger management
17  problems?
18     A.    No.
19     Q.    Have you ever been referred to
20  any kind of anger management counseling by
21  any of your employers?
22     A.    No.
23     Q.    During this incident that we

Page 52

1  are looking at in Exhibit 5, do you admit
2  or deny that you used this disrespectful
3  language to a fellow employee?
4     A.    Deny.
5     Q.    And do you admit or deny
6  yelling at a fellow employee?
7     A.    Deny.
8     Q.    Do you admit or deny that you
9  used the bird toward him?
10     A.    Deny.
11     Q.    Did you have any claims of
12  discrimination that you made during the
13  time you worked at Rheem?
14     A.    No.
15     Q.    Did Mr. Jones have any reason
16  to dislike you?
17     A.    No.
18     Q.    Did you and he get along well?
19     A.    I never talked with him.  He
20  is the plant manager.
21     Q.    He was a few levels up --
22     A.    Yes.
23     Q.    -- in your supervision?  So

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 53

1  you say you didn't lose your temper on
2  this time?
3       A.   No.
4       Q.   Why did you sign this sheet
5  that was saying solution was treat others
6  with respect and control temper if you
7  didn't agree with that?
8       A.   I just signed it.
9       Q.   Okay.  Well, at the time you
10 signed it, you didn't think you had lost
11 your temper?
12      A.   No.  I didn't agree with it,
13 but I signed it.
14      Q.   And I think it says right here
15 your signing it doesn't necessarily mean
16 you agree with it.
17      A.   Right.
18      Q.   So after Rheem, you go to
19 Hyundai?
20      A.   Uh-huh.
21      Q.   And then tell me about from
22 Hyundai to the present; give me your list
23 of employers you have worked for in that

Page 54

1  time frame.
2       A.   Oh, I have been working for
3  temporary agencies.  I have been to a lot
4  of different jobs.
5       Q.   Okay.  Did you have any
6  full-time jobs during --
7       A.   I worked at CRH.
8       Q.   When did you first start
9  working at CRH?
10      A.   I think in January.
11      Q.   When did you -- what was your
12 job at CRH?
13      A.   Shipping coordinator.
14      Q.   Were you hired on full time or
15 did you --
16      A.   Yes.
17      Q.   Okay.  You didn't go through a
18 temp agency there first?
19      A.   I applied with them and they
20 faxed my resume to CRH.  And then CRH told
21 the manager -- board personnel they wanted
22 to interview me for a supervisor position.
23 And I interviewed for it, but I didn't get

Page 55

1  it.  They offered me a shipping
2  coordinator position.
3       Q.   What was your pay in the
4  shipping coordinator position?
5       A.   I think I started out thirteen
6  dollars an hour, I think it was.
7       Q.   Did you have benefits?
8       A.   Yes.
9       Q.   What benefits did you have?
10      A.   Blue Cross Blue Shield,
11 just --
12      Q.   Family coverage?
13      A.   Yeah, uh-huh.
14      Q.   Were the benefits you had at
15 CRH comparable to the benefits you were
16 receiving at Hyundai?
17      A.   No.  It was eighty-six dollars
18 every two weeks.  The insurance at Hyundai
19 was fifteen dollars every two weeks.
20      Q.   Okay.  Any other difference in
21 benefits between there and -- between
22 Hyundai and CRH?
23      A.   Yeah.  Hyundai offered braces.

Page 56

1  They didn't offer braces there.  And --
2  let me see.
3       Q.   What do you mean by braces?
4       A.   Braces (indicating).
5       Q.   For?
6       A.   Teeth.
7       Q.   For who, you?
8       A.   My daughter.
9       Q.   Okay.  Through the dental
10 plan?
11      A.   Uh-huh, through the Blue Cross
12 Blue Shield.
13      Q.   Any other difference in
14 benefits that you know about?
15      A.   I don't recall.  There may be,
16 but I can't recall right now.
17      Q.   Do you recall applying for a
18 manager position with Wal-Mart?
19      A.   I sent in a resume or
20 something like that.  I think I did.
21      Q.   Did you ever have an interview
22 with Wal-Mart?
23      A.   Yes, I did.

Page 57

1    Q.    Okay.  Did that result in a
2  job offer?
3    A.    No, it did not.
4    Q.    Do you recall where you
5  interviewed?
6    A.    At a hotel over here off of
7  Monticello, I believe it was.
8    Q.    Did you ever get a job offer
9  out of that?
10   A.    No.
11   Q.    Okay.  Any kind of like
12  response from them as to what your status
13  was?
14   A.    No, no.
15   Q.    Okay.
16       (Whereupon, Defendant's
17       Exhibit 6 was marked for
18       identification.)
19   Q.    Can you identify Exhibit 6 for
20  me?
21   A.    (Reviewing document.)
22   Q.    Can you identify this for me?
23   A.    Yes.  It's an application.

Page 58

1    Q.    Okay.  Is this your
2  handwriting?
3    A.    Yes, it is.
4    Q.    Is there anything on this
5  that's incorrect that you would like to
6  correct now?
7    A.    What application is this for?
8  What job am I applying for?
9    Q.    It says it was filled out in
10  May of '06.  Do you know who that would
11  be?
12   A.    I have no idea who this -- who
13  this --
14   Q.    It says are you looking for
15  temporary or -- it says I'm seeking temp
16  to perm.
17       I mean, does this refresh if
18  this was for some employment --
19   A.    Oh, this is probably
20  Industrial Relations, yeah.  Industrial --
21  I don't know.  I don't know who it's with,
22  I don't know.
23   Q.    Looking down you have a

Page 59

1  listing of your employers that you worked
2  for and the reason resigned.
3    A.    Uh-huh.
4    Q.    Are all of those reasons
5  correct?
6    A.    Well, I didn't have enough
7  room to explain what happened out there at
8  Hyundai.  I don't have any room.
9    Q.    And you just put disagreement?
10   A.    Uh-huh, I disagree with why I
11  was being terminated.
12   Q.    Is that a true statement that
13  the reason you left Russell Corporation
14  was moved to Montgomery?
15   A.    I worked at Russell in
16  Montgomery.  See, I'm trying to understand
17  what you are saying.
18   Q.    I'm asking if you lied on this
19  application when you said the reason you
20  resigned Russell Corporation was because
21  you're saying moved to Montgomery?
22   A.    No.
23   Q.    You didn't lie?

Page 60

1    A.    No, I did not.
2    Q.    Okay.  Did you tell me earlier
3  that the reason you left Russell
4  Corporation was that you were
5  involuntarily terminated?
6    A.    I worked at Russell in
7  Montgomery.  Wait a minute, I don't think
8  I'm understanding what you are saying
9  here.
10   Q.    Why did you leave Russell
11  Corporation?
12   A.    I was terminated, but I was
13  employed again after that for Russell
14  again.
15   Q.    Where were you employed again?
16   A.    In Wetumpka.
17   Q.    Okay.  When were you employed
18  there?
19   A.    I don't remember, but I worked
20  in Wetumpka for a while.
21   Q.    Who was your supervisor in
22  Wetumpka?
23   A.    I don't remember his name.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 61

1    Q.    So what location were you at
2  when you were term'd for attendance?
3    A.    In Alexander City.
4    Q.    And are you saying that after
5  that termination, that you worked at
6  another Russell facility --
7    A.    Yes.
8    Q.    -- for Russell Corporation?
9    A.    Uh-huh.
10   Q.    At Wetumpka?
11   A.    Uh-huh.
12   Q.    Why did you leave CRH?
13   A.    I was let go per my ninety-day
14  probation period.  No reason was given.
15   Q.    Do you recall if there were
16  any specific incidences?
17   A.    Yes.  That happened to me
18  or -- what are you saying?
19   Q.    Yes.  Was there any specific
20  incident that led to your termination?
21   A.    I wasn't terminated.  They
22  said I was let go due to the ninety-day
23  probationary period.  Due to the

Page 62

1  probationary period is what they told me.
2    Q.    Do you remember an incident
3  with a shipment that was supposed to go to
4  Duncan, South Carolina?
5    A.    Certainly do.
6    Q.    Okay.  What happened with that
7  shipment?
8    A.    Shipment was supposed to go
9  to -- wait a minute.  Yeah, Duncan, South
10  Carolina.  There was seven roll packs that
11  were supposed to go on the truck.  Three
12  of them did not have labels.  It's not my
13  job to make labels.  I scan the labels and
14  then the information goes into the system
15  which shows that we gave the customer
16  those items.  I can't ship them if there
17  are no labels on them.
18        Okay.  There were two other
19  items that go on the shipment that were
20  not even made.  I don't make the items.  I
21  load the trucks.  Two items that I had, I
22  checked them off as being loaded on the
23  truck.  But I did not load them on the

Page 63

1  truck because I was told to try to find a
2  way to make labels for the three items
3  that didn't have labels on them.  And
4  that's not my job.  I was told to find the
5  people who supposedly had made those
6  labels.
7        And in the process of me trying
8  to find these people, it took about two
9  and a half to three hours to find them, no
10  one was there, they couldn't make the
11  labels.  And therefore I had checked off
12  two items that I said that I had loaded on
13  the truck, but because I was trying to do
14  somebody else's job, I forgot and did not
15  load those two items on the truck.
16        (Whereupon, Defendant's
17        Exhibit 7 was marked for
18        identification.)
19   Q.    I will show you what I have
20  marked as Exhibit 7 and ask if you have
21  seen that document before?
22   A.    (Reviewing document.)  Yes.
23   Q.    Do you agree or disagree with

Page 64

1  the description of the performance
2  problem/behavior section that's listed
3  there?  Do you see that section I'm
4  talking about?
5    A.    No, I don't see what you are
6  talking about.
7    Q.    The first -- do you see --
8  there is a little explanation here
9  (indicating).  Just look at that and --
10   A.    Okay.  I totally disagree with
11  that.
12   Q.    What do you disagree with that
13  on?
14   A.    Okay.  (Reviewing document.)
15  Okay.  I disagree that there were
16  "discrepancies on what actually was
17  shipped 887's, the paperwork had quantity
18  76 and customer actually received
19  something different."  I don't put -- I
20  don't pack those roll packs.  I'm not
21  responsible for how many parts are in the
22  roll pack.  If I scan it and it says it
23  has got forty-eight, then that's what

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 65 to 68)

Page 65

1  should be in there.  I don't pack them.
2  So that's not my responsibility.
3      Q.   Okay.  Did you do anything
4  wrong on this incident?
5      A.   No.  Yeah, one thing I did
6  wrong.  I checked off two items that I had
7  checked off that I had put on the truck.
8  But because I was trying to do somebody
9  else's job, I forgot that I physically
10  didn't put them on the truck.  And,
11  therefore, that's my responsibility for
12  those two roll packs.  I honestly made a
13  mistake because I was trying to do
14  somebody else's job by making labels.  It
15  wasn't my job to do that.  So I did make
16  that error, yes, I did.
17      Q.   Okay.  What about during the
18  time you were at Trentech; I mean, do you
19  admit that you had performance problems
20  there?
21      A.   Never.  Never.
22      Q.   Your testimony is you never
23  did anything that would justify any type

Page 66

1  of disciplinary action there?
2      A.   No, I did not.
3      Q.   What about during the time
4  that you worked at Rheem?
5      A.   No, uh-uh.  No, I did not.
6      Q.   What about during the time you
7  worked at Russell Corporation?
8      A.   No.  Yeah, I was late.  Yeah,
9  I deserved, yeah, to be terminated for
10  being late.  Yes, I was constantly late at
11  Russell.
12      Q.   Other than being late at
13  Russell --
14      A.   That was --
15      Q.   -- was there anything that you
16  did that was warranting disciplinary
17  action?
18      A.   No.
19      (Whereupon, Defendant's
20      Exhibit 8 was marked for
21      identification.)
22      Q.   Exhibit 8 was an employee
23  termination form listed from the CRH file.

Page 67

1  Is that consistent with your recollection
2  that it was about March 14th of '07 when
3  they let you go?
4      A.   Uh-huh.
5      Q.   So that was about, what, three
6  or four months ago?  Have you gotten a job
7  since CRH?
8      A.   No, I'm drawing unemployment.
9      Q.   Okay.  You are not employed as
10  you sit here today?
11      A.   Uh-uh.
12      Q.   Okay.  Where have you applied
13  for jobs since leaving CRH?
14      A.   Walker Personnel again.  Let
15  me see.  I got a list of them at home.  I
16  always write down where I apply.  I can't
17  recall right now.  My memory right now is
18  not working too good.  Oh, I applied at
19  Industrial Staffing.  It will come to me,
20  I just have to think about it.  There are
21  several other places, but I don't have my
22  list in front of me, so I can't recall.
23      Q.   Have you had any job offers

Page 68

1  since --
2      A.   I have had interviews.  I had
3  an interview -- a couple of interviews.
4      Q.   Who have you had interviews
5  with?
6      A.   Industrial Staffing sent me on
7  an interview with a mail company, and they
8  chose another applicant over me.  And --
9  what was the other place I told you,
10  Workforce?
11      Q.   Walker Personnel?
12      A.   They offered me a job in
13  Clanton for seven dollars an hour, and I
14  told them I couldn't afford to drive there
15  for that.  Wasn't enough money -- that
16  wouldn't pay for my gas.
17      Q.   Who was that job going to be
18  with?
19      A.   I don't recall who it was
20  with.
21      Q.   Have you had interviews with
22  any companies that aren't temp or staffing
23  agencies?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 69

1     A.   I interviewed with Kershaw.
2     Q.   What is Kershaw?
3     A.   They make railcars.
4     Q.   What position did you
5  interview for?
6     A.   As a fabricator, I believe.
7  When you cut steel, fabrication.
8     Q.   Did they make you a job offer?
9     A.   They did a background check on
10 me, and I'm waiting to hear from them on
11 that.
12    Q.   Okay.  When was that
13 interview?
14    A.   About a month ago, I think.
15    Q.   Okay.
16      (Whereupon, Defendant's
17      Exhibit 9 was marked for
18      identification.)
19    Q.   Do you recall receiving this
20 letter from CRH?
21    A.   Uh-huh.
22    Q.   Is their listing of your pay
23 and benefits and their --

Page 70

1     A.   Wait a minute.
2     Q.   Is that what you -- were you
3  paid thirteen dollars an hour?
4     A.   Wait a minute.  Let me --
5     Q.   Okay.
6     A.   Let me read this.  (Reviewing
7  document.)  Okay, I think I recall seeing
8  this.
9     Q.   Okay.  I mean, just -- are you
10 -- was thirteen dollars an hour going to
11 be your starting pay?
12    A.   Yes.  That's exactly what I
13 started with.
14    Q.   And shipping coordinator was
15 going to be your title?
16    A.   Yes.
17    Q.   Did you work forty hours a
18 week or more --
19    A.   Yes.
20    Q.   -- most weeks there?
21    A.   Uh-huh.
22    Q.   Did you work a lot of overtime
23 there?

Page 71

1     A.   At first.
2     Q.   How much overtime would you
3  average a week?
4     A.   I don't remember.  It varies.
5      (Whereupon, Defendant's
6      Exhibit 10 was marked for
7      identification.)
8     A.   (Reviewing document.)
9     Q.   Do you recall this document,
10 Exhibit 10?
11    A.   Seems like I'm signing my wife
12 up for insurance, putting her on the
13 insurance.
14    Q.   Did you complete this
15 information?  I mean, is this your
16 handwriting on both pages?
17    A.   Yes.  Yes, it is.
18    Q.   Is this something -- so you
19 had her on your insurance there at --
20    A.   Uh-huh.
21    Q.   -- CRH?  Okay.
22      And it says Dr. McCorvey.  Is
23 that her physician?

Page 72

1     A.   Yes, it is.
2     Q.   Okay.  What did you fill out
3  on this sheet?  Did you fill out
4  everything or is there some stuff that
5  your wife filled out?
6     A.   Let me see.  I think my wife
7  filled out from two to G, if I'm not --
8  from two to six, if I'm not mistaken.
9  Number two to G, the letter G.  When I did
10 this -- I don't know.  I can't recall.
11    Q.   Okay.
12    A.   I may have done it -- I may
13 have filled it out for her, I may have.
14 As a matter of fact, I believe I did fill
15 this whole thing out.  As a matter of
16 fact, I did.  I think I did it at work,
17 too.
18    Q.   Have you been arrested before?
19    A.   Yes.
20    Q.   When were you arrested?
21    A.   In '98.
22    Q.   And what was that charge?
23    A.   My wife -- me and my wife got

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 73

1  into an argument, and she called the
2  police.
3      Q.    Was the charge disorderly
4  conduct?
5      A.    Yes.
6      Q.    Was that here in Montgomery
7  County?
8      A.    Yes, it was.
9      Q.    Okay.  What was the result of
10  that charge?
11      A.    I paid a fine and probation
12  was suspended.
13      Q.    What had your wife told the
14  police you had done?
15      A.    Called her a name.
16      Q.    What did you -- what did she
17  say you called her?
18      A.    I don't recall.
19      Q.    Was it a --
20      A.    I don't recall.
21      Q.    Bad language?
22      A.    I don't recall.
23      Q.    Did she claim that you made

Page 74

1  threats towards her?
2      A.    Oh, no.  No.
3      Q.    Do you admit or deny that you
4  did call your wife a name?
5      A.    I called her a name.
6      Q.    What did you call her?
7      A.    I don't recall what it was.
8      Q.    Okay.  So were you under the
9  influence that night?
10      A.    I had had two beers.  She was
11  mad because I went out.
12      Q.    Is there something that would
13  affect your ability to remember what you
14  said in this discussion with your wife?
15      A.    I called her a name, I don't
16  remember what it was.  And I had two
17  Budweisers.
18      Q.    If I deposed your wife, would
19  she know what --
20      A.    I don't know.  I have no idea.
21      Q.    In the nine years since this
22  incident, has your wife told you this is
23  what I claim you called me that night?

Page 75

1      A.    No.
2      Q.    Has anyone else told you --
3      A.    I don't mean to laugh, I'm
4  sorry.
5      Q.    Has anyone else told you what
6  you said that night?
7      A.    No.
8      Q.    Is there some reason why you
9  don't recall what you said?
10      A.    I don't remember exactly what
11  I said.
12      Q.    I'm not asking exactly.  To
13  the best of your recollection, what do you
14  recall saying?
15      A.    I don't remember.
16      Q.    Do you remember what you were
17  arguing about?
18      A.    Well, she was mad at me for
19  coming home a little late, and I called
20  her a name.
21      Q.    What did she say to you when
22  you got in?
23      A.    Where have you been?  What are

Page 76

1  you doing coming home this time of night
2  and -- I think to that effect, I'm not
3  sure.  I don't recall.
4      Q.    And what did you say to that?
5      A.    I don't recall.
6      Q.    You don't recall anything that
7  you said to her that night?
8      A.    Not the name calling, no.
9      Q.    Did the police tell you when
10  they showed up what your wife had told
11  them you said?
12      A.    Not that I remember.
13      Q.    Did she testify against you at
14  some point?
15      A.    No.
16      Q.    Was there ever a point where
17  you were asked to give a statement about
18  the incident?
19      A.    I don't recall.
20      Q.    Okay.  Do you know if your
21  wife filled out a warrant?
22      A.    She did not.
23      Q.    Okay.  Did she fill out any

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 77

1 kind of report?
2     A.    No.
3     Q.    Have you been arrested on any
4 other occasions?
5     A.    Other than traffic violations,
6 no.
7     Q.    Were you angry with her that
8 night?
9     A.    I got angry with her that
10 night.
11     Q.    Is it possible that you got so
12 angry that you just don't remember what
13 you said or did from the point you lost
14 your temper?
15     A.    Oh, I remember -- there was
16 nothing happened.  It was just a name I
17 called her.  That's the only thing that
18 happened, it was a name.
19     Q.    But something has caused you
20 to forget that.  I mean, have you ever
21 been told that your losing temper causes
22 you to have a bad recollection of events
23 that occur when you are losing your

Page 78

1 temper?
2     A.    No.
3     Q.    So your testimony is that your
4 recollection of this event with your wife
5 or this incident that allegedly happened
6 at Russell Corporation where they claim
7 you threatened to kill supervisors, that
8 there is nothing about your makeup,
9 physically or emotionally, that would
10 cause you to be hazy in remembering the
11 specific details that happened on those
12 occasions?
13     A.    You are going to have to
14 repeat that again, because I can't -- you
15 added so many different -- you added my
16 wife and then you added the job.  Could
17 you please list everything separate so I
18 can answer each thing as you ask it
19 instead of adding them together?  You are
20 confusing me when you do that.
21     Q.    Sure, I will be glad to
22 rephrase my question.
23         Is it your testimony that there

Page 79

1 is nothing in your physical or emotional
2 state that you are aware of that causes
3 you to have lapses in memory when you lose
4 your temper?
5     A.    There is nothing in my
6 physical state that causes me to have
7 lapses in my memory.
8         MR. BOSTICK:  Do y'all want to
9 take a break for a few minutes?
10         (Whereupon, a break was had
11         from 10:16 a.m. until 10:33
12         a.m.)
13     Q.    (BY MR. BOSTICK:)  Mr. Smith,
14 now that we have taken a break, is there
15 anything from your earlier testimony that
16 you want to revise before we get started
17 back?
18     A.    No.
19     Q.    Just some other background.
20 You've told me about all of your arrests?
21     A.    Yes, uh-huh.
22     Q.    Have you ever filed for
23 bankruptcy?

Page 80

1     A.    No.
2     Q.    Okay.  Ever applied for Social
3 Security disability benefits?
4     A.    No.
5     Q.    Ever applied for any type of
6 long-term disability benefits?
7     A.    No.
8     Q.    Have you ever been a party to
9 a lawsuit other than this lawsuit?
10     A.    No.
11     Q.    Okay.  Is this your first
12 marriage?
13     A.    Yes.
14     Q.    Okay.  Have you ever filed an
15 EEOC charge against any other employer
16 other than Hyundai?
17     A.    Yes, uh-huh.
18     Q.    Okay.  Who did you file a
19 charge against?
20     A.    CRH.
21     Q.    Okay.  When did you file that
22 charge?
23     A.    April, I think it was.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 81 to 84)

Page 81

1    Q.    Of this year?
2    A.    Yes.
3    Q.    What is the status of that
4    charge?
5    A.    Right now it is being -- I'm
6    waiting to hear back from them.  I think
7    they are going to request files from CRH.
8    Q.    Okay.  What do you contend in
9    that charge?
10   A.    Discrimination.
11   Q.    On what basis?
12   A.    Hiring process.  And the new
13   supervisor they brought in, he
14   discriminated against me.  And CRH, when
15   they hired him, he has no shipping
16   experience whatsoever, and they gave him
17   the position that I was sent there to
18   interview for at the very beginning, and
19   they gave it to him with no shipping
20   experience whatsoever.
21   Q.    What is that person's name who
22   got the position?
23   A.    Charles Martin.

Page 82

1    Q.    Who were the people making the
2    decisions --
3    A.    Judy Benson and Ricky Colburn.
4    Q.    Ricky Colburn?
5    A.    C-o-l-b-u-r-n, Colburn.
6    Q.    Do you contend that anybody at
7    CRH made racist statements to you?
8    A.    Not statements, but he made a
9    gesture that was racial.
10   Q.    Who is this, Ricky Colburn?
11   A.    No.  Charles Martin.
12   Q.    What did he do?
13   A.    We was in the office sitting
14   down, I was in there with two other white
15   employees.  He came in and shook both of
16   their hands and spit in his hand and
17   offered to shake mine.
18   Q.    Who were the other two
19   employees there?
20   A.    Brian Silcox and Matthew
21   Phillips.
22   Q.    Anything other than that that
23   took place at CRH that you contend was a

Page 83

1    racist remark or action?
2    A.    No remarks.  But I reported it
3    to Judy Benson, Human Resource manager,
4    and she didn't do anything about it.
5    Q.    I take it -- I don't want to
6    spend too much time on that claim, but
7    your contention is you were better
8    qualified than Charles Martin for the
9    position he received, is that right?
10   A.    Yes.  I was sent there for
11   that position and I was denied that
12   position, and no reason was given why I
13   would not receive that position.
14   Q.    Okay.  Did you have any
15   arguments with anyone during the time you
16   were at CRH?
17   A.    No.
18   Q.    And you don't know at this
19   time if CRH has submitted a response to
20   the charge or not?
21   A.    I don't know.
22   Q.    Did you give the EEOC any
23   other documents -- any documentation to

Page 84

1    support that charge other than the filling
2    out of the one-page charge?
3    A.    She called me over the phone
4    and I gave her some information over the
5    phone.
6    Q.    But did you give her any
7    documents?
8    A.    Oh, sure, yeah.
9    Q.    What did you give her
10   documentwise?
11   A.    A tape recording -- well, no,
12   that's not true.  She wouldn't accept that
13   from me.  I gave her documentation -- I
14   gave her the letter from the manager of
15   Walker Personnel who sent me there for --
16   to interview for a supervisor position.
17   They are denying that I was interviewed
18   for that position, but she sent me there
19   for that position.  I have a written
20   statement from the manager of Walker
21   Personnel.  I never knew anything about
22   the company.  She faxed my resume to them.
23   She called me and told me they wanted to

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 85

1  interview me for a supervisor's position.
2  And I got a letter from her, and I gave it
3  to the EEOC.
4      Q.   Who did you tape-record a
5  conversation with?
6      A.   Judy Benson and Ricky Colburn
7  and the two witnesses that saw him spit in
8  his hand after he -- he shook theirs first
9  and spit in his hand.  And I recorded them
10  telling me that that was wrong the way he
11  did me.
12      Q.   Do you have any tape
13  recordings in your possession that you
14  made from your interaction with any
15  Hyundai employees?
16      A.   In my possession now, right
17  now?  Do you mean just have period?
18      Q.   Have period.
19      A.   Yes.
20      Q.   Okay.  Who have you got
21  tape-recorded conversations --
22      A.   Joshua Groves.
23      Q.   When did that conversation

Page 86

1  take place?
2      A.   Went on his job maybe about a
3  month and a half ago and -- I went on his
4  job, his employment.
5      Q.   Did you tell him you were
6  tape-recording the conversation?
7      A.   No.
8      Q.   What is he saying on the tape?
9      A.   He is saying that he told
10  Reggie Johnson to kiss his a-s-s.  And he
11  said Scott Weddington called him in the
12  office and made him write out the
13  statement that he told Reggie to kiss his
14  a-s-s, and he wasn't going to do anything
15  that Reggie didn't know how to do himself.
16  And he said that Scott gave him a verbal
17  warning for that.
18      Q.   Did he say anything else on
19  the tape?
20      A.   Yes.  He also said that Scott
21  was arrested for stealing a car from the
22  company.
23      Q.   Arrested?

Page 87

1      A.   He said that Scott was
2  arrested by customs out there, customs --
3  and he was suspended for a couple of
4  months or something and all of a sudden
5  they gave him his job back.
6      Q.   Anything else that he said on
7  the tape?
8      A.   Let me see.  Let me think
9  about this, now.  Oh, he said he has got
10  in a fight with Michael Harris.
11      Q.   Got in a fight with Michael
12  Harris?
13      A.   Uh-huh.  And he said Scott
14  gave both of them three-day suspension.
15      Q.   Do you know who Michael Harris
16  is?
17      A.   He is a coworker that I share
18  lockers with, with PDI.
19      Q.   What race is he?
20      A.   He is white.
21      Q.   Anything else that he told you
22  on the tape?
23      A.   I went back again to pick up

Page 88

1  paperwork from him -- some paperwork from
2  him, but I didn't get it.  And I asked him
3  was there any other witnesses that -- was
4  there some witnesses that I could put
5  their names down to help me and to prove
6  that this fight took place between me and
7  him.  And he said I could tell you some
8  people, but it wouldn't do you any good,
9  they wouldn't help you.
10      Q.   He didn't give you any names?
11      A.   He wouldn't give -- he said it
12  wouldn't do any good to give me names,
13  they are not going to help you.
14      Q.   What was your job title at
15  Hyundai?
16      A.   PDI light repair.
17      Q.   Did you have a -- were you a
18  team member, was that your --
19      A.   Yes.
20      Q.   Okay.  Who was your immediate
21  supervisor?
22      A.   Reggie Johnson.
23      Q.   What was his title?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 89

1    A.    Team leader.
2    Q.    And who did he report to?
3    A.    At first it was I think
4  Michael Ashley, he is the group leader.
5  And then Scott was the manager.  Scott
6  used to be group leader, but he got
7  promoted.  So I think Reggie started off
8  reporting to Scott and then Scott got
9  promoted to plant manager, I guess that's
10  what it is.
11    Q.    Okay.  And so when Scott was
12  plant manager --
13    A.    Uh-huh.
14    Q.    -- is there someone between
15  Reggie and him?
16    A.    Yes.  Michael Ashley.  He is
17  group leader.
18    Q.    What is Reggie Johnson's
19  title?
20    A.    Team leader.
21    Q.    And then what was your title?
22    A.    Team member.
23    Q.    Okay.  Do you know what Joshua

Page 90

1  Groves' job title was?
2    A.    He was a parts runner in PDI.
3  He would go back and forth on the orange
4  cart to get parts that we needed to put on
5  the cars that was damaged or needed to be
6  replaced.
7    Q.    Who was his team leader?
8    A.    Reggie Johnson.
9    Q.    Did Mr. Groves tell you he had
10  been terminated from Hyundai?
11    A.    I don't think we ever asked
12  that question.  I never asked that
13  question.
14    Q.    What paperwork were you trying
15  to get from him?
16    A.    I wasn't trying to get any
17  paperwork.  I was trying to get an answer
18  on a question from him, was he going to --
19  what was the question?  I want to make
20  sure before I -- to get it right.  Sign an
21  affidavit.
22    Q.    Did he sign it?
23    A.    No.

Page 91

1    Q.    Did you give him an affidavit
2  to sign?
3    A.    Yes, we presented him with
4  one.  We presented him with an affidavit.
5    Q.    And he didn't sign it, though?
6    A.    He said he wanted to let his
7  father -- talk to his dad about it before
8  he signed it.
9    Q.    Did you tell him you were
10  tape-recording the conversation?
11    A.    No.
12    Q.    Do you have any other tape
13  recordings other than this one of Joshua
14  Groves?
15    A.    That's all.
16    Q.    Where is this tape recording?
17    A.    My attorney has a copy of it.
18    Q.    You have given it to your
19  attorney?
20    A.    But she doesn't have a copy of
21  the --
22        MS. DICKEY:  I think I have
23  the tape recorder.  It's a digital.  And

Page 92

1  so I'm in the process now of making it.
2  And I will bring it tomorrow, the
3  recording.  I don't have -- the only way I
4  can do it is record it and have another
5  tape going.
6    Q.    Do you remember when it was
7  that you met with Mr. Groves and got the
8  recording?
9    A.    I don't know.  Probably about
10  a month and a half ago, roughly.
11        (Whereupon, Defendant's
12        Exhibit 11 was marked for
13        identification.)
14    Q.    Have you seen Exhibit 11
15  before?
16    A.    Yes, I have.  I have seen
17  this.  Yes, I have seen this.
18    Q.    Look on the next to last page.
19  It's asking about contact you have had
20  since December of 2005.  And the next page
21  starts in April of 2006?
22    A.    Uh-huh.
23    Q.    Can you read -- just read that

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 93

1    paragraph for me.  Not out loud, just read
2    it, I want to ask you some questions about
3    it.
4        A.    You want me to just read it to
5    myself?
6        Q.    Yes.
7        A.    Okay.  (Reviewing document.)
8    Okay.
9        Q.    Is this conversation -- or
10   this interaction between you and Groves
11   when you recorded the conversation?
12       A.    No.
13       Q.    Okay.  When did you record
14   that conversation?
15       A.    About a month and a half ago.
16       Q.    Okay.  When did you give the
17   tape to your attorney?
18       A.    Same day I recorded it.
19       Q.    Do you know if it was before
20   or after March 16 --
21       A.    I didn't give it to her the
22   same day I recorded it, I'm sorry.  It
23   might have been a few days after that, a

Page 94

1    week or so.  I can't recall exactly when,
2    but I didn't give it to her the same day.
3        Q.    Okay.  What other documents
4    have you given your attorney that relate
5    to your case?
6        A.    You mean -- the
7    interrogatories.
8        Q.    Were there any specific
9    documents you took from Hyundai that you
10   have given your attorney?
11       A.    Not that I'm aware of.  Not
12   that I can recall right now, other than
13   the -- answering the interrogatories,
14   providing what you all asked us to
15   provide.
16       Q.    Do you have -- did you take
17   notes or have a diary during the time you
18   worked at HMMA?
19       A.    No.
20       Q.    Would there be somewhere where
21   you would make a notation about what
22   happened to you -- other than your EEOC
23   charge, a notebook or something where you

Page 95

1    might have written down your side of what
2    happened?
3        A.    All the statements that I
4    wrote down, I turned in to the EEOC when I
5    wrote my original complaint.
6        Q.    Okay.
7        A.    I sent it in to the EEOC.  And
8    I may have typed up some more things and
9    gave to my attorney.  That's basically
10   about it.  I don't keep a diary.
11       Q.    Okay.  So any documents that
12   you prepared about this stuff at Hyundai,
13   you have given to your attorney?
14       A.    Yes.  Yes, I think that I have
15   given everything to her pretty much.
16       Q.    Okay.  Is there a calendar or
17   something that you might keep that would
18   have notations on it from this time?
19       A.    No.
20       Q.    I'm looking at the question
21   that says EEOC file.  And it says,
22   "Plaintiff received the EEOC file from his
23   previous attorney and believe some pages

Page 96

1    may be missing."
2            What -- is there something
3    specific that you --
4        A.    What happened was there was a
5    transfer of paper, and -- the EEOC file,
6    and I think I may have lost a few pages.
7    And that's all.  I wanted to be sure, but
8    I think I have them all now.
9        Q.    Just so I'm clear, it is not
10   that you are saying it is something the
11   EEOC lost --
12       A.    No.  I lost.  I misplaced a
13   few pages.
14       Q.    Okay.  And then is number one
15   of the interrogatory answers true to the
16   best of your knowledge of the different
17   places you have worked?  Keep going with
18   me, they are not numbered --
19       A.    To the best of my knowledge,
20   yes, that's true.
21       Q.    Number three says -- asks for
22   any transcripts or oral recordings of any
23   statements other than this recording of

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 97 to 100)

Page 97

1  Joshua Groves.
2         Are you aware of any other such
3  statements or recordings?
4     A.  No.
5     Q.  Okay.  Would there be any
6  emails that you would send to someone back
7  at this time explaining to you what had
8  been going on at Hyundai?
9     A.  No.
10    Q.  Would you have any kind of
11 written correspondence with Reverend
12 Sankey?
13    A.  Yes.  He supplied a letter.
14 He signed a letter in my behalf.  He has
15 been counseling me.  I talk to him.  He
16 has been counseling me.
17    Q.  What kind of letter did he
18 provide you?
19    A.  I can't recall exactly what it
20 says.  You don't have a copy of that
21 either?
22    Q.  I don't think so.
23    A.  Okay.  Well, he is just

Page 98

1  testifying that I have been going through
2  a tremendous financial strain and there's
3  a lot of stress in my life because of
4  being terminated from Hyundai, financial
5  stress and mental stress and physical
6  stress.
7     Q.  Is that a letter he gave to
8  you?
9     A.  Yes.
10    Q.  Did you give it to your
11 attorney?
12    A.  Yes, I believe I did, yes.
13    Q.  I mean, did he write the
14 letter to anyone else, the EEOC or
15 anything like that?
16    A.  No, no.  It was just one of
17 the interrogatories.
18    Q.  Okay.  Did Groves say who --
19 what specifics did he say about this
20 altercation with Michael Harris?  I mean,
21 what exactly did he say happened?
22    A.  That's about it.  He just said
23 that he got into a physical altercation

Page 99

1  with him.  And he said on the tape that
2  him and his buddies was picking on him,
3  calling him names, picking on him, and he
4  said they got in a fight, basically.
5  That's what he said.
6     Q.  Did he say when that took
7  place?
8     A.  No, he didn't say when.
9     Q.  Did you run into a former
10 Hyundai employee named Shane Nice at one
11 point at the Wal-Mart on the Atlanta
12 Highway?
13    A.  He tapped me on my shoulder,
14 yeah.  He tapped me on my shoulder --
15 yeah, he tapped me on my shoulder a couple
16 of Saturdays ago.
17    Q.  What did you say to him?
18    A.  He started talking to me.
19    Q.  What did he say to you and you
20 say to him?
21    A.  He asked me how was I doing, I
22 told him I was tired.  And I asked him --
23 I told him that I had -- did he ever see

Page 100

1  Joshua get suspended from Hyundai, and he
2  said yeah, he had got suspended, but he
3  didn't know what for.  What is his name
4  again?  Excuse me, what was the name of
5  the person?
6     Q.  Shane Nice.
7     A.  Oh, no, no, not Shane.  I
8  don't know him.  I don't even know a
9  Shane.
10    Q.  Okay.  Who is this you were
11 talking to?
12    A.  James.  All I know is James.
13 I'm sorry.
14    Q.  Okay.  Did you bring up Scott
15 Weddington in this conversation?
16    A.  No, uh-uh.  I don't know
17 anybody named Shane.  I don't know him.
18    Q.  Have you told anybody since
19 leaving Hyundai that Mr. Weddington should
20 watch his back or that you were going to
21 get him?
22    A.  No.
23    Q.  Never made any threats toward

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 101 to 104)

Page 101

1  him since leaving?
2      A.   No.
3      Q.   You deny that?
4      A.   Deny that.
5      Q.   Do you know an employee from
6  Hyundai named Dante?
7      A.   I sure don't.  Sure don't.
8          (Whereupon, Defendant's
9          Exhibit 12 was marked for
10         identification.)
11     Q.   Can you identify Exhibit 12
12 for me, please?
13     A.   (Reviewing document.)
14     Q.   Can you identify this for me?
15     A.   This is an application.
16     Q.   Did you fill this out?
17     A.   Yes.
18     Q.   Was this at the time you were
19 applying to Hyundai?
20     A.   Yes.
21     Q.   Is there anything on the
22 application you want to correct at this
23 time?

Page 102

1      A.   Not that I know -- no.
2      Q.   Who is Antonio Duncan?
3      A.   That's a guy I worked with at
4  Rheem.  He got hired on at Hyundai before
5  I did.
6      Q.   Do you remember who you
7  interviewed with at Hyundai?
8      A.   Sure don't.
9      Q.   Do you know if they were in a
10 particular department or were they Human
11 Resources or anything?
12     A.   I have no idea.
13     Q.   Do you know if you interviewed
14 with Scott Weddington?
15     A.   No, I didn't interview with
16 him.
17     Q.   Do you know were they white or
18 black or male or female?
19     A.   Both of them were white, and a
20 male and female.
21     Q.   Okay.  Anything more specific
22 that you remember about it than that?
23     A.   That's about it.

Page 103

1      Q.   Did you just have one
2  interview?
3      A.   I had an interview with them
4  and then I started testing.  One
5  interview.
6      Q.   December 16th of 2004, does
7  that sound around -- or December 13th,
8  does that sound around the time you
9  submitted the application?
10     A.   I would imagine so.  Yes, I
11 would say so.  That's the day on the
12 application.
13     Q.   Did you work for Sterris
14 Corporation?
15     A.   As a temp.  I was a temporary.
16     Q.   Who was your supervisor there?
17     A.   I don't remember his name.
18     Q.   Is Sterris a temp agency?
19     A.   No.  I was working through
20 Workforce.  Temporary assignment.  It was
21 a temporary job.
22     Q.   Have you been assigned --
23 worked somewhere where a Ken Thomas was

Page 104

1  your supervisor?
2      A.   I can't recall him.
3      Q.   When approximately did you
4  work for Sterris Corporation?
5      A.   I don't remember.  It wasn't
6  long.  It was a temporary job.
7      Q.   June through August of 2006,
8  would that be consistent with your
9  recollection?
10     A.   I don't recall.
11     Q.   Would it have been at a time
12 after you left Hyundai?
13     A.   Yeah, it was after I left.
14 Might have been one of the first little
15 jobs I had, I'm not sure.  It was through
16 Walker Personnel, that's all I know.
17     Q.   Okay.  And would it have been
18 between the time you worked for Hyundai
19 and when you worked for CRH?
20     A.   I would imagine so.
21     Q.   Okay.  Do you remember a
22 supervisor named Ken Thomas?
23     A.   I sure don't.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 105 to 108)

Page 105

1  Q.   Do you have any recollection
2  of being let go from there because of
3  inability to follow directions?
4  A.   I don't recall that.
5  Q.   Do you recall if you were
6  released from there involuntarily?
7  A.   I was released from there
8  because we had completed our assignment.
9  Assignment was completed and they let us
10  all go at the same time.
11  Q.   So your testimony is there was
12  nothing related to your performance that
13  caused you --
14  A.   No.
15  Q.   -- to be let go from there?
16  A.   No, uh-uh.  Walker Personnel
17  called me and told me that we had
18  completed our assignment.
19        (Whereupon, Defendant's
20        Exhibit 13 was marked for
21        identification.)
22  Q.   Can you identify Exhibit 13
23  for me?

Page 106

1  A.   Yes.  Looks like an
2  introductory to a new job, introduction to
3  new job and how much I will be making.
4  And I signed and dated it.
5  Q.   Is that your signature date of
6  April 11th of '05?
7  A.   Yes, it is.
8  Q.   Okay.  It says start date of
9  April 11th, 2005.  Is that consistent with
10  your recollection?
11  A.   That's exactly right.
12  Q.   Was that your starting salary,
13  fourteen forty-six?
14  A.   Yes, it was.
15  Q.   Okay.  When you started
16  working, was there a period of time where
17  you were being trained or -- tell me about
18  kind of your job assignments throughout
19  the --
20  A.   Well, when I first got there,
21  we wasn't making cars, so we had -- we
22  were practicing on dummy cars, so that was
23  our training right there.

Page 107

1  Q.   Okay.  And then what was your
2  -- what area were you initially assigned
3  to?
4  A.   PDI light repair.
5  Q.   Was that the same area you
6  were assigned to throughout the time you
7  worked there?
8  A.   Yes, I worked in the same
9  department the whole time.
10  Q.   Okay.  What does PDI light
11  repair do, if you are explaining it to a
12  lay person?
13  A.   Okay.  They make repairs on
14  the car while the line is moving.  When
15  the production line is in the process of
16  moving, you are -- every day when you come
17  to work, your team leader will assign you
18  to a specific duty, and that's what you
19  do.  And I was assigned to flushing and
20  gapping the right side doors on the cars.
21        When I got there, there was a
22  board that had one through ten.  Number
23  one means that -- number one meant that

Page 108

1  that item had the most problems.  Like the
2  right side doors?  That was number one.
3  In other words, we was having so many
4  write-ups -- quality write-ups, it was
5  terrible.  But when I came in, after about
6  a month I became so good on it that it was
7  no longer an issue.  But there were people
8  doing it before me, and they couldn't do
9  it.  So I came in and I was great at it
10  and I was good at it.  And that's where I
11  was assigned ninety-nine percent of the
12  time is right there on those doors.
13  Q.   What does PDI stand for?
14  A.   You know, I don't even
15  remember, but I'm sure they told me.
16  Q.   So I guess help me -- a car
17  comes in to PDI.  What's the difference
18  between it from when it comes to you and
19  when it leaves?  Are you actually
20  assembling a door onto it or --
21  A.   Okay.  If I can remember
22  correctly, when the line stops working, we
23  go to the back -- or after the shift is

27

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 109

1 over, we will go to the back and work
2 another two hours. We are repairing cars
3 that we couldn't make -- didn't have time
4 to make repairs to on the line. Because
5 the line is constantly moving. You only
6 get a short amount of time to make those
7 repairs.
8        If for some reason you can't
9 make that repair or if it's a difficult
10 repair, the car is taken to the back and
11 parked in a row. And at the end of the
12 shift, we will go back there for the
13 remaining two hours and complete those
14 repairs, as many as we can get out in that
15 day to keep the cars from being
16 overstocked and trying to get them through
17 the plant and get them out for sale.
18        But when you go to the back --
19 you will be changing bumpers, taillights.
20 That's where you get your training when
21 you go to the back, because you will be
22 doing anything, universal.
23     Q.    Okay. So what specifically --

Page 110

1 you said there was something you were
2 doing ninety-nine percent of the time.
3     A.    Yeah.
4     Q.    What was it you were doing?
5     A.    Flushing and gapping the right
6 side doors.
7     Q.    What does that mean, flushing
8 and gapping?
9     A.    Okay. When a car comes down
10 the line, you know, the machine -- well,
11 the guys put the doors on. The front door
12 will be a little bit higher than the back
13 door. You know when you open the car up,
14 there is a little gap in between? Well,
15 the door will be sitting up higher -- you
16 know, where your window is, where your
17 glass is? It will be sitting up a little
18 higher than the other one. And I get a
19 hammer and striker, a rubber hammer with a
20 metal striker with a little tongue like
21 that (indicating). And when you open the
22 door, that little round bar sticks out.
23 And I hit it and get the door flush. And

Page 111

1 you have to have it within a certain gauge
2 level. And they have a little gauge. You
3 do the back door the same way.
4        And I also had to adjust the B
5 pillars. If they were sticking out -- the
6 front windshield sticking out over the
7 back windshield, you have to kind of bend
8 it in. And the bottom of the door would
9 sometimes be a little bit curled under.
10 This is the back door, and the front door
11 would be a little bit curled under, so I
12 have to get my hammer and pull it back
13 down even to make it look good. You know,
14 make it look flush, all -- flush the doors
15 and make them look smooth. That's what I
16 did ninety-nine percent of the time.
17     Q.    Okay. Is there somebody who's
18 doing the same thing you are but to the
19 left door?
20     A.    Yes, on the other side. But
21 they will swap them out two or three times
22 a night because they couldn't get it
23 right.

Page 112

1     Q.    Who were the people who were
2 doing that?
3     A.    One guy was Fonzy. One of
4 them was Gary Myers. And Bobby, Travis
5 and -- there was about four guys, but they
6 never bothered me. They let me stay on
7 that one side because I was good at what I
8 did.
9     Q.    Okay. And then Reggie Johnson
10 was your team leader, right?
11     A.    Yes, he was.
12     Q.    Was he your team leader
13 throughout the time you worked at Hyundai?
14     A.    When I first came there, I
15 believe Patrick was my team leader for a
16 short while, and he went -- got promoted
17 to group leader. Then they moved Reggie
18 Johnson up. Reggie was in the process of
19 being trained by -- Patrick was my first
20 team leader, I believe, and then he got
21 promoted to group leader. And then Reggie
22 Johnson became team leader. But I was
23 under Reggie for -- I mean Patrick for a

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 113 to 116)

Page 113

1    short time.
2        Q.    Okay.  And what is Reggie's
3    race?
4        A.    He is black.
5        Q.    Okay.  And did you get along
6    working with Reggie?
7        A.    No problems.
8        Q.    When we come back from lunch,
9    I know that we have a couple of incidences
10   in like November I think of 2006 --
11       A.    Yes.
12       Q.    -- we are going to talk about.
13   I'm trying to -- before that time, in your
14   working with Reggie, had you had any
15   problems with him?
16       A.    No.
17       Q.    Okay.  Do you contend that he
18   made any racist statements to you or made
19   any racially derogatory comments to you
20   during the time you worked there?
21       A.    Not to me, no.
22       Q.    Okay.  Are you aware of him
23   making any racist statements maybe to

Page 114

1    someone else?
2        A.    No.  Reggie Johnson, no.
3        Q.    Okay.  Prior to these
4    incidences in November, had you had any
5    run-ins with Scott Weddington?
6        A.    No.
7        Q.    Okay.  Had you had any
8    arguments with him prior to that time?
9        A.    No.
10       Q.    Had you ever had him say
11   anything racist to you or derogatory?
12       A.    Not to me.
13       Q.    Okay.  Do you know of someone
14   who claims that Weddington had made racist
15   or derogatory statements to them?
16       A.    I overheard Lisa Chumney make
17   a comment that Scott was rude to the
18   Koreans and he talked about the Koreans
19   all the time.  And I heard him call them
20   slant-eyes and said that they needed to
21   leave the plant, that they didn't need to
22   be here -- here in the plant.  I overheard
23   him say that.

Page 115

1        Q.    You heard Scott Weddington say
2    that?
3        A.    Yes.
4        Q.    When was that?
5        A.    When I was employed with HMMA.
6        Q.    Can you be more specific than
7    that?
8        A.    It was during the time when I
9    was working at Hyundai.  I don't know
10   exactly when it was.
11       Q.    Where were you in the plant
12   when you heard this?
13       A.    I was in the PDI area.
14       Q.    How big is the PDI area?
15       A.    It's a pretty good size area.
16   It's pretty big.
17       Q.    As big as a football field, if
18   not bigger, isn't it?
19       A.    Yeah, but you work in a
20   confined area.
21       Q.    Where within PDI were you?
22       A.    Oh, where we repair the cars,
23   where we make the repairs.

Page 116

1        Q.    Who else was with you that
2    would have heard this statement?
3        A.    I don't recall.  I don't
4    recall.
5        Q.    Tell me what you recall fully
6    about that conversation.
7        A.    Oh, I know where I was at.  We
8    had to work out in the PDI area.  It's
9    another area past the car wash area, I
10   forgot the name of it.  But anyway, you
11   are on the assembly line and the cars are
12   moving.
13            And the Koreans want everything
14   exactly right.  And I saw one of the
15   Koreans get to arguing with another
16   manager named -- I can't recall his name.
17   They had a real bad verbal altercation.
18   And he was standing over there.  And as he
19   was walking by with that manager, he
20   called him slant-eyes and they needed to
21   get out of here and go back to where they
22   came from because they just wanted
23   everything exactly right.  I overheard him

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 117

1  telling the other manager that after the
2  heated argument. And I was working on the
3  car as both of them was walking by. And
4  he said let's go to the office and I will
5  buy you a soda. The other one told Scott
6  he would buy him a drink.
7  Q. Who was the manager?
8  A. You know, I have his name
9  probably somewhere at home. But he is
10  still there now. He is a blond-haired
11  guy. What is his name? Craig something.
12  It's Craig something. He got into a
13  heated argument with that tall dark-haired
14  Korean. And that Korean is a plant
15  manager also.
16  Q. Do you know what that person's
17  name is?
18  A. I forgot. I used to know it.
19  He is a real nice gentleman.
20  Q. Is it your testimony today
21  that you heard Scott use the word
22  slant-eyes?
23  A. Yes, uh-huh. He said they

Page 118

1  need to get out of the plant. And also he
2  said they were dumb and stupid.
3  Q. Did you ever see any other
4  interaction with Scott Weddington where he
5  said or did something that you contend was
6  racist or derogatory? I understand --
7  other than your particular incident that
8  we will talk about --
9  A. Well, I heard him tell Reggie
10  one day when everybody was on the line
11  working what are y'all standing around
12  here with your thumbs up your a-s-s for?
13  And I thought that was, you know, uncalled
14  for.
15  Q. Who would have heard that
16  statement?
17  A. Well, he told Reggie Johnson
18  -- he told Reggie Johnson that, he got on
19  to him and told him -- told him what are
20  y'all standing around here with your
21  thumbs up your A for, like that. And I
22  overheard it, I was on the line working.
23  Q. Who else was there?

Page 119

1  A. I don't recall. I don't know.
2  I mean, everybody was on the line working.
3  All I know is what I heard, that's all I
4  know.
5  Q. Any other derogatory comments
6  you are aware of regarding Mr. Weddington?
7  A. As far as I can remember right
8  now, that's all right now.
9  Q. Okay. But he has never used
10  the N word in your presence, has he?
11  A. No, I have never heard him say
12  the N word.
13  Q. I mean, are you aware of him
14  saying anything in your presence that was
15  a racist remark?
16  A. Yeah, when he called the
17  Korean slant-eyes, I think that's racist.
18  Q. Okay. Other than that?
19  A. That's about it.
20  Q. Okay. Did you have any
21  interactions with Lisa Chumney prior to
22  November when you had this interaction
23  with her?

Page 120

1  A. What do you mean when you say
2  interaction?
3  Q. Well, you know that she had --
4  there was a time you were in a break room
5  on November 28th, I believe --
6  A. Yeah.
7  Q. I mean, you know she went and
8  made a complaint about you, don't you?
9  A. She didn't make a complaint.
10  Q. Okay. But you are aware there
11  was an investigation into y'all's -- the
12  interaction between you and her?
13  A. Uh-huh.
14  Q. But prior to that time, did
15  you have any interactions with her that --
16  A. I have never had any
17  interactions with her that would cause her
18  to file a complaint against me at all.
19  Q. Y'all didn't have any problems
20  with each other?
21  A. No.
22  Q. You never heard her make any
23  racist statements or anything like that?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 121

1    A.    No.  Just only heard her
2  criticize Scott and how he treated the
3  Koreans.
4    Q.    Okay.  And that was her saying
5  that she thought Scott was rude to the
6  Koreans?
7    A.    Yes.
8    Q.    Anything else she said more
9  specific than that?
10    A.    She just said he was rude to
11  them.
12    Q.    Okay.  And you don't remember
13  anything else specific she said other than
14  that?
15    A.    Just overheard her say that.
16        (Whereupon, Defendant's
17        Exhibit 14 was marked for
18        identification.)
19    Q.    Can you identify Exhibit 14
20  for me, please?
21    A.    Do you want me to go ahead?
22    Q.    Yes, tell me what it is.
23    A.    Yes, this looks like it is a

Page 122

1  quality of work sheet.
2    Q.    Is that --
3    A.    Job performance.
4    Q.    Is that your signature?
5    A.    Yes, it is.
6    Q.    Did you agree with the ratings
7  you got?
8    A.    No, I didn't, but I signed it
9  anyway.
10    Q.    Okay.  Why did you disagree
11  with them?
12    A.    Because I had perfect
13  attendance and my skills were real
14  exceptional, because I took on a job that
15  nobody else could do.  It was number one
16  on the board.  And after being on it a
17  month, it was no longer an issue.  And
18  people would argue -- the quality people
19  that would check my work, they would argue
20  about who would be on my side of the car,
21  because they knew they wouldn't have to
22  write up that many doors.  They would have
23  an easy night because I did such an

Page 123

1  exceptional job of what I did.  And they
2  would argue about who wanted to grade my
3  side of the car.
4        And flexibility, I should have
5  received higher marks than that.
6  Communication skills should have been
7  better than that, because I didn't do a
8  lot of talking, I just did the job.  And
9  teamwork, I got along with all of my team
10  members.  I didn't deal with any customer
11  service -- well, I guess I did.
12        When the Koreans would come
13  through the plant and they would show how
14  the process was being done, they made sure
15  they brought them on my side of the car,
16  because I performed the best job and they
17  wanted to show them how well that the job
18  was being done.  They wanted to give them
19  the best possible look at how it was
20  supposed to be done.
21    Q.    Would there be times where you
22  would rotate from the job you were in to
23  other positions?

Page 124

1    A.    Very rare.  Very rare.  It
2  would happen.
3    Q.    So is it your testimony your
4  skills were pretty much limited to just
5  the one aspect of this flushing the
6  doors --
7    A.    No, it wasn't limited.  I knew
8  how to do everything.
9    Q.    Well, how did you know how to
10  do everything if you weren't rotated
11  around to other jobs?
12    A.    When the line would stop after
13  eight hours, we would go to the back and
14  work and make all repairs for two hours.
15  Remember when I told you that?
16    Q.    Okay.  So you would have had
17  the ability to do various different job
18  duties on the line?
19    A.    If given the proper tools to
20  do it, yes, I could.
21    Q.    Okay.  And so were there times
22  when someone would be out sick and you
23  might need to fill in for them in a spot?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 125

1    A.    That was Reggie's decision,
2  not mine.
3    Q.    Okay.  So did you have
4  problems performing the functions of other
5  assigned positions as compared to the one
6  that you were in ninety-nine percent of
7  the time?
8    A.    No, I did not.
9    Q.    So as far as you were
10  concerned, you were qualified, given the
11  right tools, to do any job out there?
12    A.    That's exactly right.
13    Q.    So I guess -- did you -- you
14  didn't feel like there was something -- so
15  if somebody came out and said we need you
16  to do this aspect of the job today, you
17  felt fully qualified to do whatever aspect
18  they were asking you to do?
19    A.    Yes, I did.
20    Q.    Okay.  So you don't have any
21  contention here that by asking you to do
22  one job versus another or another was
23  setting you up for failure?

Page 126

1    A.    Only if I am given the proper
2  tools, I can do anything.
3    Q.    Okay.  If you have the proper
4  tools, you are going to be able to do
5  whatever they ask you to do out there?
6    A.    Yes.
7    Q.    Okay.  How often would you see
8  Mr. Weddington in the plant during the
9  time you worked there?
10    A.    Whenever the line would stop
11  for some reason, he would call us and make
12  us all go to the back and make repairs.
13  So as long as the line was moving, you
14  would see him periodically.  But if the
15  line stopped, he would come through there
16  and make sure that everybody went to the
17  back and started making repairs on the
18  cars that were parked that needed to be
19  worked on.  So probably in a day's time,
20  probably about three or four times a day,
21  if not more.  Maybe six or seven.  It
22  depends on how we are running.
23    Q.    I guess prior to November of

Page 127

1  2005, give me your best estimate of the
2  number of times you had a conversation
3  with Scott Weddington there at the plant.
4    A.    Prior to what now?
5    Q.    To November of 2005 when --
6    A.    Never.
7    Q.    You had never spoken to him
8  prior to that time?
9    A.    He introduced himself when we
10  came to the plant, and that was it.  Never
11  had any other conversation with him.
12    Q.    Okay.  Would he come and give
13  you a specific direction on a job you were
14  doing?
15    A.    No, that was Reggie Johnson's
16  job to do that.  Reggie assigned us to our
17  jobs every day.  We would have a meeting
18  at the beginning of the shift, and then he
19  would put every person where he wanted
20  them to work.
21    Q.    Okay.  That's Reggie that was
22  doing that?
23    A.    The team leader, that's his

Page 128

1  job.
2    Q.    So had you ever been called
3  into the office to speak with Scott prior
4  to, you know, November 22nd when this
5  stuff goes on with Reggie?
6    A.    No.
7    Q.    Had he ever come and said you
8  are not doing anything -- this particular
9  task correctly?  I mean, anything where
10  Scott is giving you some direction on your
11  performance?
12    A.    No.
13    Q.    Okay.  Do you know whether or
14  not he knew what your name was on November
15  22nd when Reggie comes to him?
16    A.    Yeah, because when he got
17  there, he called my name.
18    Q.    Okay.  But, I guess, had he
19  passed you in the plant prior to that time
20  and said hello or --
21    A.    No.
22    Q.    Okay.  And so it sounds like
23  he -- there is probably at least two to

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 129

1  three levels of supervision between him
2  and you, right?
3      A.   Eventually when he got
4  promoted, yes.
5      Q.   Right, okay.  And so do you
6  have any idea how many people are
7  underneath his supervision?
8      A.   I don't have a clue.  I have
9  no idea.
10     Q.   Okay.  Would it be more or
11  less than a hundred?
12     A.   I have no idea.  I don't know
13  his jurisdiction.  I don't know.
14     Q.   Okay.  But prior to November
15  of 2005, to the best of your knowledge,
16  Scott Weddington doesn't have any reason
17  to dislike you prior to that -- whatever
18  happens in --
19     A.   No, no reason whatsoever.
20     Q.   Y'all hadn't had any arguments
21  or altercations, anything like that?
22     A.   No.
23     Q.   Had you made any complaints of

Page 130

1  discrimination during the time you worked
2  at Hyundai prior to this November 22nd/
3  28th time frame?
4      A.   No.
5      Q.   Have there been any job
6  assignments you felt you should have had
7  or promotions, anything like that?
8      A.   No.  I didn't apply for any
9  promotions or anything.  I was happy with
10  what I was doing.
11     Q.   Okay.  And, you know, I guess
12  when you came in were you trained by the
13  HR people on various aspects of the job
14  and I guess given a handbook, that type of
15  thing?
16     A.   Yeah, we was all trained when
17  we came in, yeah.
18     Q.   Okay.  I mean, what was your
19  understanding -- if you wanted to complain
20  about discrimination or something, where
21  should you go?
22     A.   You were supposed to go to
23  Team Relations.

Page 131

1      Q.   Okay.  And I guess -- you
2  hadn't gone to Team Relations and made any
3  complaints of discrimination?
4      A.   No.
5      Q.   Did you ever go to Team
6  Relations and make any complaints about
7  anything, not necessarily discrimination?
8      A.   Yes.  When Reggie Johnson
9  promised me a vacation day three weeks in
10  advance and -- he promised it to me and it
11  was the 17th, and it was like -- we get up
12  at 5:15 in the morning, it was like 4:00.
13  And three weeks prior to that, I went to
14  him once or twice a week and he guaranteed
15  me I would have the day off.  When that
16  day came, I noticed he put another
17  employee's name in that calendar, in that
18  blank space, and it wasn't mine.  And I
19  couldn't get to him.
20          So Marcus Hannah was walking
21  by.  And I never knew him.  And he said do
22  you need anything?  And I said yeah, I
23  want to talk to you about something.  And

Page 132

1  I told him about the vacation day.  He
2  went and got Reggie.
3      Q.   Tell me what Marcus Hannah --
4      A.   Marcus Hannah is the Team
5  Relations investigator.
6      Q.   Okay.
7      A.   He went and got Reggie and
8  brought him down there.  And Reggie told
9  me that I was supposed to have filled out
10  a swap, a half a day's swap.  And I knew
11  in order to get a vacation day, you have
12  to fill out a request form.  They have to
13  approve it.  Okay, I didn't know you have
14  to fill one out in order to get a day
15  moved.  I thought it went by seniority,
16  you know, whatever.  But he reassured me
17  that I had it anyway.  So I --
18     Q.   Who reassured you?
19     A.   Reggie Johnson.
20     Q.   Okay.
21     A.   And so I told -- when I asked
22  him about it, he said someone else had
23  gotten that day.  And I said well, you

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 133 to 136)

Page 133

1 promised it to me. And he said well, I'm
2 sorry. And then I found out it was a guy
3 that had less seniority than me.
4         And then I went to -- then
5 Marcus came by and I told him about it.
6 He brought Reggie down there. And then
7 Michael Ashley came and said I apologize
8 for Reggie not giving you that day, I'll
9 take responsibility for it, it's me and
10 Reggie's fault, you can have that day off
11 tomorrow.
12     Q.   Who said that to you?
13     A.   Michael Ashley.
14     Q.   What is his position?
15     A.   He is the group leader. And
16 he gave me the day off.
17     Q.   Okay. Did Marcus ever get
18 back to you?
19     A.   He was standing right there.
20     Q.   Okay. Other than that
21 situation, was there any times prior to
22 that that you had gone to Team Relations
23 with a complaint?

Page 134

1     A.   That was my first and only
2 complaint that I ever made to Team
3 Relations.
4     Q.   Okay. Did you know -- did you
5 ever have any interaction with Rob
6 Clevenger?
7     A.   He was present at a meeting
8 with him and Audie Swagman.
9     Q.   Okay. Prior to that
10 meeting --
11     A.   No.
12     Q.   That was close to the time you
13 were terminated, right?
14     A.   Well, they had -- Scott had
15 sent me home, fired me, and Audie Swagman
16 called me at home and told me could I come
17 to the plant at 10 that morning the next
18 day. And when I got there, Clevenger and
19 Swagman was sitting in there when I came
20 in. And they asked me what happened, and
21 I told them. No one wrote down anything
22 that I was saying. And he said that you
23 go home, don't tell your wife and kids

Page 135

1 anything, you will be back to work
2 tomorrow. Keep your badge, here is my
3 personal card. If you have any more
4 trouble out of Scott Weddington or Reggie
5 Johnson, call me.
6     Q.   Who told you this?
7     A.   Audie Swagman, and I have his
8 card in my wallet, what he gave me, and I
9 still have my badge to this day. And on
10 my way out of the plant, the security
11 guard, he said son, did they take your
12 badge from you? I said no, sir. He said
13 you've still got your job? I said well,
14 he told me I will be back to work
15 tomorrow. He said he was recommending
16 probation. And he talked about --
17     Q.   Okay. We are going to get
18 into all of this stuff later. I'm trying
19 to figure out before you meet with Swagman
20 and Clevenger around November 29th,
21 somewhere in there, had you had any
22 interaction with them prior to that time?
23     A.   Uh-uh, no.

Page 136

1     Q.   And did you know who they
2 were?
3     A.   I didn't know who they were.
4     Q.   Did they know who you were?
5     A.   I don't know if they knew who
6 I was.
7     Q.   And so I guess you hadn't had
8 any problems with them prior to that time?
9     A.   Never met them before in my
10 life before until then.
11     Q.   Never heard either of them
12 making any kind of racist comments or
13 anything like that?
14     A.   I didn't know Audie Swagman or
15 Clevenger until I met them that one day.
16     Q.   Okay.
17         MR. BOSTICK: It's 11:30 now.
18 Do y'all want to take our break and come
19 back at 1?
20         MS. DICKEY: That will be
21 fine.
22         (Whereupon, the lunch recess
23         was taken at 11:30 a.m. until

34

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 137

1        1:12 p.m.)
2        (Whereupon, Defendant's
3        Exhibit 15 was marked for
4        identification.)
5        Q.    (BY MR. BOSTICK:)  Mr. Smith,
6    can you identify what I have marked as
7    Exhibit 15 for me, please?
8        A.    It looks like the charge of
9    discrimination I filed with the EEOC.
10        (Whereupon, Defendant's
11        Exhibit 16 was marked for
12        identification.)
13        Q.    I guess I will get you to
14    identify Exhibit 16 for me also.
15        A.    This is another description I
16    gave of what occurred to the EEOC.
17        Q.    And is Exhibit 16 filled out
18    in your handwriting?
19        A.    Yes, it is.
20        Q.    Flip to page three of Exhibit
21    16.
22        A.    Okay.
23        Q.    You say -- it says, "Provide a

Page 138

1    brief explanation of discriminatory action
2    taken against you."  And you say,
3    "Suspended for eight days without knowing
4    whether I had a job or not."
5        When did you learn you were
6    being suspended?
7        A.    I was never told that I was
8    going to be suspended.
9        Q.    Then why did you circle
10    suspension on here or state that you were
11    suspended for eight days?
12        A.    Because after talking to Audie
13    Swagman, he said that I was suspended for
14    eight days, that's why he didn't notify
15    me.  He didn't -- I was never told that I
16    was suspended, never.
17        Q.    So Audie Swagman tells you
18    when you meet with him that you had been
19    suspended prior to that time?
20        A.    No, because it was the next
21    day.  I worked that night before.  They
22    sent me home that night, and it was the
23    next morning when he told me to come down

Page 139

1    there.
2        Q.    Okay.  So did Audie Swagman --
3    who did Audie Swagman tell you had
4    suspended you?
5        A.    He never said anybody
6    suspended me.
7        Q.    What are the dates that you
8    contend you were suspended?
9        A.    I was never suspended.
10        Q.    Was there some time you were
11    sent home pending an investigation?
12        A.    No.  Scott sent me home,
13    didn't give me any reason why.
14        Q.    Okay.  He didn't tell you that
15    you were terminated at that time, did he?
16        A.    He said to leave.  And he
17    called security and I left.
18        Q.    Did he take your badge?
19        A.    No.
20        Q.    And you made a big deal about
21    that, that's not a -- so he obviously
22    wasn't terminating you when he sent you
23    home, right?

Page 140

1        A.    Well, I don't know.  I wasn't
2    given an explanation.
3        Q.    Okay.  So then this testimony
4    earlier about the importance of not asking
5    for the badge, that doesn't apply to this
6    conversation?
7        A.    I was speaking about Audie
8    Swagman, the manager -- the Team Relations
9    manager.  He is the one that gives out the
10    disciplinary action.
11        Q.    He would as opposed to
12    Weddington?
13        A.    He is Team Relations manager.
14        Q.    So Weddington would not give
15    out the disciplinary action?
16        A.    No.  He wrote a report and him
17    and Marcus -- Marcus did, and then they
18    passed that along to Audie Swagman.  And
19    then Audie Swagman, he told me he had to
20    go -- he is the one that makes the
21    decision.
22        Q.    He told you he had to go
23    before a committee, right?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 141

1     A.    Right.
2     Q.    Okay.  Did Audie Swagman tell
3  you -- what did he tell you about this
4  committee?
5     A.    He said it was made up of
6  eight people, eight managers.
7     Q.    Eight managers?
8     A.    Uh-huh.
9     Q.    Did he give you any particular
10  names?
11     A.    No.
12     Q.    Do you know what the name of
13  the committee was?
14     A.    No.
15     Q.    As you sit here today, do you
16  know who any of the people on that
17  committee were?
18     A.    Have no idea.
19     Q.    Okay.  You put on here you
20  were -- it says what reasons were given
21  for the actions taken, and you say,
22  "insubordinate and disrespectful."  Who
23  told you that?

Page 142

1     A.    I got a letter from Wendy
2  Warner, and that's what he said.
3     Q.    Okay.  And then you say, "It
4  happened to a white coworker and he was
5  not fired, he was given a different job."
6  What is that referring to?
7     A.    Okay.  I probably didn't word
8  it -- well, it's worded, but -- that's
9  referring to Joshua Groves.
10     Q.    Okay.  Was he given a
11  different job?
12     A.    Yeah, he was transferred from
13  his normal job as a parts man because he
14  was being nonproductive, and he was put on
15  the line with me.  As torquing the doors
16  after I adjusted them, he was tightening
17  up the screws after I hit down and strike
18  them.
19     Q.    Okay.  And then are you saying
20  that he engaged in insubordination and
21  that that was a result of his move?
22     A.    No.  Insubordination took
23  place first when he cursed Reggie and told

Page 143

1  Reggie to kiss his a-s-s, he wasn't going
2  to do anything that Reggie didn't know how
3  to do.  And Reggie called Scott
4  Weddington, and Scott took Joshua in the
5  office and had him write out a statement
6  stating that he did tell Reggie to kiss
7  his a-s-s and he wasn't going to do
8  anything he didn't know how to do.  And he
9  gave him a verbal warning for that.
10         And then, I don't know, several
11  weeks later he was transferred off of his
12  parts running job and put on a line with
13  me because he was being nonproductive.
14     Q.    Okay.  And so did you
15  personally witness Joshua telling Reggie
16  to kiss his ass?
17     A.    Yes, I heard him say that.
18     Q.    Did you report that to
19  Weddington?
20     A.    No, I didn't have anything to
21  do with it.  Reggie reported it to
22  Weddington.
23     Q.    Did you observe any

Page 144

1  discussions between Weddington and Reggie
2  about that incident?
3     A.    I know Joshua was talking with
4  Weddington and he got real loud, and he
5  got loud with Reggie too.  He got real
6  loud when they were having a discussion.
7  You know, he was just loud.  You know,
8  just real loud, screaming.
9     Q.    Listen to my question.  Did
10  you witness any conversations between
11  Weddington and Reggie about Joshua?
12     A.    No.
13     Q.    Okay.  So you don't know what
14  report Reggie made to Weddington, right?
15     A.    No.
16     Q.    Okay.  And so then Weddington,
17  you said he spoke to Joshua.  Where did
18  that meeting take place?
19     A.    In the office.
20     Q.    Okay.  Were you in the office
21  with him?
22     A.    No.
23     Q.    Okay.  Were you somewhere

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 145 to 148)

Page 145

1  where you could see in the office?
2      A.   No.
3      Q.   So when you say Joshua got
4  real loud with him, is that what Joshua
5  told you?
6      A.   No.  I could hear him.
7      Q.   Okay.  Could you hear anything
8  that he said?
9      A.   No, uh-uh.
10     Q.   You just heard it sounded like
11 his voice was raised?
12     A.   Uh-huh, it was.
13     Q.   How do you know whether or not
14 he was asked to give a statement?
15     A.   Who, Joshua?
16     Q.   Yes.
17     A.   Because he told me.
18     Q.   What did he tell you about
19 that?
20     A.   He told me Scott called him in
21 the office and made him write out exactly
22 what he had said to Reggie Johnson.  And
23 then he said that Scott gave him a verbal

Page 146

1  warning.
2      Q.   And then he -- then you are
3  saying at some point he moved -- or Joshua
4  moves a few weeks later from the spot he
5  is working at to another spot?
6      A.   Yeah, put him on the line with
7  me because he was being nonproductive.
8      Q.   Well, wasn't he reporting to
9  Reggie --
10     A.   Still.
11     Q.   So, I mean, it's not like they
12 moved him out from underneath Reggie,
13 right?
14     A.   Right.
15     Q.   Okay.  So in your situation,
16 when Mr. -- when Reggie went to Scott
17 about your situation --
18     A.   Uh-huh.
19     Q.   -- Scott came and moved you
20 out from underneath Reggie for a period of
21 time, right?
22     A.   Well, my attorney worded that
23 wrong -- she -- part of it wrong --

Page 147

1      Q.   Listen to my question.
2      A.   Yeah.  Okay.
3      Q.   Scott Weddington came around
4  November 22nd --
5      A.   Right.
6      Q.   -- when Reggie --
7      First of all, Reggie goes to
8  Scott on November 22nd, calls him,
9  correct?
10     A.   Uh-huh.
11     Q.   And he tells him that you are
12 being disrespectful to him, right?
13     A.   Yeah -- whatever he told him,
14 yeah.
15     Q.   And that you called him a
16 nappy-headed nigger?
17     A.   That's what I heard.  That's
18 what they said.
19     Q.   Do you have any reason to
20 dispute that Reggie did not tell Scott
21 that?
22     A.   I don't know what Reggie told
23 Scott.

Page 148

1      Q.   Okay.  And after that
2  discussion with Scott, Scott moved you
3  over to the paint department, didn't he?
4      A.   He asked me can you go back
5  out and work with Reggie, and I told him I
6  did not want to work under Reggie's
7  supervision anymore, could they transfer
8  me to another department.  And that's what
9  they did.
10     Q.   Okay.  Were you issued a
11 verbal warning as a result of that
12 discussion on the 22nd?
13     A.   Wasn't issued anything.
14     Q.   Were you suspended?
15     A.   No.
16     Q.   So no disciplinary action was
17 taken against you for that?
18     A.   No.
19     Q.   Let's look back at Exhibit 15,
20 if you would.  Do you see the typewritten
21 statement that starts on the second page?
22     A.   Yes.
23     Q.   And it's three pages.  Did you

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 149 to 152)

Page 149

1  type that up yourself?
2      A.  Yes, I did.
3      Q.  Where were you when you typed
4  that up?
5      A.  At home.
6      Q.  Okay.  And you took that with
7  you to the EEOC office?
8      A.  Yes.
9      Q.  Did you put, as best you
10  could, your version of the events in this
11  statement?
12      A.  Yes.
13      Q.  Okay.  Well, let's just go
14  through and talk a little bit about this
15  statement.  This says, "On October 31st, I
16  approached my team leader Reggie Johnson
17  and asked to move a scheduled vacation day
18  from 11/17 to 11/18."  Is that true?
19      A.  That's true.
20      Q.  You say a few days later you
21  note -- and I'm not reading verbatim.
22      A.  Right.
23      Q.  But you say it wasn't on the

Page 150

1  calendar.  And he said -- he reassured
2  you.
3          Do you remember whose name was
4  on the calendar?  Didn't you say --
5      A.  At that time it was blank.
6  The guy had scratched his name out and it
7  was open.
8      Q.  Okay.  You say, "I noticed
9  that someone else's name was written in."
10          Whose name was that?
11      A.  I forgot his name, but he had
12  less seniority than me.  His name was -- I
13  called it earlier.  I will think of it in
14  a minute, but I can't remember right now.
15      Q.  Okay.  Was he black or white?
16      A.  He was white.
17      Q.  Then you said you --
18      A.  Claude.  His name was Claude,
19  that's all I know.
20      Q.  Okay.  You say you talked to
21  Marcus with Team Relations.  Is that
22  Marcus Hannah?
23      A.  Exactly.

Page 151

1      Q.  Okay.  So basically the issue
2  was should you have filled out a piece of
3  paper or not to make the request?
4      A.  I was never told to by Reggie.
5  He told me I had the day.
6      Q.  Okay.  But that was his reason
7  at the start for saying he wasn't going to
8  give you the day, is that how it started
9  out?
10      A.  That's what he told Marcus and
11  me when Marcus approached him and brought
12  him to me.
13      Q.  Okay.  And what did Michael
14  Ashley say about it being their mistake?
15      A.  I told him that Reggie never
16  told me to fill out a form, that I had
17  asked him three weeks prior.  And he said
18  that -- I guess evidently he asked Reggie
19  did Larry ask you for this day three weeks
20  in advance.  He told him yes.  He said
21  well, why didn't you tell him to fill out
22  a form so he could get it?  I'm assuming
23  that's what he told him, you know.

Page 152

1      Q.  It says you had the flu and
2  went home early on the 21st.
3      A.  Uh-huh.
4      Q.  And the 22nd you have this
5  second -- this issue with Reggie.  Tell me
6  about what happened on that day.
7      A.  Okay.  When I came in that
8  day, I went to the doors -- well, Reggie
9  told me he was going to put Bobby doing my
10  job, flushing the right side doors.  He
11  wanted me to back him up.  Any doors that
12  was not fixed properly, he wanted me to go
13  behind him and correct him on both sides
14  of the car.  Okay, so I was -- I had a
15  hammer and a striker, those are the tools
16  you use.  So as the cars was coming down,
17  Reggie walked up behind me and told me,
18  Larry, repair that taillight right there.
19  And I said I don't have the tools to
20  repair the taillight with, and he knew
21  that.  And he said well, hold on a minute,
22  I will get you the tools.
23          So he brought me back a

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 153 to 156)

Page 153

1  Phillips screwdriver.  In order to change
2  a taillight, you have to have a Phillips
3  screwdriver, a ratchet and a socket.  All
4  the Phillips screwdriver will do is take
5  off the plastic panel, you know, the trunk
6  line.  But when you get ready to
7  physically take the light out, you have to
8  have a ratchet and extension.  Okay, he
9  didn't provide me with that.
10      And so Gary came up and said
11  hey, I have the tools to do this with, why
12  are you doing this?  And I said Reggie
13  told me to take the taillight out, and I
14  don't have the tools.  And then he says --
15  and then Gary tells Reggie, you know, I'm
16  doing this job, you know.  And he said no,
17  I want Larry to do it, I want Larry to do
18  it.  He said it in a loud way.
19      By that time I still don't have
20  the tools.  And then Carl walks up and
21  says, you know, why is he asking you to do
22  this taillight?  I said man, I don't know,
23  I don't have any tools.  And then Carl

Page 154

1  made a comment about him, you know -- I
2  don't remember exactly what the comment
3  was, but I think he said something is
4  wrong with him or something like that.
5  And he said I will go and see if I can
6  find you some tools.  And he never came
7  back with any tools.  And I couldn't
8  perform the job.  But I stayed with the
9  car, but I never got any tools.  He never
10  brought me any tools that I needed to
11  change it with.
12      Q.  Okay.  Did you witness Reggie
13  making a call to Scott Weddington?
14      A.  No, I didn't.
15      Q.  Okay.
16      A.  Not that I can remember.
17      Q.  Do you remember if -- would he
18  have a cell phone he could do -- how would
19  he get in touch with Scott Weddington?
20      A.  I don't know.  All of them
21  have cell phones and radios.
22      Q.  Okay.  I mean, could he radio
23  him if he needed to?

Page 155

1      A.  I guess.
2      Q.  Did you raise your voice with
3  Reggie?
4      A.  No, I did not.
5      Q.  Did you tell him that he was
6  -- did you call him crazy during your
7  conversation?
8      A.  No, I did not.
9      Q.  Did you tell him that nobody
10  likes you on this line?
11      A.  No, I did not.
12      Q.  Did you call him a liar or
13  back-stabber?
14      A.  No, I did not.
15      Q.  Did you call him a
16  nappy-headed nigger?
17      A.  No, I did not.
18      Q.  Okay.  What did you tell him
19  during that conversation?
20      A.  I told him I can't repair the
21  car because I don't have the tools to do
22  it with.  And he never brought me the
23  tools.  Never got them.

Page 156

1      Q.  So you never raised your voice
2  at him, is that your testimony?
3      A.  No.
4      Q.  Never used any words that were
5  inappropriate?
6      A.  No.
7      Q.  Never did anything
8  disrespectful is your testimony?
9      A.  No.
10      Q.  Tell me about what you recall
11  about Scott Weddington arriving on the
12  scene.
13      A.  Well, Scott came up -- well, I
14  was -- had my back turned, I was standing
15  at the car.  Scott rode up on a bike and
16  -- well, first of all, I heard yelling and
17  screaming behind me.  And I turned around
18  and it was him, and he was breathing heavy
19  and he had his hands made in a fist.  And
20  he said you get in that office right now.
21  And I looked at him and I said are you
22  talking to me?  And he said yeah, you get
23  in this office right now.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 157 to 160)

Page 157

1    So I went in the office. And
2 he said you sit down right there. So I
3 sat down. And he was outside. Then he
4 came back in. And he said I got four
5 witnesses that heard you call Reggie a
6 name -- something like that, calling him a
7 name. And I said I haven't called Reggie
8 anything. And then he said -- what did he
9 say after that? He said -- I said you got
10 four people not telling you the truth.
11    And he said -- what did he say
12 after that? He said something to the
13 effect that -- he said on my last job, I
14 had a supervisor get shot by a black man.
15 That's what he told me. I said what? And
16 then he said -- I said -- he said I had a
17 supervisor get shot on my last job by a
18 black man. And then he said -- I said
19 what color was the man that got shot? He
20 said white. I said what does this have to
21 do with me? He didn't say nothing. I
22 said that doesn't have nothing to do with
23 me. I never shot anybody in my life. And

Page 158

1 then he said -- and I said --
2    Then I said furthermore, I
3 don't appreciate you disrespecting and
4 yelling at me and coming at me with
5 clinched fists in front of other
6 employees, my coworkers. I said I have
7 never done anything wrong since I have
8 been here. And then he apologized for
9 approaching me that way.
10    Q.   Now, he -- before Weddington
11 had gotten there, had Reggie asked you to
12 go in the office to wait for Weddington to
13 get there?
14    A.   No, no.
15    Q.   Had anybody asked you to go
16 sit in the office?
17    A.   No.
18    Q.   Were you -- how far were you
19 standing away from Reggie when Weddington
20 arrived?
21    A.   All I know -- I don't know.
22 Reggie went to the back. He went to the
23 back. He said stand right here until they

Page 159

1 bring you your car. And he went to the
2 back.
3    Q.   So you weren't up in his
4 personal space?
5    A.   Nowhere around him. Nowhere
6 around him.
7    Q.   You said Scott apologized.
8 What did he say?
9    A.   He said he was sorry for
10 yelling at me and screaming at me and
11 coming at me with clinched fists.
12    Q.   Did he just tell you he had
13 just ridden his bike all the way down --
14    A.   Yes. He said he had rode his
15 bike all the way over there. The part
16 about somebody on his last job getting
17 shot, you know, his supervisor getting
18 shot by a black man, that was wrong.
19    Q.   Can you show me where you put
20 that in your statement in here?
21    A.   I forgot to put that in there,
22 I certainly did. I certainly forgot to
23 put that in there.

Page 160

1    Q.   You knew you were making
2 allegations of race discrimination at the
3 time you filled this out, didn't you?
4    A.   Yes, but I think I had it in
5 another form that I sent in to the EEOC.
6 It is included in another -- I think in
7 another statement that my attorney sent in
8 to the EEOC, it is included in there.
9 It's in the paperwork.
10    Q.   This is what you sat down at
11 your computer and not what your attorneys
12 came up with later, this is what you sat
13 down at your computer and what --
14    A.   My attorneys didn't come up
15 with anything. I told my attorneys what
16 happened.
17    Q.   Yeah, but you are sitting down
18 and spilling your guts for three pages on
19 your story --
20    A.   There is a statement sent to
21 the EEOC where I did say that he did tell
22 me about his supervisor being shot by a
23 black man. There is a statement that was

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 161 to 164)

Page 161

1  turned in to the EEOC that says that.
2      Q.    Did he specifically say shot
3  by a black man?
4      A.    That's exactly what he said.
5      Q.    Was he telling you this in the
6  context that they had zero tolerance
7  policy for workplace violence?
8      A.    No. He said that in front of
9  Reggie and -- in front of Marcus Hannah
10  and Maggie. Nobody was in the office but
11  me and him when this occurred.
12      Q.    Was there some discussion
13  where he used the phrase zero tolerance?
14      A.    Yes, in the presence of Marcus
15  Hannah and Maggie Prestridge.
16      Q.    What did he say zero tolerance
17  for?
18      A.    He said zero tolerance for
19  talking in an aggressive manner to -- at
20  your supervisor and -- what else did he
21  say? Name calling.
22      Q.    Or workplace violence, did he
23  say that?

Page 162

1      A.    He didn't say anything about
2  being violent, not that I recall.
3      Q.    What else was said between you
4  and Scott in this conversation in the
5  office when nobody else was there?
6      A.    And I told him, I said how can
7  you talk to me about zero tolerance when I
8  haven't done anything wrong? I have been
9  lied on. And I said you supposed to
10  investigate something before you accuse
11  anybody of anything. And I said if this
12  company had expressed zero tolerance when
13  you stole that car -- those car parts, you
14  never would be here to talk to me today.
15      Q.    Well, what is that in
16  reference to?
17      A.    He stole -- he stole parts to
18  the car that he -- the company gave him.
19  I saw him do it. He complained that he
20  wanted leather seats instead of cloth
21  seats. He said he wanted seventeen-inch
22  tires and rims. He wanted a six-disc CD
23  player. So he took the car and took it

Page 163

1  and had it repaired and had those changes
2  made without getting any authorization
3  whatsoever from anybody. And later on --
4      Q.    Now, how do you know whether
5  or not he had authorization or not?
6      A.    Because he got escorted out of
7  the plant by security for stealing.
8      Q.    Do you know that for a fact?
9      A.    It was all over the --
10  everybody was talking about it.
11      Q.    So if he had authorization
12  from his supervisor to do these things,
13  you wouldn't have any problem with this,
14  is that what you are saying?
15      A.    He is an example. He is a
16  manager. He is supposed to lead by
17  example. You don't steal from a company.
18  I mean, that's not a good example for us
19  to follow.
20      Q.    What was your purpose in
21  bringing that up to him? Does that have
22  any relevance to your situation?
23      A.    Because he has no -- he has

Page 164

1  no -- it's like they gave him a chance to
2  correct something wrong that he did. And
3  he was coming down on me like -- you know,
4  just coming down on me really hard with
5  the accusation that was made against me
6  and forgot all about what he had done, you
7  know. You know, it's like he is perfect
8  or something, like he never did anything
9  wrong.
10      Q.    So you were going to point out
11  his flaws in this conversation is what
12  you're --
13      A.    No, I told the truth of what
14  he did. And if they were to exercise --
15  when he mentioned zero tolerance to me
16  after what he had done, that was wrong.
17  Because if the company had demonstrated
18  zero tolerance and used zero tolerance
19  policy against theft, he would not have
20  been in there to talk to me and have that
21  conversation, because he would have been
22  terminated like he should have been.
23      Q.    You said you told him you have

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 165

1  been lied upon. Who are you saying was
2  lying?
3      A.   Reggie Johnson.
4      Q.   Okay. Did you say why you
5  thought Reggie might lie against you?
6      A.   At that particular time, I
7  didn't know why Reggie treated me the way
8  he did and asked me to make those repairs
9  without the tools. But after -- after
10 working -- later on I realized why he did
11 that, because I went to Team Relations and
12 reported him for not giving me that
13 vacation day. That's why he retaliated
14 against me. And he was retaliating
15 against me because I reported him and I
16 got that vacation day.
17         And also when we was in there,
18 Scott mentioned to me -- and he is a
19 manager now, he said why did you not come
20 to me about that vacation day? I don't
21 supposed to go to the plant manager about
22 a vacation day. I follow chain of
23 command. I go to my team leader and I go

Page 166

1  to my group leader, and that's exactly
2  what I did, and I went to Team Relations.
3  I have no business going to a plant
4  manager about a vacation day, and I was
5  shocked that he even inquired about that.
6  I was shocked somebody even told him about
7  that.
8          So that lets me know that both
9  of them had a personal vendetta against me
10 because I went to Team Relations and
11 reported what Reggie Johnson had did. Why
12 he knew about it, why he questioned me
13 about it that day, I have no idea. And I
14 found that very strange for a plant
15 manager to ask me why didn't I come to him
16 about a vacation day. I found that very
17 strange.
18     Q.   Was this a full day of
19 vacation or half day?
20     A.   It was a full day.
21     Q.   I mean, how many days of
22 vacation do you get a year?
23     A.   I got -- I think I had three

Page 167

1  personal days and I think I got four
2  regular days. And when they terminated
3  me, I still had three vacation days left.
4      Q.   All right. I mean, let me be
5  clear, it's your contention that Scott
6  Weddington had a personal vendetta against
7  you because you took a vacation day that
8  you had a dispute with about a week
9  earlier?
10     A.   Yeah, because he mentioned it.
11 I mean, you know, why would he ask me how
12 come I didn't come to him? He is way up
13 the ladder. I don't go to the plant
14 manager and ask them about a vacation day.
15 I never went to Scott Weddington about
16 anything the entire time I was employed
17 with HMMA, I never went to him about
18 anything. I was following chain of
19 command.
20     Q.   You didn't have to go to him
21 anyway, because it had been resolved long
22 before that, right?
23     A.   Yes.

Page 168

1      Q.   To your satisfaction? You got
2  what you wanted --
3      A.   Exactly right. And that
4  should have been the end of it.
5      Q.   So do you know what, if
6  anything, Reggie said to Scott Weddington
7  about the vacation day?
8      A.   I don't have a clue.
9      Q.   Okay. So are Scott and you
10 talking in the office and then at some
11 point Maggie and Marcus come in?
12     A.   That's exactly right.
13     Q.   Okay. How long were you and
14 Scott in the office before they came in?
15     A.   I don't recall. I don't
16 remember.
17     Q.   I mean, would you say it was
18 thirty minutes or two minutes?
19     A.   I don't remember. I can't put
20 a time on it. I don't remember.
21     Q.   What do you recall -- is there
22 anything else that you and Scott talked
23 about before Maggie and Marcus arrived?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 169

1    A.    Other than he said he had four
2  witnesses.
3    Q.    Okay.  What do you recall
4  being said when Maggie and Marcus came
5  there?
6    A.    That's when he said about the
7  zero tolerance, and I told him that zero
8  tolerance -- how can you talk to me about
9  zero tolerance when you stole from the
10  company?  And then Marcus and Maggie said
11  oh, no, no, no, like that, and I said it's
12  true, you know.  And I said he needs to be
13  more humble than what he is.  You know,
14  they gave him a second chance and he's
15  going to come at me like that, I never
16  done anything wrong, haven't done anything
17  wrong today.  He needs to be more humble
18  and appreciative of what these people did
19  for him when he is trying to give
20  disciplinary action towards somebody else
21  that's not even been proven guilty on
22  anything when accusation has been made
23  against them.

Page 170

1    Q.    Does Marcus -- and does he go
2  out and talk to the people in the plant?
3    A.    Yes, he does.
4    Q.    Okay.  Do you know who he
5  talked to?
6    A.    I saw him talking to -- I
7  didn't see him talking to anybody that I
8  can remember.  I was in the office and he
9  went outside and conducted that.
10    Q.    Okay.  And you say in here
11  that he was gone about an hour and
12  forty-five minutes?
13    A.    Yes, uh-huh.
14    Q.    What was -- was anybody in the
15  office with you during that time?
16    A.    I was by myself the entire
17  time.
18    Q.    What did Maggie do during that
19  time?
20    A.    Maggie listened and she didn't
21  say anything.  She was in there during the
22  meeting.  But on my way to going -- on my
23  way to the paint shop, when I asked not to

Page 171

1  work under Reggie anymore, she said Larry,
2  you are an intelligent man and I would
3  like for you to take these three days and
4  work over in the paint department, and I
5  would like for you to come back in PDI
6  because you are a good worker and I don't
7  want to lose you.  And I told her my mind
8  was made up.  She said just think about it
9  for me.  And I said okay, I will think
10  about it.
11    Q.    Okay.  So what is Maggie -- is
12  it Maggie Prestridge, is that right?
13    A.    Prestridge, yes.
14    Q.    What was her position?
15    A.    She was a manager too.  I
16  don't know if she is assistant plant
17  manager or a regular manager.  She is a
18  manager.
19    Q.    Is she in your line of
20  supervision?
21    A.    Yes, she is.
22    Q.    Okay.  Where does she fit in
23  in that?

Page 172

1    A.    She might be underneath the
2  plant manager as the assistant manager,
3  I'm thinking, in that area.
4    Q.    Underneath Weddington?
5    A.    I would think so.  I could be
6  wrong.
7    Q.    Okay.  Did Maggie or Marcus
8  say anything during that meeting that you
9  felt was inappropriate?
10    A.    No.  I felt like that they
11  didn't tell Scott to stop yelling and
12  screaming at me when I asked them to tell
13  him to get himself under control, because
14  he was the only one talking loud and
15  screaming.  Everybody else was conducting
16  themselves right.  And he was the only one
17  out of control.  And I asked them would
18  they tell him to calm down, and they
19  didn't say anything, you know.
20    Q.    And so Marcus -- does Marcus
21  come back in to you and is there a meeting
22  again at some point?  I mean, you are
23  sitting in there by yourself.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 173 to 176)

Page 173

1    A.    Uh-huh.
2    Q.    What's the next thing that
3  happened?
4    A.    The next thing that happened
5  was Scott comes in and asked me can you go
6  back to work with Reggie? I said I don't
7  want to work for Reggie anymore, can I be
8  transferred? And he said okay, I will
9  find you a place to work. And he left me
10  in there again and came back and told me
11  to go in the paint department for three
12  days and report back to him Monday
13  morning. And they was trying to find me
14  another position somewhere in the plant
15  where I would not have to work for Reggie
16  anymore. That was the process that was
17  going on to move me.
18    Q.    Okay. And Marcus is the one
19  that tells you this, is that right?
20    A.    No, Scott is the one that told
21  me that.
22    Q.    Okay. Scott is the one that
23  told you that?

Page 174

1    A.    Uh-huh.
2    Q.    What is Marcus' race?
3    A.    He is black.
4    Q.    Okay. So who did you report
5  to during the three days you were in the
6  paint department?
7    A.    It was a black supervisor, I
8  don't know his name. I don't remember
9  him.
10    Q.    So in this conversation you
11  are saying that you don't want to work --
12  report to Reggie anymore, is that right?
13    A.    That's exactly right.
14    Q.    What did you tell him about
15  why you didn't want to report to him?
16    A.    Because there had been like
17  four other people that had reported him.
18  He threatened two other employees' jobs,
19  Shane and Billy, and they reported him to
20  Team Relations. And I don't know what the
21  outcome was. And I saw him disrespect the
22  tall -- a big, tall, young white guy which
23  is about six six, about three hundred

Page 175

1  pounds, his name is James, which he can
2  just snap you in half. I saw him be very
3  rude and disrespectful and make fun of him
4  in front of me and another employee, I
5  can't call her name, and he came to me
6  about it. And I told him just to ignore
7  him and if he does it again, just go
8  report him.
9    Q.    To Team Relations?
10    A.    Yes, that's what I told him.
11    Q.    What race is Shane?
12    A.    He is white.
13    Q.    What about Billy?
14    A.    He is black.
15    Q.    And then James?
16    A.    He is white.
17    Q.    Okay. And these are -- you
18  are saying these are guys who are having
19  difficulty with --
20    A.    With Reggie Johnson.
21    Q.    Okay. And so, I mean, are
22  you -- what exactly are you taking from
23  the fact that they are having difficulty

Page 176

1  with him?
2    A.    Well, they came -- these
3  people came and told me what he was doing
4  to them. See, a lot of people confided in
5  me out there, because I am a Christian, I
6  am a good person. I'm not perfect. But
7  they came and told me these things. But I
8  witnessed the incident with James, I heard
9  him insult that young man. But Billy told
10  me that him and Shane had reported Reggie
11  because he threatened both of their jobs
12  and they didn't do anything wrong.
13      And I saw a pattern going on,
14  and he was like just going around and
15  having conflicts with everybody. And the
16  department was in an uproar and everybody
17  was dissatisfied with him. There were
18  numerous conversations about that he was
19  not managing the line properly and he was
20  not giving people tools to do their job.
21  Bobby in particular, a couple of occasions
22  he came to me and said that Reggie never
23  provided him with the tools he needed to

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 177 to 180)

Page 177

1  do the job with.
2      Q.    So did Shane or Billy or
3  James, did any of them ever get
4  terminated?
5      A.    No, uh-uh.  But I heard Bobby
6  quit.
7      Q.    Is it Bobby or Billy?
8      A.    Bobby.
9      Q.    Or is that the same person?
10     A.    No, Billy and Bobby is two
11  different people.  Billy is black.  Bobby
12  is white.
13     Q.    Why did Bobby quit?
14     A.    I don't know.
15     Q.    Had he had similar kind of
16  problems with Reggie's --
17     A.    Reggie would never provide him
18  with the tools.  He always complained that
19  Reggie promised -- he approached Reggie
20  several times about tools, and Reggie
21  never gave him any tools.  He always came
22  and told me he just won't give me any
23  tools to work with.

Page 178

1      Q.    So from what I'm hearing you
2  say is that you are seeing that there are
3  several people in the department who don't
4  like his management style or are having
5  problems with him, right?
6      A.    Right, right.
7      Q.    So when you are asking to get
8  out, is it that kind of concern or are you
9  thinking he has a personal vendetta for
10  you at this --
11     A.    Personal vendetta against me
12  because I reported him about that vacation
13  day.  And I had never had any problems
14  with Reggie Johnson whatsoever until I
15  went to Team Relations about that vacation
16  day.
17     Q.    Okay.  So they come back in
18  the office and they tell you that they are
19  going to put you in the paint department?
20     A.    Yes.
21     Q.    Okay.  Did somebody walk you
22  over to the paint department?
23     A.    Maggie Prestridge.

Page 179

1      Q.    Okay.  And that's when she
2  tells you she would like for you to come
3  back?
4      A.    Right.
5      Q.    Okay.  What did you say to her
6  in response to that?
7      A.    I told her I didn't want to
8  work underneath him but I would think
9  about it.
10     Q.    Okay.  Were there any other
11  conversations that day between you and
12  Scott and -- or Maggie or Marcus that we
13  haven't talked about already?
14     A.    No.
15     Q.    Okay.  And so your
16  understanding as you are walking over to
17  the paint department is you are going to
18  be over there temporarily --
19     A.    Right.
20     Q.    -- they are going to look for
21  somewhere out from under Reggie to put
22  you?
23     A.    That's exactly right.

Page 180

1      Q.    And you would have been
2  satisfied with that move if you had gotten
3  it?
4      A.    Yes, I would have.
5      Q.    Okay.  I guess the next thing
6  is we have Thanksgiving holidays?
7      A.    Yes.
8      Q.    You work in the paint
9  department?
10     A.    Uh-huh.
11     Q.    Is there any interaction with
12  anybody involved in that -- those three
13  people while you are in the paint
14  department?
15     A.    No.
16     Q.    Okay.  What's the next
17  incident that comes up?
18     A.    Well, I came to work Monday
19  and worked and -- I had the flu, I came on
20  anyway.  The doctor sent me home because
21  he said that he had to send a whole line
22  home with the flu.  And he told me to
23  hurry up and get out of there because he

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 181

1  didn't want me to infect everybody.  So I
2  went home and came back the next day.
3       I was told to report to the PDI
4  office -- wait a minute, now, let me make
5  sure.  Let me get this right now, hold on.
6  Yeah, that's right.  And I was told by
7  Scott to report to him in the PDI office,
8  and I did.  He told me that I was going to
9  be working on the other line adjacent to
10 our normal line.  This is our trim line
11 four, I believe, and they put me on three,
12 putting me on screws on a battery or
13 something.
14      But before I went there, he
15 told me where I was going to be working,
16 he told me to go get your stuff.  So I
17 went and got my gloves.  On the way to get
18 my gloves, Lisa Chumney approached me.  I
19 was going this way to the break area and
20 she was going this way (indicating).  And
21 she said Larry, what are they getting
22 ready to do to you?  And I just kept
23 going, I ignored her, you know, I didn't

Page 182

1  say anything to her.  And then when I got
2  to the break area, I turned around and she
3  walked up on me again, and she said what
4  are they getting ready to do to you?  I
5  said Lisa, just leave me alone, and I
6  said I heard what you said about me that I
7  should be fired, a friend of mine that was
8  concerned told me what you said about me,
9  and I said leave me alone.  She said I
10 didn't say anything about you.  I said
11 well, I believe him.  And I told her I
12 believed him, and then I walked away from
13 her.
14      And then she went back on the
15 line and -- I think she went back on the
16 line and worked a few minutes, because I
17 was standing over there getting my stuff
18 and just waiting.  And then she came back
19 a few minutes later and approached me
20 again, asked me who told me that.  And I
21 told her I'm not going to tell you.  And I
22 turned and walked away from her.  And then
23 all of a sudden I get called to the office

Page 183

1  by -- well, one of the team leaders.
2       One of the team leaders take me
3  to the office, and Scott is in there and
4  Marcus is in there.  And Scott is holding
5  a piece of paper, a yellow piece of paper
6  like you have, and he says that Lisa
7  Chumney had wrote a statement and said
8  that I had stepped toward her.  And I said
9  what do you mean stepped toward her?  And
10 he said well, you made -- what did he say?
11 He said you made a threatening move toward
12 her or a violent move or something like
13 that.
14      I said can I see that statement
15 that she wrote in your hand, can I read
16 and see if she said that about me, because
17 I haven't done anything.  He wouldn't let
18 me see it, he wouldn't let me read it.
19 And Marcus Hannah was right there.
20      Q.   Who all was in the office?
21      A.   Me and Scott and Marcus
22 Hannah.
23      Q.   Anybody else?

Page 184

1  A.   Karen.  Karen was in there
2  too.
3       Q.   What is Karen's last name?
4       A.   I don't know.
5       Q.   What was her job?
6       A.   She was team leader.
7       Q.   Okay.  All right, let me --
8  let me fill in a couple of pieces.
9       You had met with Scott earlier
10 and he told you you are going to be moving
11 to trim line three, is that right?
12      A.   All I know is they assigned me
13 to work there that particular day.  It was
14 not going to be my permanent home.
15      Q.   Okay.  Now, would trim line
16 three report to Reggie?
17      A.   I was under Scott's -- well,
18 he introduced me to the other team leader.
19 I forgot his name.  That's who I was
20 under.
21      Q.   But not Reggie?
22      A.   Not Reggie anymore.  It was
23 another team leader.  I forgot his name.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 185 to 188)

Page 185

1 He was the one that escorted me to the
2 office with Marcus and Scott.
3     Q.    Okay.  So do you know what
4 that team leader's name is?
5     A.    I have no idea.
6     Q.    Did Scott say anything about
7 whether or not that was going to be a
8 permanent assignment or not?
9     A.    He didn't say it was
10 permanent.
11     Q.    Okay.  Did he say it was
12 temporary?
13     A.    He didn't say.
14     Q.    Okay.  Did y'all have any
15 discussions about Reggie during that or
16 whether or not you would be willing to
17 report to him again?
18     A.    No discussions whatsoever.
19     Q.    Okay.  Were you fine with that
20 assignment?
21     A.    I would have been fine with
22 it, yes.
23     Q.  . Okay.  So where are you in the

Page 186

1 plant when you first run into Lisa
2 Chumney?
3     A.    I am on my way out to the PDI
4 office to get my gloves to work with.  And
5 she was walking the opposite direction of
6 me and she asked me what were they going
7 to do with me.  And I ignored her and I
8 kept going.  I purposefully ignored her.
9     Q.    Did you know her by name at
10 that time?
11     A.    Yes, I knew her name.
12     Q.    I mean, would you consider
13 yourself friends with her?
14     A.    Never had that much
15 conversation with her.  Just -- she just
16 checked my doors, you know.  She was the
17 person that checked my doors.  We
18 communicated about the job, that was about
19 it.
20     Q.    And I guess when she is asking
21 you this, you had been in the paint
22 department for several days.  Was she on
23 your line --

Page 187

1     A.    She was on my line, yeah, when
2 I was doing the doors, yes.
3     Q.    When you were reporting to
4 Reggie?
5     A.    Yes.
6     Q.    Okay.  So she sees you are not
7 on the line for a couple of days and
8 asking, you know -- she said are you going
9 to come back to our line or something like
10 that?
11     A.    No.  She said what are they
12 getting ready to do with you?
13     Q.    Okay.  So who is this person
14 that told you that Lisa Chumney said that
15 she wanted you to get fired?
16     A.    He said that -- he told me
17 that she said I should be fired.  And she
18 wasn't even around when those allegations
19 were charged against me, she wasn't even
20 in the vicinity to make a comment like
21 that.  And then -- and I tell you the
22 reason he told me that --
23     Q.    Who is he?

Page 188

1     A.    Larry Nichols.
2     Q.    Who is that?
3     A.    He is a team leader.  He is
4 under Arthur Artis' supervision.  That's
5 his team leader, Arthur Artis.
6     Q.    Okay.
7     A.    The night that they sent me to
8 the paint department to go to work, the
9 first night, I came back because I left my
10 lunch on the rack.  We all eat in a
11 specific area right close to our job.
12 Lisa Chumney sits at this table with her
13 everyday friends, and there is a table in
14 the middle and I sit over here
15 (indicating).  The first night they
16 transferred me to the paint department,
17 she got up from her table and came two
18 tables over and sat right next to me and
19 asked me what was they going to do with
20 me.  And she said what happened?  And I
21 said Reggie lied on me.  And Larry winked
22 at me and says -- (indicating).  So I cut
23 it off.  And so she got up and left.  And

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 189

1    then he told me what she had said.
2            Then the following Tuesday when
3    I reported to Scott and I was on my way
4    out of the PDI office to get my gloves,
5    she approached me again.  Then she
6    followed me to the coat rack and asked me
7    again.  Then she went on the line and
8    while I was standing there waiting, she
9    came back a fourth time and asked me who
10   told me that.  And I said no.  And, see,
11   she was harassing me.  And before I left
12   out of the PDI meeting with Marcus Hannah
13   and Maggie Prestridge and Scott
14   Weddington, he told me not to discuss
15   anything with anyone.  Marcus Hannah told
16   me that.
17       Q.    Okay.  So going back to the
18   22nd, other than you and Reggie, who would
19   have been in the vicinity that could have
20   seen what was going on between the two of
21   y'all?
22       A.    I don't know.  I don't know if
23   anybody was looking or whatever.  I have

Page 190

1    no idea.  I have no idea.  I wish I could
2    tell you, but -- because it would prove
3    that she was following me and harassing
4    me, but I wish I had someone to tell you
5    that --
6        Q.    Listen to my question.  I'm
7    talking about you and Reggie, not you and
8    her.
9        A.    I'm sorry.
10       Q.    You and Reggie, you know,
11   y'all have the interaction on the 22nd?
12       A.    Uh-huh.
13       Q.    Okay.  And Scott comes up on
14   his bike later?
15       A.    Uh-huh.
16       Q.    Prior to Scott getting there,
17   is there anybody that you could point to
18   and say this person was there and could
19   have heard what was going on?
20       A.    Between me and Reggie?
21       Q.    Yes.
22       A.    Carl Tyrus was there.
23       Q.    Okay.

Page 191

1        A.    Gary Myers, he was there.
2        Q.    Anybody else?
3        A.    Joshua, he told me he he --
4    Joshua, Joshua Groves, he was there.
5        Q.    So what has Joshua told you
6    that he saw that day?
7        A.    He know -- he said that Reggie
8    Johnson was asking me -- he really doesn't
9    know specifics about it, but he witnessed
10   my demeanor and everything.  So he can --
11   he will tell you that I didn't do anything
12   wrong.
13       Q.    I mean, is it your testimony
14   that you had a calm demeanor throughout
15   that --
16       A.    Yes, I certainly did.
17       Q.    -- interaction with Reggie?
18       A.    Yes, I did.
19       Q.    Okay.  Is it your testimony
20   that you had a calm demeanor when you met
21   with Scott Weddington and Maggie
22   Prestridge and Marcus Hannah later?
23       A.    Yes.  I just spoke.  That's

Page 192

1    all, I was calm and I just spoke.
2        Q.    Is it your testimony that you
3    were calm in your discussions with Lisa
4    Chumney?
5        A.    Yes.
6        Q.    And you say you didn't
7    threaten or intimidate her?
8        A.    No, I did not.
9        Q.    Do you understand that Lisa
10   Chumney reported to you and said I feel
11   like he was threatening me?
12       A.    Lisa Chumney never said I
13   threatened her.
14       Q.    Why do you say that?
15       A.    Because she never stated that.
16       Q.    Have you spoken to her?
17       A.    I have seen the EEOC file.  I
18   have seen when EEOC questioned her.  And
19   you was there, or whoever was representing
20   Hyundai.  She never said I threatened her.
21   She never said she feared me or anything.
22       Q.    Was she asked by the EEOC
23   investigators --

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 193 to 196)

Page 193

1      A.   To tell exactly what happened
2  that night.
3      Q.   What you saw was the notes,
4  the investigator's notes, right?  You
5  didn't sit in on that interview, right?
6      A.   No, but the Hyundai attorney
7  was there.
8      Q.   Do what?
9      A.   The Hyundai attorney was
10  present.
11      Q.   Did the Hyundai attorney make
12  the notes that were in there?
13      A.   I don't know who made the
14  notes.  But I know that those notes were
15  taken by the EEOC and those were
16  statements given by Lisa Chumney to the
17  EEOC.
18      Q.   Do you know -- you don't have
19  any personal knowledge other than seeing
20  what's in the EEOC file about what Lisa
21  Chumney reported, is that right?
22      A.   That's exactly right.
23      Q.   So has Lisa Chumney ever

Page 194

1  spoken to you and said no, I didn't report
2  you?
3      A.   No.  But he -- no, she did
4  not.  But that statement that Marcus
5  Hannah and Scott Weddington said they
6  received from her, where is it, how come
7  it wasn't presented to the EEOC and given
8  to them?  How come a copy wasn't given to
9  them?
10      Q.   Do you know whether or not --
11  I mean, do you -- how much interaction
12  were you having with the EEOC investigator
13  who was --
14      A.   I was reading what I see in
15  the file.
16      Q.   Okay.
17      A.   The file says that Marcus
18  Hannah typed up the statement that Scott
19  Weddington received a statement from Lisa
20  Chumney and then he brought it to Marcus
21  Hannah.  That's what Marcus Hannah typed.
22  Where is that statement that she wrote?
23  If I was threatening or violent toward

Page 195

1  her, where is that statement?  How come it
2  wasn't presented in evidence against me?
3      Q.   And this is one you are saying
4  that Weddington received it?
5      A.   He received it.  Marcus Hannah
6  said that Scott Weddington received it
7  from Lisa, and then Marcus said that
8  Weddington brought it to him.  And there
9  was no evidence of any statement she wrote
10  and signed with her name on it.
11      Q.   So you get back in the office
12  with -- okay.
13          You told me about this initial
14  conversation with Weddington where he says
15  we are going to move you over here to this
16  line, okay?
17      A.   Yes.
18      Q.   Have you told me about
19  everything that happened in that
20  conversation?
21      A.   (No response.)
22      Q.   I don't -- it didn't sound
23  like the Lisa Chumney issue has come up at

Page 196

1  that point in time?
2      A.   Well, I went back to work
3  after the Lisa Chumney incident.  That's
4  when I went to the line and worked.  He
5  said you are going to be working right
6  over here.  He introduced me to the team
7  leader and the team leader -- the team
8  leader came and got me and told me you are
9  going to be working with me and this is
10  what you are going to be doing.  And he
11  took me to the job and had me watch it for
12  like a minute and then I began to --
13      Q.   Okay.  So then you get called
14  back to Scott's office a second time that
15  day, is that right?
16      A.   Yeah, I reported to him to get
17  my assignment, and then after Lisa
18  Chumney, then I get escorted to the office
19  by my new team leader and Marcus Hannah
20  and Scott is in the office.
21      Q.   Okay.  Was there any
22  discussion about Lisa Chumney during that
23  first meeting?

49

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 197 to 200)

Page 197

1    A.   First meeting?
2    Q.   Yes, when he said here is your
3  new assignment.
4    A.   No.
5    Q.   Okay.  Tell me about the
6  second meeting where Lisa Chumney is
7  discussed.
8    A.   I was escorted by the new team
9  leader into the office with -- Marcus
10  Hannah was in there and Karen was in there
11  and Scott was in there.  And Scott had a
12  piece of paper in his hand, and he looked
13  at it and he said that Lisa Chumney said
14  you stepped toward her.  And I said what
15  do you mean stepped toward her?  And he
16  said you made a threatening move or
17  something like that, he said.  And I said
18  I haven't threatened Lisa Chumney
19  whatsoever.  I said Lisa Chumney was
20  pursuing me.
21        And I told him that Marcus
22  Hannah told me not to report anything that
23  went on in that office in there when we

Page 198

1  had a discussion.  And Marcus Hannah
2  agreed I did tell you that, that's right.
3        Okay.  He started yelling and
4  screaming at me, Scott did.  And he was
5  adding lies to what Lisa -- to what the
6  so-called statement that he had in his
7  hand, but I didn't see anything written on
8  that paper.  He lied and said that I
9  threatened her.  And I told him that I did
10  not threaten her.  And I said she didn't
11  say I threatened her either.  And I asked
12  could I see that letter, could I see what
13  she wrote on that letter, and he wouldn't
14  give it to me.
15    Q.   Did you tell Scott during that
16  meeting that Scott was trying to stab you
17  in the back, or words to that effect?
18    A.   No.
19    Q.   Did you tell him that you felt
20  like you were being harassed?
21    A.   I certainly did.  I felt -- I
22  told him I was being harassed by him and
23  yelled and screamed at and lied on by him.

Page 199

1    Q.   Did you threaten to file a
2  harassment lawsuit?
3    A.   I asked -- no, no.  No.
4    Q.   Did you say something to that
5  effect?
6    A.   No.
7    Q.   Did you --
8    A.   Well, I'm sorry.  I told Scott
9  this was harassment, that's what I said.
10  I think this is harassment, that's what I
11  told him.
12    Q.   Okay.  Did you tell him words
13  to the effect of you need to tell that
14  white lady to stay out of my business?
15    A.   No, no.  Never.
16    Q.   Anything to that effect?
17    A.   I told him that she had no
18  business asking me personal questions
19  about my business.  I said because Marcus
20  Hannah told me not to discuss it with
21  anyone.
22    Q.   Did you say anything to the
23  effect of that you weren't going to take

Page 200

1  any mess off of anyone?
2    A.   No.
3    Q.   Anything about taking this up
4  to the front office or taking things to
5  the top?
6    A.   Well, when he stood up and
7  called security and when security came,
8  they told me to come outside, I asked for
9  the number to Human Resources because I
10  wanted to file a complaint against Scott.
11  That's what -- and they didn't give me any
12  information whatsoever.
13    Q.   Okay.  And did you say
14  something to him about having Satan
15  running through his body?
16    A.   No, no.  Never heard of that
17  in my life until I saw it on that paper.
18    Q.   You deny that?
19    A.   I deny it.
20    Q.   Did you ask him during the
21  conversation are you getting pleasure out
22  of this, or words to that effect?
23    A.   No, no.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 201 to 204)

Page 201

1    Q.    What do you contend that you
2  told Scott Weddington during that meeting?
3    A.    I told him to stop screaming
4  and yelling at me.  And I asked Karen and
5  Marcus would they get -- would they ask
6  him to get himself under control.  And he
7  was -- and then Karen said you all need to
8  stop going back and forth.  I said I'm not
9  going back and forth with him, I'm just
10  asking you all to tell him to stop
11  screaming and yelling.  And he stood up
12  over the table -- he was sitting like we
13  are sitting right now, and he stood up
14  over the table and he grabbed his radio
15  off of his hip and he called security.
16    Team Relations didn't see the
17  need for security.  They are the ones that
18  are supposed to give out the disciplinary
19  action.
20    Q.    So security comes and gets
21  you?  Tell me about that walk to the front
22  door.
23    A.    I just walked to the car.

Page 202

1    Q.    What was your next contact
2  with somebody from --
3    A.    Audie Swagman called me the
4  next morning and asked could I come in
5  about 10 or 11 a.m., and I told him I
6  would be there.  And when I got there, Rod
7  Clevenger was in there with him.  And they
8  asked me what took place, and I told them
9  everything.  And Rod Clevenger said that
10  that was no way for Scott Weddington to
11  talk or treat anybody in the plant.  And I
12  wrote a statement that -- in the office
13  that I told Scott that he stole from the
14  company and it was wrong for him to talk
15  to me about zero tolerance when he had
16  stole from the company and wasn't
17  terminated for it.  And I signed it in the
18  presence of Audie Swagman and Rod
19  Clevenger.
20    Q.    Tell me about this statement.
21  Is it in your handwriting?
22    A.    Yes, it's in my handwriting,
23  and I signed it.  They didn't turn that in

Page 203

1  to the EEOC.
2    Q.    Who did you give that to?
3    A.    Audie Swagman.  And then after
4  the meeting was adjourned, Audie Swagman
5  stood up and shook my hand and hugged me
6  and said you go home, don't tell your wife
7  and kids anything, I'm going to recommend
8  probation before the committee tomorrow,
9  you will be back to work tomorrow.  And he
10  said keep your badge, here is my personal
11  card, if you have any trouble out of Scott
12  Weddington or Reggie Johnson, you
13  personally call me.  And here is the card
14  that he gave.  I have had -- and there is
15  my badge, still got it.  And there is his
16  personal card he gave me right there.
17    Q.    Okay.
18    MR. BOSTICK:  We will want
19  copies.
20    Q.    What did you have written on
21  the back of the statement --
22    A.    Just phone numbers.  Probably
23  from jobs and stuff, trying to get jobs.

Page 204

1    Q.    When did you mark the stuff
2  out on here?
3    A.    I don't know.  It's phone
4  numbers for jobs.  All the cards in my
5  wallet got numbers on them.  I will show
6  you.  I don't know what you are thinking,
7  but -- I have got numbers on everything,
8  pretty much.  See, I always write on the
9  back of cards when I'm looking for jobs
10  and stuff.
11    Q.    Do you have any others where
12  they are marked out?
13    A.    Right there, couple marked out
14  right there (indicating).
15    Q.    Does that say polygraph?
16    A.    Here's one right here -- huh?
17    Q.    Is the word polygraph on
18  there?
19    A.    Where?  This is Aerotech, this
20  is where I looked for a job at.
21    Q.    Aerotech?
22    A.    See Industrial Staffing where
23  I worked, see that phone number?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 205

1    Q.    So did Audie Swagman give you
2  kind of an opportunity to go through and
3  talk about these different incidents?
4    A.    Yes, he did.
5    Q.    Did y'all talk about the
6  Reggie incident during that meeting?
7    A.    I don't think so.  I don't
8  think he brought that up.
9    Q.    What about the Lisa Chumney
10  stuff?
11    A.    I don't recall.  He may have,
12  but I don't recall.  I can't remember.  He
13  may have, but I can't recall that.
14    Q.    Did Rod Clevenger say anything
15  to you during that meeting?
16    A.    Only thing he said was that --
17  he said that that was no way for Scott to
18  talk to anybody in the plant.  After I
19  told him about the -- his supervisor on
20  his last job being shot by a black man, I
21  told him that, and he said that -- and he
22  was yelling and screaming at me, and he
23  said that's no way for him to talk to

Page 206

1  anybody in the plant.
2    Q.    So I guess just -- I think we
3  talked about this earlier.  Did Swagman
4  tell you anything about the committee or
5  how that process would work.
6    A.    He said we will meet with the
7  committee in the morning and he would call
8  me in on second shift and I would be
9  coming to work, and recommending that I be
10  put on some type of probation.  He said it
11  would be probation.
12    Q.    But I gather from that he did
13  say it would be a recommendation?
14    A.    No.  He said I would be back
15  to work tomorrow and I will put you on
16  some type of probation, I will meet with
17  the committee in the morning.
18    Q.    He said I'm going to recommend
19  probation is what you put in your
20  statement.
21    A.    That's exactly what he said.
22  I will recommend probation.  I will meet
23  with the committee in the morning and get

Page 207

1  you back to work in the evening.  See, I
2  worked in the evening.  I was on the
3  evening shift.  He was going to take care
4  of it the next morning and call me in to
5  work at 6.  He was going to meet with the
6  committee that next morning.
7    Q.    Okay.  Did you hear from him
8  that next day?
9    A.    No.
10    Q.    Did you go into the plant that
11  day?
12    A.    I wasn't allowed -- I didn't
13  go back, no.
14    Q.    Okay.  Then you say eight days
15  later he called.  This is Swagman, I
16  guess?
17    A.    Yes.  I received a letter in
18  the mail and then he called.
19    Q.    Okay.  What did Swagman tell
20  you during the telephone conversation?
21    A.    He said that I was terminated.
22    Q.    I mean, he said that -- your
23  statement says he said the committee voted

Page 208

1  that I was to be terminated.
2    Q.    Did he say anything about the
3  committee at that point in time?
4    A.    I don't recall.  All I know is
5  I asked him was there anybody else I could
6  talk to about my job, and he said no,
7  there is nobody else you can talk to.
8    Q.    Did you say anything to him
9  about look, you told me you were just
10  going to recommend probation --
11    A.    Yes, I told him, I said I
12  thought I was supposed to be back the next
13  day, why didn't you call me?  And he said
14  well, I couldn't get the committee
15  together.  That's what he said, he
16  couldn't get the committee together,
17  couldn't get everybody together at one
18  time.
19    Q.    Did he say anything about the
20  committee going against his recommendation
21  or anything like --
22    A.    He didn't talk about it.  He
23  just said I'm sorry to say you are

52

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 209

1  terminated.  He said the committee voted
2  and they decided to terminate you.
3      Q.    And so then you made a call to
4  Greg Kimble?
5      A.    Yes, I did.
6      Q.    Tell me about your
7  conversation with Kimble.
8      A.    After Swagman told me there
9  was no one else that I could talk to about
10 it, so I went ahead on and called Kimble
11 anyway.  I told him about what happened,
12 and he told me over the phone that he had
13 never heard my side of the story, so he
14 was going to do a second investigation.
15     Q.    And so did you -- did he kind
16 of go through the facts with you?
17     A.    No.  No, he did not.
18     Q.    I saw you got a letter from
19 him.  Did you get a call from him
20 sometime?
21     A.    No, he just sent a letter,
22 that's all.  It was about three weeks
23 after I kept calling him back and calling

Page 210

1  him back, and they said that somebody had
2  gotten sick in his family or something.
3  It took about twenty days to get a
4  response back from him.
5      MR. BOSTICK:  Do you want to
6  take a restroom break for a few minutes?
7      (Whereupon, a break was had
8      from 2:15 p.m. until 2:23 p.m.)
9      (Whereupon, Defendant's
10     Exhibit 17 was marked for
11     identification.)
12     Q.    (BY MR. BOSTICK:)  I couldn't
13 find my extra copies of this, but if you
14 would identify this Exhibit 17 for me?
15     A.    (Reviewing document.)  Okay.
16     Q.    Can you identify it for me?
17     A.    Yes, this is the letter I
18 received from Wendy Warner letting me know
19 that I was terminated from Hyundai.
20     Q.    Okay.  Did you have any
21 telephone conversations or anywise talk
22 with Wendy Warner about any of this?
23     A.    No.

Page 211

1      Q.    Okay.
2      (Whereupon, Defendant's
3      Exhibit 18 was marked for
4      identification.)
5      Q.    Can you identify Exhibit 18
6  for me, please?
7      A.    This is a letter that I
8  received from Greg Kimble after he had
9  conducted a so-called second investigation
10 without writing down any statements on my
11 behalf and taking any notes from me over
12 the phone to investigate any allegations
13 that I -- in my defense.
14     Q.    How long had y'all spoken on
15 the phone when you first talked to him?
16     A.    How long did we speak over the
17 phone?
18     Q.    Yes.
19     A.    I just told him what had
20 happened, and he said that he had heard
21 that I was terminated but he never heard
22 my side of the story.  And he said that
23 he -- now since he had heard my side of

Page 212

1  the story, he was doing a second
2  investigation.  As I was telling him my
3  side of the story, he didn't tell me to
4  pause or let me write this down or write
5  this down.  He didn't write anything down,
6  as far as I'm concerned.  He couldn't
7  have, not the way I was explaining it.
8      Q.    Not the way what?
9      A.    When I was explaining to him
10 over the phone, what took place, he didn't
11 write anything down, because if he had
12 been writing anything that I said took
13 place in my defense, he would have needed
14 me to slow down and give him time to copy
15 it.  So, in my opinion, there is no
16 evidence of a second investigation being
17 conducted, there was nothing turned in to
18 the EEOC to prove that he even did a
19 second investigation.
20     So, therefore, I believe that
21 he did not conduct a second investigation.
22 There is no proof on paper to prove that.
23 There is no witness statements.  There is

Page 213

1  no interviews with no signatures or
2  anything on them.
3      Q.   And what is Mr. Kimble's race?
4      A.   He is black.
5          (Whereupon, Defendant's
6          Exhibit 19 was marked for
7          identification.)
8      Q.   Can you identify Exhibit 19
9  for me?
10     A.   (Reviewing document.)  I typed
11 this at home.
12     Q.   You did?
13     A.   Yes.
14     Q.   Who did you send this to?
15     A.   EEOC.
16     Q.   Did you send it to anybody at
17 Hyundai?
18     A.   No.
19     Q.   Okay.  Why do you have Greg
20 Kimble's name on there?
21     A.   Because he is the Human
22 Resource manager.
23     Q.   I mean, did you send it to

Page 214

1  him?
2      A.   No, no.
3      Q.   This was drafted for you to
4  send to the EEOC?
5      A.   Yeah, I typed that myself.
6      Q.   Okay.  When you say they came
7  back and were no witnesses to you calling
8  Reggie Johnson a name, are you talking
9  about not counting Reggie saying that you
10 said that?
11     A.   Could you repeat the question,
12 please?
13     Q.   You don't dispute that Reggie
14 Johnson claimed that you called him a
15 nappy-headed nigger?  Do you dispute that?
16     A.   I don't dispute that's what
17 they told me he said I called him.
18     Q.   Okay.  So when you say there
19 are no other witnesses, you are saying
20 other than Reggie Johnson you don't know
21 of anyone who would say they heard that?
22     A.   Everyone that was questioned,
23 no one said they heard me call him the N

Page 215

1  word.
2      Q.   Everyone other than Reggie
3  Johnson?
4      A.   Everyone other than Reggie
5  Johnson that was questioned.  Scott came
6  and told me he had four witnesses that
7  heard me call him that name.  But after
8  everyone was questioned, no one said that
9  they heard me call him that name.
10     Q.   Okay.  How do you know what
11 the different people investigated said?
12     A.   How do I know -- because I saw
13 it in the EEOC file.
14     Q.   Okay.
15     A.   And relating to that fact that
16 you just brought up about the people that
17 were being questioned, those statements
18 made by those people were not statements
19 made by those people.  Those statements
20 were made by Marcus Hannah.  There is no
21 signatures to those statements.  Whenever
22 you are employed on a job, if you have a
23 witness, you are supposed to have that

Page 216

1  witness come in, write out a statement and
2  sign it.  Or if you type it, you are
3  supposed to present it to that witness,
4  let them read over it and ask them do they
5  agree to this statement, and then you have
6  them sign it.  There were no signatures on
7  any of these statements made by any of
8  these people.  So, therefore, they did not
9  say it.  This was typed up by Marcus
10 Hannah.
11     Q.   Who is black?
12     A.   Doesn't matter.  Color is not
13 an issue in this fact -- in this matter
14 here.
15     Q.   It's not an issue -- color is
16 not an issue in this lawsuit?
17     A.   No, it doesn't matter who
18 typed it up --
19     Q.   Are you saying that Marcus
20 Hannah, who is a black man, fabricated
21 statements against you?
22     A.   That's exactly what I'm
23 saying.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 217 to 220)

Page 217

1    Q.    Why would he fabricate
2  statements --
3    A.    Yo u would have to ask him
4  that.
5    Q.    Okay.  I mean, do you have any
6  belief right now as to why -- do you
7  contend that Marcus Hannah fabricated
8  statements against you because you are
9  black?
10    A.    I would say yes.
11    Q.    Okay.  And what is your basis
12  for that contention?
13    A.    Because Marcus Hannah would do
14  anything that Scott Weddington told him to
15  do to keep his job.
16    Q.    Marcus Hannah doesn't report
17  to Scott Weddington, does he?
18    A.    Well, I guess he doesn't want
19  to make any waves.
20    Q.    Okay.  And I guess while we
21  are on this, Scott Weddington doesn't have
22  the power to terminate somebody, does he?
23    A.    I don't know.  I don't know.

Page 218

1    Q.    Do you know of a situation
2  where he has terminated somebody?
3    A.    I don't recall.
4    Q.    Okay.  So --
5    A.    May I say something else?
6  When Joshua Groves was insubordinate and
7  cursed Reggie Johnson, Team Relations --
8  it was not reported to Team Relations.
9  When accusations was made against me, he
10  called Team Relations.  Whenever there is
11  an incident of so-called insubordination,
12  it seems if a person is not prejudiced
13  toward a person of color, they would use
14  the same procedures no matter what the
15  color of the person is.  When the
16  allegation was made against me, Scott
17  called in -- Team Relations in every time.
18       When Joshua cursed Reggie and
19  refused to do his job and was not being
20  productive and transferred to another job,
21  he did not report these incidences to Team
22  Relations as he did with me.  And I feel
23  he is discriminatory because he gave me

Page 219

1  unequal treatment.
2    Q.    Let me start with something,
3  though.  You were the first person to
4  bring Team Relations into any situation on
5  November 22nd, weren't you?  I mean, you
6  went to Marcus Hannah with a complaint,
7  didn't you?
8    A.    Marcus was walking by and
9  asked me if I needed anything.
10    Q.    And you said you had this
11  complaint about this vacation day, didn't
12  you?
13    A.    Exactly right.
14    Q.    Okay.  So, I mean, do you have
15  any evidence that Joshua Groves ever
16  brought Team Relations into a situation
17  involving him or he made some complaint to
18  Team Relations?
19    A.    Well, first of all, when I --
20    Q.    Wait --
21    A.    Okay.
22    Q.    Read my question back, I want
23  a specific answer to this question.  You

Page 220

1  can go sit on the stand and tell the judge
2  and jury everything you want.  You will
3  get your day to write three hundred pages
4  of notes like you have or claim that
5  everybody on the face of the earth has
6  lied against you, but today I have my
7  right to get my questions answered, okay?
8  And I would like this question answered
9  that I just asked.
10       (Record read.)
11    A.    I don't know.
12    Q.    Now, have you ever had anyone
13  -- doctor, physician or anyone suggest to
14  you that you might suffer from some type
15  of a paranoid condition?
16    A.    Never.
17    Q.    Okay.  I mean, would you agree
18  with me that today we have seen documents
19  from four different employers that you
20  claim were fabricated against you?
21    A.    Would you repeat the question?
22    Q.    Yes.  I mean, we saw documents
23  from four employers today that were in

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 221 to 224)

Page 221

1  your personnel file where you say someone
2  fabricated a story against you that didn't
3  happen?
4      A.   Exactly right.
5      Q.   Okay.  I mean, do you have any
6  reason as you sit here today as to why you
7  think that would happen to you?
8      A.   Yes.  If these statements
9  would have been true against me, I would
10  have been terminated.  I wasn't terminated
11  from those jobs.
12      Q.   Russell Corporation you were.
13      A.   I was being tardy.  That's why
14  I was terminated from that job, because of
15  being tardy.
16      Q.   So they should have fired you
17  a second time when you threatened to kill
18  somebody again or --
19      A.   If I had been guilty of that,
20  I would have been fired.
21      Q.   Okay.  I'm just making sure
22  that there is no common thread that
23  somebody has been following -- you don't

Page 222

1  -- is there somebody out there that you
2  contend has this grand conspiracy --
3      A.   No.
4      Q.   Is it your testimony that this
5  is -- it's just a very strange coincidence
6  that this has happened to you at multiple
7  occasions with multiple employers?
8      A.   Could you repeat the question?
9      Q.   Yes.  I mean, is it your
10  testimony -- I just want to make sure that
11  I understand what's going on in the world
12  of Larry Smith.
13      A.   Okay.
14      Q.   I don't want to find out at
15  trial that there is a contention that
16  there is somebody who has been trying to
17  meddle with your life since 1983.  I mean,
18  is that a contention in this lawsuit?
19      A.   No.
20      Q.   Okay.
21          (Whereupon, Defendant's
22          Exhibit 20 was marked for
23          identification.)

Page 223

1      Q.   Can you tell me what Exhibit
2  20 is about?
3      A.   Let me read it, please.
4      Q.   Sure.
5      A.   (Reviewing document.)  I --
6  when you apply for unemployment benefits,
7  you have to have your statement turned in
8  by a certain time.  And because I was
9  waiting on a response from Greg Kimble and
10  I was sure that I would be going back to
11  work, I didn't get that information to
12  them on time.  And so I had to send them a
13  letter that -- a copy of the letter that
14  Greg Kimble had sent to me stating that I
15  would not be reemployed with Hyundai.  And
16  that was to let them know that that was
17  why I did not turn that paperwork back in,
18  because I thought that I was going back to
19  work for Hyundai.
20          (Whereupon, Defendant's
21          Exhibit 21 was marked for
22          identification.)
23      Q.   Do you recall putting together

Page 224

1  a statement about your damages in this
2  case?
3      A.   Yes.
4      Q.   Is that a copy of it that I
5  have marked as 21?
6      A.   Yes.
7      Q.   Did you do this on your home
8  computer?
9      A.   Yes, I did.
10      Q.   When did you receive your last
11  paycheck from Hyundai?
12      A.   I don't know.  I think around
13  the first week of December or something
14  like that.
15      Q.   Okay.  And then what -- what
16  was your rate of pay when you were let go?
17      A.   Seventeen seventy-nine.
18      Q.   Okay.  And when did you start
19  working for CRH?
20      A.   In January of this year, 2007.
21      Q.   Do you know what your W-2
22  showed your income as being for the year
23  2006?

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

Page 225

1    A.    No.
2    Q.    Not your W-2, but your 1040 or
3  whatever you call it --
4    A.    I don't recall.  I gave you a
5  copy, I think, of that.
6    Q.    Okay.  But in 2006, until CRH,
7  you worked for different temporary
8  staffing companies during that year?
9    A.    Yes, yes.
10   Q.    Okay.  Do you remember what
11 you made at Hyundai on an annual basis?
12   A.    Do you mean gross income or
13 net pay?
14   Q.    Gross income.
15   A.    We did a lot of overtime, so
16 probably -- probably grossed about -- you
17 said gross, right?  Or net?
18   Q.    Yes, gross.
19   A.    Probably about eighteen or
20 nineteen hundred every two weeks.
21   Q.    Okay.  When you say in here
22 you borrowed money from family and
23 friends, who did you borrow money from?

Page 226

1    A.    Wayne Burch, my wife's Aunt
2  Nita.
3    Q.    How much did you borrow from
4  them?
5    A.    From who, Wayne?
6    Q.    Yes.
7    A.    About six thousand dollars.
8    Q.    Have you paid him back?
9    A.    No.
10   Q.    How much did you borrow from
11 the aunt?
12   A.    About five hundred dollars.
13   Q.    Anybody else that you borrowed
14 money from?
15   A.    My wife's sister.
16   Q.    How much did you borrow from
17 her?
18   A.    Two hundred fifty dollars.
19   Q.    Anybody else?
20   A.    Five hundred from my two
21 brothers, two fifty apiece.
22   Q.    Anybody else?
23   A.    No, that's it.

Page 227

1    Q.    Who did you -- when you say
2  you sold the wedding rings, lawn mower,
3  DVD players, weed eaters, camcorder, yard
4  blower, Play Station, TV, who did you sell
5  those to?
6    A.    I went to a pawn shop and sold
7  them, got as much as I could for them.
8    Q.    How much did you get?
9    A.    I don't know.  Probably about
10 -- all together -- let me see what all I
11 have on here.  I will have to figure it up
12 in my head.  I'd say about seven hundred
13 dollars.
14   Q.    Okay.  And then when you say
15 you applied for several jobs before
16 Christmas, who did you apply with?
17   A.    Staffing agencies, temporary
18 agencies, Walker Personnel, Industrial
19 Staffing.  Those places, temporary
20 agencies.
21   Q.    When did you get your first
22 job assignment in 2006?
23   A.    I don't recall.  I was in so

Page 228

1  much stress, I don't remember.  I'm sorry,
2  I can't answer that question.  I had too
3  much going on in my life.  I apologize,
4  but I don't know.  You have to look at
5  those W-2s I gave you.  I don't remember.
6  It's blank from the first part of that
7  year until after I got that second letter
8  from Greg Kimble, I was sick, I don't
9  remember it.  I don't remember.
10   Q.    What types of cars were the
11 cars that were repossessed?
12   A.    2001 Pontiac Gran Prix GT and
13 a 2000 Mazda 626.
14   Q.    Who was the lender on those?
15   A.    Comala Credit Union.
16   Q.    What are the two cars you have
17 bought since then?
18   A.    A 2003 Chevrolet Impala, 2003
19 Ford Taurus.
20   Q.    What did you pay for the
21 Impala?
22   A.    About thirteen thousand
23 dollars.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 229 to 232)

Page 229

1    Q.    How about for the Taurus?
2    A.    Twelve thousand dollars.
3    Q.    Did you put any money down on
4    those or --
5    A.    Yes, I put money down.
6    Q.    How much did you put down on
7    each one?
8    A.    Seventeen hundred on the
9    Impala and seventeen hundred on the
10   Taurus, because my credit was ruined.
11   Q.    Have you consulted with any
12   credit bureaus or anything about debt
13   consolidation?
14   A.    No.  I'm just being sued by
15   everybody right now.
16   Q.    At the time you write this,
17   you say, "My daily commute to and from
18   work is two hours," who are you working
19   for at the time --
20   A.    CRH.  It's in Clanton.
21   Q.    Okay.  And I see this as being
22   kind of like a listing of how the
23   financial thing -- I mean, what do you

Page 230

1    contend you have had to spend out of
2    pocket as a result of being terminated at
3    Hyundai?
4    A.    What do you mean out of
5    pocket?  I don't understand.
6    Q.    Well, I mean, I guess there
7    is -- for example, are there medical bills
8    that you had to pay --
9    A.    I can't afford to pay them.
10   They are coming after me with attorneys
11   now.
12   Q.    Okay.  I mean, I guess if --
13   have you done any kind of a calculation of
14   these are bills that I have had to pay
15   that I wouldn't have had to pay if I had
16   insurance through --
17   A.    I turned in one.
18   Q.    Do you have insurance now -- I
19   mean, did you have insurance through CRH?
20   A.    Yes.  It was eighty-six
21   dollars every two weeks.
22   Q.    And they gave you a COBRA
23   notice, I guess, when you got terminated?

Page 231

1    A.    Yes, yes.
2    Q.    And you elected not to
3    continue under COBRA?
4    A.    Six hundred dollars a month.
5    I can't afford it.
6    Q.    Okay.  Tell me about this
7    incident -- you said there was some
8    incident where you went to the Pri-Med,
9    you felt like you were having a heart
10   attack or something?
11   A.    Yes.
12   Q.    When was that?
13   A.    I don't know what day of the
14   week it was.  I was in the car and I had a
15   lot of, you know, bills and stuff and I
16   didn't have any money to pay them with.
17   And I had picked up the phone and called
18   the gas company and the power company and
19   water company, the mortgage company.  I
20   called everybody and extended everything
21   as far as I could.  And it was just -- I
22   didn't have the money to pay it with.  And
23   I just -- all of a sudden my whole left

Page 232

1    side got numb and I got real dizzy, and I
2    felt weak and I thought I was having a
3    heart attack.  And I barely made it to
4    Pri-Med.
5         And when I got in there, you
6    know, I just was -- they -- the doctor
7    didn't know what was going on with me.
8    They did a blood test on me to see if I
9    had a disease of any kind, and it came
10   back negative.  He diagnosed me with
11   fatigue and being under so much stress
12   that I just -- my body was just shutting
13   down because I was under so much stress.
14   Q.    I don't need to make this an
15   exhibit, I don't think, but this is -- on
16   Pri-Med, it is dated April 21st of '06.
17   Does that sound consistent with the date
18   this happened?
19   A.    Yes.
20   Q.    Did you tell them you had
21   weakness in your hands and legs?
22   A.    Yes.
23   Q.    And the side of your body --

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 233 to 236)

Page 233

what did they come back and say was the
diagnosis? Did they -- other than
fatigue, did they say anything?
    A.   He said I was under a lot of
stress and not to -- he said if I didn't
get some of this stress out of my life, I
was probably going to have a heart attack.
    Q.   Have you been back to the
doctor since that time?
    A.   I went to my doctor for my
blood pressure.
    Q.   You have been on medication
throughout this time?
    A.   Throughout the time --
    Q.   Has it been within proper
ranges when you have gone in to see the
doctor?
    A.   Yes, it has.
    Q.   Other than that one incident
in April of 2006, have there been any
other instances where you felt like you
were having a heart attack or --
    A.   All the time.  I couldn't

Page 234

sleep at night, my body would ache all
night long.  I would get up in the middle
of the night.  I would have to lie down
during the day because my blood pressure
would shoot up so high, I had to get off
of my feet.  You know, it was miserable.
You know, I just hurt and suffered all the
time because I was stressed out and I
didn't have any money to pay my bills
with.
    Q.   Well, how much do you
attribute that stress to what happened at
Hyundai and how much do you attribute to
what happened at CRH?
    A.   Let me answer the first
question first.  How much do I contribute
the stress to Hyundai?  One hundred
percent of all -- all of the stress that I
endured was because of Hyundai.  I worked
for Rheem for seven years -- six years and
eight months to be exact.  I have proven
that I know how to work and maintain a job
to support my family.  I worked at Hyundai

Page 235

for seven months and never missed a day.
My job performance was good.  I did my
job.
    I did not get -- did not get
what I deserved from them.  They brought
all of this on me.  I have a history of
working.  And I'm a working man, and I
take care of my family.  And they deprived
me of all of that.  They stripped me as a
man and treated me less than a human
being.
    Q.   So you are not seeking any
damages against CRH?  You don't contend
they have damaged you in any way?
    A.   They have too.  Yes, they
have.
    Q.   Did they treat you worse than
a human there also?
    A.   They discriminated against me.
    Q.   During your conversations with
Scott Weddington, did you ever say that
you felt like these actions were being
brought on you because of your race?

Page 236

    A.   I believe I did tell Scott
that, yes.  I believe -- I think I did
tell him that, yes.  I believe I did tell
him that.  Scott Weddington, I did.
    Q.   When did you say that?
    A.   I think when -- after security
had -- right before security had came, I
believe I did.  He called security.
    Q.   He called security and then
you said I think this has to do with my
race at that point?
    A.   I don't know exactly when, but
I told him.  I can't recall.  I don't want
to say, but I know I told him.
    Q.   Well, I mean, the whole -- I
mean, what you have told me today is that
the whole motivation for Reggie coming to
him, you say, is this is your vacation
pay, the vacation day, right?
    A.   Exactly.
    Q.   And you think he didn't like
the fact you went to Team Relations?
    A.   I have no idea whether he

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 237 to 240)

Page 237

1 liked it or not.
2 Q. I'm just wondering, you know
3 -- it sounds like -- obviously -- I assume
4 you didn't go to Scott Weddington and say
5 I think Reggie made this report on me
6 because I'm black?
7 A. I didn't tell anyone that.
8 Q. Okay. I mean, that's where,
9 you know -- so did you say that you
10 thought Lisa Chumney was making her
11 allegations against you because you were
12 black?
13 A. She was retaliating against me
14 because I would not give her any
15 information.
16 Q. Okay.
17 A. Reggie Johnson was retaliating
18 against me because I reported him. Scott
19 Weddington was discriminary toward me.
20 He told me about a supervisor being shot
21 by a black man, I had nothing to do with
22 that. He reported everything that was
23 alleged against me to Team Relations.

Page 238

1 When Joshua Groves did something, he
2 didn't report it to Team Relations, he
3 dealt with it himself. That's not fair.
4 Q. Okay.
5 A. And also, you know, I truly in
6 my heart believe and know that Scott has a
7 racial -- has a racial problem. He is
8 discriminary. He doesn't apply rules
9 the same. And he called the Koreans
10 slant-eyes and he had to leave the plant.
11 I have never heard him say anything about
12 a white person the whole time I worked
13 there, but I heard him talk about the
14 Koreans and the way he treated me.
15 Excuse me, may I add something
16 else to that?
17 Q. Sure.
18 A. I feel like that Human
19 Resource Department at Hyundai when Scott
20 stole those parts from that car, he wasn't
21 terminated, but they terminated me over
22 some allegations. I feel Human Resource
23 Department is also discriminatory. That's

Page 239

1 what I feel. That's what I believe.
2 Q. Did you tell Audie Swagman or
3 Rob Clevenger -- during your meeting with
4 them, were you making any accusations of
5 race discrimination at that time?
6 A. I'm trying to see if we got
7 into that fact. Yeah, I told him. I sure
8 did.
9 Q. What did he say?
10 A. Yes, I did. I told Swagman
11 and Clevenger that Scott had stole that
12 car and he sent me home like that. And I
13 told him about Joshua and what Joshua had
14 done, and he didn't do Joshua like he had
15 done me. And I told him that was
16 discriminatory the way he treated me. And
17 Joshua cursed his team leader out and was
18 transferred to another job for not being
19 productive. And he didn't get the
20 treatment I got.
21 And also, you know, Joshua told
22 me he got into a fight with another
23 coworker, and they both got three days.

Page 240

1 And also he got wrote up several times for
2 being tardy, and then eventually
3 terminated a few more times -- he was
4 written up twice, put on corrective phase
5 two. And then a couple more instances of
6 being late, he was terminated.
7 They didn't give me one chance.
8 I didn't have a write-up in my file, no
9 verbal warnings, anything. They treated
10 me less than a human being. I didn't get
11 the treatment that he got. And I wasn't
12 found guilty of doing anything wrong. He
13 was.
14 Q. Again, you don't have any
15 personal knowledge of what investigation
16 was conducted into Weddington or the car,
17 right?
18 A. Audie Swagman told me when we
19 discussed it that Scott had received
20 disciplinary action for what he had done.
21 Q. One of the allegations that's
22 in your complaint is hostile work
23 environment, which is saying that you have

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 241 to 244)

Page 241

1 been harassed.
2    A.   Uh-huh.
3    Q.   I'm just going to make sure --
4 I know you contend that Weddington
5 harassed you.
6    A.   Exactly.
7    Q.   Okay.  And I want to make sure
8 -- and you told me about all of these
9 incidents, I just want to make sure that
10 we have covered -- is there anything else
11 that he said or did to you during the time
12 you worked at Hyundai that you are saying
13 was harassment that we haven't talked
14 about today already?
15    A.   No.  Now, Lisa Chumney
16 harassed me too.
17    Q.   Okay.  Have we talked about
18 everything that she did to harass you?
19    A.   I want to state this fact.
20 She approached me four -- on four
21 different occasions for information, and
22 she was denied each time.
23    Q.   Do you contend Reggie harassed

Page 242

1 you?
2    A.   Reggie retaliated against me.
3    Q.   Have you told me about
4 everything that those three people did to
5 harass you?
6    A.   As far as I remember, yes.
7    Q.   Is there anybody else that you
8 had some interaction with that you are
9 saying was harassing of you?
10    A.   No, but I know of someone who
11 fabricated -- who lied a lot about
12 statements about me, and that was Marcus
13 Hannah.
14    Q.   Okay.  Are you saying that to
15 the EEOC or whatever or in his
16 statement --
17    A.   In his own written statements,
18 he lied on me numerous times.  As far as
19 witness statements that he typed up, as
20 far as his initial report that he gave the
21 night when we was in a meeting with him
22 and Reggie versus what he told the EEOC,
23 he told the EEOC that I called Scott

Page 243

1 Weddington a racist.  In his report the
2 night that the alleged incident occurred,
3 he never reported nor has Scott ever
4 stated that I ever called him a racist in
5 anything that they ever wrote.
6    Q.   Is it your contention in this
7 lawsuit that if it doesn't show up in a
8 piece of paper three years ago that nobody
9 can testify to it?
10    A.   Would you repeat that again?
11 I didn't understand that.
12    Q.   Yeah.  I saw the notes of that
13 investigator, it's like four sentences
14 long.  Are you saying that that's all that
15 was discussed during the conversations
16 between them?
17    A.   I don't know what was
18 discussed.  I don't have a clue.
19    Q.   Have you talked to the
20 investigator?
21    A.   No.
22    Q.   Did you ask her whether she
23 recorded those conversations?

Page 244

1    A.   No.  I'm assuming that --
2    Q.   You are assuming that Marcus
3 Hannah made incorrect notes four years
4 ago, but that the investigators have
5 perfect notes now, is that what I'm
6 hearing?
7    A.   I'm saying that Marcus Hannah
8 lied in his original statement on me.  His
9 statements he gave the night that the
10 alleged accusations were made against me
11 are totally opposite from what he told the
12 EEOC.
13    Q.   Well --
14    A.   That's conflicting statements,
15 that's proving that he fabricated the
16 statements.
17    Q.   Why would he have any reason
18 to fabricate a statement against you?
19    A.   I have no idea.
20    Q.   I mean, as you sit here today,
21 you can't think of any reason?
22    A.   I have no idea.  All I know is
23 he lied.

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 245 to 248)

Page 245

1    (Whereupon, Defendant's
2    Exhibit 22 was marked for
3    identification.)
4    Q.    This is a listing of the
5    potential witnesses your attorney provided
6    to us. I just want to go through and make
7    sure we have covered everything these
8    people would know.
9    A.    I am familiar with it.
10   Q.    You are, with the initial
11   disclosures?
12   A.    Yes, I am.
13   Q.    Okay. Have you told me
14   everything that Maggie Prestridge would
15   know?
16   A.    Yes.
17   Q.    Same with Marcus Hannah?
18   A.    Yes.
19   Q.    Same with Reggie Johnson?
20   A.    Yes.
21   Q.    Lisa Chumney?
22   A.    Yes.
23   Q.    Wendy Warner, is her

Page 246

1    involvement basically writing the
2    termination letter?
3    A.    I just received a letter from
4    her. I never met her, never seen her.
5    Q.    Okay. Greg Kimble, your
6    letter and discussions with him
7    afterwards?
8    A.    Right, yes.
9    Q.    And Michael Harris, is he the
10   person that you contend got in a fight
11   with Joshua Groves?
12   A.    Yes.
13   Q.    And you contend that Michael
14   Harris got a three-day suspension?
15   A.    Yes.
16   Q.    Okay. Same for Joshua, you
17   contend they got in a fight and he got a
18   three-day suspension?
19   A.    Yes.
20   Q.    Who is Larry Nichols?
21   A.    He is the witness that saw
22   Lisa Chumney come sit beside me and ask me
23   what was happening between me and Reggie

Page 247

1    Johnson.
2    Q.    That's the one you said shook
3    his head or something like that?
4    A.    He told me not to -- don't
5    tell her anything.
6    Q.    Who is this Carl person? What
7    would he know?
8    A.    Carl is the backup team
9    leader. He is like -- if he's out, he
10   fills in for Reggie Johnson. When he was
11   -- if you look at the paperwork -- well, I
12   will leave that along. He is the backup
13   team leader.
14   Q.    What would he have to know
15   about --
16   A.    He knows that I was not
17   disrespectful or rude to Reggie, didn't
18   call him a name. He knows that.
19   Q.    He would have been there that
20   first time?
21   A.    He was there.
22   Q.    What is his race?
23   A.    Black.

Page 248

1    Q.    Okay. Just so I'm clear, you
2    talked about the situation with Joshua
3    Groves as being a comparator, being
4    someone that you feel was treated
5    differently than you who is white,
6    correct?
7    A.    Yes.
8    Q.    You have also told me about
9    Scott Weddington's situation with the car,
10   you felt that was another difference in
11   treatment.
12          As we sit here today, are you
13   aware are there any other situations
14   involving a white employee out at HMMA
15   where you feel like they received better
16   treatment than you?
17   A.    That's all I recall.
18   Q.    Okay.
19          MR. BOSTICK: Why don't we
20   take a break a few minutes? I just need
21   to look through my notes.
22          (Whereupon, a break was had
23          from 3:01 p.m. until 3:17 p.m.)

Page 249

1      Q.    (BY MR. BOSTICK:)  I just have
2   a couple more questions.
3      A.    Okay.
4            (Whereupon, Defendant's
5            Exhibit 23 was marked for
6            identification.)
7      Q.    I have put in front of you
8   Defendant's Exhibit 23.  Could you
9   identify that for me?
10     A.    Is this the amended charge, I
11  believe?
12     Q.    Yes, it says amended at the
13  top.
14     A.    Yes.
15     Q.    Did you draft up the
16  handwritten statement that goes with this
17  that says additional particulars?
18     A.    The handwritten statement, let
19  me see if I can find it.  Do you have it?
20     Q.    Yeah -- I'm sorry, not
21  handwritten, the typewritten that has LDS.
22  Is that your initials down in each corner?
23     A.    Yeah, those are my initials,

Page 250

1   but I'm trying to see if I typed this up.
2   (Reviewing document.)  This is what my
3   attorney typed up.
4      Q.    Okay.  Did you read this
5   before you signed it?
6      A.    I don't recall if I read it.
7   I'm pretty -- I don't know.  I don't know.
8   I know I didn't type it.
9      Q.    I mean, is that your signature
10  on the last page?
11     A.    Yes, that's my signature.
12     Q.    And is that your initials?
13     A.    Yeah, I read it.  I'm pretty
14  sure I did.
15     Q.    Okay.  And then did you submit
16  this all as one document with your -- I
17  mean, you knew this was being submitted
18  under penalty of perjury when you
19  submitted this?
20     A.    Oh, yes.  Oh, yes.  Oh, yes.
21     Q.    Looking back at your discovery
22  responses which is document Number 11 that
23  is in front of you --

Page 251

1      A.    Uh-huh.
2      Q.    -- did you sign that on the
3   next to last page?
4            MR. BOSTICK:  Are you a
5   notary, Kathy?
6            MS. DICKEY:  Yes.
7            MR. BOSTICK:  Okay.  Does the
8   stamp just not show up on the --
9            MS. DICKEY:  Yes, it doesn't
10  show up on the copy.
11     A.    Yes, that is my signature.
12     Q.    Okay.  And you signed that in
13  front of Ms. Dickey?
14     A.    Yes.
15     Q.    And you were saying these are
16  true and correct to the best of your
17  knowledge?
18     A.    Now, a different lawyer typed
19  this up, now (indicating).
20     Q.    I don't want to know about
21  discussions with your lawyer.
22           I know I talked to you about
23  what Swagman and Clevenger told you.  As

Page 252

1   you sit here today, is there anything
2   about what anybody has told you about the
3   composition of this committee that made
4   your termination decision other than what
5   you told me already?
6      A.    No.
7      Q.    Do you know what information
8   that committee relied on in making that
9   decision?
10     A.    No one took a statement from
11  me.  No one took my version of what took
12  place whatsoever.  No one wrote down, no
13  one told me to write down my -- my side of
14  the story what happened.  No one took any
15  statement from me.
16     Q.    Okay.  So do you know whether
17  or not Scott Weddington was a member of
18  that committee?
19     A.    I have no idea.  I don't know
20  anybody that was on the committee, if the
21  committee even got together.  Which I
22  don't believe a committee got together.
23     Q.    Okay.  And, you know, one of

Page 253

1    the things we talked about is your claim
2    in the case about a hostile work
3    environment. I just want to make sure
4    that I'm clear on this.
5            November 22nd, we have the
6    first incident with Reggie which kind of
7    starts this time line that we have been
8    talking about for the last two hours.
9    Just so I am clear, is there any incident
10   that happened to you at HMMA prior to that
11   November 22nd that you contend was
12   harassment or discriminatory towards you?
13       A.   When you say November 22nd,
14   are you speaking about Reggie Johnson --
15   who are you speaking of, Reggie or Scott?
16       Q.   I'm talking about anybody at
17   HMMA. Is there any action that took place
18   prior to November 22nd which relates to
19   you that you claim was discriminatory or
20   harassing?
21       A.   No, uh-uh, not to me.
22       Q.   Okay. And then the charge
23   that we just looked at, Exhibit 23, the

Page 254

1    earliest was the 28th. Is that --
2        A.   I'm not understanding what you
3    are saying.
4        Q.   Do you see right here where it
5    says when is the earliest date when
6    discrimination took place?
7        A.   My attorney put that in, I
8    didn't put that in. She put the wrong
9    date down.
10       Q.   What date would you have put
11   if you were filling this out?
12       A.   The 22nd.
13       Q.   You mentioned the story about
14   Scott talking to you about a prior
15   incident of violence in the workplace. Do
16   you know what that employer was, who it
17   was he was saying?
18       A.   He said his past job.
19       Q.   Did he say anything about
20   NABI?
21       A.   He didn't call the name of it.
22       Q.   Do you know whether or not the
23   people involved in that shooting were both

Page 255

1    white?
2        A.   He told me that the black guy
3    shot his supervisor. And I said what
4    color is the supervisor, and he said
5    white.
6        Q.   So it's your testimony that he
7    told you the shooter was black?
8        A.   He said a black guy shot his
9    supervisor on his past job.
10       Q.   Did he say anything else about
11   where it was? Was it in a particular
12   city?
13       A.   No. He just said his
14   supervisor was shot by a black guy.
15       Q.   Do you know what particular
16   place this was?
17       A.   No, he didn't mention the
18   place. He said his previous job.
19       Q.   Did you report to someone
20   named Dan Smith for a period of time?
21       A.   No.
22       Q.   Do you know any group leader
23   named Dan Smith?

Page 256

1        A.   He wasn't a group leader when
2    I was working there. He was a regular
3    employee.
4        Q.   Was he in the same area that
5    you were worked?
6        A.   He worked on the other end.
7    He worked where you -- where the line was
8    moving and you had to make your repairs.
9    I worked down there on the doors. He was
10   separated from me.
11       Q.   Was there ever -- what was his
12   job title?
13       A.   A team member.
14       Q.   Okay. Did you and he ever
15   have any kind of discussion that led to
16   Scott Weddington coming to talk to you?
17       A.   No.
18       Q.   Do you remember having some
19   request to do rotating around jobs from
20   Mr. Smith?
21       A.   Could you repeat the question
22   again?
23       Q.   Did you ever have -- did Dan

LARRY SMITH
HYUNDAI MOTOR MANUFACTURING, INC.

LARRY SMITH
May 22, 2007

(Pages 257 to 259)

Page 257

1  ever serve as your team leader?
2      A.   No.
3      Q.   Did you ever have any
4  interaction with Dan where he was asking
5  you to do some job rotation?
6      A.   No.
7      Q.   Did you ever have any
8  conversations with Scott Weddington about
9  your refusal to do something that Dan
10  asked you to do?
11      A.   No.
12      Q.   Did you ever have any
13  conversations with Scott anytime prior to
14  -- Scott Weddington prior to November
15  22nd --
16      A.   No.
17      Q.   -- where he was asking you
18  about your interaction with another
19  employee?
20      A.   No.
21      MR. BOSTICK:  Okay.  I think
22  that's all we have, except we would like
23  to reserve the right, like we talked about

Page 258

1  during our break, about we would like to
2  take your deposition a little bit in the
3  morning just to ask you about this tape
4  that you have identified today, if that's
5  all right.
6      A.   Okay.
7      MR. BOSTICK:  Okay.
8
9      (Whereupon, the deposition of
10      Larry Smith was adjourned at
11      3:24 p.m. on May 22, 2007, to
12      be reconvened at a later
13      date and time.)
14
15
16
17
18
19
20
21
22
23

Page 259

1              C E R T I F I C A T E
2
3
4  STATE OF ALABAMA)
5  JEFFERSON COUNTY)
6
7          I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotypy, and the questions
10  and answers thereto were reduced to
11  typewriting under my supervision, and that
12  the foregoing represents a true and
13  correct transcript of the deposition given
14  by said witness upon said hearing.
15          I further certify that I am
16  neither of counsel nor of kin to the
17  parties to the action, nor am I in anywise
18  interested in the result of said cause.
19
20
21
22
23      COMMISSIONER - NOTARY PUBLIC

WALKER PERSONNEL
1300-A E. MAIN ST.
PRATTVILLE, AL 36066
(334) 365-5556   FAX (334) 365-4

# LARRY D SMITH

5675 Valley Brook Lane        Montgomery, AL 36117        (334) 213-7320

## Education

Sylacauga High School 1983

## Work History and Experience

**2005-2006** Hyundai Motor Manufacturing Alabama
**PDI Light Repair**
- Flushed and gapped front and rear doors
- Replaced damaged and defective parts in interior
- Assessed damage and appropriated materials for rework

**1998-2005** Rheem Manufacturing
**Lead Man**
- Assembled water heaters
- Fork Lift Operator loading & unloading heaters
- Operated a Machine Arc Welder to weld bottoms

**1995-1998** Trentech
**Assistant Warehouse Manager**
- Training new employees
- Ensure all freight is shipped properly via truck line, ups, fed-x, dhl
- Maintained inventory control
- Fabricate steel and aluminum
- Built computerized control cabinets, etc.

**1984-1995** Russell Corporation
**Stenciler Fork Lift operator**
- Operated stenciler to apply numbers and names to sports wear
- Loaded and unloaded truck loads of yarn.

References available upon request

**EXHIBIT**

1

Smith

RC — 131

# PERSONNEL CHANGE OF STATUS
### PLEASE TYPE OR PRINT

 **RUSSELL®**

## A. ACTION TO BE TAKEN:

[ ] EMPLOYMENT
- 01. New Hire
- 02. Re-Hire
- 03. Return From L.O.A.
- 05. Part Time
- 06. Military Re-instatement

[ ] RECLASSIFICATION
- 12. Merit Increase
- 13. Pay Transfer
- 14. Dept./Shift/Job Chg.
- 15. General Increase
- 16. Name Change
- 17. Change Tax Code
- 18. Change Marital Status
- 19. Other

[ ] LEAVE OF ABSENCE
- 21. Personal
- 22. Medical
- 23. Military
- 24. Maternity
- 25. Lay Off

[ X ] TERMINATION
- ㉛ Discharge
- 32. Retirement
- 33. Lack of Work
- 34. Quit
- 36. Other

| KEY | LEVEL 1 | LEVEL 2 |
|-----|---------|---------|
|     |         |         |

## B. PERSONAL DATA:

EMPL. NO. __ / __ / _7612_    NAME _Larry D. Smith_

ADDRESS _____ CITY/STATE _____ ZIP CODE __

DATE OF BIRTH _____ EEO CODE _1-3_ 7 MARITAL STATUS _____ NO. OF DEPENDENTS __

PHONE NO. _____ FEDERAL TAX CODE _ _ _ STATE TAX CODE _ _ _ PAY CODE _____

ADDITIONAL FEDERAL WITHHOLDING _____ ADDITIONAL STATE WITHHOLDING _____

**PAY BASIS:** [X] PERMANENT   [ ] PART-TIME   [X] WEEKLY   [ ] BI-WEEKLY

## C. JOB DATA:

PLANT NO. _8_ PLANT NAME _screen print_ DEPT. NAME _____   DATE BEGAN WORK _4-8-85_

|        | HRS. PER SHIFT | JOB NUMBER | SHIFT | OVERSEER CODE | PAY RATE |
|--------|------|--|--|--|--|
| FROM:  | 1-4-6-8 |  |  |  |  |
| TO:    | 1-4-6-8 |  |  |  |  |

JOB TITLE _Stenciler_

## D. LEAVE OF ABSENCE:
13   FROM _____ TO _____   LAST DATE WORKED _5-21-86_

## E. EXPLANATION:
On 5-21-86 employee reached step 4 of company absentee policy and was subsequently terminated by a plant review committee. At approximately 4:00 A.M. this date, prior to the review committee hearing, employee was advised by his supervisors of the fact that he was subject to termination for absenteeism pending decision of plant review committee. Employee went into a rage, stormed out of the office and onto the production floor. At this time, the supervisors were on their way to call security when the employee pushed one of the supervisors from behind and began making threats to the effect that he was going to kill the supervisor for terminating him.   **EFFECTIVE DATE:** _5-21-86_

PEFORMANCE RATING (Circle one): Above Average,  Good,  Average,  Fair,  (Poor)

ATTITUDE _Poor_    ATTENDANCE _Poor_    QUALITY _Fair_

WOULD YOU REHIRE?   YES ( )    NO ( X )

## F. APPROVALS:

PLANT _____   PERSONNEL _____   PAYROLL _____

EXHIBIT 2  Smith

PERSONNEL WHITE, PAYROLL YELLOW, PLANT PINK

D 00062 L Smith

| ABSENTEEISM | | POLICIES | | |
|---|---|---|---|---|
| DATE | REASON | DATE | MINOR | MAJOR |
| ~~━━━━━~~ | | 2-24-86 | Employee ran 3/12 of order | |
| 2-26-86 | No Report | | in wrong place, off center, | |
| 3-3-86 | Sick | | & had sten while training | |
| 3-5-86 | Left work sick | | on Richardson machine | |
| 3-10-86 | Called in sick | 2-27-86 | Verbal "No Report" | |
| 3-24-86 | Car Trouble | 3-11-86 | 1st Written   38.3 hrs. | |
| 4-5-86 | Late | 3-11-86 | 13/12 Raw Wrong sleeve | |
| 4-8-86 | Car Trouble | | Russell order; Quality; Verbal | |
| 4-23-86 | Late | 4-4-86 | Employee got into argument with | |
| 5-12-86 | Family problems | | inspector. Cautioned and allowed | |
| 5-19-86 | Went to somebody's graduation | | apology between | |
| 5-20-86 | No Report | ~~━━━~~ | ~~━━━━━━━━~~ ~~━━~~ | |
| | | 4-9-86 | 2nd Written   Absenteeism 38.5 hrs. | |

┌─────────────────┐
│    EXHIBIT      │
│                 │
│       3         │
│                 │
│     Smith       │
└─────────────────┘

**Memo to HRD**



Date: 1/15/98
From: Ken Fuller

Follows is my recollection of conversations concerning an incident with employee Larry Smith:

*January 13, 1998*
Approx. 7:45 AM on above date, Kenny Burnette, Trenntech Warehouse Manager, came to my office to let me know of an incident that had occurred with Larry Smith concerning his time sheet (see attached report from Kenny Burnette). After being advised of the circumstances detailed in Kenny's report, and the nature of the confrontation that had occurred, I advised Kenny to terminate Larry for insubordination. Kenny left my office and at some point he did as I had directed and informed Larry of his termination.

Fifteen or twenty minutes later, my other two supervisors, Elaine Truelove and Conrad Smith came to my office for a discussion. They had heard that Larry was being terminated and wanted to know if there was another solution. They advised that they had never had any trouble with Larry and felt that he did his job well. I partially explained the circumstances and my concerns over <u>not</u> terminating Larry as I did not feel that it was at all appropriate for one of my employees to be insulting and insubordinate to his immediate supervisor. They felt that there was a conflict in personalities that prompted the incident and that Larry would be ok if he was not working for Kenny. Conrad stated that he would take him into his employ in the rough fabrication area although he knew as I did that there was not a lot of work at the moment. I agreed to transfer Larry in lieu of termination if Conrad wanted to take the responsibility of having Larry work for him.

After my discussion with Elaine and Conrad (maybe twenty or thirty minutes of conversation) I went back to the warehouse, found Larry, and told him to come to my office. Larry basically appeared to have the same story as Kenny. Larry admitted that there had been a disagreement over his time sheet and that he had been insubordinate and had made insulting remarks to Kenny, but added the accusation that Kenny was a racist and indicated that that was the source of the conflict. Larry went on to say that said that Kenny had told him at some point in the past that he hoped a tree would fall on his trailer. He also said that a few months back, Kenny had drawn a picture of KKK klansmen and had given it to him. He also stated that Kenny was jealous of him and did not like him interacting with the other production employees - specifically the ladies in the wiring department.

At that point I told Larry that I did not think that I could condone his actions and that I had actually instructed Kenny to terminate him that morning. I went on to inform him that a couple of people had went to bat for him and had convinced me that as an alternative to outright termination, I should offer a transfer to the rough fabrication department. He told me that he liked his job, thought that he was good at it, and that he did not see why he should be forced to leave his current position. I informed him that I was not going to force him to do anything he

didn't want to do, and that if he wanted to make formal accusations of racism that that was his option to take this incident to another level. I told him that what I was offering was an option to outright termination due to insubordination. He accepted and I informed him that I intended to issue a formal written reprimand over the incident in the next couple of days.

I then called Kenny back in and explained to him that I had countermanded my original directive. He indicated that he thought it was a mistake and I agreed that it might turn out that way, but instructed him to avoid any type of confrontation with Larry. He stated that he would comply.

*January 15, 1998*
Approx 8:00 AM on above date, I called Conrad Smith (Larry's new supervisor in the rough fab department) and told him to send Larry to my office. Conrad told me that Larry was not here, that he had to take his kids and wife somewhere as they only had one car. I told Conrad to send him up when he arrived.

Conrad came to my office later this morning for another reason and we entered into another discussion of the incident. I told Conrad that I had formally written Larry up and that I was placing him on a 90 day probation. I told Conrad to keep an eye out for anything out of the way and to report any incident immediately as I still had my concerns.

Later, Larry arrived at my office and I informed him that I was issuing a formally reprimand (see attached) and placing him on a 90 day probationary period during which time any incident could result in his immediate dismissal. I also instructed him that it was against my better judgment to do so. At this point Larry became angry and upset and again stated that he did not see why he had to give up his job in the warehouse. He pulled out his wallet and removed a folded piece of paper with a drawing that he said was of the KKK. He said Kenny had gave it to him and that he had saved it. I asked him how long ago he had given it to him, and he said about 3 months. He again began making accusations of racism of Kenny's part and stated that he had no problem with suing the company and that he would indeed do so. I again informed him that it was completely up to him if he was wanting to make formal charges and take this entire incident to another level. He did not really respond to this.

He then indicated that he would not sign the written reprimand in front of him and that it was within his rights not to do so. I asked him at that point if he wanted the deal I was offering or not and if he even read the written reprimand. He had not read it, and at that point he took the time to do so. He then said that he would sign it and that he did accept the transfer. He asked if that was all and I said that it was. As he was leaving I stressed to him that he should be very careful during his probationary period.

1/15/98

To: Larry Smith
From: Ken Fuller - Production Mgr.

Subject: Written reprimand

You are being reprimanded for being insubordinate and insulting in your language to your immediate supervisor, Kenny Burnette (warehouse manager), over a disagreement concerning your time sheet. In lieu of immediate dismissal, you have been offered and have accepted the option of a transfer to the Rough Fab department of Trentech Production - effectively immediately.

Along with the transfer, you are being placed on a 90 day probationary status. Any inappropriate conduct within this period can and may result in immediate dismissal.

Your signature indicates that you have been advised of the above.

X _Larry Smith_

On Dec. 23. 1997 Larry Smith approached me (Kenny Brunette) with the posibility of taking a half day vacation. Time sheets had already been turned in due to Melissa going on vacation.

It was agreed ~~upon~~ that he would take a ½ day vacation on Dec. 23 and a full day vacation on Dec. 26 (Ken Fuller) with the understanding that the time taken for vacation would be made up. Larry made up the full day Dec. 26 on the following Monday Dec. 29. On Tuesday Dec. 30. Larry was stating that Melissa had told him he had another ½ day Vac. due him which was false because he still owed ½ day for taking ½ day on Dec. 23. On dec. 30. Larry decided to take his final week of Vac. which led to the ½ day owed because you can not make up a Vac-day on Vac. When informed on Dec. 30 he had a ½ day Vac. to make up he got hostile and started calling me names (redneck, ignorant redneck etc) which I didn't respond too.

On Dec. 31 Larry refused to speak or even be in the same area with me so I let him go his own ~~way~~ way in hopes of avoiding a confrontation with him. When time sheets were made out for the week of Jan 4 thru 10 he didnot make adjustments for the half day owed on Dec. 23 so I made the adjustment ac I was previously told by my boss (Ken Fuller) to do. When the time sheets returned he (Larry) questioned me about

and he started cursing me flipping me off
and saying F — — — you more than once. this
is the second time Larry has attacked me
with such language. During the verbal abuse
I walked out and called Betsy DAVIS (human resources)
and enformed her on what had just taken place.
I was told to avail contact with Larry and report
it to Ken Fuller as soon as possible. 1-12-98

Around 4 oclock in the afternoon I was processing
transmittals when Larry came up to me and
started up again I did not respond I finished doing
my U.P.S. Book and left the area. Around 4:25 P.M.
I was outside giving Larry all the space he needed
when he came out of the building got in his
car pulled up to where I was and started trying
to get me in to a confrentation which I told him
to just go away. Started with the name calling again
(white trash etc) which I ignored again this seemed
to really unsettle him because he started attacking
the integrity of my wife for what reason I do not know
this ~~xxxxx~~ keep on until Larry Nichols came out
of his door and Larry Smith saw him that's when
he promised he would see to my termination and
left.

Jan 13 I reported it to Ken Fuller and
left it in his hands

Kenny Burnett
Warehouse Mgr. Trentoch

Rheem Manufacturing Company

## PERSONAL REPORT
(Commendation or Warning)

Name: Larry Smith                     Date: 12-27-01

Dept: 09

Clock #_____   Time_____

The following report is made concerning the above named employee: (What happened? When did it happen? Where did it happen? Were there any witnesses?)

Facts: Threw 2140 on ground causing it to be Scrapped
Left line early before break-buzzer
Disrespectful language to fellow employee
Including yelling "the bird", and other inappropriate
Rules #2, 5, 12                              Behavior.

Objecties: (What must change?)

Solution: (How it can change?)
Treat others w/ Respect
Control Temper

Actions: (What happened if it breaks down?)
1½ day suspension — Return to work on/2/02
further violations will result in Termination.

My signature hereto does not necessarily imply that I agree with this report.

This report has been issued to the above named employee as:
( ) confirmation of a Verbal Warning
( ) a Written Warning  Final warning / Suspension
( ) a Commendation

Larry Smith
Employee Signature

Betty J. Jones 09
Supervisor Signature Signature

Employee Comments

EXHIBIT
5
Smith

tabbies

D 00143 | Smith v Hyundai

**EXHIBIT 6** Smith

# APPLICATION

PLEASE ANSWER ALL QUESTIONS BOTH SIDES

ANDERSON PERSONNEL MANAGEMENT SERVICES (800) 635-9182

PUHM 1UIA U90D   UHUEM NO. 80040

I-9 COMPLETED □   **INDUSTRIAL** (Initial)

| NAME (LAST) | FIRST | MIDDLE | DATE |
|---|---|---|---|
| Smith | Larry | Darnell | 5-23-06 |

| STREET ADDRESS | APARTMENT NO. |
|---|---|
| 5625 Valleybrook Lane | |

| CITY | STATE | ZIP |
|---|---|---|
| Montgomery | AL | 36117 |

HOME PHONE # (334) 213-7320
MESSAGE PHONE # 3/2-3021
CELL PHONE # (334) 312-3021

SOCIAL SECURITY NO. ___-__-7612

E-MAIL ADDRESS

PERSON TO NOTIFY IN CASE OF EMERGENCY: Kim Smith
ADDRESS: 5625 Valleybrook Lane
CITY: Montgomery STATE: AL ZIP: 36117

ARE YOU A STUDENT? □ YES ☑ NO
DO YOU HAVE USE OF AN AUTOMOBILE? ☑ YES □ NO
ARE YOU ON YOUR OWN BUS LINE? □ YES ☑ NO
TYPE OF WORK DESIRED: Manual

## EDUCATION

LAST SCHOOL ATTENDED: B.B. Comer

| | DEGREE/MAJOR | GRADUATED |
|---|---|---|
| | | GED |

**CIRCLE HIGHEST GRADE**
HIGH SCHOOL 1 2 3 (4)
COLLEGE 1 2 3 4

WHY ARE YOU SEEKING TEMPORARY EMPLOYMENT?
I am starting Temp to Perm

DATE/AVAILABLE TO START WORK: 5-24-06
CIRCLE DAYS AVAIL: M T W TH F S S

HAVE YOU EVER WORKED FOR A TEMPORARY SVC? □ YES ☑ NO
WHICH ONES?

NAMES & ADDRESSES OF FIRMS WORKED FOR AS TEMPORARY:
1.
2.

FIRST JOB PREFERENCE:

HAVE YOU EVER BEEN BONDED? □ YES ☑ NO
HAVE YOU EVER BEEN REFUSED BONDING? □ YES ☑ NO
ADDRESS:

SECOND JOB PREFERENCE:

ARE YOU BONDABLE NOW? □ YES ☑ NO
HAVE YOU EVER BEEN CONVICTED OF A FELONY? □ YES ☑ NO

THIRD JOB PREFERENCE:

HOW WERE YOU REFERRED?
□ YELLOW PAGES
□ NEWSPAPER
□ OTHER:

WILL YOU WORK AS TEMPORARY? ☑ YES □ NO
NIGHT HOURS: 12 am 9 pm
DAY HOURS: 12 am 9 pm

WILL YOU CHANGE NAME DAYS OF ASSIGNMENT?

ARE YOU FREE FOR PERMANENT WORK? ☑ YES □ NO

WILL YOU BE AVAILABLE LONG TERM? ☑ YES □ NO

REASON RESUME: Smith

## PREVIOUS EMPLOYERS:  LAST POSITION FIRST

| DATES FROM / TO | NAME OF EMPLOYER | ADDRESS | PHONE NUMBER | LAST SUPERVISOR | TYPE WORK | SALARY |
|---|---|---|---|---|---|---|
| 4-05 / 12-05 | Hyundai | Hyundai Blvd | (334) 387-8000 | Mike Lusby | Car Rep | 19.79 |
| 8-90 / 4-05 | Rheem Manufacturing | Coosta Park | (256) 313-3400 | Wayman Leonte | Assembler | 13.85 |
| 1-74 / 10-87 | Teartch | Old Hayesville Rd | (334) 831-0420 | Darnell Smith | Fabricator | 7.00 |
| | | Alexander City AL | (334) 360-6430 | Greg Thell | Fork Lift | |

## CHECK ONLY SKILLS WHERE YOU HAVE WORK EXPERIENCE. ESTIMATE YOUR SKILL.  1 (GOOD)  2 (AVERAGE)  3 (FAIR)

| PLANT MAINTENANCE: 1 2 3 | GENERAL LABOR 1 2 3 | MACHINE OPERATIONS: 1 2 3 | PAPER-PRINTING 1 2 3 | SKILL TRADE: 1 2 3 | DRIVING 1 2 3 |
|---|---|---|---|---|---|
| CARPENTRY | AUTO REPAIR | BRIDGEPORT | ARTIST | ARC WELDING | DELIVERY VAN |
| ELECTRICAL | BLUEPRINT READ. | C N C | BINDERY/BOOKING | BLUEPRINT READ. | TRACTOR/TRAIL. |
| HEAT. LIC/HTAC | CASHIER | DRILLING | CAMERA OPER. | CUTTER/GRINDER | GRADING EQUIP. |
| MACHINE MAINT. | FOOD HANDLING | EXTRUSION | COLLATOR OPER. | MIG | LICENSED FOR: |
| MACHINE REPAIR | LANDSCAPING | FOAM | 4-COLOR STRIP | MOULDMAKER | □ CLASS I  □ CLASS II |
| PAINTING | MAT. HANDLING | FOOTPRESS | LAYOUT/DESIGN | SHEETMETAL | OTHER: |
| PLUMBING | PACKING/SHIPP. | GRINDING | PASTE-UP | T I G | |
| OTHER: | RETAIL | INJECT. MOULD. | PRESS OPERATOR | TOOL MAKER | |
| | SECURITY | LATHE | PRESS HELPER | OTHER: | |
| | SIDEWORK | MILLING | SEWING/STITCH | | FORK LIFT OPR. 1 2 3 |
| | WAREHOUSE PER. | NUMERI. CONT. | SILKSCREEN | TEXTILE: 1 2 3 | GAS |
| | OTHER: | PLATING | TYPESETTING | CARDING/COMB. | ELECTRIC |
| | | POLISHING | COMP/GRAPHIC | CUTTER | PROPANE |
| ASSEMBLY 1 2 3 | | PUNCH PRESS | MERGENTHALER | KNITTING | STAND-UP |
| ELECTRICAL | | SETUP | PIC-UP | PUNCH, CUT, FOR | SET-DOWN |
| MECHANICAL | | WOODCUTTING | PC | SEWING | COMPUTERIZED |
| PACKING | | OTHER: | MAC | TWIST/BEAM/WR. | CERTIFIED: □ YES □ NO |
| PC BOARD | | | OTHER: | WEAVING | OTHER: |
| SOLDERING | | | | OTHER: | |
| WIRE HARNESS | | | | | TECHNICAL: 1 2 3 |
| OTHER: | | | | | MECHAN. LICEN. |
| | | | | | ELECTRICAL LICEN. |
| QUALITY CONTROL 1 2 3 | | | | | CHEMICAL LICEN. |
| CHEMICAL INSP. | | | | | PESTICIDE LICEN. |
| ELECTRICAL INSP. | | | | | |
| FIRST PIECE INSP. | | | | | CAN YOU DRIVE A TRUCK? 1 2 3 |
| LAYOUT INSP. | | | | | |
| METALLURGICAL | | | | | WHAT SIZE CAN? |
| N D T | | | | | |
| PARTS INSPEC. | | | | | LICENSE CLASS 1 2 3 |
| TESTING MECH. | | | | | |
| OTHER: | | | | | LICENSE NUMBER |
| | | | | | VALID   STATE |



North America, Inc.

# Employee Discussion Report

**To:**  Larry Smith                                      **Date:**  3/12/2007
_____                 _____
           (employee's name)                                  (date employee signed)

**Subject:**  Shipping errors
            _____
               (nature of the performance problem/behavior)

**Detailed description of the performance problem / behavior (attach additional paper if necessary:**
Larry made a shipment for Duncan S.C. and did not ship everything on the load plan. The tracks (888's)
were availible and Larry had them checked off  the load plan but were not shipped. There were also
discrepencies on what actually shipped (887's). The paperwork had one qty (76pcs) and the customer
actually received something different (48pc).  This is not the first time this has happened.

**Has employee received previous feedback concerning this issue?**  ☒ yes   ☐ no

**Supporting information:**
The customer was ask to check again and they confirmed the discrepency.

**NOTE:**  Attach any documentation or copies from training verifications, employee file, etc.

**List the negative consequences of this problem / behavior to the employee:**
Due to the shipping errors we had to expedite the tracks to the customer which is very expensive. It also
causes the customer to doubt our process and procedures.
If this continues further actions will be taken by CRH in order to prevent shipping discrepencies.

**Employee's response to the performance problems / behavior:**

Your continued failure to follow the working guidelines of this plant may be cause for future
disciplinary action.  It is hoped and expected that you will correct your problem / behavior and no
further action will be necessary.  If you have a problem that is affecting your work and would like
to receive additional assistance from your supervisor or the Human Resources Office, you should
make your request known.

This Discussion Report will be placed in your personnel file.

would not sign

_____                    _____
Supervisor                                          Employee

_____                    _____
Production Manager                                  Date

EXHIBIT
7
Sm. 7h

**CRH North America Inc**
**2541 7ᵗʰ Street South**
**Clanton, Alabama 35045**

# EMPLOYEE TERMINATION FORM

**Name:** Larry Smith

**Department:** Logistics

**Clock Number:** 2827

**Social Security Number:** ███-7612

**Effective Date of Termination:** March 14, 2007

**Last Day Worked:** March 13, 2007

**Job Title:** Shipping Coordinator

**Reason for Termination:** Please circle one of the following:

Voluntarily Quit, (Terminated,) Retired, No Work Available, Death/Sickness

**Would you Rehire:** Yes   or   (No)

**Please explain in detail:** Employee was terminated during 90 day Probationary Period

HR Manager Signature _____ Date 3/14/07
Logistics Mgr. Signature _____ Date 3/14/07

EXHIBIT

~~Smith~~

09/01/99 CRHNA113

January 4, 2007

Re: Larry D. Smith

Dear Larry,

CRH would like to make a job offer for the position of Shipping Coordinator on January 8, 2007, for a rate of 13.00/hr. This position requires a successful completion of your 90 day probationary period. We ask that you report to work at 8:00 a.m. on your first day to main lobby. You will have an employee orientation that day. You will be assigned to second shift after you are trained on first shift.

Employment offer is conditioned on prior to your hire date a drug screen, criminal background check, and pre-employment physical. Please make preparations to make this prior to employment. Our company doctor is Chilton Family Medicine. The telephone number is (205) 280-1010. You will need to come by the H.R. office to pick up your form for the physician and complete your criminal background check. If you wear prescription eyeglasses you will need to make an appointment with Dr. Lyn and Lyn to get your eyeglasses with riveted side shields (205) 755-1351.

Dress code is jeans or pants and uniform shirts. CRH will provide six polo shirts following employment. They offer other services but you will be responsible if you elect these services. During the interim time of waiting on your shirts you will need to wear a short or long sleeve (sleeveless is not permitted according to OSHA guidelines). You will need to wear steel-toe shoes in designated areas. Please have this prior to your employment. We reimburse up to $50.00 per calendar year.

Please bring with you on the day you begin work the following for identification purposes:

Driver's License
Birth Certificate or Social Security Card
Voided Check

Sincerely,

Judy Benson
H.R. Manager
(205) 755-9994 Ext 1903

EXHIBIT
9
Smith

EXHIBIT
10
Smith

## STATEMENT OF HEALTH FORM
To be Completed by the Employer

**MetLife** ®
Metropolitan Life Insurance Company, New York, NY

| Employer Name | | |
|---|---|---|
| CRH North America, Inc. | Customer Number 119607 | Reporting Location Number |
| Employer's Street Address 2541 7th Street South | City Clanton | State AL | Zip Code 35046 |

Insurance Requested (To be completed for each Proposed Insured)
☐ Basic Life   ☐ Optional Life   ☐ Group Universal Life   ☐ Group Variable Universal Life   ☒ Dependent Life
Additional Amount of Life Insurance Subject to Medical Underwriting $ 40,000
☐ Short Term Disability   ☐ Long Term Disability   ☐ Unified Disability
Enrollment Year: 2007

To be Completed by the Proposed Insured (A separate form must be completed for each Proposed Insured)

Employee Name (Must Complete)
First Larry D.   Last Smith
Employee Social Security Number (Must Complete)     7612

Insurance is for
☐ Employee   ☒ Spouse   ☐ Child
Proposed Insured Name   First Kim   Germany   Last Smith
☐ Male   ☒ Female
Date of Birth (Mo Day Yr)     69

Street Address 5675 Valleybrook Lane
City Montgomery
State AL   Zip Code 36117

Business Phone Number ( )
Home Phone Number (334) 213-7320
E-mail Address
State of Birth   Country of Birth

GEF02-1
ADM

Medical Information — Please complete all questions below. Omitted information will cause delays. "You" and "Your" refers to the Proposed Insured.

1. Height 5 feet 3 inches   Weight 140 lbs

2. Are you now:
   a. pregnant?
   b. taking prescribed medications or on a prescribed diet? If "yes," list:_____
   c. receiving or applying for any disability benefits including workers' compensation?

   Yes No
   ☐ ☒
   ☐ ☒
   ☐ ☒

3. In the past 5 years, have you received medical treatment or counseling by a physician for, or been advised by a physician to discontinue, the use of alcohol or prescribed or non-prescribed drugs?   ☐ ☒

4. In the past 3 years, have you been convicted of driving while intoxicated or under the influence of alcohol and/or any drug?   ☐ ☒
   If "yes," specify date of conviction (Mo./Day/Yr.)._____

5. Have you been diagnosed, treated, tested or given medical advice by a physician or other health care provider for:

   | | Yes | No |
   |---|---|---|
   | a. chest pain or heart trouble? | ☐ | ☒ |
   | b. high blood pressure, stroke or circulatory disorder? | ☐ | ☒ |
   | c. cancer or tumors? | ☐ | ☒ |
   | d. anemia, leukemia or other blood disorder? | ☐ | ☒ |
   | e. diabetes? | ☐ | ☒ |
   |    insulin treated? | ☐ | ☒ |
   | f. asthma, tuberculosis, pneumonia, or other lung disease? | ☐ | ☒ |
   | g. ulcers, stomach or liver disorder? | ☐ | ☒ |

   | | Yes | No |
   |---|---|---|
   | h. colitis, Crohn's or any intestinal disorder? | ☐ | ☒ |
   | i. Epilepsy, paralysis or dizziness? | ☐ | ☒ |
   | j. mental or nervous disorder? | ☐ | ☒ |
   | k. Lyme disease, Epstein-Barr or chronic fatigue syndrome? | ☐ | ☒ |
   | l. arthritis, carpal tunnel, or any muscle weakness? | ☐ | ☒ |
   | m. kidney or urinary tract disorder? | ☐ | ☒ |
   | n. thyroid or other gland disorder? | ☐ | ☒ |
   | o. back, neck or spinal disorder? | ☐ | ☒ |

Have you ever been diagnosed or treated by a member of the medical profession for Acquired Immune Deficiency Syndrome (AIDS), AIDS Related Complex (ARC) or the Human Immune Deficiency Virus (HIV) infection?   ☐ ☒

Personal Physician: DR. McCorvey
Address: Montgomery, AL   Date and reason for last visit: 2005 Check Up
Phone Number:_____

ive full details for "Yes" answers on the next page.

EF02-1

SOH/NW

EMPLOYEE – Make A Copy For Your Records & Return the Completed Form to Your Employer
EMPLOYER – Mail Completed Form to MetLife, PO Box 14069, Lexington, KY 40512-4069
For Inquiries, Contact 1-800-638-6420, Prompt 1 Option 1

(08/05)

Give full details for "Yes" answers. If more space is needed for full details, attach a separate sheet, sign and date it.

| Question Number | Dates of Treatment | Diagnosis/Condition | Duration | Name of Physician or Name of Clinic or Hospital and Complete Address, Including Zip Code |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

GEF02-1
MQ

**Declaration** — I have read this Statement of Health and declare that all information given above is true and complete to the best of my knowledge and belief. I understand that this information will be used by MetLife to determine my insurability.

**Fraud Warning:**

If you reside in or are applying for insurance under a policy issued in one of the following states, please read the applicable warning.

**New York** [only applies to Accident and Health Benefits (AD&D/Disability/Dental)]: Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Florida:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Massachusetts:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, and may subject such person to criminal and civil penalties.

**New Jersey:** Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.

**Oklahoma:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Kansas, Oregon, Washington and Vermont:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto may be guilty of insurance fraud, and may be subject to criminal and civil penalties.

**Puerto Rico:** Any person who, knowingly and with the intent to defraud, presents false information in an insurance request form, or who presents, helps or has presented, a fraudulent claim for the payment of a loss or other benefit, or presents more than one claim for the same damage or loss, will incur a felony, and upon conviction will be penalized for each violation with a fine no less than five thousand (5,000) dollars nor more than ten thousand (10,000), or imprisonment for a fixed term of three (3) years, or both penalties. If aggravated circumstances prevail, the fixed established imprisonment may be increased to a maximum of five (5) years; if attenuating circumstances prevail, it may be reduced to a minimum of two (2) years.

**Virginia:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**All other states:**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which may be a crime and may subject such person to criminal and civil penalties.

| | |
|---|---|
| (Employee must always sign) | |
| Signed _Gary D. Smith_ | Date _1-8-07_ |
| (Proposed Insured, other than Employee and at least 18 years of age) | |
| Signed _Kevin Smith_ | Date _1-8-07_ |

GEF02-1a
DEC

SOH/NW

(08/05)



DEFENDANT'S
EXHIBIT
11
Smith

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORHTERN DIVISION

LARRY SMITH,                              *
                                          *
Plaintiff,                                *
                                          *
                                          *          CIVIL ACTION NO.:
v.                                        *
                                          *            2:06-cv-966-ID-SRW
                                          *
HYUNDAI MOTOR                             *
MANUFACTURING, INC.                       *
                                          *
Defendant.                                *
                                          *

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

**COMES NOW**, Plaintiff Larry Smith, and responds to the Defendant's First Interrogatories and requests for production of documents, pursuant to Fed. R. Civ. P. 33 and 34, as follows:

### Responses to Requests for Production of Documents

1.      All notes taken or other written records or documents authored by Plaintiff (including, but not limited to, diaries, notes, tapes, recordings, or other documents) regarding his employment with HMMA or concerning any matter alleged in the complaint.

Response:      There are no such documents.

2.      All notes, documents, taper recording or other tangible evidence which tends to verify the truth or establish the falsity of any allegation in the complaint.

Response:      EEOC file, Employee Handbook.  Plaintiff received the EEOC file from his previous attorney and believes some pages may be missing.

Plaintiff's Responses to Defendant's Interrogatories

1.    Identify the name and address for each person or entity for whom plaintiff

has worked or received compensation since leaving the employment of HMMA,

and provide dates of employment for the plaintiff.

Response:  1.  Lear Corporation
                200 Folmer Pky
                Montgomery, AL 36105
                03/27/2006 – 04/03/2006

           2.  Express Services, Inc.
               8516 New Expressway
               Oklahoma City, OK 73162
               04/10/2006 – 04/19/2006

           3.  Workforce of Montgomery, Inc.
               300 Arba St.
               Montgomery, AL 36104
               04/25/2006 – 07/17/2006

           4.  Staffing Solutions
               540 Lomac St.
               Montgomery, AL 36106

           5.  Industrial Staffing of Alabama
               901 S. Hull St.
               Montgomery, AL 36104
               09/05/2006 – 12/05/2006

           6.  CRH
               2541 7th St. South
               Clanton, AL 35046
               01/08/2007 – present

3.    If you or anyone acting on your behalf has obtained any statement,

transcript or recording of any oral statement made by anyone you believe was an

agent, servant or employee of the defendant, please produce true and complete

copies of such statements, transcripts or recordings.

Response:    There are no such documents.

4.    All copies of plaintiff's state and federal income tax returns for the years

2002 through the present including W-2 forms, paycheck stubs, and any other

documents reflecting income for said years.

Response:    See attached.

5.    All documents the plaintiff or his agents or representatives gave to or

obtained from HMMA that relate to plaintiff's employment with HMMA, any

complaints of discrimination, harassment or retaliation and/or the matters alleged

in the complaint.

Response:    See documents in response to request numbers two and

six.

6.    All documents that reflect or relate to the terms, conditions or benefits of

plaintiff's employment with HMMA or with any person or entity that

subsequently employed the plaintiff.

Response:    See attached.

7.    All documents that reflect or relate in any way to any effort that plaintiff

made to obtain employment with any employer during the time he was employed

by HMMA or thereafter including, but not limited to, any correspondence

between plaintiff and any potential employer and any application, resume or other qualifications or experience prepared by or for plaintiff.

Response:     See attached.

8.     All documents that plaintiff has sent to or received from any employer for which plaintiff has worked since he worked for HMMA.

Response:     See documents in response to request number 4 and 7.

9.     All documents that relate to any claim by plaintiff for unemployment compensation benefits after leaving HMMA.

Response:     See attached.

10.     All documents that plaintiff or his agent or representative submitted to or received from the Equal Employment Opportunity Commission concerning his employment with HMMA and/or the matters alleged in the complaint.

Response:     See documents in response to request number two.  Plaintiff received the EEOC file from his previous attorney and believes there may be some pages missing.

11.     All documents reflecting or relating in any way to any mental, physical, or pecuniary damage that plaintiff allegedly suffered as a result of the matters alleged in the complaint.

Response:     See attached.  Plaintiff has typed a summary describing how he has suffered mentally and physically from his termination.  Also, attached is documentation from a visit to Pri-Med when Plaintiff believed he was having a heart attack.

12.    All documents reflecting the identity of any witness to the matters alleged in the complaint.

Response:    Other than the EEOC file, there are no additional documents at this time.

13.    All documents reflecting the identity of any doctor, optometrist, ophthalmologist, therapist, chiropractor, psychiatrist, psychologist, minister or other counselor that plaintiff made an appointment with, consulted, or received treatment from at any time during his employment with HMMA or thereafter.

Response:    See document from Pri-Med in response to request number eleven.

14.    All medical, psychiatric or psychological reports, writings, histories and charts, x-ray reports, prescriptions, bills and any other records pertaining or referable in any way to any diagnosis, observation or treatment of plaintiff from at any time during his employment with HMMA or thereafter.

Response:    See document from Pri-Med in response to request number eleven.

15.    All documents reflecting litigation, whether civil or criminal, in which plaintiff is or was a party, including arrests and EEOC charges.

Response:    See attached.

16.    All documents relating to any proceeding in which plaintiff sought social security disability benefits or any other type of disability benefits.

Response:    There are no such documents.


Plaintiff shall supplement these responses if additional documentation is discovered.

2.     Identify the name and address for each person or entity to whom plaintiff has submitted an application or resume or expressed an interest in a position during the time plaintiff was employed by HMMA or thereafter.

Response:     Larry Smith left a position at Rheem to work at HMMA.  He wanted HMMA to be his last employment, because of the opportunity for growth. See response to interrogatory number one.  Additionally, see attached documents.

3.     Identify the name and address for each doctor, optometrist, ophthalmologist, therapist, chiropractor, psychiatrist, psychologist, minister or other counsel from whom plaintiff has sought treatment or counseling during the time plaintiff was employed by HMMA or thereafter.

Response:     After plaintiff's termination from HMMA he sought counsel from a local minister, Rev. Albert Sankey, Old Selma Road, Montgomery, AL 36108.

4.     Identify the name and address for each person the plaintiff intends to call as witnesses in support of his claims and identify the subject matter upon which each person is expected to testify.

Response:     See witnesses identified in Plaintiff's Initial Disclosures.  The last name of Plaintiff's rule 26 initial disclosures is believed to be Carl Tyus, back-up team member for Reggie Johnson, who was a witness to a conversation between

plaintiff and Johnson.  Rev. Albert Sankey may be a witness to testify to his conversations with plaintiff related to the mental anguish suffered by plaintiff.

5.    Identify any experts who have been retained or specially employed by the plaintiff with regard to this litigation and state the facts known and the opinion held by any such expert.

Response:    No experts have been retained by plaintiff at this time.

6.    Identify the name and address of any HMMA employee from whom plaintiff or anyone representing him has obtained a written or oral statement.

Response:    No statements, written or orally, have been obtained at this time.

7.    Identify the name of any HMMA employee with whom plaintiff has had contact since December 6, 2005, and give the nature of such contact and the substance of any such communications.

Response:    Larry Smith saw an employee from his department at HMMA at Wal-Mart in July or August of 2006.  Smith does not know the name of this employee.  The two of them exchanged greetings.  The unknown employee told Smith that Reggie Johnson had been taken off the line at HMMA.  Smith does not recall any other details of the conversation.  It was a short conversation.

In April of 2006 Plaintiff was driving his car in his neighborhood when he saw Joshua Groves. Joshua was looking at a house for sale in Plaintiff's neighborhood with his wife and mother-in-law. Smith stopped to talk with Groves for a few minutes. Larry Smith and Joshua Groves talked about the neighborhood, houses, and family. Smith asked Groves to tell Michael Harris that he needed his tools. Smith and Harris shared a locker at HMMA and some of Smith's personal tools were left in the locker. Groves informed Smith that he did not get along with Michael Harris. In fact Groves and Harris had a physical altercation at work and were suspended for three days. Groves then informed Smith that he no longer worked at HMMA, so he could not relay the message to Michael Harris.

Smith had no conversation with either employee about his EEOC charge or complaint.

Submitted this 16th day of March 2007.

Kathryn Dickey (DIC025)
322 Alabama Street
Suite B
Montgomery, AL 36104
(334) 262-9728
(334) 265-7696  fax

_Larry Smith_

STATE OF ALABAMA                    )
MONTGOMERY COUNTY                   )

Before me, the undersigned notary public, personally appeared, Larry Smith, who is known to me, and who, knowingly have duly sworn, said that the foregoing answers are true and that the documents produced herewith are authentic, on this 16th day of March, 2007.

_Notary Public_

My commission expires: 6-28-09

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document by placing a copy of same by e-mail and in the United States mail, postage prepaid and properly addressed on this the 19th day of March 2007 to the following:

Honorable Brian Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Building
1819 Fifth Avenue North
Birmingham, AL 35203

OF COUNSEL



—OK



...ry Change to 4/7?
will call back at about 9:30
Thurs to confirm

# Employment Application



RECEIVED
DEC 1 6 2004
BY: *RMN*

**Name:** *LARRY DARNELL SMITH*

**Position Desired:** *OPEN*

**Application Date:** *12-13-04*



**Applicant Notice**

HMMA fully complies with the spirit and intent of laws regarding nondiscrimination for employment because of sex, race, creed, color, national origin, age, disability, or Vietnam veteran status. The questions on this form are designed to assist you in your proper placement.

Please be accurate in filling out this application. HMMA verifies work history, compensation and educational information.

**HYUNDAI**
Hyundai Motor Manufacturing Alabama, LLC

D 00243  L Smith v Hyundai

DEFENDANT'S
EXHIBIT
12
Smith

## PERSONAL

| LAST NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| SMITH | LARRY | DARNELL |

CURRENT ADDRESS (Number and Street)
5675 Valleybrook Lane

| CITY | STATE | ZIP | EMAIL ADDRESS |
|---|---|---|---|
| MONTGOMERY | ALABAMA | 36117 | |

| HOME PHONE | ALTERNATE PHONE NUMBER | SOCIAL SECURITY NUMBER | DRIVER'S LICENSE NO/EXP DATE/STATE |
|---|---|---|---|
| (334)213-7320 | (334) 312-4473 | ■ - ■ -7612 | ■ 8-4-06 AL |

NOTIFY IN CASE OF EMERGENCY: ■■■

ARE YOU UNDER 18 YEARS OF AGE?   ☐ YES   ☑ NO

WHAT CAUSED YOU TO SEEK EMPLOYMENT AT HMMA?   ☐ ADVERTISEMENT   ☐ REFERRAL   ☐ OTHER (Specify)
REFERRED BY: ANTONIO DUNCAN

ARE YOU RELATED TO ANYONE EMPLOYED WITH HMMA?   ☑ NO   ☐ YES   IF "YES" IN WHICH DEPARTMENT? _____

HAVE YOU EVER BEEN CONVICTED OF A FELONY?   ☑ NO   ☐ YES   IF "YES", PLEASE EXPLAIN: _____
(A conviction may not necessarily disqualify you from the job applied for)

DO YOU KNOW OF ANY REASON WHY YOU WOULD NOT BE ABLE TO PERFORM THE VARIOUS FUNCTIONS OF THE JOB YOU ARE SEEKING?   ☑ NO   ☐ YES   IF "YES", EXPLAIN:

IF APPLICABLE, WHAT SOFTWARE PACKAGES ARE YOU PROFICIENT IN?
Windows XP

CAN YOU TYPE?   ☐ NO   ☑ YES   25 WPM

## CAREER OBJECTIVES

POSITION DESIRED
1st CHOICE: Production          2nd CHOICE: Anything

OTHER POSITIONS FOR WHICH YOU ARE QUALIFIED: Machine Arc Welding

HAVE YOU WORKED FOR OUR COMPANY BEFORE?   ☐ YES   ☑ NO   (If "Yes", state date left)

ABILITIES, INTERESTS, HOBBIES, OR PERSONAL ASSOCIATIONS WHICH YOU BELIEVE WILL ASSIST US IN EVALUATING YOUR APPLICATION (OPTIONAL):
Machine Arc Welding, Air testing, Steel fabrication, Blueprint Reading, Assembling Engine

## EDUCATION

| CIRCLE HIGHEST GRADE COMPLETED IN EACH SCHOOL GRADE CATEGORY | SCHOOL | LOCATION | MAJOR/DEGREE | DID YOU GRADUATE? | GRADE PT. AVG. |
|---|---|---|---|---|---|
| HIGH SCHOOL 9 10 11 12 | B.B. Comner | Sylacauga, AL | I have a GED | NO | 86 |
| COLLEGE 1 2 3 4 | | | | | |
| GRADUATE SCHOOL 1 2 3 4 | | | | | |
| APPRENTICE, BUSINESS OR VOCATIONAL SCHOOL NO. OF YEARS 1 2 3 4 | Pittard Area Vocational | | Building Construction | | |
| OTHER TRAINING OR SKILLS (Special Courses, Military Training, if appropriate) | | | | | |

D 00244  L Smith v Hyundai

## PREVIOUS EMPLOYMENT

LIST ALL JOBS AND ACTIVITIES INCLUDING FULL-TIME, PART-TIME EMPLOYMENT WHILE IN SCHOOL, AND SELF-EMPLOYMENT. BEGIN WITH MOST RECENT.
DO NOT REFERENCE A RESUME.
PLEASE LIST ALL PERIODS OF UNEMPLOYMENT IN SPACE AT BOTTOM OF PAGE.
MAY WE CONTACT YOUR PRESENT EMPLOYER?   ☐ YES   ☐ NO

| FROM | TO | EMPLOYER | PHONE# | REASON FOR LEAVING |
|------|-----|----------|--------|--------------------|
| MO. YR. | MO. YR. | Rheem MANUFACTURING | (334) 260-1500 | |
| 8-98 | Present | STREET ADDRESS 2600 GUNTER PARK DRIVE EAST | | |
| BASE RATE OF PAY* | | CITY MONTGOMERY | STATE AL | ZIP 36109-1413 |
| START 9.50 | FINAL 12.69 | YOUR TITLE AND JOB DUTIES Assembler; MACHINE Arc Welder, AIR TESTER | | |
| OTHER CONSIDERATIONS | | Plugger, BAND AND CHECKER | | |
| | | NAME AND TITLE OF SUPERVISOR NORMAN LEWIS SUPERVISOR BOILER DEPARTMENT | | |

| FROM | TO | EMPLOYER | PHONE# | REASON FOR LEAVING |
|------|-----|----------|--------|--------------------|
| MO. YR. | MO. YR. | | | |

| FROM | TO | EMPLOYER | PHONE# | REASON FOR LEAVING |
|------|-----|----------|--------|--------------------|
| MO. YR. | MO. YR. | RUSSELL MILL CORP | (256) 500-5588 | Increase Income |
| 1-85 | 2-96 | STREET ADDRESS 155 LEE STREET | | |
| BASE RATE OF PAY* | | CITY ALEXANDRIA CITY | STATE AL | ZIP 35110 |
| START 6.00 | FINAL 6.25 | YOUR TITLE AND JOB DUTIES ForKLIFT OPERATOR, STENCILOR | | |
| OTHER CONSIDERATIONS | | | | |
| | | NAME AND TITLE OF SUPERVISOR GREG TUCK   SUPERVISOR OF SCREENING DEPT | | |

| FROM | TO | EMPLOYER | PHONE# | REASON FOR LEAVING |
|------|-----|----------|--------|--------------------|
| MO. YR. | MO. YR. | | | |

| FROM | TO | EMPLOYER | PHONE# | REASON FOR LEAVING |
|------|-----|----------|--------|--------------------|
| MO. YR. | MO. YR. | | | |
| | | STREET ADDRESS | | |
| BASE RATE OF PAY* | | CITY | STATE | ZIP |
| START | FINAL | YOUR TITLE AND JOB DUTIES | | |
| OTHER CONSIDERATIONS | | | | |
| | | NAME AND TITLE OF SUPERVISOR | | |

PERIODS OF UNEMPLOYMENT

*BASE PAY IS YOUR BASIC RATE OF PAY EXCLUDING OVERTIME PREMIUMS, SPECIAL BONUSES OR ALLOWANCES. IF SIGNIFICANT, PLEASE LIST UNDER "OTHER CONSIDERATIONS."
IF YOUR NUMBER OF PREVIOUS EMPLOYMENT LISTINGS IS MORE THAN FIVE, PLEASE ADD SUPPLEMENTAL PAGES AS NEEDED.

## PROFESSIONAL REFERENCES

PLEASE LIST FORMER SUPERVISORS AND/OR ASSOCIATES WHO ARE ACQUAINTED WITH YOUR PROFESSIONAL QUALIFICATIONS WHO MAY BE CONTACTED FOR REFERENCES.

| NAME | ORGANIZATION | TITLE |
|------|--------------|-------|
| NORMAN LEWIS | Rheem MANUFACTURING | Supervisor of Boiler Dept |

| HOME PHONE | BUSINESS PHONE | PROFESSIONAL RELATIONSHIP |
|------------|----------------|---------------------------|
| ( ) | (334) 260-1325 | NEIGHBOR |

| NAME | ORGANIZATION | TITLE |
|------|--------------|-------|
| ~~RICHIE SMITH~~ | ~~RADIO SHACK~~ | ~~MANAGER~~ |

| HOME PHONE | BUSINESS PHONE | PROFESSIONAL RELATIONSHIP |
|------------|----------------|---------------------------|
| ~~(334)~~ | | |

| NAME | ORGANIZATION | TITLE |
|------|--------------|-------|
| Wayne Birch | Trentech | Steel Fabricator |

| HOME PHONE | BUSINESS PHONE | PROFESSIONAL RELATIONSHIP |
|------------|----------------|---------------------------|
| (334) 263-9265 | ( ) | Good Friend |

## PROFESSIONAL/TECHNICAL LICENSES, REGISTRATIONS AND/OR CERTIFICATIONS

| TYPE | | STATE ISSUED | DATE | NUMBER |
|------|--|--------------|------|--------|
| TYPE | | STATE ISSUED | DATE | NUMBER |
| TYPE | | STATE ISSUED | DATE | NUMBER |
| TYPE | | STATE ISSUED | DATE | NUMBER |

## OPERATING A COMPANY OWNED VEHICLE

Consistent with the Company's objective of promoting safety and safeguarding Company assets, employees who elect to lease, or who are required to operate a Company vehicle in order to perform their job function, must maintain a driving record that conforms to standards established by HMMA and its insurance carrier.

Your driving record will be reviewed through the appropriate state agency. If your job requires you to drive a Company vehicle, and you meet all other job related requirements of the position, any job offer made to you will be contingent on the fact that your driving record conforms to Company standards.

The Company will periodically review the driving records of those employees who operate Company owned vehicles. If it is shown that an employee's driving record contains accidents and/or violations that exceed Company standards, the employee will not be permitted to drive a Company owned vehicle.

During the period that the employee operates a Company vehicle, it is the employee's responsibility to report all accidents, citations, violations or other vehicle related offenses within 10 days of the occurrence, or be subject to disciplinary action, up to and including termination.

Employee agrees to pay the lease charge by payroll deduction. Any money owed HMMA, due to damage to the leased vehicle or unpaid lease payment, may be deducted from the employee's paycheck.

Signature of Applicant _Lary Smith_    Date _12-13-04_

## CERTIFICATION

I hereby certify that the entries on this form and any other statements made by me to Hyundai Motor Manufacturing Alabama, LLC are, in connection with my application for employment, true and correct. Any material omissions or misstatements are grounds for termination.

I understand that if an offer of employment is made, it is contingent upon my submitting documentation of my legal right to work in the United States.

I agree to submit to a physical examination and drug screen. I also authorize HMMA to request from my former employers, and any other source, any information which HMMA may lawfully seek in considering my application for employment and I hereby release HMMA, and such other employers or sources, from any liability whatsoever for requesting and/or providing such information. I UNDERSTAND THAT I WILL BE SUBJECT TO DISMISSAL IF ANYTHING IN THIS APPLICATION IS FOUND TO BE FALSE.

In consideration of my employment, I agree to conform to the rules and regulations of HMMA. I UNDERSTAND THAT MY EMPLOYMENT AND COMPENSATION IS AT WILL AND CAN BE TERMINATED WITHOUT CAUSE OR NOTICE AT ANY TIME AT THE OPTION OF MYSELF OR HMMA. I understand that no employee or representative of HMMA, other than the President, has any authority to authorize an agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing.

_Lary O. Smith_    _12-13-04_
Signature of Applicant    Date

Hyundai Motor Manufacturing Alabama, LLC, 700 Hyundai Blvd., Montgomery, AL 36105

D 00246  L Smith v Hyundai



**HYUNDAI**

Motor Manufacturing Alabama, LLC
700 Halcyon Boulevard
Montgomery, Al 36105

**Confidential**

March 31, 2005

LARRY SMITH,
5675 Valleybrook Lane
MONTGOMERY, AL  36117

I am happy to confirm Hyundai Motor Manufacturing Alabama LLC's offer of employment to you as a Production Team Member. **Your first day of employment will be Monday, April 11, 2005 starting at 8:00 a.m.**

Your starting salary is $14.46/hr, with progression increases up to $21.70/hr within a two-year time frame. As discussed, it is a first shift assignment (8:00 a.m. – 4:45 p.m., Monday through Friday) during start-up, which shall be subject to change to maintain efficient plant operations.

In order to verify your employment eligibility, you **must** provide documentation to verify your identity and authorization to work in the United States. We prefer that you bring these documents on your first day; however, you do have three days to provide it. The documentation most commonly provided is a passport, or driver's license and birth certificate, or driver's license and social security card. Please review the enclosed form which lists all acceptable documents.

Please dress in business casual (no jeans or tennis shoes); uniforms will be provided at a later date.

Please be aware that domestic and international travel may be required and is not guaranteed.

Neither our offer nor your acceptance creates a contract of employment. Employment at HMMA is offered on an at-will basis and can be terminated without cause or notice at anytime by either party. Please be advised all offers are subject to the successful completion of a physical, drug screen and background check.

Congratulations on your selection!  We are looking forward to you joining us on April 11, 2005. Please report to the HMMA Training Center at 900 Hyundai Boulevard in Montgomery, AL and **check in with the receptionist by 8:00 a.m.** Welcome to Hyundai!

*Wendy J. Warner*

Wendy Warner
Manager, Employment

_____  4-11-05
Signature                          (Date)

Please sign this letter and bring it with you to orientation along with picture identification.

**DEFENDANT'S EXHIBIT**
*L3*
*Smith*

D 00242  L Smith v Hyundai

| HYUNDAI  Hyundai Motor Manufacturing Alabama | 30, 60, 85 Day Evaluation | HR-AL-HR-TR-F-00010 |
|---|---|---|
| Revision Date:      1-Sep-04 | Owner: Team Relations | Revision Level:  00 |

Team Member #:        101800        Team Member Hire Date:        4/11/2005

Name:        Larry D. Smith        Job Title:        Team Member *6-A*

Manager:        Craig Stapley        Dept:        PDI

Review Period:      30 Day: _____   60 Day:    x    85 Day: _____

*Score the performance in each job factor on a scale of 1 ~ 5, as follows*

5=    Outstanding, consistantly exceeds the job factor expectations and is recognized by peers and/ or customers as a leader and positive example for others.
4=    Above expectations, consistantly meets and occasionaly exceeds this job factors expectations
3=    Meets expectations, consistantly meets this job factors expectations
2=    Below expectations, occassionally fails to meet this job factors expectations
1=    Needs improvement, consistantly fails to meet this job factors expectations and a job performance improvement is required

### Section 1- Job Performance        *Fill in spaces provided based on above scale*

Quality of Work:        3

Quantity of Work:        3

Comments:        Keep up the good work and learn as much as you can.
Always stay busy and practice good house keeping and Safety

### Section 2- Personal Performance        Dependability        3

Attendance & Punctuality        3        Communication Skills        3

Interpersonal Skills        3        Teamwork        3

Flexibility        3        Customer Service        3

Comments: _____

Perfomance needing improvement for next period: _____

Team Member comments: _____

*Signatures*

Team Member:    *Larry Smith*        Date:        06/21/05

Group Leader/ Manager:    *Wesha Stashley*        Date:        06/21/05

Department Head: _____        Date: _____



DEFENDANT'S EXHIBIT
14
Smith

D 00230  L Smith v Hyundai

DEFENDANT'S EXHIBIT
15
Smith

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 420-2006-00521 |

State or local Agency, if any                                    and EEOC

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Larry D. Smith | (334) 213-7320 | ~~████~~1965 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5675 Valleybrook Lane, Montgomery, AL 36117 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| HYUNDAI MOTOR MANUFACTURING | 500 or More | (334) 387-8000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 700 Hyundai Boulevard,  Montgomery, AL 36105 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 11-28-2005 | 12-08-2005 |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began my employment with the employer named above as a PDI Light Repair Member on April 11, 2005.  On November 28, 2005, I was suspended for eight days without a reason being given.  On or about December 8, 2005, I was discharged.  I was informed by Wendy Warner, Employment Manager that I was discharged for misconduct and insubordination.  A White employee, who became loud and argumentative with management and who failed to follow instructions of management, was not discharged as I was.

I believe that I was discriminated against in violation of Title VII of the 1964 Civil Rights Act, as amended because of my race, Black.

RECEIVED
EEOC

JAN 3 1 2006

BIRMINGHAM DISTRICT OFFICE

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Jan 31, 2006          *Larry D. Smith*
Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

D 00297  L Smith v Hyundai

I Larry Smith am filing a Racial Discrimination, Harassment and Defamation of Character Claim against Hyundai Motor Manufacturing Alabama

I was employed by HMMA on 4/11/05. I left my former employer Rheem Manufacturing whom I was employed with for 6 years and 8 months to work for HMMA. On 10/31/05 I approached my team leader Reggie Johnson and asked to move a scheduled vacation day from 11/17/05 to 11/18/05, Reggie said it would be no problem for me to have the days swapped. A few days later I noticed the day was not reflected on the calendar so I asked him about it, at that time he reassured me I would get the day in question. I asked Reggie several more times over the course of the next three weeks. Reggie never wrote my name on the calendar for the 18th being off. I asked him why my name was not on the calendar and the 17th came and I noticed that someone else's name was written in. I saw Reggie and asked him about it and he just said that someone else had gotten it. I felt so let down. Marcus (Team Relations Rep) walked by and asked if I needed anything. I told him what happened he went and talked to Reggie about it and they both came to me. Reggie stood in front of us both and said he instructed me to fill out a request form to get the days switched. I told Reggie he never said to fill out a form. At that time our Group Leader (Mike Lashley) walks up and apologized for the mistake and claimed it was his and Reggie's fault and therefore gave me the day off. I reported back to work on 11/21/05 but did not stay long because I had the flu and was sent home by the plant Doctor. When I returned on Tuesday 11/22/05, Reggie pulled me off of my normal job, which is adjusting the right side doors, and decided to put me on the line to repair what the other team members did not adjust properly, while adjusting the right and left side doors. The tools required for my job are a rubber hammer and a metal striker, he insisted I remove a tail light without the proper tools. At that time another team member named Gary approached and said to Reggie that I have the tools to perform this job. I have been doing this job all night. Reggie said I don't care I want Larry to do it. He then provided a screwdriver, but I still needed a ratchet, socket, and extension he never provided, and was aware I did not have. He was very angry when he told me to remove the taillight. The job was not completed so he told me to have it pulled to the side and repair it. He then said that he told Scott Winington to come and talk to me. Scott Winington was my former group leader he was promoted to Plant Operations Manager. Scott road up behind me on a bicycle, he got off the bike and started yelling and screaming at me with his hand made into fists. He was also breathing very hard .I asked him what was wrong why are you yelling and screaming at me. Then he said get into this office right now. I went into the office and sat down Scott, Maggie (plant manager), and Marcus (Team Relations Rep) all came in together and sat down. Scott began verbally attacking me and yelling at me from across the table saying that Reggie said that I had called him a name and that I was violent. I immediately asked Maggie and Reggie would they ask Scott to get himself under control and to stop yelling and screaming at me. I felt very nervous and threatened by him. Maggie and Marcus did not say anything they just looked down at the floor. Scott apologized for yelling and screaming at me and said that he had four witnesses that heard me call Reggie a name. I said that was not true I never called him a name or was violent toward him in any way. The investigation was conducted immediately by Marcus, after 1 hour and 45 minutes they all came back in and

RECEIVED

JAN 2 4 2006

HUMAN

told me to go back to work. Everything that Reggie had accused me of and the untruth that Scott had told that he had for witness it all came back to be untrue. Before I went back to work Scott asked me why didn't I ask him for that vacation day to be moved, I replied that I had never talked with him about anything since becoming employed with HMMA that I was only following company chain of command. I was shocked to know that he knew anything about it him being the Plant Manager. They let me work in the paint department until after the holidays. I returned to work on Monday 11-28-05 they placed me back on another different job. I was leaving the office after reporting to Scott like I was told to do on Monday morning and a quality team member named Lisa approached me. She asked me what was going on. I told her I couldn't talk about it. She pressed on for some kind of information from me again. I told her no. Lisa and I had never had any prior conversation. All she wanted to do was tell everyone on the assembly any information she could get. I told her that a concerned team member told me that you said that I should be fired without knowing what happened. She became defensive and I turned and walked away. Later that day Scott called me to the office and read a letter that Lisa had written she said that I had stepped toward her. When Scott was reading the letter he was very angry, loud and violent again. I told him that I did not step toward her at all in any way. That she approached me and she said in the letter that she approached me. And also that Marcus told me not to discuss this with anyone and Marcus then agreed that he told me that. Scott became even more angered and started talking to me in a loud and violent manner. I asked Marcus and Karen would they talk to Scott about yelling and being violent toward me, that I was tired of it, neither one of them said a word they just looked down. Karen then said that we both needed to stop going back and fourth. I said that I am tired of Scott yelling and harassing me, that he is the only person in here who can't control himself. Scott then stood up over me at the table and called security. Security came and escorted me out of the building. I realized that Scott and Reggie were harassing me because I went and told team relations about that vacation day that I was promised. I had never had any problems with Reggie or Scott until after I went to team relations. The next day on 11-30-05 Audie Swegman (Team Relations Manager) called me at home and asked me to come to the plant and tell him what happened. I went and Mr. Swegman and Rob Clevenger (Assistant Team Relations Manager) were there to get my statement. I told them what happened and Mr. Clevenger said that Scott was very unprofessional and that was no way for any manager to act toward anybody in the plant. I also said that in both meeting Scott became loud, violent and harassing. I told Mr. Swagman that I became upset at Scott because no one would tell him when he was wrong; they all just ignored everything he said angrily and violently toward me. I signed a statement saying that I was upset but I did not call him any names or conduct myself in any unprofessional way. Mr. Swagman then said that he would call me in a day, and not to tell my wife that I was fired because I am going to recommend probation. He then gave me one of his personal cards and then we all shook hands and I left. Eight days later he called and said that the comity had voted and I was to be terminated. I was devastated. I then called Greg Kimbell (Human Resource Manager) on 12-9-05 and told him what happened and he said that he was never told my side of the story. There is a team member in my department which is PDI Light Repair named Joshua. He is a white team member. He was a parts runner. His job was to go and get the parts that everyone needed when replacing a damaged or defective part. Reggie Johnson (Team Leader) approached Joshua

JAN 2 4 2006

D 00299  L Smith v Hyundai

several times about not performing his job properly. There was a verbal altercation followed by the third warning. Other team members and myself witnessed the altercation. There were loud verbal exchanges between the two. Reggie then went and got Plant Management involved. Management came and pulled Joshua to the side. Another loud altercation took place between Joshua and management. Management then took Joshua away and wrote him up and placed him on a different job. Myself and other team member witnessed verbal insubordination and unacceptable job performance by Joshua. He was not terminated but I was. I have never been written up or verbally warned about anything since becoming employed with Hyundai. I have a wife and three kids 8,13, and 15 and I am the sole supporter of my family. I was employed on my past job for six years and eight months I have proven that I know how to act to keep a job. This company has no respect for people's families or their financial obligations. My first choice is to reinstated with back pay, and my second choice would be to sue.

Company Name: Hyundai Motor Manufacturing Alabama

Address: 700 Hyundai Boulevard,

Montgomery, Alabama 36105, USA

Human Resource Manager: Greg Kimball
Phone Number: (334) 387-8077 OR (334) 387-8000

RECEIVED
EEOC
JAN 2 4 2006
BIRMINGHAM DISTRICT OFFICE

Larry Smith
5675 Valleybrook Lane,
Montgomery, Alabama 36117

Phone: (334) 213-7320 OR (334) 312-3021
Date of Birth: ████65
Social Security Number: ███-██-7612
Race: Black
Sex: Male
Immediate Supervisor: Reggie Johnson
Reason For Discharge: Insubordination
Termination Date 12-6-05

*Larry D Smith*
1-23-06

*Byrdsong*

DEFENDANT'S
EXHIBIT
16
Smith

# YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## BIRMINGHAM DISTRICT OFFICE

### CHARGE QUESTIONNAIRE

This Form Is Affected By The Privacy Act Of 1974; Read The Last Page Before Completing This Form.

PLEASE READ THE FOLLOWING INFORMATION BEFORE PROCEEDING:

* <u>A charge must be filed with the EEOC within 180 days</u> after the alleged unlawful practice has occurred (300 days, if the employer is within the jurisdiction of a Fair Employment Practice Agency – If you are a state employee or you worked in Richmond County).

* <u>The employer must have</u> 15 or more employees if the alleged unlawful practice falls under Title VII of the Civil Rights Act and the Americans With Disabilities Act; 20 employees if the alleged unlawful practice falls under the Age Discrimination In Employment Act and 2 employees if the alleged unlawful practice falls under the Equal Pay Act.

* <u>Federal employees</u> should file with their Agency EEO Counselor, unless the unlawful practice falls under the Equal Pay Act.

Please complete this questionnaire and return it to the Receptionist. You will be interviewed by an Investigator to determine if your employment situation falls within the jurisdiction of the EEOC. Be prepared to spend up to approximately three hours here today. Interviews are conducted on a first-come, first-served basis. Thank you for your patience and cooperation.

## PLEASE PRINT

NAME *Larry D. Smith*                                    DATE OF BIRTH ▓▓ ▓▓ 65

ADDRESS *5675 Valleybrook Lane*

CITY *Montgomery*          STATE *AL*   ZIP *36117*   COUNTY *Montgomery*

TELEPHONE *(334) 213-7320*   CELL/PAGER *(334) 312-3021*

YOUR RACE *Black*      YOUR SEX : FEMALE _____   MALE ✓

SS# ▓▓ - ▓▓ - *7612*

PAGE 2

WHAT DAY(S) AND TIME(S) ARE YOU AVAILABLE BY TELEPHONE BETWEEN THE HOURS OF 8:30 AM AND 5:00 PM? _Any time_

CONTACT PERSON: (SOMEONE AT A DIFFERENT ADDRESS AND TELEPHONE NUMBER WHO KNOWS WHERE YOU CAN BE REACHED)

NAME _Kim Smith_                    TELEPHONE _(334) 312-4473_

ADDRESS _5625 Valley Brook Lane_

CITY _Montgomery_          STATE _AL_   ZIP _36117_

ARE YOU REPRESENTED BY AN ATTORNEY?  IF SO, PROVIDE HIS/HER NAME AND TELEPHONE NUMBER:

NAME_____   TELEPHONE_____

## PLEASE ANSWER THE FOLLOWING QUESTIONS

DATE OF YOUR EMPLOYMENT _4-11-05_     JOB AT TIME OF HIRE _PDI Light Repair_

_____ JOB AT TIME OF DISCRIMINATORY ACTION _On Line Repair_

I BELIEVE I WAS DISCRIMINATED AGAINST BY: (CHECK THOSE THAT APPLY)

COMPANY __✓__ UNION (Give Local Number)_____ EMPLOYMENT AGENCY_____

NAME _Hyundai Motor Manufacturing Ala_

ADDRESS _700 Hyundai Boulevard, Ala._

CITY, STATE, ZIP _Montgomery, Alabama 36105_

TELEPHONE _(334) 387-8000_ APPROXIMATE NO. OF EMPLOYEES _2000_

NAME_____

ADDRESS_____

CITY, STATE, ZIP_____

TELEPHONE_____ APPROXIMATE NO. OF EMPLOYEES_____

WHAT IS THE BUSINESS OF YOUR EMPLOYER _Car Manufacturer_

Page 3

PROVIDE THE NAME OF THE COMPANY OFFICIAL (OWNER, PRESIDENT OR PERSONNEL DIRECTOR)

NAME *Wendy Warner*　　　　　　　　TITLE *Manager, Employment*

YOUR BEST RECOLLECTION OF THE MOST RECENT DATE OF THE DISCRIMINATORY ACTIONS TAKEN BY THE EMPLOYER *11-28-05*

DO YOU BELIEVE THE ACTION WAS TAKEN AGAINST YOU BECAUSE OF ANYONE (OR MORE) OF THE CATEGORIES LISTED BELOW? ✓ YES _____ NO  ( IF YES, CIRCLE THE ONE(S) THAT APPLY)

RACE, COLOR, SEX, RELIGION, NATIONAL ORIGIN, AGE, RETALIATION OR DISABILITY (SPECIFY)

SPECIFIC DISCRIMINATORY ACTION: (CIRCLE THE ONE(S) THAT APPLY)
(DISCHARGE); HIRING; LAYOFF; RECALL; (SUSPENSION); PROMOTION; RETIREMENT (INVOLUNTARY); WAGES; (HARASSMENT); SEXUAL HARASSMENT; OTHER (SPECIFY)_____

PROVIDE A BRIEF EXPLANATION OF THE DISCRIMINATORY ACTION TAKEN AGAINST YOU:

*Confronted by a Hostile Manager He had hands made into fists and was yelling and screaming at me. Lied on by Team Leader and Manager and Quality Employee and Two Team Relation Employees. Suspended for 8 days without knowing whether I had a job or not. Wrongfully Discharged for no reason*

WHAT REASON(S) WERE YOU GIVEN FOR THE ACTION TAKEN *Insubordinate, disrespectful*

WHY DO YOU THINK THE ACTION BY THE EMPLOYER WAS DISCRIMINATORY? *I was not insubordinate I was defending my Innocense. It happened to a white co-worker and he was not fired he was given a different job.*

D 00294  L Smith v Hyundai

Page 4

IF YOUR ISSUE OF DISCRIMINATION IS HIRING OR PROMOTION, LIST THE POSITION YOU WERE
SEEKING _____

PROVIDE THE NAME & JOB TITLE OF THE PERSON IN THE SAME OR SIMILAR SITUATION WHO WAS
TREATED MORE FAVORABLE THAN YOU (Identify this person by race, sex, religion, national origin or age)
NAME _Joshua  White Male_____  JOB TITLE _PDI  Parts Runner____

_____

_____

PROVIDE THE NAME(S) AND TELEPHONE NUMBERS OF THE WITNESS(ES) WHO YOU THINK CAN
PROVIDE EVIDENCE IN SUPPORT OF YOUR ALLEGATIONS OF DISCRIMINATION.
NAME _Gary, Karl  PDI Light Repair__ TELEPHONE NUMBER _(334)-387-8000__

_____

_____

_____

PROVIDE A DESCRIPTION OF THE INFORMATION THAT EACH PERSON LISTED ABOVE CAN SUBMIT IN
SUPPORT OF YOUR ALLEGATIONS.
_That Reggie Johnson told me to perform a job duty that I did_
_not have the tools for.__

_____

_____

_____

WHAT RELIEF ARE YOU SEEKING THROUGH THE EEOC? _Reinstatement on job, back pay,_
_Lost benefits, damages___

## YOU HAVE A RIGHT TO FILE A CHARGE OF DISCRIMINATION

I SWEAR OR AFFIRM THAT THE INFORMATION PROVIDED IS TRUE AND CORRECT TO THE BEST OF MY
KNOWLEDGE.
SIGNATURE _Lary D. Smith____    DATE _1-31-06__



**HYUNDAI**

Motor Manufacturing Alabama, LLC
700 Hyundai Blvd.
Montgomery, Al 36105



December 6, 2005

Larry Smith

5675 Valleybrook Ln.

Montgomery, Al 36117

Dear Larry:

It has been brought to my attention that on November 22, 2005 you conducted yourself in a disrespectful and insubordinate manner towards fellow Team Members and your management team. There was another incident of similar nature on November 28, 2005.

After thorough investigation it was determined that your actions are contrary to HMMA's serious misconduct policy and are considered insubordination.

HMMA policy states that insubordination is a serious misconduct violation.  When a person commits an action such as this against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment.

Based on the aforementioned, I regret that I have no alternative but to terminate your employment, effective immediately. The benefits department will send COBRA information within the next two (2) weeks.

Sincerely,

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

 **HYUNDAI** | Hyundai Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard, Montgomery, AL 36105
TEL: 334-387-8000
www.hmmausa.com



January 17, 2006

Mr. Larry Smith

5675 Valleybrook Lane

Montgomery, Al 36117

Dear Larry:

As we discussed earlier, I have investigated your concerns regarding your termination for insubordination and conduct. I wanted to follow up with this letter to make you aware of my findings.

I spoke to all that were involved in the incident that lead to you termination. The facts don't seem to be as you had presented them to me. The accounts of all those who witnessed the events reflect that it was you, who was being loud and disrespectful.

I further learned that there have been some other occasions recently where you had issues with your management group and following their instructions when asked.

I want to assure you these decisions are never made lightly and much research and investigation is done. I have determined that your status will remain termination for insubordination.

Sincerely,

*Greg Kimble*

Greg Kimble
Director of Human Resources
Hyundai Motor Manufacturing Alabama, LLC

DEFENDANT'S
EXHIBIT
18
Smith
PENGAD 800-631-6989

To Whom It May Concern

In September of 2005 Scott Winington was being promoted from my PDI Group Leader to second shift Plant Operations Manager. Hyundai supplied him with a company car for use to and from work. I and other employees heard him complain about the cloth seats and tires and rims. He said that he didn't like them. A few days later myself and other team members saw Scott Winington take the car to the heavy repair department. He then told them to put in leather seats and change the tires and rims to 17inch sport. I later saw him drive the car through the plant all the changes had been made. A few days later everyone was talking about how Scott was being escorted out of the plant by security. Scott was being sent home on suspension. What he did was against company policy. It was the same as stealing. Every Hyundai employee must complete orientation and in orientation we were told under no circumstance were we to take anything out of the plant without authorization. It would be immediate termination. Scott Winington did not get authorization to make any of those changes to that car. He was allowed to come back to work after two weeks and maintain his same position. This same person, Scott Wining ton, asked that I be terminated because I asked him to stop being violent, harassing, loud and disrespectful to me. They investigated all accusations made against me. Scott lied and said in the meeting that he had 4 witnesses that heard me call Reggie Johnson a name. After the investigation, there were no witnesses that said they heard me call Reggie a name or saw me do anything to him that I was being accused of. I have never been given a verbal warning or a written warning since becoming employed with Hyundai. Hyundai has a four- step termination process. They never gave me a chance. Scott Winington's wrong doings were witnessed by me and other team members. Scott as a Plant Manager instructed these wrong doings. Hyundai has a zero tolerance for theft of property. They choose not to enforce it against Scott Winington. There were no witnesses to the false allegations made against me, but there were many witnesses that saw what Scott did including me. Scott was not terminated, but I was this is very unfair. Because Scott Winington is White he did not get fired and because I am Black I did.

Company Name: Hyundai Motor Manufacturing Alabama

Human Resource Manager: Greg Kimball
Phone Number: (334) – 387-8077 or (334) –387-8000

Termination Date: 12-6-05

RECEIVED
EEOC
JAN 2 4 2006
BIRMINGHAM DISTRICT OFFICE

Larry D. Smith
1-23-06

DEFENDANT'S
EXHIBIT
19
Smith

PENGAD 800-631-6989

D 00301  L Smith v Hyundai

# Office DEPOT.

## *Taking Care of Business*

DEFENDANT'S
EXHIBIT
20
Smith

## Fax Transmission
### PLEASE PRINT

**TO:** *Hearing and Appeals Division*    **FROM:** *Larry Smith*

**FAX NUMBER:** (334) 242-2084    **SENDER'S PHONE #:** (334) 213-7320

**DATE:** 1-23-06    **# OF PAGES:** 2
(Including cover)

**Message:** _____

_____

_____

_____

If you have any difficulties with this transmission, please contact the sender at the phone number listed above.

### OFFICE DEPOT'S TERMS OF USE

SENDER AGREES NOT TO USE THIS FAX TO: (I) TRANSMIT MATERIAL WHOSE TRANSMISSION IS UNLAWFUL, HARASSING, LIBELOUS, ABUSIVE, THREATENING, HARMFUL, VULGAR, OBSCENE, PORNOGRAPHIC OR OTHERWISE OBJECTIONABLE; (II) CREATE A FALSE IDENTITY, OR OTHERWISE ATTEMPT TO MISLEAD OTHERS AS TO THE IDENTITY OF THE SENDER OR THE ORIGIN OF THIS FAX; (III) POST OR TRANSMIT ANY MATERIAL THAT MAY INFRINGE THE COPYRIGHT, TRADE SECRET, OR OTHER RIGHTS OF ANY THIRD PARTY; (IV) VIOLATE ANY FEDERAL, STATE OR LOCAL LAW IN THE LOCATION, OR (V) CONDUCT ACTIVITIES RELATED TO GAMBLING, SWEEPSTAKES, RAFFLES, LOTTERIES, CONTESTS, PONZI SCHEMES OR THE LIKE.

PLEASE NOTE THAT OFFICE DEPOT DOES NOT REVIEW THE CONTENTS OF ANY FAX SENT USING ITS SERVICES. FURTHER, BY SIGNING BELOW THE SENDER OF THIS FAX HEREBY AGREES TO INDEMNIFY OFFICE DEPOT TO THE FULLEST EXTENT OF THE LAW AND FOR ANY AND ALL CLAIMS, SUITS, OR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE REQUEST TO SEND, OR SENDING THIS FAX.

X *Larry D Smith*
(CUSTOMER'S SIGNATURE)

## VISIT OFFICE DEPOT FOR YOUR:

- Color Copies- High Volume Copies
- Digital color, and Black & White copies
- Business Cards, Letterhead and Envelopes
- Custom Pre-Inked Stamps
- Customs Signs and Banners
- UPS Shipping Service
- Passport Photos
- Ad Specialties

**Store Information**

OFFICE DEPOT #163
5070 VAUGHN ROAD
MONTGOMERY, AL 36116
334-279-6633
334-279-0058 FAX

### Thank you for using Office Depot's Customer FAX Service

ATTENTION HEARING AND APPEALS DEPARTMENT

I Larry D Smith did not file my appeal for penalized employment benefits because the human resource manager Gregg Kimble talked with me and said that he would do another investigation to see if I would be reinstated. The results were the same. I am asking that there please be an appeal because of this investigation. I contacted Gregg Kimble by phone on 1-11-06 and he said that he would do another investigation. He then said that he would call me in two days. He did not and on the third day I called him. His secretary said that he had a family emergency and did not know when he would be back. I called back two more times before Christmas he still had not returned. The plant was closed for Christmas beginning on 12-23-05 through 1-2-06. I received a decision from Mr Kimble in the mail on 1-19-06. I am faxing this to you on 1-23-06. I thought that I would be going back to work and that is why I did not fill an appeal. I am sending you a copy of the letter I received for Hyundia as proof. I previously worked for Rheem Manufacturing for six years and eights months providing for me and my wife and three kids. Rheem has a no rehire policy and I wish that I had never left.

Name: Larry Smith
Address: 5675 Valleybrook Lane
Montgomery, Alabama 36117
Phone: (334) 213-7320 OR Cell (334) 312-3021

## ANSWER TO MENTAL, PHYSICAL AND PECUNIARY DAMAGE

    I Larry Smith suffered mentally, physically and suffered pecuniary damage due to the false allegations made against me by Hyuandai's Management team and team members. When I applied for the job, I stated that I have high blood pressure. After being wrongfully terminated and knowing that I was the only provider for my family. I immediately started thinking about my mortgage, and other creditors. Due to all the stress and constant worry, I began to experience dizziness, felling faint, nervous, weak, upset stomach, body aches and pains, indigestion, and numbness. I also could not sleep at night. I would have to lie down throughout the day to get my blood pressure down. During this stressful time I received more bad news, a letter from the Employment Office stating that I would not receive a check until the end of January. Now I had no income and no insurance the cancellation date of the insurance had passed. I began to feel so bad that I went to the DR without insurance or money. Also my blood pressure medication was only ten dollars a month with my insurance. Once my insurance had canceled I had to pay seventy three dollars a month. This added more stress on me and my family to come up with the money for my medication. I applied for several jobs and everyone said to come back after the Christmas Holidays because business was slow and the companies were going to be closed for the holidays. My wife, kids and I were out of food and had to apply for food stamps. Until the food stamps arrived we had to sell our wedding rings, lawn mower, dvd players, weed eater, cam corder, yard blower, the kids play station and tv. We also borrowed money from family and friends. This was humiliating and degrading for me and my family. As a man who has always provided for my wife and kids by working and earning my pay, this became too much to bear. I began to breakdown and cry in the presence of my family. When my family saw me cry they would cry too. They worried about my health. Also Christmas was coming and I had to tell my three children for the first time in there lives there would be no Christmas. My wife and kids suffered emotionally and physically. When my wife and kids became sick we had no insurance to go to the doctor. My wife would often suffer from bladder infections. Her DR would prescribe six months worth of medication. After that she would have to go back to see him in order to get another prescription for more medication. Without any insurance we could not afford to go to the DR after her prescription had expired. All of my car payments, mortgage, credit cards, personal loans, insurance, utilities, phone and cell phone bills were due. I called and made arrangements with all of my creditors, extending the bills as far as I could to give me enough time to come up with the money. I got behind on my mortgage and all the other bills even though I had started receiving unemployment checks. Four Unemployment checks would not cover one month mortgage. Eventually both cars were repossed. My wife and I at this time were working. We both were making very little money. We had to call and ask family and friends to help take us to and from work. Our neighbors noticed that our cars were gone and asked what had happened. As humiliating as it was I told them. One of my concerned neighbors helped us by taking our daughter too and from school until we had purchased another car. Now all of our loans are charged off and have been assigned to attorneys to collect from me and my wife. They are calling us daily and sending letters to pay off these loans. Our credit has been ruined. Also I told my children that I could not afford to buy them any thing for there birthdays nor could I reward them for good grades. I could



not even reward my oldest daughter for graduating to high school with honors. I could not buy my wife anything for her birthday, mother,s day, valentines day or our anniversary. My oldest daughter had a consultation for braces we had to cancel. All of my children would get there teeth cleaned ever six months. After a while the dentist office began to call asking why the kids had not been brought in to have there teeth cleaned. One of the dental assistant just happens to be one of the members of my church. I was forced to tell her the embarrassing news about my job and that I no longer had insurance to cover the cleanings for my kids. Without insurance we could not afford to have there teeth cleaned and as a result of this my son has developed five cavities and my youngest daughter three cavities and my oldest daughter one cavity. We have bought two others cars since the repossessions and the interest rates on the loans are three times higher than before because of the damage to our credit. Also my pastor has asked me several times about becoming active in the church in different organiza- tions. I finally confided in him the reasons why I could not participate in any of the church functions as of now because of health, stress, emotional and financial hardship that my family and I are suffering from. I submitted resumes and applications to various companies. While waiting for a response I had to seek immediate employment. So I applied for temporary assignments. These assignments would not last very long. As a result of this I had to keep going from job to job to keep providing for my family. This went on for fourteen months. Now I finally have permanent employment. I am making        much less money. My health care coverage for my family is six times more than what I paid at Hyundai. Also this companies insurance does not offer some of the other benefits that I had with Hyundai. My daily commute to and from work is two hours. I am assigned to second shift and can not be home in evenings to help with my kids home work, cook and make sure that my daughter gets home from school safely because my wife works in the evenings also at times. As of today my family and I are still suffering.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**



| | |
|---|---|
| LARRY SMITH, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **CIVIL ACTION NO. 2:06-cv-966-ID-SRW** |
| | ) |
| HYUNDAI MOTOR MANUFACTURING, | ) |
| | ) |
| **Defendant.** | ) |
| | ) |
| | ) |

## PLAINTIFF'S RULE 26 INITIAL DISCLOSURES

    1.     Provide to other parties the name and, if known, the address and telephone number of each individual believed by it to have discoverable non-privileged personal knowledge concerning any significant factual issue specifically raised in the pleadings or identified by the parties in their report to the court under Fed. R. Civ. P. 26(f), appropriately indicating the subjects about which the person has such knowledge.

Larry Smith
5675 Valleybrook Lane
Montgomery, AL 36117
(334) 213-7320

Plaintiff in case
knowledge of his own case

Scott Weddington
700 Hyundai Boulevard
Montgomery, AL 36105
(334) 387-8000

Operations Manager
knowledge of his actions towards
Larry Smith

Maggie Prestridge
700 Hyundai Boulevard
Montgomery, AL 36105

Asst. Operations Manager
present at meeting with Weddington,
Marcus Hannah and Smith

Marcus Hannah                    Team Relations
700 Hyundai Boulevard            conducted investigation
Montgomery, AL 36105


Reggie Johnson                   Team Leader (PDI)
700 Hyundai Boulevard
Montgomery, AL 36105


Lisa Chumney                     Quality Inspector
700 Hyundai Boulevard            co-worker of Larry Smith
Montgomery, AL 36105

Wendy Warner                     Manager, Employment
700 Hyundai Boulevard            terminated Larry Smith's
Montgomery, AL 36105             employment with Hyundai

Greg Kimble                      Director of Human Resources
700 Hyundai Boulevard            knowledge of policies and procedures
Montgomery, AL 36105             investigated Smith's termination

Michael Harris                   Caucasian co-worker of Plaintiff
700 Hyundai Boulevard
Montgomery, AL 36105

Joshua Groves                    Caucasian co-Worker of Plaintiff
700 Hyundai Boulevard
Montgomery, AL 36105

Larry Nichols                    Co-worker
700 Hyundai Boulevard
Montgomery, AL 36105

Carl (last name unknown at this time) Back-up Team Leader
700 Hyundai Boulevard
Montgomery, AL 36105


   This list will be supplemented if Plaintiff discovers other individuals with

knowledge of Plaintiff's termination claim and/or unlawful conduct in the

workplace.

2.     Make available to other parties for inspection and copying, as under Fed. R. Civ. P. 34, all documents, data compilations, and tangible things in its possession, custody, or control that may be used by it (other than solely for impeachment purposes) to support its contentions with respect to any significant factual issue in the case.

Complete EEO Investigative file.  Other documents gathered in the course of discovery, including, but not limited to, Larry Smith's personnel file; all documents related to his termination;  all documents produced by Defendant in response to Plaintiff's Request for Production of Documents;, and all documents used in depositions taken in this case.

3.     Provide to other parties a computation of any category of damages claimed by it, making available for inspection and copying, as under Fed. R. Civ. P. 34, the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered.

Plaintiff seeks compensatory damages, including back pay, front pay, mental anguish, attorney's fees, punitive damages, and any and all other damages which the court may deem just under the circumstances of this case.

4.     Disclose to other parties the existence and extent of coverage of any insurance agreement under which any insurer may be liable to satisfy part or all of a judgment which may be entered against it in the action or to indemnify or reimburse it for payments made to satisfy the judgment.

Not applicable to Plaintiff.

_Kathryn Dickey (ASB8797-d57k)_
Attorney for Plaintiff Larry Smith

**OF COUNSEL:**

**LAW OFFICES OF KATHRYN DICKEY**
322 Alabama Street
Montgomery, AL 36104
(334) 262-0728
(334) 265-7696  fax
Email  kay@dickeyandmcclelland.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document by placing a copy of same by e-mail and in the United States mail, postage prepaid and properly addressed on this the 11th day of January 2007 to the following:

Honorable Brian Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Building
1819 Fifth Avenue North
Birmingham, AL 35203

OF COUNSEL

**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| | AGENCY<br>[ ] FEPA<br>[X] EEOC | CHARGE NUMBER<br>"AMENDED"<br>420-2006-00521 |
|---|---|---|

_State or local Agency, if any_ _____ and EEOC

| NAME (Indicate Mr., Ms., Mrs.)<br>Mr. Larry D. Smith | HOME TELEPHONE (Include Area Code)<br>(334) 213-7320 |
|---|---|
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>5675 Valleybrook Lane, Montgomery, AL 36117 | DATE OF BIRTH<br>November 17, 1965 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME<br>Hyundai Motor Manufacturing, Inc. | NUMBER OF EMPLOYEES, MEMBERS<br>500 or more | TELEPHONE (Include Area Code)<br>(334) 387-8000 |
|---|---|---|
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>700 Hyundai Boulevard, Montgomery, AL 36105 | | COUNTY<br>Montgomery |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS        CITY, STATE AND ZIP CODE | | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))<br><br>[ X ] RACE    [ ] COLOR    [ ] SEX    [ ] RELIGION    [ ] NATIONAL ORIGIN<br>[ ] RETALIATION          [ ] AGE    [ ] DISABILITY    [ ] OTHER (Specify) | DATE DISCRIMINATION TOOK PLACE<br><br>Earliest  11/28/05    Latest  12/08/05<br><br>[ ] CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I am an African-American citizen of the United States. I was employed with Hyundai Motor Manufacturing, Inc. as a PDI light repair member from April 11, 2005 until my unlawful termination on December 8, 2005. I believe that I was terminated because of my race.

My problems began around October 31, 2005 following my request to change a scheduled vacation day from November 17, 2005 to November 18, 2005. My team leader (and immediate supervisor) Reggie Johnson, a black male, indicated that it would not be a problem for me to have the days swapped. I followed up with him several times over the next couple of weeks to make sure that the day had been changed. As the 17th approached, I learned that Johnson had not made the change as he indicated that he would. Marcus, the team relations representative, and Mike Lashley, the group leader, looked into the matter, apologized for the mistake and gave me the requested day off.

_CONTINUED ON THE NEXT PAGE_

| [ ] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY (When necessary for State or Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>Date 2-22-06          _Larry Smith_<br>                    Charging Party (Signature) | SIGNATURE OF COMPLAINANT<br>_Larry Smith_<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)  _Marcus Woodham_<br>_22 February 2006_<br>_Commission Expires 12/6/2008_ |

EEOC Form 5 (Test 10/94)

RECEIVED FEB 24 2006

DEFENDANT'S EXHIBIT 23 Smith

D 00272  L Smith v Hyundai

## ADDITIONAL PARTICULARS:

On the next day I was scheduled to work, November 21, 2005, I was sent home by the plant doctor because I had the flu. When I returned to work on November 22, 2005, Reggie removed me from my normal job and placed me in a different area (tail lights). Initially, Reggie refused to provide me with the proper tools (screwdriver, ratchet, socket and extension) necessary to perform the job in this area. When I requested the proper tools, Reggie only provided me with a screwdriver. I tried performing my job, but was unable to do so because of the lack of proper tools. Eventually the car I was working on had to be pulled off of the line. The next thing I knew, Scott Winington, a white male and plant operations manager, came behind me screaming and yelling. At first I did not know who he was upset with until he approached me with clenched fists. When I asked why he was yelling and screaming at me, Scott instructed me to report to his office immediately. Prior to his promotion, Scott was my group leader. I never saw him speak to or make gestures towards a white employee in this manner. However, I had previously heard Scott make comments about the Asian-American and Korean-American employees. Scott referred to them as "dumb" and "stupid," and commented that these employees needed to leave the plant.

As I arrived at his office, Maggie (white female plant manager) and Marcus came into the office with Scott. Scott continued to verbally attack and yell at me. I had never been reprimanded or disciplined during my employment so I was still puzzled and disturbed by his behavior. He indicated that he was upset because Reggie accused me of being violent and making derogatory

LDS

2



RECEIVED
FEB 2 4 2006
E.E.O.C.

D 00273  L Smith v Hyundai

statements about Reggie. I immediately requested that Scott stop yelling at me and indicated that there was no truth or basis for Reggie's accusations. Marcus and Maggie then proceeded to the floor to conduct an investigation. When they returned approximately 45 minutes later, they reported that there was no basis or evidence to support Reggie's accusations and that they could find no one to corroborate his statements. I was instructed to return to work and for the next few days was assigned to work in the paint department. I was also told to report to Scott at the beginning of my shift each day until further notice.

On November 28, 2005, I reported to Scott and received yet another assignment in another department. No explanation was given for the change in the assignments or why I could not report back to my assigned duties as a light repair member. However as I began to report to my new duty station, Lisa, a white female employee approached me and asked about my situation. I explained to her that I could not speak on the matter and proceeded to my duty station. She became upset that I did not provide her with any information and made a false report to Scott alleging that I had approached her in an inappropriate manner. I was again called into Scott's office and was again subjected to his yelling and screaming. When I asked Scott to refrain from speaking to me in this manner, he called security and had me escorted out of the building. Again accusations were made against me that were unfounded. Nevertheless, I was terminated from my position.

It is clear that there are different rules for employees of different races. For example, prior to my termination, Joshua, a white employee in my department, exhibited insubordinate behavior on a regular basis. Joshua would also speak negatively about Reggie and members of management. Joshua had several loud discussions with Reggie and members of management because he refused

_L DS_
LDS

3



D 00274  L Smith v Hyundai

to properly carry out his duties and responsibilities. A number of employees witnessed these exchanges, however Joshua was never disciplined or reprimanded for his behavior. To this day, he is still an employee at Hyundai. Additionally, Scott Winington was caught leaving company property with unauthorized parts for the company car he was assigned. His actions were characterized as theft, but Scott was not terminated. Instead, upon information and belief, he was placed on probation for this major infraction.

I had stellar reviews throughout my employment with Hyundai. I was not violent nor insubordinate. I only asked that I be treated in the same manner as other employees. I believe that I was treated differently solely because of my race. I was directly affected by said discriminatory practices and deprived of working in an environment free of race discrimination. I believe that I am entitled to back pay, interest thereon, front pay, compensatory and punitive damages and interest thereon.



_____
Larry D. Smith

RECEIVED
FEB 2 4 2003
E.E.O.C.

# Exhibit B

1               IN THE CIRCUIT COURT

2              COUNTY OF MONTGOMERY

3               STATE OF ALABAMA

4

5

LARRY SMITH,

6          Plaintiff,

7

8      VS.

9

10   HYUNDAI MOTOR MANUFACTURING

11   of ALABAMA,

12          Defendant.

13

14

15

16            *        *        *

17

18        DEPOSITION OF LARRY SMITH, taken on behalf

19   of the Defendant, pursuant to the stipulations set

20   forth herein, before Talitha B. Lovin Certified

21   Court Reporter and Notary Public, at the offices of

22   Alabama State Bar Association, commencing at

23   approximately 9:00, Wednesday, May 23rd, 2007.

```
 1              APPEARANCES OF COUNSEL

 2   FOR THE PLAINTIFF:

 3           MS. KATHRYN DICKEY

 4           Attorney at Law

 5           322 Alabama Street

 6           Suite  B

 7           Montgomery, Alabama 36104

 8

 9   FOR THE DEFENDANT:

10           MR. BRIAN BOSTIC

11           Attorney at Law

12           1819  5th Avenue North

13           Suite 1000

14           Birmingham, Alabama 35203

15

16   ALSO PRESENT:

17           MR. CHRISTOPHER N. SMITH

18           Attorney at Law

19           Hyundai Motor Manufacturing Alabama

20           700 Hyundai Boulevard

21           Montgomery, Alabama 36105

22

23
```

```
 1

 2                    *         *         *

 3                    STIPULATIONS

 4         It is hereby stipulated and agreed by and

 5    between counsel for the respective parties and the

 6    witness that the deposition of LARRY SMITH, is taken

 7    pursuant to notice and stipulation on behalf of the

 8    Defendant; that all formalities with respect to

 9    procedural requirements are waived; that said

10    deposition may be taken before Talitha B. Lovin,

11    Certified Professional Reporter and Notary Public in

12    and for the State of Alabama At Large, without the

13    formality of a commission; that objections to

14    questions, other than objections as to the form of

15    the questions, need not be made at this time, but

16    may be reserved for a ruling at such time as the

17    deposition may be offered in evidence or used for

18    any other purpose as provided for by the Civil Rules

19    of Procedure for the State of Alabama.

20         It is further stipulated and agreed by and

21    between counsel representing the parties in this

22    case that the filing of the deposition of LARRY

23    SMITH, is hereby waived; and that said deposition
```

1    may be introduced at the trial of this case or used

2    in any other manner by either party hereto provided

3    for by the Statute, regardless of the waiving of the

4    filing of same.

5            It is further stipulated and agreed by and

6    between the parties hereto and the witness that the

7    signature of the witness to this deposition is

8    hereby waived.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1

 2                            LARRY SMITH

 3    having been first duly sworn to tell the truth,

 4    the whole truth, and nothing but the truth, was

 5    examined, and testified as follows:

 6

 7

 8                            EXAMINATION

 9    BY MR. BOSTICK

10    Q    Mr. Smith, did you produce a copy of a tape

11         recording for me yesterday?

12    A    Yes.

13    Q    Tell me what that tape recording is.

14    A    It was a conversation that me and my

15         attorney, Kathryn Dickey, recorded from

16         Joshua Groves, when went to his employment

17         at Wal-Mart here in Montgomery.

18    Q    What job does he have there?

19    A    He is a supervisor in the oil change area

20         department.

21    Q    What day of the week did y'all go there?

22    A    I think it was a Tuesday.

23    Q    Were they pretty busy at the time that you
```

```
 1        went in?

 2   A    Not really, just slow.

 3   Q    And then -- was he actually on-the-clock,

 4        working, when you talked to him?

 5   A    I don't know.

 6   Q    What time of day was it?

 7   A    It was in the morning -- hold on, let me

 8        see.  It was in the morning, I believe.

 9   Q    And did you -- where were you physically

10        located on the Wal-Mart property when you

11        were talking to him?

12   A    Outside the -- outside the building on the

13        concrete where the cars drive in to get the

14        oil changed.  It was right outside the door.

15   Q    How many times did you talk to him since you

16        left Hyundai prior to this conversation?

17   A    Since I left Hyundai, let me see.  Since I

18        left Hyundai, I'd probably say -- one,

19        two -- three.

20   Q    Had you recorded any of those conversations?

21   A    Only -- I recorded two.  No, only two; two

22        conversations.

23   Q    Did you play for me both conversations
```

1        yesterday?

2    A   No, I didn't because the other one, I forgot

3        to mention it to you.  It only said that --

4        it didn't have anything on there, except he

5        said that he knew some people that was

6        witnesses.  But it wouldn't do him any good

7        to tell me because they wouldn't talk to me.

8        I still have it.

9    Q   Can y'all give me a copy of that tape, too?

10   A   Yeah, I can give you a copy of it.

11   Q   Did he tell you on these other conversations

12       that he -- did his story change from

13       conversation to conversation?

14   A   Let me see, he said that -- he asked me:

15       What was my attorney wanting to do?  And I

16       told him. I explained to him.  And I asked

17       him:  Were there any other witness that saw

18       the fight between him and Michael Harris?

19       And he said, yes, but they wouldn't do you

20       any good.  They're not going to talk.  He

21       said something similar to that.

22   Q   Did -- have you been told by anybody at

23       Hyundai in the recent past that Joshua was

```
 1          not telling you the truth?

 2   A      No.

 3   Q      Did you run into somebody named J.T.

 4          Kendrick?

 5   A      Never heard of him.

 6   Q      Do you know who James Kendrick is?

 7   A      James?  I know a guy named James approached

 8          me in Wal-Mart.

 9   Q      Did you tell him about how Joshua Groves had

10          this testimony for you?

11   A      No, I asked him:  Did he ever know if Joshua

12          had been suspended?  And he said, yeah.

13   Q      Your testimony is: He said he had been?

14   A      James said he had heard that he was

15          suspended.

16   Q      He didn't tell you that -- the words he

17          didn't tell you were that Joshua is full of

18          shit?

19   A      No.

20   Q      You deny that?

21   A      I deny that.

22   Q      Has Joshua's story changed from time to time

23          about whether he was actually suspended?
```

```
1    A    Nope, it's been the same.

2    Q    Well, on the tape yesterday when you asked

3         him about that incident, his first phrase

4         out of his mouth was, "That's when I got a

5         verbal," wasn't it?

6    A    When he cursed Reggie Johnson, yeah.

7    Q    He said, "That's when I got a verbal."

8    A    When he cursed Reggie Johnson.

9    Q    And then, you come in and say, "No, that's

10        when you got a three day suspension."  I'm

11        just wondering, was this -- who first

12        mentioned this three day suspension, was it

13        you or him?

14   A    He told me that.

15   Q    Where is this second tape?

16   A    I have it at home.

17   Q    Is the reason you didn't produce that

18        because there's statements by him on there

19        that are inconsistent with the tape that

20        you've got?

21   A    No.

22   Q    And you went with Ms. Dickey.  And Ms.

23        Dickey was with you as well when you met
```

1          with him.

2     A    Exactly right.

3     Q    And y'all tried to get him to sign an

4          affidavit under oath, didn't you?

5     A    Exactly right.

6     Q    And he refused to put what he was telling

7          you under oath, didn't he?

8     A    He didn't refuse.  He said he wanted to go

9          talk it over with his father.

10    Q    To date, he hasn't signed an affidavit under

11         oath, has he?

12    A    Not that I'm aware of.

13    Q    When you recorded this conversation, there

14         are portions of y'all's conversation that

15         were not on that tape, aren't there?

16    A    Exactly right.  When we first started the

17         conversation I noticed I didn't have it on

18         when I cheeked it.  And so I hurried up and

19         turned it on.  I tried to do it where he

20         couldn't see me.

21    Q    But you took a tape recorder in there with

22         the full intention of tape recording him,

23         right?

```
1    A    Exactly right.

2    Q    Did you ever tell him you were recording

3         this conversation?              ..

4    A    I did not.

5    Q    Why did you not tell him?

6    A    I didn't want him to know.

7    Q    Why did you not want to him to know?

8    A    I didn't want him to know.

9    Q    Did you think his story would change if he

10        knew he was being tape recorded?

11   A    I just didn't want him to know.

12   Q    Well, my question is:  Did you think his

13        story would change if he knew he was being

14        tape recorded?

15   A    I didn't know if his story would change or

16        not.

17   Q    Did -- when was this second tape recording

18        made?

19   A    He told us to come back and -- to get the

20        paperwork that he was supposed to sign.  So

21        I went to see if he had it with him.  And

22        that's when he told me to call his -- call

23        his dad.  He said his dad had it.  And I had
```

```
 1          to call him.
 2     Q    And you recorded that conversation as well?
 3     A    I don't think I have that.  I don't think.  I
 4          may have I'm not sure.  I haven't listened
 5          to that in a while.  I may, I may not.  I
 6          don't know.
 7     Q    Would that be a third tape recording?
 8     A    No, no, no, no.  I only went there twice.
 9     Q    Why are you not sure if that tape still
10          exists or not?
11     A    I have the tape.  The tape exists. I'm not
12          sure if that comment was recorded.  It may
13          be on the tape.  I have only listened to it
14          maybe on time.  And I can't recall exactly
15          if that comment is on there.
16     Q    What comment are you saying?
17     A    The one you just asked me about.
18     Q    Which was what?
19     A    I don't remember what you just asked me.
20              MR. BOSTICK:  Can you go back and see
21                  what --
22                      (A portion of the transcript
23                      was read back.)
```

```
 1          MR. BOSTICK:  The one before that.
 2                    (A portion of the transcript
 3                     was read back.)
 4     Q    (By Mr. Bostick) When you went to make the
 5  recordings is what we got started on.
 6  A    I don't know the exact time, but I think it
 7       may have been two weeks after -- about a
 8       week or two after me and Ms. Dickey
 9       approached him.
10  Q    So this is when you go back and --
11  A    To retrieve the affidavit, yes.
12  Q    And then did he -- how long is that tape
13       recording?
14  A    I don't know.
15  Q    Is it on the same tape that you played for
16       me yesterday?
17  A    I don't know which one of them I took.  I
18       don't know if it's on -- I know I took one
19       of the recorders.  I have two.  I don't know
20       which one of them it's on.  I don't know.
21  Q    Have you given that tape recording to your
22       attorney?
23  A    No, I did not.
```

```
1   Q   But it is your testimony that there is

2       nothing on that tape recording that would

3       support your claims?

4   A   No, that is not my testimony.  My testimony

5       is that there is something that would

6       support my claim on there.  He said there

7       was other people that witnessed what

8       happened.  But it wouldn't do me any good if

9       he -- it wouldn't do him any good to tell me

10      -- it wouldn't do me any good if he told me

11      their names because they were not going to

12      participate.

13  Q   Well, if you knew there was testimony on

14      there that you would use to support your

15      claims, why didn't you tell me about this

16      tape yesterday?

17  A   I don't know.  I don't know why I didn't

18      tell you about it.  I don't know.

19  Q   Well, as we sit here today, is there any

20      other part of your testimony where you

21      weren't truthful with me?

22  A   It's not -- no. I was truthful yesterday.  I

23      was truthful.
```

```
 1   Q    My question is:  Is there any part of your

 2        testimony, as you sit here today, that you

 3        want to revise?

 4   A    I forgot to give you that information of the

 5        tape recording yesterday.

 6   Q    What kind of tape recorder was this?

 7   A    I have two digital tape recorders.  One is

 8        silver and one is brown.

 9   Q    What does it record to?  I mean, the

10        old-school tape recorder I'm used to has a

11        little tape.

12   A    I just bought them.  I don't know.  It's my

13        first time ever using them.  I don't know.

14   Q    Does it have a tape that you can pull out?

15   A    No.  It's just digital.

16   Q    When did you buy the tape recorders?

17   A    I think I bought them in March, something

18        like that.

19   Q    I mean, did you buy the tape recorders with

20        the intentive purpose of recording

21        conversations, with Joshua and other people,

22        to support your claims in your other charge?

23   A    Exactly right.
```

| | | |
|---|---|---|
| 1 | Q | Did you buy them for any other purpose? |
| 2 | A | No other purpose. |
| 3 | Q | Who was with you when you bought them? |
| 4 | A | Nobody but me. |
| 5 | Q | Did you tell anybody at CRH that you were |
| 6 | | recording them? |
| 7 | A | Yes, I did. |
| 8 | Q | Who did you tell you were recording them? |
| 9 | A | Talking about while I was recording them? |
| 10 | Q | Right.  Is there anybody that you |
| 11 | | surreptitiously recorded -- that you told |
| 12 | | that you were about to record their |
| 13 | | conversation? |
| 14 | A | Oh, no, I didn't tell anyone I was about to |
| 15 | | record them. |
| 16 | Q | Where did you hide the recorder when you |
| 17 | | were talking to them? |
| 18 | A | In my front shirt pocket. |
| 19 | Q | What type of shirt were you wearing? |
| 20 | A | I don't know.  As long as it had a little |
| 21 | | pocket in the front.  I made sure it had a |
| 22 | | little pocket in the front. |
| 23 | Q | Prior to buying these two recorders, have |

| | | |
|---|---|---|
| 1 | | you recorded any other conversations in the |
| 2 | | past? |
| 3 | A | On those, no. |
| 4 | Q | I'm not talking about, necessarily, these |
| 5 | | two recorders.  Have you ever recorded any |
| 6 | | of your past employers? |
| 7 | A | No, never. |
| 8 | Q | And -- this argument with your wife, did you |
| 9 | | ever record anything with that? |
| 10 | A | No. |
| 11 | Q | So we can't find out what this phrase is |
| 12 | | that has conveniently slipped your mind? |
| 13 | A | No, I'm sorry.  I'm sorry. |
| 14 | Q | How much did you pay for the tape recorders? |
| 15 | A | One was 30 -- one was $29.99, and the other |
| 16 | | one was like $39.99. |
| 17 | Q | Why did you buy two? |
| 18 | A | Extra copies. |
| 19 | Q | Did you have both recorders going at the |
| 20 | | same time? |
| 21 | A | No, I did not. |
| 22 | Q | Were you going to use one for your Hyundai |
| 23 | | case and one for your CRH case? |

| 1 | A | I just wanted to have an extra copy to |
| 2 | | record one to the other one, so I'd have one |
| 3 | | in case it malfunctioned.  Because when I |
| 4 | | was reading the directions, it said that, if |
| 5 | | they get water damage, it could malfunction. |
| 6 | Q | Are there extra copies of these tapes |
| 7 | | running around somewhere? |
| 8 | A | You have one from yesterday.  And Ms. Dickey |
| 9 | | has one from yesterday. |
| 10 | Q | Do you have two separate recorders that |
| 11 | | you've recorded on? |
| 12 | A | Yes, I have two separate recorders. |
| 13 | Q | Did you record the conversation with Joshua |
| 14 | | and then, transpose that onto the other |
| 15 | | recorder? |
| 16 | A | Yes. |
| 17 | Q | Which one did I listen to yesterday? |
| 18 | A | The one that I took in Wal-Mart. |
| 19 | Q | So it's your testimony that what I heard |
| 20 | | yesterday -- we stopped the tape and it was |
| 21 | | just you and your attorney talking; correct? |
| 22 | A | That's right. |
| 23 | Q | But your testimony is:  I heard everything |

```
 1        on the tape.  What I got to record (sic)

 2        yesterday is your full recording of Joshua

 3        on that -- in the interaction y'all had that

 4        day, except for once you got started in the

 5        middle of the conversation.

 6    A   Exactly right.

 7            MR. BOSTICK:  I think that's all I've

 8            got.

 9                    (The deposition concluded at

10                    approximately 9:37 a.m.)

11                    (The deposition resumed at

12                    approximately 1:03 p.m.)

13    Q   Mr. Smith, this is continuing your

14        deposition from this morning.  Earlier, you

15        told me about two tape recordings of

16        conversations that you had with Joshua

17        Groves; is that correct?

18    A   That's correct.

19    Q   One that I listened to yesterday.

20    A   Correct.

21    Q   And the other, you were going to obtain

22        during lunch so that I could listen to it.

23    A   Correct.
```

| | | |
|---|---|---|
| 1 | Q | What did you discover at lunch? |
| 2 | A | It's no longer on the tape.  I don't know.  I |
| 3 | | must have accidentally erased it.  During |
| 4 | | the scramble in trying to get you the other |
| 5 | | tape the other day, I must have erased it |
| 6 | | because it's no longer on the track.  So I |
| 7 | | don't know.  I must have accidentally erased |
| 8 | | it.  That's the only thing I can think of. |
| 9 | Q | Was it -- was it on the same tape that I |
| 10 | | listened to yesterday? |
| 11 | A | I don't remember which one exactly I used. |
| 12 | | But I know I had it recorded.  Evidently, it |
| 13 | | must have been there.  But during the |
| 14 | | scrambling around, I must have erased it. |
| 15 | Q | And yesterday -- or this morning, you told |
| 16 | | me that you recorded the conversations.  And |
| 17 | | then you took those and played it again to |
| 18 | | record on another.  Did you check both tapes |
| 19 | | to see if it exists on either? |
| 20 | A | I checked both.  And I think what happened |
| 21 | | was:  The first conversation with Joshua, I |
| 22 | | recorded it, I know, on both tapes.  But I |
| 23 | | don't think I ever did the second |

| 1 | | conversation because it did not have that |
|---|---|---|
| 2 | | much evidence on it.  So I don't believe I |
| 3 | | played it twice. |
| 4 | Q | And so, as you sit here today, you don't |
| 5 | | believe you have a copy of the second |
| 6 | | conversation anywhere in your possession? |
| 7 | A | No. |
| 8 | Q | When was the last time that you listened to |
| 9 | | the tape recording of the second |
| 10 | | conversation? |
| 11 | A | After leaving the store, I believe, when I |
| 12 | | had it I wanted to make sure it was |
| 13 | | recorded.  And when I was on the way the |
| 14 | | home, I was listening to it.  I think -- I'm |
| 15 | | pretty sure that's the last time I listened |
| 16 | | to it. |
| 17 | Q | You talked about the first recording.  You |
| 18 | | told me that was roughly a month ago or so |
| 19 | | somewhere along that.  How long ago was the |
| 20 | | second recording made? |
| 21 | A | Two weeks after that. |
| 22 | Q | So certainly, it's been since the filing of |
| 23 | | this lawsuit? |

| | | |
|---|---|---|
| 1 | A | Yeah. |
| 2 | Q | And the first conversation that you provided |
| 3 | | to me is the conversation where y'all first |
| 4 | | discussed with him the signing of an |
| 5 | | affidavit? |
| 6 | A | Yes. |
| 7 | Q | And the tape recording that no longer |
| 8 | | exists.  Is the conversation where he told |
| 9 | | you that he is not going to sign the |
| 10 | | affidavit at that time; right? |
| 11 | A | No, no, no.  He didn't say that.  He said |
| 12 | | that his father had it.  And he had to go |
| 13 | | retrieve it, for me to call him, something |
| 14 | | to that effect.  He did not say that he |
| 15 | | wasn't going to sign it.  He said that his |
| 16 | | father had it.  And he was going to talk to |
| 17 | | his father about it. |
| 18 | Q | But you went back that time to retrieve, |
| 19 | | from him, a signed copy of that statement on |
| 20 | | the second tape; right? |
| 21 | A | Yes. |
| 22 | Q | And you did not leave there with a signed |
| 23 | | copy of that statement; correct? |

```
 1    A    That's correct.

 2              MR. BOSTICK:  That's all I've got.

 3                   (The deposition concluded at

 4                   approximately 1:06 p.m.)

 5

 6

 7

 8

 9

10

11              REPORTER'S CERTIFICATE

12   STATE OF ALABAMA

13   MONTGOMERY COUNTY

14              I, Talitha B. Lovin, Certified

15   Professional Reporter and Notary Public in and for

16   the State of Alabama at Large, do hereby certify on

17   Wednesday, May 23rd, 2007, that pursuant to notice

18   and stipulation on behalf of the Defendant, I

19   reported the deposition of LARRY SMITH, who was

20   first duly sworn by me to speak the truth, the whole

21   truth, and nothing but the truth, in the matter of

22   LARRY SMITH, Plaintiff, versus HYUNDAI MOTOR

23   MANUFACTURING ALABAMA, LLC, Defendant, now pending
```

1    in the Circuit Court for Montgomery County, Alabama;

2    that the foregoing colloquies, statements, questions

3    and answers thereto were reduced to 25 typewritten

4    pages under my direction and supervision; that the

5    deposition is a true and accurate transcription of

6    the testimony/evidence of the examination of said

7    witness by counsel for the parties set out herein;

8    that the reading and signing of said deposition was

9    waived by witness and counsel for the parties.

10        I further certify that I am neither of

11   relative, employee, attorney or counsel of any of

12   the parties, nor am I a relative or employee of such

13   attorney or counsel, nor am I financially interested

14   in the results thereof.  All rates charged are usual

15   and customary.

16        This the 19th day of July, 2007.

17

18

19

20   _____

21        Talitha B. Lovin
          Certified Court Reporter and
22        Notary Public
          Commission expires: 10/17/2007

23

# Exhibit C

IN THE CIRCUIT COURT FOR THE

COUNTY OF MONTGOMERY

STATE OF ALABAMA


LARRY SMITH,

            Plaintiff,

        VS.


HYUNDAI MOTOR MANUFACTURING

of ALABAMA,

            Defendant.




                *        *        *

        DEPOSITION OF PAUL SCOTT WEDDINGTON, taken
on behalf of the Plaintiff, pursuant to the
stipulations set forth herein, before Talitha B.
Lovin, Certified Court Reporter and Notary Public,
at the offices of Alabama State Bar Association,
commencing at approximately 9:30, Wednesday, May
23rd, 2007.

```
 1                    APPEARANCES OF COUNSEL

 2

     FOR THE PLAINTIFF:
 3

 4          MS. KATHRYN DICKEY

 5          Attorney at Law

 6          322 Alabama Street

 7          Suite  B

 8          Montgomery, Alabama 36104

 9

     FOR THE DEFENDANT:
10

11          MR. BRIAN BOSTIC

12          Attorney at Law

13          1819 5th Avenue North

14          Suite 1000

15          Birmingham, Alabama 35203

16   ALSO PRESENT:

17          MR. CHRISTOPHER N. SMITH

18          Attorney at Law

19          Hyundai Motor Manufacturing Alabama

20          700 Hyundai Boulevard

21          Montgomery, Alabama 36105

22

23
```

Boggs Reporting & Video Services
334.264.6227/800.397.5590/www.boggsreporters.com

```
1                    PLAINTIFF'S EXHIBIT INDEX

2      Plaintiff's Exhibit No. 1 ...................47

3      Plaintiff's Exhibit No. 2....................49

4

5      Reporter's

6      Certificate.........................58

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

1

2                      *         *         *

3                          STIPULATION

4          It is hereby stipulated and agreed by and

5   between counsel for the respective parties and the

6   witness that the deposition of PAUL SCOTT

7   WEDDINGTON, is taken pursuant to notice and

8   stipulation on behalf of the Plaintiff; that all

9   formalities with respect to procedural requirements

10  are waived; that said deposition may be taken before

11  Talitha B. Lovin, Certified Professional Reporter

12  and Notary Public in and for the State of Alabama At

13  Large, without the formality of a commission; that

14  objections to questions, other than objections as to

15  the form of the questions, need not be made at this

16  time, but may be reserved for a ruling at such time

17  as the deposition may be offered in evidence or used

18  for any other purpose as provided for by the Civil

19  Rules of Procedure for the State of Alabama.

20          It is further stipulated and agreed by and

21  between counsel representing the parties in this

22  case that the filing of the deposition of PAUL SCOTT

23  WEDDINGTON, is hereby not waived; and that said

5

1    deposition may be introduced at the trial of this

2    case or used in any other manner by either party

3    hereto provided for by the Statute, regardless of

4    the waiving of the filing of same.

5         It is further stipulated and agreed by and

6    between the parties hereto and the witness that the

7    signature of the witness to this deposition is

8    hereby not waived.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                    PAUL SCOTT WEDDINGTON,

 2   of lawful age, having been first duly sworn, was

 3   examined and testified as follows:

 4

 5                    DIRECT EXAMINATION

 6   BY MS. DICKEY

 7   Q    Good morning.

 8   A    Good morning.

 9   Q    Mr. Weddington, I'm Kay Dickey.  I met you

10        yesterday for the first time at Larry

11        Smith's deposition.

12   A    Yes, ma'am.

13   Q    This is part of what we call the discovery

14        stage. I'm representing Larry Smith in the

15        action that he has against Hyundai.  And I

16        just have a few questions that I want to ask

17        you.  I don't anticipate this deposition

18        taking a very long time.  But if you should

19        need a break, let us know and I will be glad

20        to do that.  If I ask a question that you

21        don't understand, just ask me to repeat it

22        and I'll be glad to do that.  Particularly

23        when it comes to those questions about your
```

```
1         department at Hyundai and different

2         positions.  Since I'm not familiar with

3         those I may mess up a few questions.

4              State your name for the record,

5         please, sir.

6    A    Paul Scott Weddington.

7    Q    Mr. Weddington, have you given a deposition

8         before?

9    A    No, ma'am.

10   Q    And for the record, what is your race?

11   A    I am Caucasian.

12   Q    Are you still employed by Hyundai?

13   A    Yes, ma'am.

14   Q    What is your position?

15   A    Production manager, general assembly.

16   Q    How long have you had that position?

17   A    About 1.7 years, so since July of 2005.

18   Q    And what are your responsibilities as

19        production manager?

20   A    I'm responsible for the productivity of

21        manufacturing 73 units per hour. I'm

22        responsible for line balancing, which is

23        making sure that everyone has an equal
```

1    amount of work to do.  And I'm responsible

2    for overseeing the staff.  And I'm

3    responsible for controlling equipment and

4    making sure it's put in right and making

5    sure it's maintained right.

6  Q    When you say, "73 units per hour," are units

7    cars?

8  A    Yes, ma'am, 73 cars per hour.  I'm sorry.

9  Q    No, that's fine.  Are there time limits on

10    responsibilities or functions out there?

11  A    During the -- on the production team members

12    that are working on actually assembling a

13    car, yes, ma'am.  We run 49 seconds per car

14    and we try to have 40 seconds worth of work

15    for each person.

16    Repair would typically be

17    different.  It's impossible to figure out

18    how much repair you're going to need.  So

19    repair would definitely be different.

20  Q    What happens when that time limit is not

21    met?

22  A    When the --

23  Q    When there's a particular repair or function

1   for a car and the time's up?

2 A Typically, one of two things will happen,

3   either -- (1) It will get pulled back into

4   the repair bate in PDI, and PDI stands for

5   Pre-Delivery Insection.  Or if it's a quick

6   repair, it will simply be pulled to the side

7   of the line.  It depends on the nature of

8   the repair.

9 Q Are you still -- do you still have some

10   responsibility over PDI?

11 A I'm still responsible for the entire general

12   assembly, which includes:  Trim department,

13   chassis department, final department, and

14   pre-delivery inspection.  So PDI is one of

15   four departments I have responsibility for.

16 Q Is it a fairly common occurrence to have a

17   car pulled to the side?

18 A Our FTT, which is First Time Through, is

19   running about 90 percent.  So about

20   10 percent of the time you could have a car

21   pulled to the side.

22 Q Are there any repercussions to the employee

23   when that happens?

```
 1   A     It would depend on the nature of the
 2         occurrence.
 3   Q     Can you give an example of when there would
 4         be a repercussion or negative consequence?
 5   A     A negative consequence:  If a team member
 6         forgot part of their assignment, if they
 7         forgot part of the process and a job was
 8         left undone, then it would result in some
 9         form of disciplinary action.
10   Q     Are these disciplinary actions forwarded to
11         you when that happens?
12   A     Not on all occurrences. Generally, the staff
13         that works beneath me handles most of the
14         disciplinary action.
15   Q     Can you tell me who those staff people are?
16   A     I have four different assistant managers.
17         One in the each of the departments I
18         mentioned earlier.  And I also have six
19         group leaders that report to those assistant
20         managers.  And we have twenty-eight team
21         leaders that report to the six group
22         leaders.
23              So generally, the disciplinary
```

11

```
 1        action would probably stop at the group

 2        leader level if it's a minor infraction.

 3   Q    What was your position prior to production

 4        manager?

 5   A    I was a PDI assistant manager -- PDI and

 6        final assistant manager because it used to

 7        be one department.

 8   Q    Was that your position in November of 2005?

 9   A    No, ma'am.  I was already production manager

10        by then.

11   Q    And for what position were you hired at

12        Hyundai?

13   A    Assistant manager, final line PDI.

14   Q    And so you have had two promotions since

15        then?

16   A    No, ma'am, just the one.  I'm still

17        production manager.

18   Q    Then maybe I got confused.  I thought you

19        were production manager from July 2005?

20   A    Yes, ma'am.

21   Q    And that's when you were hired?

22   A    No ma'am, I was hired in January of 2004.

23   Q    And January 2004 you were hired into what
```

```
 1        position?
 2   A    I was hired into the position of assistant
 3        manager, final PDI.
 4   Q    What were your responsibilities as a PDI
 5        final assistant?
 6   A    I was over the final assembly of the car. I
 7        had a group leader in the final area.  And I
 8        had a group leader in pre-delivery.  And I
 9        was over final assembly in the final area.
10        And I was over repair in the PDI area.
11   Q    In November of 2005, were you in Larry
12        Smith's line of supervision?
13   A    Larry Smith reported to -- down the line,
14        yes, but way down the line.
15   Q    Can you tell me where you were in that line?
16   A    Larry Smith reported to Reginold Johnson,
17        who was a team leader.
18   Q    And then did Mr. Johnson report to you?
19   A    No.  Mr. Johnson reported to Michael
20        Lashley, who is a group leader.
21   Q    Do you know how long Reggie Johnson has been
22        employed at Hyundai?
23   A    I am not for certain, but I know he's been
```

1    here since 2004.  I don't know if it was

2    January or March.  But he was either the

3    first or second hire.  But I don't remember

4    which month it was.

5  Q    What is his race?

6  A    He is African-American.

7  Q    What about Michael Lashley?

8  A    He is Caucasian.

9  Q    What are the responsibilities of a team

10    leader?

11  A    A team leader is:  They direct their team's

12    activities, they make job assignments, and

13    they move manpower periodically throughout

14    the shift to where the need arises.

15  Q    What about a group leader?

16  A    A group leader manages an overall

17    department.  They manage up to six teams.

18    And they coordinate the efforts of all their

19    teams in the department structure.

20        And then from the group leader

21    there is assistant manager.

22  Q    In November of '05, did Hyundai have a

23    progressive disciplinary policy?

1  A     Yes, ma'am.

2  Q     Can you explain what that policy is?

3  A     Probably not 100 percent accurately sitting

4        right here today.  It would depend on the

5        nature of the issue.  Serious issues of a

6        serious nature could result in immediate

7        termination, it depends on the severity of

8        the issue.  But minor infractions, there's

9        generally a verbal warning, which is called

10       a Group Leader Discussion and that happens

11       first.

12              And then before you go into the

13       Corrective Action Phase, you have the Group

14       Leader Discussion.

15              If there's a further occurrence,

16       you go to Phase One.  And Phase One is the

17       first formal step of corrective action.

18              And then if there's a further

19       occurrence within on year, you go to Phase

20       Two.  Phase Two is a little more severe; the

21       managers and senior managers sit in on Phase

22       Two.

23              From Phase Three -- or from Phase

```
 1          Two you go to Phase Three, which is the

 2     commitment level where you're asked to write

 3     out a commitment letter explaining how

 4     you're going to improve your actions.

 5               And then from Phase Three you go

 6     to Phase Four.  And from Phase Four to

 7     termination.

 8   Q   What would be considered serious misconduct?

 9               MR. BOSTICK:  Object to form.

10   A   Am I allowed to answer?

11               MR. BOSTICK:  I just put an objection

12                    on the record.  You can answer.

13   A   There are several things that could be

14     considered serious.  Do you want me to just

15     name one?

16   Q   Well, let me ask you this:  When was the

17     last time someone was terminated in your

18     department for serious misconduct?

19   A   For serious misconduct --

20               MR. BOSTICK:  Object to form.

21   A   Prior to Larry?

22   Q   Well, the last time.  Was Larry the last

23     time?
```

| 1  | A | No.  We had a workplace violence. I can't |
|----|---|---|
| 2  |   | remember the exact date, but I think it was |
| 3  |   | back in December when we lost a team member |
| 4  |   | for a first time occurrence. |
| 5  | Q | What was the occurrence, what happened? |
| 6  | A | It was a Workplace Violence Investigation. |
| 7  |   | And I'm not on the investigative team or the |
| 8  |   | disciplinary team, so I don't know the |
| 9  |   | outcome. |
| 10 | Q | What triggers a Workplace Violence |
| 11 |   | Investigation? |
| 12 | A | Typically, it's a complaint to team |
| 13 |   | relations and then a team relations |
| 14 |   | investigation. |
| 15 | Q | Was there a Workplace Violence Investigation |
| 16 |   | involved with Mr. Smith? |
| 17 | A | I'm not sure.  I mean, I don't instigate or |
| 18 |   | take part in the Workplace Violence |
| 19 |   | Investigations. |
| 20 | Q | Who does that? |
| 21 | A | Team relations. |
| 22 | Q | And who is in charge of team relations? |
| 23 | A | Rob Clevenger. |

```
 1            COURT REPORTER:  Can you spell his last

 2                   name, please?

 3    A    Clevenger; C-L-E-V-E-N-G-E-R.

 4    Q    Was Reggie Johnson a team leader in November

 5         of '05?

 6    A    Yes, ma'am.

 7    Q    Did you recommend him for that position?

 8    A    No, ma'am.  Our promotion policy doesn't go

 9         off recommendations.

10    Q    How does it work?

11    A    Team members apply to an open posting.

12         There's a posting made and team members

13         apply to a posting.  And after they apply to

14         a posting, they are given a peer review by

15         their fellow team members within their team.

16         And they take a written assessment and then

17         they have a management review.  And all of

18         the scores, there's a weight for each of

19         those categories and the weights are added

20         together.  And the one with the best score

21         gets the job.

22    Q    Did you hear complaints about Reggie Johnson

23         from employees under his supervision?
```

```
 1              MR. BOSTICK:  Object to form.
 2    A    Not that I can recall.
 3    Q    Did Mr. Smith ever complain to you about
 4         Reggie Johnson?
 5    A    Not that I can recall.  If it happened, I
 6         can't recall.
 7    Q    What is Reggie Johnson's current position?
 8    A    He is a team leader.
 9    Q    In the same department?
10    A    No, ma'am.  We move -- we move our team
11         leaders around pretty frequently for
12         cross-training.  He is still pre-delivery.
13         He is just in a different area.
14    Q    How often do they transfer?
15    A    Pre-delivery, we don't have a set transfer
16         when we move them around.  But we have moved
17         three other team leaders around.
18    Q    What time frame when you say, three other
19         team members?
20    A    Within a year.
21    Q    And you never received any complaints from
22         Joshua Groves?
23    A    Not that I can recall.  If it happened, it
```

1    escapes my recollection.

2  Q    Had you given any written or verbal

3    reprimands to Larry Smith prior to November

4    of 2005?

5  A    A very informal verbal in June.  And it

6    wasn't -- it wasn't of a serious nature to

7    where I would call team relations and make a

8    huge report.  It was very informal.

9         The team leader at the time in

10   June was -- Dan Smith was the team leader at

11   the time.  The instruction was:  When the

12   line was empty, the PDI repair men that are

13   on the line they go to the back of the shop

14   and make repairs on the long delay cars.

15   And Larry, per Dan, Larry constantly refused

16   and was very argumentative about going to

17   the back of the shop.

18         So Dan asked to tried to settle

19   the issue.  And he eventually called me and

20   said, "Can you come talk to this guy?"

21         So I stoped by, you know, and

22   asked Larry what was going on.  And said,

23   "Hey, can you help us out, make sure you go

1    to the back of the shop?  When we don't have

2    any cars to work on, on the line, we go to

3    the back of the shop and get rid of the

4    repair cars in the back."  And it was very

5    informal.

6  Q    When you had this informal discussion with

7    Mr. Smith, did he argue with you?

8  A    No, he didn't really argue with me.

9  Q    Is Dan Smith still employed at Hyundai?

10  A    Yes, ma'am.

11  Q    What is his position currently?

12  A    He is a team leader.

13  Q    In PDI?

14  A    In PDI.

15  Q    So he wasn't one of the three that got

16    moved?

17  A    No, ma'am., he hasn't been moved yet.

18  Q    How long has he been a team leader in PDI?

19  A    I don't know the exact date.  I know he was

20    promoted some time -- some time in the

21    spring of 2005.  The date I may not be exact

22    on, but to the best of my recollection, I

23    think, it was June of 2005.

1    Q    Who is Maggie Prestridge?

2    A    She is an assistant manager of final PDI

3         that Mike Lashley reports to.

4    Q    What is her race?

5    A    She is a Caucasian female.

6    Q    Is she still employed at Hyundai?

7    A    Yes, ma'am.

8    Q    In what position?

9    A    She is assistant manager of final line only

10        now.

11   Q    Who is Marcus Hannah?

12   A    Marcus Hannah is a team relations

13        representative.

14   Q    What does he do as a team relations

15        representative?

16   A    I don't know the full extent of Marcus' job

17        duties, but I know that he settles conflict

18        between team members and members in

19        management.  And he helps team members with

20        forms they may need through employment,

21        forms that may need through medical.

22        They're a support division for the

23        production team members.

1    Q    Is he still employed at Hyundai?

2    A    Yes, ma'am.

3    Q    Is he still a team relations representative?

4    A    Yes, ma'am.

5    Q    On November 22cnd, 2005, did you receive a

6         call from Reggie Johnson concerning Larry

7         Smith?

8    A    Yes, ma'am.

9    Q    Tell me about that call.

10   A    Well, I received a radio call first and it

11        didn't mention Larry.  It was a call from

12        Reggie saying, "Hey, Scott, can you come

13        back to the TF line?"  And I said, "Yeah,

14        Reggie.  I will be there in a minute."

15             And then he calls me again, and

16        asked me to come to the TF line for the

17        second time.  And I said, "Is it an

18        emergency?" And, I think, at that point he

19        said, "No."  And I told him, I said, "Call

20        me on my cell phone."  And probably within a

21        minute, my cell phone rang and it was

22        Reggie.

23   Q    So within a minute -- when you say, the two

1    calls: one was on the radio, and one was a

2    cell?

3  A    Well, two were on the radio, the first two

4    were on the radio saying, "Scott, can you

5    come to the TF line?" I said, "Yeah,

6    Reggie.  I'll be there in a minute."

7         And then not very long -- from the

8    I can recall maybe a minute went by.

9         "Hey, Scott, are you on your way?"

10         "Reggie, I'll be there in a

11    minute.  Is this an emergency?"

12         I think that Reggie said, "No."

13    And I told Reggie, "Well, call me on my cell

14    phone if there's a problem."  And then

15    probably -- very soon thereafter -- I don't

16    know the exact time frame -- but very soon

17    thereafter, Reggie called my cell phone.

18  Q    And what did he say when he called your cell

19    phone?

20  A    He said, "Scott, I need you to get down here

21    right now."  And I said, "Reggie, what's

22    going on?" He said, "This guy, Larry, looks

23    like he's about to put his hands on me.  I

| 1 | | need you to get down here now." So I told |
|---|---|---|
| 2 | | him, "I'm on my way right now." |
| 3 | | So, I closed the cell phone and I |
| 4 | | ran down three flights of stairs, as fast as |
| 5 | | I could go down the stairs. I ran into a |
| 6 | | bicycle that was maybe 50 feet away -- a |
| 7 | | tricycle, actually. And I peddled as fast |
| 8 | | as I could go to the end of the general |
| 9 | | assembly plant on the trim final line. |
| 10 | Q | And when you got there what did you see? |
| 11 | A | I seen Larry in Reggie's personal space. |
| 12 | Q | What do you consider personal space? |
| 13 | A | Very close to somebody, within -- within a |
| 14 | | few inches of their face. And I seen Reggie |
| 15 | | trying to back away. |
| 16 | Q | Could you hear what was being said? |
| 17 | A | No, ma'am, I couldn't hear what was being |
| 18 | | said. |
| 19 | Q | And about how far were you from Reggie and |
| 20 | | Larry? |
| 21 | A | Well, when I was coming up on the bicycle |
| 22 | | when I first seen them, I was probably 50 |
| 23 | | feet, maybe 100 feet, from when I first seen |

```
 1        them.   And as I got closer and I parked the

 2        bicycle, Larry had started to walk away and

 3        Reggie had started to come towards me, so.

 4   Q    And then at some point, did you and Reggie

 5        meet and have a discussion about what had

 6        just occurred?

 7   A    No, I immediately wanted to diffuse the

 8        situation.  I knew from the telephone call

 9        that there was potential for a physical

10        altercation.  So I asked Larry to go to the

11        office that was directly next door.

12   Q    Now, what made you think there was potential

13        for a physical altercation?

14   A    Reggie told me that the guy was about to put

15        his hands on him.  And when I get down

16        there, I see Larry in Reggie's personal

17        space.

18   Q    But then Larry walked away and Reggie walked

19        towards you.  So is that an indication that

20        maybe it had been diffused?

21   A    No.

22   Q    Why not?

23   A    I still didn't have the facts. I needed to
```

1    know what happened.  I needed team relations

2    to know what happened, so that somebody

3    didn't stew on something and get angry over

4    the shift. I needed to make sure it was

5    over.

6  Q    So instead of talking to Reggie, you

7        contacted someone in team relations?

8  A    Yes, I -- the first thing I did was ask

9        Larry to go to the PDI office.

10  Q    Did he do that?

11  A    Not initially, he resisted at first.  And he

12        still was very visibly agitated, still

13        physically very upset:  Shaking, lip

14        quivering, still upset.

15  Q    Then after you asked Larry to go to the PDI

16        office, you called --

17  A    Marcus Hannah.

18  Q    Did Marcus Hannah meet you at some point?

19  A    Yes, ma'am.

20  Q    Did anyone else meet you?

21  A    Maggie Prestridge.

22  Q    So, at some point were you and Maggie and

23        Marcus in the office with Mr. Smith?

1   A    Yes, ma'am.

2   Q    Tell me about that meeting.

3   A    I asked Larry to go to the office.  Larry

4        went into the office.  When Marcus got there

5        I came in with him.  Larry was still visibly

6        upset.  I was exhausted.  I was winded, out

7        of breath, breathing heavy.

8              And I asked Larry -- I told Larry

9        that we had zero tolerance for

10       insubordination or any type of work place

11       violence.  Because previous to coming to the

12       office, I talked to Reggie and I talked to

13       some other team members.  So I came in the

14       office, I was out of breath.  I said, "Larry,

15       we've got zero tolerance for work place

16       violence.  I just wanted you to know that."

17             And then he asked me what was I so

18       upset about.  And I said, "I'm not upset,

19       I'm breathing heavy.  I apologize for being

20       out of the breath."  And I caught my breath

21       and we proceeded to talk about the issue.

22             And I could see it was going

23       nowhere pretty fast.  Larry said, "So you

1     got zero tolerance for stealing?" I said,

2     "Yeah, we've got zero tolerance for

3     stealing. What are you referring to?"

4           "Well, what if a manager stole

5     some parts and put it on his car?"

6           "That's not why we're in here.

7     That has nothing to do with this

8     investigation. It has nothing to do with

9     that."

10   Q   Tell me what employees you had a

11     conversation with or talked to before going

12     to the PDI office.

13   A   Reggie Johnson, Gary Myers, Carl Tyce, and

14     there was a temp and I can't recollect his

15     name off the top of my head. I would say it

16     wrong if I tried to, but there was a

17     temporary employee that I also talked to.

18   Q   Who is Gary Myers?

19   A   He is a repair team member.

20   Q   What race is he?

21   A   He is white; Caucasian.

22   Q   Who is Carl Tyce?

23   A   He is also a repair team member.

1   Q    And what is his race?

2   A    Black.

3   Q    What did Gary Myers tell you?

4   A    He told me -- from the best of my

5        recollection, he told me that Larry was

6        visibly upset and he was in Reggie's

7        personal space.  And he couldn't hear

8        everything that was being said, but he

9        definitely seen Reggie backing away and

10       Larry walking to him.

11  Q    Where was Gary in relation to the

12       discussion, or whatever was going on,

13       between Mr. Smith and Mr. Johnson?

14  A    Gary works on the end of the trim final

15       line, so he was within 20 feet of where the

16       altercation took place.

17  Q    Did he tell you what started this problem

18       between Mr. Johnson and Mr. Smith?

19  A    Not that I recollect.

20  Q    Did you ask?

21  A    I didn't ask Gary, no, ma'am.

22  Q    What did Carl Tyce tell you?

23  A    Pretty much the same thing.  And he heard

```
 1        some reference to nappy-headed and that's
 2        all he heard and that's what he told him.
 3        But he observed Reggie trying to walk away
 4        and Larry not letting him retreat.
 5   Q    And is he within 20 feet of Gary?
 6   A    Yes, ma'am.
 7   Q    All right.  Let's go back to the office now
 8        with you, and Marcus Hannah, Maggie
 9        Prestridge, and Mr. Smith.
10             How was -- was there any
11        resolution from that meeting?
12   A    Not really, the only resolution was:  We
13        were going to let team relations investigate
14        the matter.  But Larry was still very
15        visibly upset: his facial expressions, his
16        demeanor, and tone of his voice was very
17        hostile.  But I didn't want to make any type
18        of a knee-jerk reaction, I wanted to know
19        what was going on.  But I also wanted to
20        diffuse the situation.
21             So I asked Larry if he minded
22        going to work in the paint shop until we got
23        all of this sorted out. Larry agreed, said
```

```
 1        he didn't have a problem doing that.  So I
 2        had Maggie Prestridge walk Larry to Larry
 3        Helstrum, who is the paint shop assistant
 4        manager.  And Larry worked over there until
 5        we got off the Thanksgiving break.  It was a
 6        Tuesday and Wednesday night.
 7    Q   During that meting, did at some point -- did
 8        Maggie and Marcus Hannah leave that
 9        office -- leave your office and go ask some
10        questions of employees?
11    A   I don't think it was during that meeting.  I
12        can't recall exactly when it was, but I'm
13        sure Marcus conducted an investigation.  But
14        I don't know what that time frame he did it
15        in.
16    Q   When Marcus does an investigation, is there
17        a written report of his findings?
18    A   Again, that's not part of my department.  It
19        would be speculation for me to say one way
20        or the other.
21    Q   You've never seen one?
22    A   Yes, ma'am, I have seen some reports.
23    Q   You have seen some written reports as a
```

```
 1        result of team relations investigating an

 2        incident?

 3   A    Yes, ma'am.

 4   Q    But you have not seen this one?

 5             MR. BOSTICK:  Object to the form.

 6   A    I have seen one that was written, but I'm

 7        not sure which one you're referring to.  I

 8        don't know if this was the actual one he

 9        wrote that night or if he wrote one later

10        on.  I have seen one copy of the report by

11        Marcus Hannah.

12   Q    And what did it say?

13   A    From the best that I can recall, it said

14        that Larry was agitated and I brought him

15        into the PDI office and tried to diffuse the

16        situation.  And it also mentions that Larry

17        was disrespectful to me.  And that's all

18        that I can really remember of the report.

19   Q    Was it fairly short?

20   A    Yeah, it was fairly short.

21   Q    Do you know where those written reports end

22        up?

23   A    No, ma'am.
```

```
1    Q    Do you know how long the investigation

2         actually took place?

3    A    No, ma'am.

4    Q    Did you have a conversation with anyone,

5         other than the people we've already

6         discussed, about Larry Smith and this

7         incident?

8              MR. BOSTICK:  Object to the form.

9                   Talking about the incident with

10                  Reggie --

11   Q    Right, the November 22 incident with Reggie

12        Johnson.

13             MR. BOSTICK:  You can answer.

14   A    I talked to my senior manager about the

15        situation just to make him aware of what was

16        going on.

17   Q    Who is your senior manager?

18   A    Ashley Fry.  And I spoke with my

19        counter-part manager on the day shift, Craig

20        Stakely.

21   Q    When did -- anyone else?

22   A    I spoke to Rob Clevenger, who is the

23        assistant manager of team relations.  And if
```

```
 1            there is someone else, I can't remember who

 2            it would be.

 3    Q    Ashley Fry is senior manager?

 4    A    Yes, ma'am.

 5    Q    Is that an Ashley female or male?

 6    A    No, male.

 7    Q    What race?

 8    A    Caucasian.

 9    Q    And what did you and Mr. Fry discuss?

10    A    Just the incident that happened:  We had two

11            team members.  I got a call from a team

12            leader that said he felt that a team member

13            was going to put his hands on him.  I

14            separated the team members.  I brought the

15            team member in to have a discussion with him

16            and try to get his side of story.  And I

17            then sent the team member the to the paint

18            shop to work for the next couple of days

19            just to keep them separated.  To report back

20            in pre-delivery we when we come back to work

21            Monday.  And I also gave him a copy of the

22            statement of the facts.

23    Q    Is that the same copy that you gave to Rob
```

| | | |
|---|---|---|
| 1 | | Clevenger? |
| 2 | A | Yes.  This was the follow-up copy, yes, |
| 3 | | ma'am. |
| 4 | Q | And what did you and Craig Stakely discuss? |
| 5 | A | I just made him aware of the situation |
| 6 | | because the team members do rotate -- I |
| 7 | | don't remember what the rotation was or what |
| 8 | | the date was.  But we have to develop a good |
| 9 | | synergy between shifts and we have to know |
| 10 | | about something that could affect the other |
| 11 | | shifts.  So it's a professional courtesy. |
| 12 | Q | What is Craig Stakely's race? |
| 13 | A | Caucasian. |
| 14 | Q | And what was your discussion with Rob |
| 15 | | Clevenger? |
| 16 | A | I just gave him a very brief description of |
| 17 | | what I saw and my conversation with Larry. |
| 18 | | And I knew that Marcus would fill him in on |
| 19 | | everything else. |
| 20 | Q | What is his race? |
| 21 | A | He's Caucasian. |
| 22 | Q | Now, Rob Clevenger -- I think you told me |
| 23 | | earlier -- is head of the team relations |

```
 1        department?

 2   A    Yes, ma'am.  He's assistant manager over

 3        team relations.

 4   Q    Who does Rob Clevenger report to?

 5   A    Now or then?

 6   Q    Then.

 7   A    Oddice Wagner.

 8   Q    What did -- at the time, November of 2005,

 9        what was Oddie's position?

10   A    Manager, team relations.

11   Q    And what race is Oddie?

12   A    Caucasian.

13   Q    Did you recommend Larry Smith's termination?

14   A    No, ma'am.

15   Q    Do you know who made that recommendation?

16   A    To the best of my knowledge, there is a

17        review committee.  There's a review

18        committee that meets and makes that

19        recommendation.  I don't know who all is on

20        the committee.

21   Q    Does that review committee change?

22   A    I'm not sure.

23   Q    Or is it just one throughout?
```

```
 1   A    I'm not involved it in, so I have no idea.

 2   Q    And would that be from the team relations

 3        department?

 4   A    Yes, ma'am.

 5   Q    Do you know why it look so long to terminate

 6        Mr. Smith?  I mean, the first incident was

 7        November 22cnd and he was not given notice

 8        of termination until December 6th, I

 9        believe.  Do you know why it took so long?

10   A    No, ma'am, I have no dealings in that part

11        of the process, that doesn't fall under my

12        realm of responsibility.

13   Q    Let's back up to the incident that you were

14        telling me earlier about in December of this

15        past year where someone was terminated.

16             Can you tell me the -- what lead

17        to that termination?  What happened within

18        your department that led to that

19        termination?

20        MR. BOSTICK:  Object to the form.

21   A    This was a conversation that discusses

22        another employee.  Can I do that?

23        MR. BOSTICK:  You can answer.
```

```
 1   A    There was two team members, one team member

 2        was horse-playing with another and the team

 3        member didn't like the horse-play.  And he

 4        threatened to cause bodily harm to the other

 5        team member.  So the team member that made

 6        the threat was terminated.

 7   Q    Was that team member terminated on that day?

 8   A    No, ma'am.  I do know -- I do know that they

 9        were not, no, ma'am.

10   Q    Do you know how soon after that incident

11        there was a termination?

12   A    I don't know how soon, no, ma'am.  There was

13        some time that went by.  I know it was

14        greater than a week.

15   Q    Have you ever been arrested?

16   A    No, ma'am.

17   Q    During your employment with Hyundai, have

18        you ever been suspended?

19   A    Yes, ma'am.

20   Q    When was that?

21   A    It was August -- end of August, beginning of

22        September 2005.

23   Q    And what was the reason for that suspension?
```

| 1 | A | Serious misconduct. |
| 2 | Q | What was the serious misconduct? |
| 3 | A | I followed an order from my senior manager |
| 4 | | to put change parts out on my car; to put |
| 5 | | scrap parts on a company car. |
| 6 | Q | How long was your suspension? |
| 7 | A | Three weeks. |
| 8 | Q | So that was right after your promotion? |
| 9 | A | Yeah, I'm wanting to say that it was.  I'm |
| 10 | | not for certain about the dates, but I'm |
| 11 | | pretty sure it was end of April to beginning |
| 12 | | of September, yes, ma'am. |
| 13 | Q | End of April or end of August? |
| 14 | A | End of August; it was August. |
| 15 | Q | During those three weeks, was there a |
| 16 | | replacement for your position? |
| 17 | A | No, ma'am. |
| 18 | Q | Following Mr. Smith's termination, was there |
| 19 | | a replacement for his position? |
| 20 | A | When -- rephrase the question, I don't |
| 21 | | understand. |
| 22 | Q | Do you know if there has been someone hired |
| 23 | | to replace Mr. Smith? |

| 1 | A | Since he's been terminated? |
|---|---|---|
| 2 | Q | Yes. |
| 3 | A | We filled an opening, so I would guess I |
| 4 | | would say, yes. |
| 5 | Q | Do you know who that person is? |
| 6 | A | No, ma'am. |
| 7 | Q | Obviously, you've never been terminated from |
| 8 | | Hyundai? |
| 9 | A | No, ma'am. |
| 10 | Q | Where you ever given a written warning? |
| 11 | A | Yes, ma'am. |
| 12 | Q | When was that? |
| 13 | A | That was for the same issue.  It would have |
| 14 | | been some time in September of '05 when I |
| 15 | | was given a warning. |
| 16 | Q | And is that warning placed in your personnel |
| 17 | | record? |
| 18 | A | Yes, ma'am. |
| 19 | Q | Are all written warnings placed in personnel |
| 20 | | records? |
| 21 | A | I can't answer that.  I don't know who keeps |
| 22 | | up with the personnel records.  I can only |
| 23 | | answer to mine. |

| | | |
|---|---|---|
| 1 | Q | Do you know Joshua Groves? |
| 2 | A | Yes, ma'am. |
| 3 | Q | How do you know him? |
| 4 | A | He was a team member at HMMA for some time. |
| 5 | Q | Was he in your line of supervision? |
| 6 | A | He was a team member.  And it goes through |
| 7 | | the same organizational chart that I |
| 8 | | mentioned earlier: team member, team leader; |
| 9 | | team leader, group leader; group leader, |
| 10 | | assistant manager. |
| 11 | Q | Did he work in the same area with Larry |
| 12 | | Smith? |
| 13 | A | Yes ma'am. |
| 14 | Q | What is his race? |
| 15 | A | Caucasian. |
| 16 | Q | Is he currently employed at Hyundai? |
| 17 | A | No, ma'am. |
| 18 | Q | Do you know if he was terminated? |
| 19 | A | Yes, ma'am. |
| 20 | Q | Do you know why he was terminated? |
| 21 | A | No, ma'am. |
| 22 | Q | Did you ever hear or know of an incident |
| 23 | | between Joshua Groves and Michael Harris? |

```
 1              MR. BOSTICK:   Object to the form.

 2    A    No, ma'am.   I did yesterday, I heard about

 3         it for the first time yesterday.

 4    Q    But to the best of your knowledge, Joshua or

 5         Michael, neither one were ever suspended for

 6         an altercation?

 7    A    Not to the best of my knowledge, no.

 8    Q    Who would know that?

 9    A    Probably, their assistant manager or group

10         leader.

11    Q    Who is that person?

12    A    That would be Michael Lashley.   And team

13         relations should also know because

14         production doesn't suspend or terminate

15         anybody.   That comes under team relations.

16    Q    And that would be Rob Clevenger?

17    A    That would be Rob Clevenger.

18    Q    Did Joshua Groves have a temper?

19    A    I didn't work closely enough with him to

20         know.

21    Q    Did you ever hear about him having a temper?

22    A    No, ma'am.

23    Q    What about Michael Harris?   Do you know
```

```
 1          Michael Harris?

 2    A     Yes, ma'am.  I know Michael Harris had a

 3          temper.

 4    Q     What is his position?

 5    A     He's a team member back in pre-delivery; he

 6          delivers parts.

 7    Q     Is he still employed at Hyundai?

 8    A     Yes, ma'am.

 9    Q     In that same position?

10    A     I believe so, yes, ma'am.

11    Q     What is his race?

12    A     Caucasian.

13    Q     There was some discussion yesterday during

14          Mr. Smith's deposition about you telling him

15          that you had a friend that was shot at some

16          other --

17    A     It wasn't -- it wasn't --

18              MR. BOSTICK:  Let her finish the

19                 question.

20    Q     -- employment.  Do you have a friend who was

21          shot at work?

22    A     No, not a friend.

23    Q     Tell me more about that.  How did that come
```

```
 1        up?

 2    A   One of my former employers years ago -- and

 3        I tell this to other team members, you know,

 4        who are having a tough time with another

 5        employee.  I had a team member that came in

 6        and -- he was on suspension, but he came in

 7        and he shot a production manager, I think,

 8        three times in the head and throat and it

 9        killed him.

10            And so, we have to take, you know,

11        every potential workplace violence issue or

12        any potential violence issue, we have to

13        take it very seriously because things like

14        that do happen.  So that's the reason we

15        diffuse the situations and we act

16        immediately.  That's the reason we do.

17        That's one of the reasons I'm pretty

18        sensitive to it and I do make sure that we

19        diffuse the situation quickly.

20    Q   Did this happen at Hyundai?

21    A   No, ma'am.

22    Q   Where was this?

23    A   North American Bus.
```

```
1    Q    How long ago?

2    A    I don't remember the exact year.  I think

3         that it was '95, but I can't be for certain.

4    Q    Is that here in Montgomery?

5    A    No, ma'am, that's in North Alabama.

6    Q    And was the person shot, Caucasian?

7    A    Yes, ma'am.

8    Q    Did person who shot him -- what was his

9         race?

10   A    He was Caucasian as well.

11   Q    Does Hyundai obtain background checks for

12        all prospective employees?

13   A    I don't know that.  I'm not in employment so

14        I don't know.

15   Q    What is a rear-combo light assignment?

16   A    It's a rear-taillight, basically.  It's

17        called a combination because it's a

18        taillight and it's a blinker.

19   Q    Is that particular assignment part of your

20        department that you supervise or manage?

21   A    Yes, ma'am.

22   Q    What tools are needed to perform that

23        particular job?
```

```
 1   A    It depends on if it's going to be removed or
 2        if it just needs to be fit.  If it's going
 3        to be removed, it could involve several
 4        different tools: a screw driver, a socket, a
 5        ratchet.  But if it's just going to be fit,
 6        you may just need a hammer.
 7   Q    Whose responsibility is it to make sure that
 8        the worker who is assigned to that task, has
 9        the correct tools?
10   A    It would be the team leader and group
11        leader, both.
12   Q    What happens if the required repairs are not
13        completed in the time allotted?
14   A    There is not an allotted time for repairs
15        per se.  It doesn't say you have do this in
16        one minute.  There is some on-line repairs
17        and some off-line repairs.  If there's a
18        repair guy takes an excessively long time to
19        make a repair, we'll develop a skill-up plan
20        for them to improve their speed.  It depends
21        on the nature of the repair.  I mean, you
22        can imagine changing an engine takes a lot
23        longer than fixing a tire.
```

```
 1   Q    Did you receive a written report from Lisa
 2        Chumney regarding Larry Smith?
 3   A    No, ma'am.  I received it from her group
 4        leader, Michael Campbell.
 5   Q    Let me show you what we'll mark as
 6        Plaintiff's Exhibit One to this deposition.
 7                         (At which time, Plaintiff's
 8                         Exhibit No. 1 was marked for
 9                         identification.)
10   Q    Is this the statement that you've seen?
11   A    Yes, ma'am.
12   Q    Who gave you this?
13   A    Michael Campbell.
14   Q    Campbell?
15   A    Campbell.
16   Q    Who is he?
17   A    He is Lisa Chumney's group leader -- or he
18        was Lisa Chumney's group leader.
19   Q    Is he no longer there?
20   A    Yes, he is still there, but he now works as
21        assistant manager in general assembly.
22   Q    But in November of '05, he was group leader?
23   A    In quality assurance.
```

```
1    Q    What is Michael Campbell's race?

2    A    He is African-American.

3    Q    What was the reason for him giving you this

4         statement?

5    A    He told me that he had a team member that

6         was emotionally upset.  And that's the

7         reason he gave me this statement.

8    Q    Can you tell me what in this statement, if

9         anything, is threatening?

10             MR. BOSTICK:  Object to the form.

11   A    Her statement says he stepped closer to her

12        and said, "I believe you're that person."

13        So her group leader, Michael Campbell, felt

14        that it was a threatening matter and he

15        invaded her personal space.

16   Q    Do you know if Lisa Chumney has a reason to

17        be angry or want to retaliate against

18        Mr. Smith?

19   A    I would have no idea.

20   Q    In this statement she says:  20 minutes

21        later she was passed Mr. Smith walking to

22        the bathroom.  And she asked him if he would

23        tell me again who told him this.
```

| | | |
|---|---|---|
| 1 | | Do you think that she would walk |
| 2 | | up to him and ask him another question if |
| 3 | | she was really frightened? |
| 4 | A | I can't speculate.  I don't know what she |
| 5 | | was thinking. |
| 6 | Q | Is Lisa Chumney still employed at Hyundai? |
| 7 | A | I believe so. |
| 8 | Q | Do you know which department? |
| 9 | A | If she is still employed, she'd be in the |
| 10 | | quality control department. |
| 11 | Q | Let me show you what we'll mark as |
| 12 | | Plaintiff's Exhibit Two and ask you if you |
| 13 | | recognize this document? |
| 14 | | (At which time, Plaintiff's |
| 15 | | Exhibit No. 2 was marked for |
| 16 | | identification.) |
| 17 | A | Yes, ma'am. |
| 18 | Q | What is that document? |
| 19 | A | It's a document that I wrote on |
| 20 | | November 29th, 2005, and I sent to Rob |
| 21 | | Clevenger, the assistant manager of team |
| 22 | | relations. |
| 23 | Q | And you cc'd Ashley Fry? |

```
 1    A    Yes, ma'am.

 2    Q    Tell me again what Ashley's position is.

 3    A    Ashley is the senior manager of general

 4         assembly.  He's my boss.

 5    Q    Did you draft this at someone's request or

 6         just on your own?

 7    A    Just on my own.

 8    Q    Why did you draft it?

 9    A    Because I felt like we needed a statement of

10         the facts of what happened.

11    Q    In that first paragraph it says, "I was

12         attempting to catch my breath.  I then went

13         and took statements from witnesses that saw

14         the occurrence first-hand."

15              Are those the same names you gave

16         me earlier:  Carl Tyce?

17    A    Yes, ma'am, Carl Tyce, Gary Myers, Reginold

18         Johnson, and there was a temp and I can't

19         remember his name.

20    Q    And the second occurrence that you refer to

21         is the Lisa Chumney?

22    A    Yes, ma'am.

23              MR. BOSTICK:  Object to form.  Show him
```

| 1 | | where you're referring to in |
|---|---|---|
| 2 | | there. |
| 3 | Q | In that first paragraph. It says, "I then |
| 4 | | called team relations and had Maggie |
| 5 | | Prestridge with me in the PDI office to |
| 6 | | address Larry. I informed him that this was |
| 7 | | the second occurrence." |
| 8 | A | The second occurrence does not refer to Lisa |
| 9 | | Chumney. |
| 10 | Q | Okay. |
| 11 | A | This being the second occurrence. The first |
| 12 | | occurrence was the incident with Dan Smith |
| 13 | | back in June. |
| 14 | Q | Could you go back and look at the first |
| 15 | | exhibit? I forgot to ask you about the |
| 16 | | scratch off. |
| 17 | | Do you know why there are lines |
| 18 | | through? |
| 19 | A | No, ma'am. |
| 20 | Q | Did you -- |
| 21 | A | I don't recall drawing lines through them, |
| 22 | | no, ma'am. |
| 23 | Q | Do you know if Lisa did? |

| | | |
|---|---|---|
| 1 | A | No, ma'am, that was not on the document when |
| 2 | | Lisa gave it to Michael Campbell.  And |
| 3 | | Michael Campbell gave the document to me. |
| 4 | Q | When you say, "that was not on the |
| 5 | | document," -- |
| 6 | A | None of the writing or the scratches. |
| 7 | Q | Do you know who wrote on this document? |
| 8 | A | My hand-writing. |
| 9 | Q | You did this? |
| 10 | A | Yes, ma'am, I wrote this, but I didn't |
| 11 | | scratch through it.  I wrote this down at a |
| 12 | | later time when I was trying to retrieve |
| 13 | | Larry's side of the matter.  I was trying to |
| 14 | | get his side of the story. |
| 15 | Q | It looks like quotation marks? |
| 16 | A | It was exactly what Larry was saying. |
| 17 | Q | Do you know when you wrote these? |
| 18 | A | I wrote these on 11/28.  It would have been |
| 19 | | the -- the -- during the time I asked Larry |
| 20 | | to come to the office to get his statement. |
| 21 | | So I got this from Lisa.  And I |
| 22 | | called Rob Clevenger and reported it to Rob |
| 23 | | Clevenger.  And I asked for his -- to get |

```
 1        his opinion of what he wanted Marcus Hannah

 2        and I to do.

 3                "This is Lisa's side of the story,

 4        should we get Larry's and find out what

 5        happened from his perspective?"

 6                And Rob said, "Yes, by all means.

 7        Make sure we find out what happened from his

 8        perspective."  And from trying to do that,

 9        we had another incident.

10   Q    So these are comments that Larry Smith made

11        during the 11/28/05 meeting?

12   A    Yes, ma'am.

13   Q    But you didn't mark them out.

14   A    No, ma'am, not that I recall.

15   Q    All right.  Let me have a second to speak

16        with my client.

17                        (At which time, a short break

18                        was taken.)

19   Q    I can't find it in my notes right now, but

20        would you tell me again where the incident

21        happened where a supervisor was shot by an

22        employee?

23   A    It was at a bus company, North American Bus,
```

```
 1        it was in North Alabama.

 2    Q   Did you work for that company?

 3    A   Yes, ma'am.

 4    Q   What was your position?

 5    A   Supervisor.

 6    Q   What year?

 7    A   '94 to 2003.

 8    Q   What year was the shooting incident?

 9    A   It was either '95 or '96, I can't be

10        certain.

11    Q   Was it in the newspaper?

12    A   Yes, ma'am.

13    Q   Now, you say, "North Alabama," was that like

14        Gadsden?

15    A   Like Anniston area.

16    Q   Did you live in the Anniston area?

17    A   No.

18    Q   Where did you live?

19    A   I lived in White Plains, it's close to

20        there, general area.

21    Q   Did you know the person who was shot?

22    A   Yes, ma'am, he was a bus driver.

23    Q   What was his name?
```

```
1   A    Michael Lucas.

2   Q    I'm sorry, what was that?

3   A    Michael Lucas; L-U-C-C-A-S.

4   Q    And who was the person who shot him?

5   A    Robert Arthur.

6   Q    Mr. Weddington, do you have a temper?

7   A    No, ma'am, I don't think so.

8   Q    Have you ever displayed any behavior at

9        Hyundai that might reflect or lead someone

10       to believe you had a temper?

11  A    I don't know, it would depend on someone's

12       perception.  I'm aggressive.  I don't know

13       if that means I have a temper or not.

14  Q    What do you mean when you say:  You're

15       aggressive?  What you are you referring to?

16  A    To getting the job done, to moving cars, to

17       fixing problems on cars.

18            MS. DICKEY:  I have no further

19                 questions at this time.

20            MR. BOSTICK:  I don't have anything.

21            MS. DICKEY:  Thank you.

22                 (The deposition ended at

23                 approximately 10:45 a.m.)
```

```
 1              REPORTER'S CERTIFICATE

 2   STATE OF ALABAMA

 3   MONTGOMERY COUNTY

 4              I, Talitha B. Lovin, Certified

 5   Professional Reporter and Notary Public in and for

 6   the State of Alabama at Large, do hereby certify on

 7   Wednesday, May 23rd, 2007, that pursuant to notice

 8   and stipulation on behalf of the Plaintiff, I

 9   reported the deposition of PAUL SCOTT WEDDINGTON,

10   who was first duly sworn by me to speak the truth,

11   the whole truth, and nothing but the truth, in the

12   matter of LARRY SMITH, Plaintiff, versus HYUNDAI

13   MOTOR MANUFACTURING ALABAMA, LLC, Defendant, now

14   pending in the Circuit Court for Montgomery County,

15   Alabama; that the foregoing colloquies, statements,

16   questions and answers thereto were reduced to 58

17   typewritten pages under my direction and

18   supervision; that the deposition is a true and

19   accurate transcription of the testimony/evidence of

20   the examination of said witness by counsel for the

21   parties set out herein; that the reading and signing

22   of said deposition was not waived by witness and

23   counsel for the parties.
```

1           I further certify that I am neither of

2    relative, employee, attorney or counsel of any of

3    the parties, nor am I a relative or employee of such

4    attorney or counsel, nor am I financially interested

5    in the results thereof.  All rates charged are usual

6    and customary.

7           This the 19th day of July, 2007.

8

9

10

11    _____

12    Talitha B. Lovin
      Certified Court Reporter and
13    Notary Public
      Commission expires: 10/17/2007

14

15

16

17

18

19

20

21

22

23

# Exhibit D

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE MIDDLE DISTRICT OF ALABAMA

 3                      NORTHERN DIVISION

 4


 5   LARRY SMITH,

 6         Plaintiff,
                             CIVIL ACTION
 7        VS.
                             FILE NO. 2:06-CV-966-ID-SRW
 8

 9   HYUNDAI MOTOR MANUFACTURING
     OF ALABAMA, LLC,
10
           Defendant.
11

12                                       COPY

13          *       *       *       *       *

14

15          TELEPHONIC DEPOSITION OF JOSHUA GROVES,

16   taken on behalf of the Plaintiff, pursuant to the

17   stipulations set forth herein, before Jeana S.

18   Boggs, Certified Court Reporter and Notary Public,

19   at the apartment of Joshua Groves, ~~100 Park Avenue~~,

20   ~~Park Place~~, Apartment 601, Foley, Alabama,

21   commencing at approximately 10:00 a.m., Wednesday,

22   September 26, 2007.

23
```

```
 1                APPEARANCES OF COUNSEL

 2    FOR THE PLAINTIFF:

 3            HONORABLE KATHRYN DICKEY

 4            Attorney At Law

 5            LAW OFFICES OF KATHRYN DICKEY, LLC

 6            322 Alabama Street, Suite B

 7            Montgomery, Alabama   36104

 8            334.262.0728

 9    FOR THE DEFENDANT:

10            HONORABLE BRIAN R. BOSTICK

11            Attorney At Law

12            OGLETREE, DEAKINS, NASH, SMOAK

13              & STEWART, PC

14            One Federal Place

15            1819 Fifth Avenue North, Suite 1000

16            Birmingham, Alabama   35203-2118

17            205.328.1900

18                      *  *  *

19

20

21

22

23
```

```
1                        *  *  *

2                     STIPULATION

3            It is hereby stipulated and agreed by and

4    between counsel for the respective parties and the

5    witness that the telephonic deposition of JOSHUA

6    GROVES is taken pursuant to notice and stipulation

7    on behalf of the Plaintiff; that all formalities

8    with respect to procedural requirements are waived;

9    that said deposition may be taken before Jeana S.

10   Boggs, Certified Professional Reporter and Notary

11   Public in and for the State of Alabama At Large,

12   without the formality of a commission; that

13   objections to questions, other than objections as to

14   the form of the questions, need not be made at this

15   time, but may be reserved for a ruling at such time

16   as the deposition may be offered in evidence or used

17   for any other purpose as provided for by the Federal

18   Rules of Civil Procedure.

19            It is further stipulated and agreed by and

20   between counsel representing the parties in this

21   case that the filing of the deposition of JOSHUA

22   GROVES is hereby waived and that said deposition may

23   be introduced at the trial of this case or used in
```

4

1   any other manner by either party hereto provided for

2   by the Statute, regardless of the waiving of the

3   filing of same.

4           It is further stipulated and agreed by and

5   between the parties hereto and the witness that the

6   signature of the witness to this deposition is

7   hereby waived.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                      JOSHUA GROVES,

 2   of lawful age, having been first duly sworn, was

 3   examined and testified as follows:

 4

 5                   DIRECT EXAMINATION

 6   BY MS. DICKEY:

 7   Q     This is Kay Dickey, and we are here for the

 8         deposition of Joshua Groves.  Would you

 9         state your name for the record.

10   A     Joshua R. Groves, G-R-O-V-E-S.

11   Q     Okay.  And, Mr. Groves, where is -- what is

12         your address now?

13   A     My address is ████████████████████s in

14         Foley, Alabama, 36535.

15   Q     Okay.  And what's the apartment number?

16   A     Currently it's 601.

17   Q     Okay.  How long have you lived there?

18   A     Maybe five months.

19   Q     Okay.  Are you currently employed?

20   A     Yes, I am.

21   Q     Who is your employer?

22   A     Wal-Mart in Fairhope, Alabama.

23   Q     Okay.  At one time, were you employed by
```

```
 1        Hyundai in Montgomery?
 2   A    Yes, ma'am.
 3   Q    Okay.  What were the dates of your
 4        employment?
 5   A    Man, it would have to be, like, five of two
 6        thousand, like, four maybe or five.  It's
 7        been awhile ago.
 8   Q    Okay.  It doesn't have to be exact.  But can
 9        you give the month and the year that you
10        started and the month and the year that you
11        ended?
12   A    Yeah.  Like, '05 -- '05 to maybe 7/06.  I
13        might be off a year.
14   Q    You were employed in November of 2005 with
15        Hyundai?
16   A    November?  No, ma'am.  I started out there
17        in January, February and March, April -- May
18        of 2005.
19   Q    Are you sure it wasn't 2004?
20   A    Maybe 2004.
21   Q    Okay.  Because the reason I am asking is,
22        you and I and Mr. Smith have already
23        discussed an incident that occurred on
```

```
 1          November 22nd, 2005.  Do you remember that

 2          discussion?

 3     A    No, ma'am.  Maybe you need to refresh my

 4          memory.

 5     Q    Okay.  Do you remember when Mr. Smith and I

 6          came to Wal-Mart here in Montgomery and

 7          talked with you?

 8     A    Yeah.  I remember you-all coming to

 9          Wal-Mart, but I don't remember what we

10          discussed.

11     Q    Okay.  All right.  Let me ask you this:

12          When you were first hired, what was your

13          position at Hyundai?

14     A    At Hyundai?

15     Q    Right.

16     A    PDI parts.

17     Q    Okay.  And what did you do?

18     A    Rode around on a cart delivering parts and

19          taking inventory of scrap parts.  And

20          immediate supervisor had been Reggie

21          Johnson.

22     Q    I didn't hear that last part.

23     A    And my immediate supervisor was Reggie
```

```
 1        Johnson.

 2   Q    Okay.  All right.  And how long did you do

 3        that?

 4   A    I would say three months.

 5   Q    Okay.  And were you transferred to another

 6        department?

 7   A    Not at that time I wasn't.  I was moved into

 8        onto the line -- onto the assembly line from

 9        there, and they let a Robert Churchwell take

10        over the parts part of it.

11   Q    Okay.  Is there a reason why you changed

12        positions?

13   A    Yes, ma'am.  First, I changed to the line

14        because I wanted to -- I wanted to learn how

15        to do the assembly part of it.

16   Q    Okay.  And that's the only reason?

17   A    Yes, ma'am.  As far as I know.  Yeah, that's

18        the only reason I moved to the line is I

19        wanted to learn how to put gas caps on and

20        all the other stuff.

21   Q    Now, when you were working on the line, was

22        Larry Smith on the line as well?

23   A    Yes, ma'am.
```

```
1   Q    Okay.  Did you talk with him?

2   A    Yes, ma'am.

3   Q    Okay.  How many others were on that line?

4   A    Oh, boy, I would say 20 or more.

5   Q    Okay.

6   A    Quite a bit.

7   Q    Was Michael Harris on that line?

8   A    Off and on, yes, ma'am.

9   Q    Okay.  Did you and Michael Harris have an

10       altercation at work one day?

11  A    As far as altercation like exchange of

12       words, yes, ma'am.

13  Q    Okay.  Can you tell me about that?

14  A    Well, I'll just tell you we had an

15       altercation.  I don't know exactly what it

16       was about or how it ended or whatever, you

17       know, because that was like, what, four

18       years ago, three years ago.  Yeah, but I can

19       tell you we had an altercation.

20  Q    All right.  And describe to me what do you

21       think an altercation is.

22  A    Well, to the point of almost physical

23       contact is an altercation.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  Was there physical contact with this |
| 2 | | altercation? |
| 3 | A | No, ma'am, not that I know of. |
| 4 | Q | Did Michael throw something at you? |
| 5 | | MR. BOSTICK:  Object to the form. |
| 6 | A | I don't think so. |
| 7 | Q | Okay. |
| 8 | A | I can't remember if he did or didn't.  So... |
| 9 | Q | Okay.  Was this incident reported to anyone, |
| 10 | | say, Reggie or anyone else? |
| 11 | A | Yes, ma'am. |
| 12 | Q | Okay. |
| 13 | | (Thereupon, a discussion was |
| 14 | | held off the record.) |
| 15 | | MR. BOSTICK:  Court Reporter, would you |
| 16 | | mine "noted" if I make an |
| 17 | | objection just so I know you heard |
| 18 | | me. |
| 19 | | THE REPORTER:  Okay.  I got it. |
| 20 | | MR. BOSTICK:  Did you get the one a few |
| 21 | | minutes ago? |
| 22 | | THE REPORTER:  Yes, I got that |
| 23 | | objection.  I heard you. |

```
 1            MR. BOSTICK:  Thank you.
 2    BY MRS. DICKEY:
 3    Q    Okay.  Explain who you reported it to.
 4    A    Reggie Johnson.
 5    Q    All right.  And what's the procedure when
 6         something like that occurs and you report to
 7         Reggie Johnson?  What happens?
 8    A    I don't know.  I have no idea.
 9    Q    So, when you reported it to Reggie Johnson,
10         you never heard anything else about it?
11    A    No.
12    Q    Who is Reggie Johnson's supervisor?
13    A    Reggie Johnson?  That would be -- what's
14         that guy's name -- Michael Lashley I
15         believe.
16    Q    Okay.  Okay.  And did you -- Were you in the
17         same line of supervision with Scott
18         Whettington?
19    A    Yeah.  Scott Whettington was over the whole
20         PDI department.
21    Q    Okay.  Did you at any time -- or was there
22         an occasion when you and Reggie Johnson
23         exchanged words?
```

```
 1   A    Well, I am sure it was, but I can't remember

 2        exactly when or how or whatever.

 3                      (At which time there was a

 4                      brief interruption.)

 5             THE WITNESS:  Hello?

 6             MRS. DICKEY:  I'm sorry.  My cell phone

 7                 went off.

 8             THE WITNESS:  Okay.  We back?

 9   Q    Did you ever tell Reggie Johnson to kiss

10        your ass?

11   A    I wouldn't use profanity but, you know,

12        nothing to that extent.  You know, I pretty

13        much argued with him a lot because me and

14        him had a disagreement about certain things,

15        and I pretty much told him to kiss my rear

16        end, yes, ma'am.  That I can tell you I told

17        him to do, but I didn't say no kiss my, you

18        know, A-S-S because, you know, profanity

19        wasn't used out there.

20   Q    Okay.  Did Scott Whettington have you go

21        into his office and write down what you had

22        told to Reggie?

23   A    Yes, ma'am.
```

| | | |
|---|---|---|
| 1 | Q | Okay.  Do you know what he did with that |
| 2 | | writing? |
| 3 | A | I have no idea. |
| 4 | Q | Did you sign it and date it? |
| 5 | A | Yes, ma'am. |
| 6 | Q | Okay.  And as far as you know, you left it |
| 7 | | with Scott Whettington, but you don't know |
| 8 | | what he did with it after that? |
| 9 | A | Right. |
| 10 | Q | Okay.  Was there any disciplinary action |
| 11 | | taken for you arguing with your superior? |
| 12 | | That superior is Reggie Johnson. |
| 13 | A | No.  No.  Not that I know of, no, ma'am. |
| 14 | Q | Okay.  Was that something that happened a |
| 15 | | lot?  I mean, did you and Reggie disagree a |
| 16 | | lot? |
| 17 | | MR. BOSTICK:  Object to the form. |
| 18 | | THE REPORTER:  Noted. |
| 19 | A | No. |
| 20 | Q | Okay.  All right.  Now, on November 22nd, |
| 21 | | there was an incident involving Reggie |
| 22 | | Johnson and Larry Smith.  On that day, you |
| 23 | | were on the line.  Do you remember observing |

| | | |
|---|---|---|
| 1 | | an altercation or any type incident that |
| 2 | | day? |
| 3 | A | What do you mean "any type incident"? |
| 4 | Q | Well, do you remember Reggie Johnson and |
| 5 | | Larry Smith exchanging words? |
| 6 | | MR. BOSTICK:  Object to the form. |
| 7 | | THE REPORTER:  Noted. |
| 8 | A | Exchanging words?  What do you -- I mean... |
| 9 | Q | Let me be more specific. |
| 10 | A | Please do. |
| 11 | Q | Do you remember a time on November 22nd when |
| 12 | | Larry Smith needed a certain tool in order |
| 13 | | to perform his job and Reggie would not give |
| 14 | | it to him? |
| 15 | | MR. BOSTICK:  Object to the leading |
| 16 | | question. |
| 17 | | THE REPORTER:  Noted. |
| 18 | A | No, I don't remember anything like that as |
| 19 | | far as -- |
| 20 | Q | What do you remember, if anything, regarding |
| 21 | | Reggie Johnson and Larry Smith? |
| 22 | A | Okay.  I remember they had -- they had a |
| 23 | | discussion about a procedure, and I remember |

```
 1          both of them having an argument about it,

 2          but I don't know exactly what words was said

 3          because I wasn't close enough to hear it.

 4          So -- and I know after that, you know, it

 5          was, like, maybe that same day he got

 6          removed from the line -- Larry Smith did.

 7   Q      Okay.  Did anyone call you -- or let's say,

 8          did Scott Whettington call you into his

 9          office and ask you questions about what you

10          observed?

11   A      Not to my knowledge.

12   Q      Okay.  So, you didn't talk to anybody about

13          that?

14   A      No, ma'am.

15              MR. BOSTICK:  Object to the form.

16              THE REPORTER:  Noted.

17   A      No.

18   Q      Okay.  How far away were you from Larry

19          Smith when this occurred?

20   A      Well, I don't know.  I don't know what the

21          distance is between the moving part of the

22          line and the metal grade that connects into

23          the concrete is, but I would say a good four
```

```
 1        or five feet.
 2   Q    Okay.  And from that distance, could you
 3        hear either Scott Whettington or Larry
 4        Smith?
 5             MR. BOSTICK:  Object to the form.
 6   A    No.
 7             THE REPORTER:  Noted.
 8   Q    Okay.  Thank you.  Joshua Groves, did you
 9        ever see or observe Scott Whettington's
10        temper?
11   A    What?  Say that again.
12   Q    Did you ever observe Scott Whettington
13        losing his temper?
14             MR. BOSTICK:  Object to the form.
15   A    Losing his temper?
16   Q    Yes.
17   A    Well, you know, people lose their temper all
18        the time, so, I mean, I am pretty sure I
19        did.  But, you know, I can't remember
20        anything, like, anything that would, like,
21        stick out like a sore thumb as far as losing
22        your temper, you know?
23   Q    Are you saying that people or employees lose
```

```
 1         their temper all the time?
 2   A     No, that's not what I am saying, ma'am.  Let
 3         me -- let me correct that.  I do not
 4         remember him ever, like, losing his temper
 5         to the point where it would stick out in
 6         your mind to remember three years.
 7   Q     Okay.  What about Reggie Johnson?
 8   A     No.  Reggie Johnson hardly ever lost his --
 9         no, I never -- I don't think he ever lost
10         his temper.
11   Q     Okay.  All right.
12              MR. BOSTICK:  Can we take a break?
13                      (At which time, a recess was
14                      taken).
15   Q     When you moved from the part runner to the
16         line, who authorized that transfer?
17   A     I don't think anybody authorized it.  Well,
18         no, that would be -- not Pat, but what's her
19         name?  Maggie Prestridge I believe.
20   Q     Okay.  Okay.  But was one of the reasons
21         that you moved because you were unproductive
22         on that job?
23              MR. BOSTICK:  Object to the form.
```

```
 1              THE REPORTER:  Noted.

 2    A    Not to my knowledge, ma'am.

 3    Q    Okay.  All right.  Now, going back, you told

 4         me earlier that you reported to Reggie

 5         Johnson this incident between you and

 6         Michael Harris?

 7    A    As far as I can remember, yes, ma'am.

 8    Q    Okay.  What did you tell Reggie?

 9    A    That Michael Harris was talking to me all

10         kind of different ways I believe.  You know,

11         there's a lot of that I don't remember.  You

12         know, I do remember talking to him.  I don't

13         remember exactly what all was discussed

14         because it was, like, three years ago.

15    Q    Right.  I understand that.  But it was

16         important enough to you that you wanted to

17         report it?

18    A    Right.  Right.  Because it upset me.  I do

19         know that.  So...

20    Q    All right.  Did you and Michael Harris get a

21         three-day suspension?

22    A    Not -- not to my knowledge -- not to my

23         memory.  I don't know.  You know, I honestly
```

```
 1            don't know if we did or didn't, you know.

 2    Q     Did you ever get suspended while you were at

 3            Hyundai?

 4    A     Yes, ma'am.

 5    Q     All right.  Can you tell me when you were

 6            suspended and the reason?

 7    A     Not exact days I can't, but I can tell you

 8            why I was suspended.

 9    Q     Okay.

10    A     That was, you know, attendance.

11    Q     Okay.  How many times were you suspended for

12            attendance?

13    A     Once as far as I can remember, but it may

14            have been twice.  I am not for sure.

15    Q     Okay.  All right.  I have no other

16            questions, Joshua.  Thank you.

17    A     Thank you, ma'am.

18                    CROSS-EXAMINATION

19    BY MR. BOSTICK:

20    Q     I have a few for you, Joshua.  This is Brian

21            Bostick.  I am an attorney for Hyundai.

22    A     Yes, sir.

23    Q     How are you doing?
```

```
 1    A    Doing all right, sir.

 2    Q    Can you tell me what your race is, just

 3         because we need that for the record.

 4    A    You need my race for your record?  That's

 5         fine.  I am a Caucasian male, sir.

 6    Q    Okay.  And let me ask you about this:  When

 7         you were talking earlier about a situation

 8         where you were asked to give a statement, a

 9         written statement --

10    A    Okay.

11    Q    -- did you say Scott Whettington asked you

12         to do that?

13    A    Yes.

14    Q    Who else was present when you were asked to

15         do that?

16    A    As far as my memory serves me, it would be

17         Reggie Johnson.

18    Q    Anybody else?

19    A    Maybe Mike Lashley.  You know, man, all this

20         stuff happened, like, years ago, dude.  My

21         memory is not that good.

22    Q    You know, I am not asking you to guess.  The

23         only thing, if you don't know, that's fine.
```

|    |   |                                                        |
|----|---|--------------------------------------------------------|
| 1  |   | But --                                                 |
| 2  | A | Okay.  Well, I don't know.  How is that?               |
| 3  | Q | Okay.  Do you know if anybody from team                |
| 4  |   | relations was in that meeting?                         |
| 5  | A | I don't know.                                          |
| 6  | Q | Do you know what team relations is?  I mean,           |
| 7  |   | do you know -- do you know that's called the           |
| 8  |   | human resource group?                                  |
| 9  | A | No, sir.                                               |
| 10 | Q | I mean, if I asked you what is team                    |
| 11 |   | relations out at Hyundai, would you know               |
| 12 |   | what that means?                                       |
| 13 | A | No, I couldn't give you a description of               |
| 14 |   | that, sir.                                             |
| 15 | Q | Could you name for me anybody that was in              |
| 16 |   | the team relations department?                         |
| 17 | A | No, sir.                                               |
| 18 | Q | Okay.  Have you ever heard the name Marcus             |
| 19 |   | Hannah?                                                 |
| 20 | A | Marcus Hannah?  No, sir.                               |
| 21 | Q | Rob Clevinger (phonetic)?                              |
| 22 | A | Who?                                                   |
| 23 | Q | Rob Clevinger?                                         |

```
1    A    No, sir.

2    Q    Bobby Swagman (phonetic)?

3    A    No, sir.

4    Q    Okay.  Did you ever meet with any of those

5         people, to your knowledge?

6    A    Not to my knowledge.

7    Q    Okay.  What specifically, as best you can

8         recall -- I am not asking word for word.

9         But what did you put in this statement?  If

10        I tried to go out to Hyundai today and find

11        this statement, what am I looking for?  Was

12        it handwritten in pen?  What is it going to

13        look like?

14   A    To my knowledge, it's handwritten.  They --

15        it was -- it's basically a description of

16        what happened.

17   Q    Was it a white paper or pencil paper?  Did

18        it have lines on it?  Do you remember?

19   A    I believe it was on copy paper.  You know,

20        just plain, white paper.

21   Q    Okay.  And the best that you can tell me,

22        what did you write down in a statement, not

23        having to give exact word, but tell me best
```

```
 1        you can recall what you said in the

 2        statement.

 3   A    Well, basically, you know, that there was an

 4        incident and, you know, exactly, you know,

 5        just what day it was, what time it was, who

 6        all was on the line and things like that.

 7        But, you know, as far as any words were

 8        said, you know, I didn't hear any words

 9        exchanged.  I do know that, you know, what

10        the argument was about.  So --

11   Q    I am confused.  Were you -- Did Whettington

12        ask you to give a statement about some

13        altercation or incident between you and

14        Reggie Johnson, or was it what you observed

15        between Reggie Johnson and Larry Smith?

16   A    Reggie Johnson and Larry Smith.  I thought

17        that's what we were discussing.

18   Q    That's what you think you gave a statement

19        about?

20   A    Yes, sir.

21   Q    Did you actually go into Mr. Whettington's

22        office to give a statement about that?

23   A    No.  There's an office, like, right across
```

```
 1        from the line.  I don't know what that is in

 2        there, where you go and you would request

 3        days off and stuff like that.  I don't know

 4        if that's Scott's office or not, but it says

 5        "PDI" on the door.

 6   Q    And my understanding is that you were in the

 7        general vicinity when Larry Smith and Reggie

 8        Johnson had this discussion, whatever it is;

 9        is that right?

10   A    Right.

11   Q    But you didn't hear, or did you, any

12        specific words that were said by either of

13        them to the other?

14   A    No specific words, sir.

15   Q    Do you know -- I would have to use the word.

16        Did you hear Mr. Smith use the word "nigger"

17        during that argument?

18   A    No, sir.

19   Q    Did you hear him the phrase "nappy-headed

20        nigger"?

21   A    No, sir.

22   Q    Okay.  Regardless of what was actually in

23        the statement was basically what you said
```

```
 1          is:  I was in the area, but I didn't really

 2          hear anything that was said from one to the

 3          other?

 4    A     That -- that would be a correct statement.

 5          Also, the only -- the only thing that I did

 6          hear was when everybody was huddled up and

 7          that Reggie had asked him to do some

 8          adjustment on the fuel doors -- or, no, it

 9          was on the trunks I believe.

10    Q     Did you hear what Mr. Smith's response was?

11    A     Well, pretty much that he wanted Reggie to

12          show him how to do it.  And then, from

13          there, I walked away and went down the line

14          and then there was -- you know, I went down

15          about four or five feet to the next car, and

16          then some heated arguments got broken out,

17          you know, James Deshler was there.  There

18          was a couple of us there.  So, you know,

19          James and them were all closer than I was.

20    Q     Okay.  And did Mr. Smith appear to be upset

21          during this conversation?

22    A     Yeah.  Both of them seemed kind of a little

23          upset about something.  And then, you know,
```

```
 1          Reggie never lost his temper, minded, but he

 2          looked kind of frustrated, you know.

 3    Q     Did Mr. Smith lose his temper?

 4    A     No, sir.  They kind of got frustrated with

 5          each other.  And, you know, I don't know

 6          what exactly was said, but I know that, you

 7          know, both of them were separated.

 8    Q     Okay.  Did you see when Mr. Whettington

 9          arrived on the scene?

10    A     No, sir.  I was not paying attention because

11          you've got cars moving down the line, see.

12    Q     Other than hearing this initial asking of

13          Reggie to Larry Smith to do this task, did

14          you hear anything past that point?

15    A     No, sir.

16    Q     Okay.  Do you recall if there were any --

17          if -- when you were asked to give this

18          statement, if there were any African/

19          American men in the room when you were asked

20          to give that statement?

21    A     Do what now?

22    Q     Any African/American men, whether you know

23          their name or not?
```

```
 1    A    In the room for what now?

 2    Q    When you were asked to give a statement

 3         about that incident, when Scott Whettington

 4         asked you to give a statement.

 5    A    Right.

 6    Q    Were there any black men in the room?  I am

 7         just wondering if you recall that other than

 8         Mr. Whettington, who is obviously white.

 9    A    Hell, I don't remember.

10    Q    Okay.  Were you ever -- It sounds like

11         Reggie Johnson was a team leader, correct?

12    A    Right.

13    Q    Because he would the authority to come and

14         say:  I need you to do this to Larry Smith,

15         right?

16    A    That would be correct.

17    Q    And he could do that with you as well in

18         your job when you reported to him?

19    A    I believe so.

20    Q    Did you ever go to -- Did anybody above

21         Reggie Johnson say that you did not want to

22         work for him and you wanted to be

23         transferred out?
```

```
 1   A    Not to my memory, I don't.

 2   Q    Okay.  Did you have -- There are some

 3        suggestion that you had told Reggie Johnson

 4        to kiss your rear end or something like

 5        that.  Were you ever -- Did Reggie Johnson

 6        ever report you for that?  Do you know?

 7   A    No, sir.

 8   Q    Okay.  I mean, did you ever get into any

 9        exchange that was heated enough where you

10        went and complained about Reggie Johnson?

11   A    No, sir.

12   Q    Did you ever use the "N" word while you

13        worked at Hyundai?

14   A    No, sir, because I am not racial.

15   Q    Did you make any racist remarks to Larry

16        Smith or Reggie Johnson while you were

17        there?

18   A    No, sir.

19   Q    Did you ever hear any racist remarks made by

20        Reggie Johnson?

21   A    No, sir.

22   Q    Did you ever hear any racist remarks by

23        Scott Whettington?
```

```
1    A    No, sir.

2    Q    You probably wouldn't have had a whole lot

3         of interaction with Scott Whettington, would

4         you?

5    A    No, sir, other than he may come and get me

6         and ask me to do something else, you know.

7    Q    How many levels above you is he in the

8         supervisory chain?

9    A    Good, God.  Let's see.  One, two, three --

10        maybe four levels.

11   Q    Okay.

12   A    Four or five levels.  I don't know if he is

13        above or the same level as Maggie

14        Prestridge, but -- you know.

15   Q    Did you ever have any situation where you

16        went and reported some kind of complaint to

17        him?

18   A    Not to my knowledge -- or what I can

19        remember, no, sir.

20   Q    Okay.  Did you ever -- Did you know if he

21        had any involvement in any of the moves you

22        had in the workplace, the transfers?

23   A    I am pretty sure he did, but, you know, as
```

```
 1        far as -- you know, I don't know.
 2   Q    I mean, I am not asking you to speculate.
 3        Any personal knowledge, did he ever come and
 4        tell you I am transferring you or anything
 5        like that?
 6   A    No.
 7   Q    Okay.  So, the best that -- you don't know
 8        one way or the other whether he ordered you
 9        transferred or anything, did he?
10   A    I would have no way of knowing that.
11   Q    That's right.  Now, you were ultimately
12        terminated from Hyundai; is that correct?
13   A    That's correct.
14   Q    That was for attendance?
15   A    I believe so.
16   Q    Okay.  And were you notified of that by
17        Wendy Warren?  I think there was a letter
18        sent.
19   A    Yeah.  But, you know, I was also pulled in
20        front of a committee too.  So...
21   Q    Okay.  Do you know who the committee was
22        that you met with?
23   A    Maggie Prestridge and a bunch of other
```

```
 1          different people I had never met in my life.

 2    Q     Okay.  Do you know any of the names of any

 3          of those people?

 4    A     I have no clue.

 5    Q     Have you signed any declarations or

 6          affidavits for this lawsuit?

 7    A     Do what now?

 8    Q     Have you signed any paperwork that was

 9          presented to you by Mrs. Dickey or Mr.

10          Smith?  It's my understanding that Mr. Smith

11          and Mrs. Dickey came to you with an

12          affidavit?

13    A     Uh-huh (positive response).

14    Q     Did you sign that or have you signed off on

15          that?

16    A     Not to my knowledge, I haven't.

17    Q     Okay.  As we sit here today, do you know if

18          you have signed off on any paperwork related

19          to this lawsuit in an affidavit, which is a

20          sworn statement?

21    A     Not to my knowledge.

22    Q     Okay.  Have you told the truth to the best

23          of your knowledge today?
```

```
 1   A     Yes, sir.

 2              MR. BOSTICK:  I think that's all the

 3                  questions I have.

 4                 REDIRECT EXAMINATION

 5   BY MRS. DICKEY:

 6   Q     Mr. Groves, just for the record, you have

 7         not signed an affidavit for Larry Smith.

 8         But I would like to ask you one more

 9         question.  Did you throw a hammer at Michael

10         Harris?

11   A     Not that I remember, ma'am.

12   Q     Okay.  Did you try to choke Michael Harris?

13   A     Not to my knowledge, ma'am.

14   Q     Okay.  You know that's -- That sounds like

15         something you might remember.  Are you

16         saying you might have done that and just

17         can't remember?

18   A     I am saying that I don't think I did.

19   Q     Okay.  So, your answer is no?

20   A     That would be my answer.

21              MRS. DICKEY:  Okay.  Okay.  All right.

22                  I have no other questions.

23
```

```
 1
 2                    (Deposition concluded at
 3              approximately 10:49 a.m.)
 4         *      *      *      *      *
 5              FURTHER DEPONENT SAITH NOT
 6                   *      *      *
 7      R E P O R T E R' S   C E R T I F I C A T E
 8
 9   STATE OF ALABAMA)
10   ELMORE COUNTY)
11
12         I, Jeana S. Boggs, Certified Professional
13   Reporter and Notary Public in and for the State of
14   Alabama at Large, do hereby certify on Wednesday,
15   September 26, 2007, that pursuant to notice and
16   stipulation on behalf of the Plaintiff, I reported
17   the deposition of JOSHUA GROVES, who was first duly
18   sworn by me to speak the truth, the whole truth, and
19   nothing but the truth, in the matter of LARRY SMITH,
20   Plaintiff, versus HYUNDAI MOTOR MANUFACTURING OF
21   ALABAMA, LLC, Defendant, Civil Action No.
22   2:06-CV-966-ID-SRW, now pending in the United States
23   District Court for the Middle District, Northern
```

34

1  Division of Alabama; that the foregoing colloquies,

2  statements, questions and answers thereto were

3  reduced to 33 typewritten pages under my direction

4  and supervision; that the deposition is a true and

5  accurate transcription of the testimony/evidence of

6  the examination of said witness by counsel for the

7  parties set out herein; that the reading and signing

8  of said deposition was waived by witness and counsel

9  for the parties.

10         I further certify that I am neither of

11  relative, employee, attorney or counsel of any of

12  the parties, nor am I a relative or employee of such

13  attorney or counsel, nor am I financially interested

14  in the results thereof.  All rates charged are usual

15  and customary.

16         This the 5th day of October, 2007.

17

18

19

20  Jeane S. Boggs, CCR
    ACCR NO. 7

21  Certified Court Reporter and
    Notary Public

22  Commission expires: 8/7/2010

23

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY SMITH

      Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING,
INC.

      Defendants.

CIVIL ACTION NO.:

2:06-cv-966-ID-SRW

## DECLARATION OF ROB CLEVENGER

1.      My name is Rob Clevenger. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.      In November of 2005, I worked with Audie Swegman and Marcus Hannah in investigating two incidents that involved accusations made against Larry Smith. The first incident occurred on November 22, 2005, and involved Larry Smith and Reggie Johnson. I was advised that Mr. Smith had lost his temper and had become very agitated toward Mr. Johnson after Mr. Johnson had asked him to conduct a repair on a rear combination light. Mr. Johnson had reported the incident because he was concerned Mr. Smith was going to physically harm him. There were reports that Mr. Smith had become upset and called Johnson a "nappy head nigger."

3.      There was also a second incident on November 28, 2005, in which Larry Smith was accused of making intimidating statements and directing threatening conduct toward fellow team member Lisa Chumney. Scott Weddington and Marcus Hannah attempted to speak with Mr. Smith about the foregoing incidents, but Mr. Smith was very defensive and lost his temper again in both of these meetings. Mr. Weddington, Mr.

Hannah, and Karin Carter all reported that when they spoke to Smith after the Lisa Chumney incident, that he became irate, and made comments like "I ain't gonna take no mess off anyone," "I ain't gonna kiss no one's butt to keep my job." Mr. Smith claimed that Mr. Weddington had "Satan running through his body." They called security to escort Mr. Smith out of the building because he had become so unprofessional and had lost his temper.

4.      Audie Swegman and I met with Larry Smith to discuss the accusations against him on the morning of November 29, 2005. Mr. Smith acknowledged that he had gotten into the argument with Reggie Johnson on November 22, 2005. He claimed that Mr. Johnson had lied and said that Smith had not done what he asked him to do. Mr. Smith admitted that he was very angry with Mr. Johnson. He also admitted to having an argument with Ms. Chumney. He said that he told her that he had heard that she said Mr. Smith should be fired and told her to stay out of his business. He said that Ms. Chumney began crying when he said this to her, but that he believed she was faking to set him up. Mr. Smith never gave any reason why Mr. Johnson or Ms. Chumney would want to lie about him or set him up.

5.      Mr. Smith denied losing his temper in his meeting with Mr. Weddington, Mr. Hannah, and Ms. Carter, and claimed that Weddington was being irate during their meeting. This was contrary to what was reported by Marcus Hannah, Karin Carter, and Scott Weddington. The statements of Mr. Hannah, Ms. Carter, and Mr. Weddington that we gathered as part of the investigation are attached to this Declaration as Exhibits 1-4. Mr. Smith also claimed that Mr. Weddington was "harassing" him and "out to get him." None of the witnesses corroborated this statement. Our investigation showed that Mr.

Weddington was merely reporting complaints by Team Members on to Team Relations, just as he should do under HMMA policy. We sent Mr. Smith home and advised him that we would have to submit the findings of the investigation to the termination committee.

6.      The termination committee was composed of the following persons: John Kalson (Director of Manufacturing), Wendy Warner (Employment Manager), Greg Kimble (Director of Human Resources), Scott Gordy (Employment Assistant Manager), and Rick Neal (General Counsel & Director of Legal). The termination committee may seek legal advice from Mr. Neal in his capacity as HMMA's General Counsel to ensure that HMMA's employment actions are legally defensible, and his involvement on the termination committee is limited to providing legal advice to the committee. The termination committee will make the decision on what disciplinary action, if any, is appropriate.

7.      HMMA does not tolerate any behavior that could lead to possible violence. After reviewing the findings of the investigation, the committee determined that, given that there were three incidents in a short period of time in which Mr. Smith had lost his temper and acted unprofessionally and insubordinate, that it was appropriate to terminate his employment. Although he had not escalated his actions to the point of trying to physically harm someone, the Committee was concerned that Mr. Smith exhibited an inability to control his temper, which could only lead to trouble in the workplace. Further, he was insubordinate and disrespectful to his managers when they tried to talk to him about these incidents. All of those factors led the Committee to vote unanimously to terminate Mr. Smith's employment.

8       Attached to this Declaration as Exhibit 5 is a true and correct copy of my November 30, 2005, memorandum to Audie Swegman, detailing my findings through the investigation.

9.      HMMA has a policy against any racial discrimination or harassment. Attached to this Declaration as Exhibit 6 is a true and correct copy of the portion of HMMA's Team Member Handbook that sets forth this policy. All employees are given copies of HMMA's Team Member Handbook, and we conduct training on this policy for all employees.

10.     HMMA investigates all claims of discrimination and harassment. Mr. Smith did not make any complaints of discrimination or retaliation while he worked at HMMA. Instead, after his employment was terminated, he complained to Human Resources Director Greg Kimble that he felt his termination was unfair. Mr. Kimble, who is African American, reviewed the situation one more time and concluded the termination decision should stand. Mr. Kimble's letter reflecting this decision is attached as Exhibit 7.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications or deletions have been made and initialed by me.

Executed on this the 3rd day of October, 2007.

ROB CLEVENGER

| ![Hyundai logo] **HYUNDAI** Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

**TO:**     Audie Swegman

**FROM:**   Marcus Hannah

**DATE:**    **11/22/05**

**SUBJECT:**  Work Place Violence TM's Involved TL Reginald Johnson & Larry Smith

**CC: Rob Clevenger & Shawn Flate**

On 11/22/05 about 8:30pm in Trim Repair TL Reginald Johnson (BM) made a complaint to his Mgr. Scott Weddington that TM Larry Smith was very aggressive towards him and called him a (nappy head nigger). I was contacted by Scott Weddington about the issue; there were two TM's and one temp as witnesses. TM's are Gray Myers and Karl Tyus, Temp Mahershal Johnson

**INVESTIGATOR: Marcus Hannah & TEAM REP: EURAL MADRY**

Statement from TM's

Reginald Johnson TL (BM) # 100514

    Reginald asked TM Larry to repair a tail light, Larry said he has not done this job in a while, in which Reginald said I will show you how, at that time Larry said he did not have the tools to do that job, Reginald said I will get the tools for you. Reginald said after he showed him how to do the job he still did not complete the task. After the job was not finish at the end of the line the car was pull off line to finish the repair and to show Larry how to complete the job. Reginald said Larry became upset with him when he started to show him again how to do the job. Reginald said that's why I am here to help you that when Larry started say things like you are crazy and that's why nobody on this line likes you. Reginald said at time that's when he called Mgr. Scott Weddington to come and talk with the TM Larry, at time Larry said why do you

EXHIBIT

1

| ![HYUNDAI logo] **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

have to Scott , and that's  when Larry said you are a "Nappy Head Nigger".
Reginald called Scott again and said you need to get down here fast and you
might need security, while Reginald was talk to Scott on the phone Larry
started walking towards him and Reginald said he started walking away from
Larry and Larry kept following him around the car. Scott told Reginald to ask
Larry to go into the PDI room and wait until he gets there. TM Larry did not go
into the PDI room until Scott arrived.

Larry Smith TM # 101800 (BM)
        Larry said Reginald doesn't like him because he stays to himself and
reads his bible. Larry said he did everything Reginald told him to do and he
did not say anything to him on the line but he did not have any tools and he
did not know the job that well. Larry said Reginald is always trying to
embarrass his TM's in front of other TM's. Note: Larry told me to ask TM Karl
Tyus about the incident.

        Note: When Scott Weddington came and down and talked with Larry,
Larry had a bad attitude. Scott said he will have zero tolerance for any TM to
talked in an aggressive manner are say any racial remarks to another TM. At
that time Larry said zero tolerance ha!!! Is there zero tolerance for stilling and
Scott said yes, then Larry said so a person can take company property and
Scott asked Larry what did he mean about that and Larry said taking parts and
putting on a car. At that time I told Larry that does not have anything to with
this Issue.

**WITNESS**

Karl Tyus TM (BM) # 101134
        Karl states that Reginald was just trying to show Larry the process and
Larry felted embarrassed. Karl said Reginald was just standing beside Larry to
see if he was doing the process the right way after he showed Larry how to do
the job. Karl said when Reginald walked away Larry called him crazy. I asked
Karl how was Reginald attitude he said he was very calm. Karl also said Larry
from time to time will have a bad attitude, and I asked did he hear Larry call
Reginald a nappy head nigger and Karl said that was at the end of final and he
was not around.

| HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

Mahershal Johnson TEMP (BM)

Mahershal said when he was getting out of the car he herd Larry say nappy head and his voice went real low but he good she Larry still saying something to Reginald. Mahershal also said Larry walked up to Reginald and Reginald started to walk away. I asked how were their attitudes and Mahershal said Larry seamed upset and Reginald was very cool.

Gray Myers (WM) # 101559

Gray said he over herd Larry say that "man nobody like you on this line and who do you think you are" and Larry walked right into Reginald face when saying this. I asked how was their attitude and Gray said Reginald was calm and Larry was very upset.

Management Team what is your advice. Does this look like serious misconduct?

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

**TO:**        Audie Swegman

**FROM:**     Marcus Hannah

**DATE:**     11/28/05

**SUBJECT:**  Larry Smith TM Trim Final (Conduct)


**CC:**        **Rob Clevenger** & Shawn Flate

    On 11/28/05 about 8:30pm Mgr. Scott Weddington came to the TR office and showed a statement that was written by a TM named Lisa Chumney. In her statement she said she asked TM Larry Smith who is presently involved in a WPV investigation did he have a good holiday and he did not reply at time. The TM Larry walked to the break area to put his things down and turn towards her like he was very upset and said do not asked me anything because you told other TM's that I should be fired and she said I did not say anything to anyone At that time he walked up to her and said I believed them. Lisa said he seemed very angry at her and she did not say anything to him at that time. About 20 minutes later she asked him would he tell her who told him that? He said he couldn't tell her and walked away. Krin and I called Lisa in to the office to verify her statement, in which she did.

    Around 9:00pm Mgr. Scott Weddington called Larry into the team relation office to ask him about the complaint made buy TM Lisa Chumney, Karin and I set with Larry as Team Reps. while Scott asked him what happen between him and TM Lisa Chumney, at that time TM Larry became very defensive and verbally attacking Mgr. Scott Weddington. TM Larry started say things like "you just out to get me," "I know your kind," "I am going to file a law suit and add you (Scott) into it," "I want to file and complaint, that white lady has no right to be in my business," if they did fire you for what you did I they can't fire me. At that time I told the TM Larry Scott has noting to do with this TM complaint he was just asked you what happen and he cut me off and started verbally attacking Scott again saying he had Satan running thru his body and I am not going to kiss nobody butt to keep a job, at that time Scott



EXHIBIT
**2**

| ![HYUNDAI logo] Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

called security to come get this TM once security came in the TM came out the room and said take me now. TM Larry asked when he come back to work because he knows he will can he file a complaint on Scott for chewing tobacco? TM also asked for the numbers to HR and to John Kalson? TM Larry was escorted out the building by security around 9:30pm.

This TM is very disrespectful and he feels that he is the only one that is right and everybody else is wrong or a liar. Larry is the type of person that can cause problems for the TM's and HMMA he feels everyone is out to get him. He has a very bad temper

| HYUNDAI | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

**TO:**       Audie Swegman and Rob Clevenger

**FROM:**   Karin Carter

**DATE:**    November 28th, 2005

**SUBJECT:**  Larry Smith

At 8:30 Scott Weddington (Manager) came into the office and informed Marcus and I that he was having some behavior issues with Larry Smith who works in Trim Final. Per Scott, Larry had been creating a hostile environment among his team and Scott further stated that he felt uncomfortable and not safe with Larry out on the line. Scott said that since the incident last Tuesday (November 22nd) Larry has been very and argumentative and causing trouble in the team. Scott said that he wanted to send Larry home tonight because he felt that Larry was a "walking time bomb" and was afraid that Larry could cause harm to other team members. Scott had asked Marcus and I to talk with Larry about his actions and the conversation he had with Lisa Chumney at the beginning of the shift.

Scott had a team member (Lisa Chumney) approach with him a written statement stating that Larry made her feel very uncomfortable with his actions at the beginning of shift. Per Lisa, at the beginning of the shift she had said "hi" to Larry and asked him if he was ok. Larry then turned to her and said that someone told him that she said he should be fired. He then stepped up to face and said "I believe the person who told me."
About an hour after the confrontation, Lisa asked Larry who told him and said he could not tell her. Lisa stated that she had never seen Larry like this nor had she had any problems with him until now. She said that she was very worried and did not understand why he talked to her the way he did.

Scott Wellington asked Marcus and I to talk with Larry and attempt to calm him down. When Scott informed Larry that a team member had wrote and formal statement regarding his behavior he denied the allegations. He said that it was not true and he felt that he was the one being harassed. Larry stated that he was tired of coming in and being singled out my Scott and that he was just a good Christian man just trying to make a living. Scott had tried to explain to him that as a leader he had an obligation to investigate the issue. Larry at this point got very angry and said again he was tired of the one being harassed. Scott again tried to explain he just wanted to investigate the issue and had asked if there was a possible misunderstanding. Again, Larry accused Scott of "picking on him" and

EXHIBIT
**3**

| ![Hyundai] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

that Scott has had it out for him for a long time.  He told Scott that he knew that he did not like him and felt that Scott was being unfair.  Larry went on to say that he did not like his kind and did not know how he has even got hired on with Hyundai.  Again he told Scott that he was tired of being harassed and he will do whatever he has to in order to keep his job and see justice done and he will take this matter into his own hands.  Larry said that he will take it to the top and sue HMMA for harassment if he had to.  Scott told him that this was nothing personal and he was just trying to get to the root cause.  At this point Larry told Scott that he had Satan's running through his body and that the only reason why he called him into the office was because Scott had it out for him.  During the investigation Larry appeared very agitated, angry and at one point of the investigation started yelling at Scott.  Scott said that he wanted us to send Larry home.  Marcus left the room to get number for Scott to call Security and Larry continued yell at Scott and accusing him of being unfair and picking on him   He said that he is again a God fearing man who is a good Christian and felt that again he was being harassed. Security arrived and Scott had asked the Group Leader to pick up Larry's personal things and bring them to the office.  During this time Larry continued to yell at Scott.  He also asked Marcus and I since we were Team Relations, why were we not doing our job to help him and then went on to say we were not much of a "Team Relations."  Larry then asked Marcus when he would hear back form HR and asked for Rob's phone number.  Larry was escorted out of the building by security at 9:30pm  We also asked security to de-activate his badge.

Marcus and I both tried to calm Larry down by explaining to him that were just trying to get the facts and understand the conversation that he had with Lisa at the beginning of the shift.  He then asked me if Lisa was going to be sent home – if not, then why?  He said he was tired of everyone of being in his business.

Per my recommendation – this is a serious misconduct issue.  Larry's actions were outside the boundaries violating HMMA's trust and respect policy and could lead to possible workplace violence in the future.  It was clear that Larry shows no respect for his leadership and peers.  Also, he would not listen to Marcus and I when we tried to explain to him why he was in the office.  There seems to be pattern with this individual from my understanding.  I recommend Decision day for the consequences of his repetitive behavior.

**CC:** Shawn Flate

HMMA

# Confidential

| | |
|---|---|
| **To:** | Rob Clevenger |
| **From:** | Scott Weddington |
| **CC:** | Ashley Frye |
| **Date:** | November 29, 2005 |
| **Re:** | Larry Smith Incident |

## Larry Smith

On 11/21/2005 Reggie Johnson, Team Leader PDI, called me on my cell phone and asked me to come to PDI. I responded that I was on my way. Reggie called back less than 1 minute later and said "You might had bring security. He is looking like he is going to get on me. I am backing up and he keeps coming at me!" At this point I took off on a full sprint to get to the end of the line. By the time I arrived, Larry was still visibly agitated. I spoke to him out of breath and said "Go to the PDI office. I will be in to speak with you in a moment." I was attempting to catch my breath. I then went and took statements from some witnesses that saw the occurrence first hand. I talked to each person one on one. I then called team relations and had Maggie Prestridge with me in the PDI office to address Larry. I informed him that this was the second occurrence I had with him disrespecting his team leaders. And that insubordination was a serious infraction that I had zero tolerance for. Larry then responded "Do you have zero tolerance for stealing?" I informed him that "Yes sir we certainly do." Larry responded "Well I heard this manager did some things to his car. What about that?" I informed Larry that the issue we were here to discuss had nothing to do with that issue. That was a separate matter that did not concern him. From that moment on the conversation was heading nowhere. I then recommended to team relations that we temporarily re-assign Larry until we had time to sort this all out and interview all parties involved.

On 11/28/2005 Larry reported back to PDI. Hank Bausch called me to let me know. Larry wanted to speak with Mike Lashley, his G/L. I asked Mike to take Larry into the PDI office while I contacted Team Relations. While trying to contact team relations, another issue arrived with Larry. A QC team member, Lisa Churnney, asked Larry how he was doing at the start of the shift. Larry made some comments to Lisa that upset her very deeply. I gave the written statement to Team Relations. Lisa went to her G/L, Mike Campbell, to file a complaint. Campbell then came to me and handed me the written statement from Lisa. At this time team relations had another emergency that they were dealing with so I moved Larry from PDI to Final line until we could get the situation resolved. Larry was very happy with the move, and had no problem learning his new assignment. He informed me that he did not want to work for Reggie in PDI anymore because Reggie was a "liar and backstabber." I asked Larry not speak about his fellow team members in that manner. I urged him to put this incident behind him and work on his professional development that would help him become the team leader that he always wanted to work for. Mike Lashley witnessed this exchange between Larry and I. Larry then told me that he felt he could no longer work for Reggie. I explained to Larry that we had to move forward and learn from this; and we had to put this behind us as we moved ahead as a team. I then asked Larry "So if you have to work under Reggie are you saying that you would refuse?" Larry responded that "it would be hard" to work under Reggie again

1

EXHIBIT
4

Hank Bausch then escorted Larry to his temporary assignment on Final 4. I stopped by Final 4 after an hour into the shift to check on Larry and make sure he had no issues with his new assignment. Larry said that everything was going fine. I continued to attempt contact with Team Relations.

Once I established a meeting with Team Relations I brought this new issue, Lisa Chumney statement, to their attention. I called Rob Clevenger and asked him for his input. Marcus and I then decided to speak with Larry concerning this newest issue. I was very apprehensive about approaching Larry again, but from the information we had and the guidance received from Rob, we felt it in HMMA'S best interest that we sit Larry down and discuss this issue to get his side of the story. I advised Marcus before hand that if Larry got out of control and lost his temper, I felt it best that we send him home to investigate this issue further and turn it over to Rob Clevenger.

Hank Bausch then brought Larry to the team relations office and we started our meeting with Marcus Hannah, Karen Carter, and myself present with Larry Smith. Marcus explained to Larry that Karen would be representing Larry and Marcus would be taking notes while I asked Larry about the incident with Lisa Chumney. Larry immediately went on the defensive and claimed that I "had Satan running thru my body!". He then stated that I was trying to "stab him in the back!" I asked him to please calm down we were only trying to get his side of the story. This further agitated Larry and he threatened to sue HMMA with a "harassment lawsuit" that he would "take to the top!" He then said "I want to file a complaint. That white lady has no right to be in my business!" "You need to speak to her about being in my business!" Marcus tried to intervene but Larry abruptly cut him of twice. Larry then continued to explode with statements such as "I aint gonna take no mess off anyone!" I am 40 years old. I been too good for too long to go down for some stupid stuff like this!" You are trying to railroad me! I aint gonna kiss no ones butt to keep my job!" Karen then tried to intervene but Larry quickly shut her down as well. At that point I felt that Larry was out of control so I asked Marcus to please contact security to have Larry removed from the property pending further investigation. At this point Larry said "You enjoying this aint ya?" I responded "No I am not, I want you to treat your fellow team members with courtesy and respect, and I want us to move forward. All we initially wanted was his side of the story." Larry continued to rant saying that I was garbage and so was this case against him. This case wasn't going to stick. He knew his rights. At this point security showed up to remove Larry from the premises and Marcus then called Rob. Marcus and I then spoke with Rob on this issue.

It is my impression that Larry is out of control and looses him temper very easily. He shows no respect for his team leaders or myself. He constantly feels that everyone is out to get him. He made me very uncomfortable with his words and actions both last Tuesday and tonight.

Scott Weddington

Production Manager

| 🔵 **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Team Relations Memo** | HR-AL-HR-TR-<br>F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

**TO:**  Audie Swegman

**FROM:**  Rob Clevenger

**DATE:**  November 30, 2005

**SUBJECT:**  Larry Smith

**Allegations:**
Larry Smith (BM, 40+)
- I  Larry made a racial comment towards his T/L, Reggie Johnson (BM)
  - a.  Called Reggie a "nappy headed nigger" was not confirmed by witnesses
- II.  Larry was aggressive towards his T/L, Reggie Johnson
  - a  Two witnesses state that Larry walked up to Reggie and was agitated, Mahershal Johnson (BM) and Gray Meyers (WM)
- III  Larry was aggressive and disrespectful towards a Team Member, Lisa Chumney (WF)
  - a.  This could not be confirmed by witnesses
  - b.  Larry admits he told her to stay out of his business and then walked away
- IV  Larry has been aggressive and disrespectful to other Team Members in the past
  - a.  T/L Dan Smith (WM) said he asked Larry to go to the repair area and Larry argued and told Dan he wouldn't go to repair. Dan got Scott Weddington and Scott gave him a direct order and Larry complied Substantiated by another witness
  - b.  Terry Green (BM) told Larry the correct way to do a process. Larry snapped and said "I know what the hell I'm doing!" The next day Larry apologized to Terry and told him that he had just learned that his brother had died.
- V.  Larry was insubordinate and disrespectful to Scott Weddington (WM)
  - a  Larry's conduct in both meetings was Confirmed by Team Relations reps
  - b  Larry states Scott Weddington was disrespectful and yelling at him all of which is not confirmed In fact witnesses say Scott remained calm while dealing with Larry

**Conclusion:** After reviewing all the statements it appears Larry King has some issues with authority and his fellow Team Members. During the interview with Larry that Audie Swegman and I conducted, it was learned that Larry has been basing his reactions towards others information or rumors he has heard, and what other people have told him and he believes is the truth. In several cases Larry took this as truthful and over reacted. His behavior towards Scott Weddington is unprofessional, disrespectful and insubordinate. Larry stated in his interview that he made the

EXHIBIT
**5**

| (logo) **HYUNDAI** Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

comment regarding stealing parts and putting them on his (Scott Weddington) car. He also said that, "I wanted to retaliate verbally because he (Scott Weddington) was hurting me." His behavior violates HMMA's serious misconduct policy that states;

> HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment. In Serious Misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Serious Misconduct Letter which will remain in the Team Member's file for 36 months. Listed below are some examples but is not an all-inclusive list of activities that constitute Serious Misconduct at HMMA:
> - Insubordination, including refusing to perform a work assignment or refusing to follow direction of HMMA Security or Safety personnel.

**Details:** On November 22, 2005 there was an incident involving Larry Smith (BM, 40+) and his T/L, Reggie Johnson (BM). Reggie had asked Larry to repair a rear combi light. Larry stated he had not done one in a while and did not know the job that well. Reggie said he would show how to do the repair. Larry stated he needed the tools to do the job. Reggie had someone get the tools. Reggie then explained to Larry how to do the repair and had Larry try to complete the repair. It was not completed prior to drive off so the car was pulled around line side for the repair to be completed. After the car was pulled put line side Reggie started to show Larry how to finish the repair. It was then that Larry became upset. He stated, "Man nobody likes you on this line, who do you think you are." The witnesses confirm this was said while Reggie was walking away and Larry was following him saying the above statement. Reggie called Scott Weddington (WM, mgr GA) on the radio at this point and asked for him to come to the line. A few moments after the radio call, Reggie called Scott Weddington on the cell phone and asked him to come to the line immediately. Reggie also told Scott he might want to bring security. From the statements it appears this would be because Larry was following Reggie as mentioned above making the statement, "Man nobody likes you on this line, who do you think you are." Scott told Reggie to have Larry wait in the PDI office and he was on his way.

Larry by all accounts did not go to the PDI office when Reggie asked. Scott arrived and told Larry to come into the PDI office. At that time Larry did enter the office and set down. During the interview with Larry Smith those present were Scott Weddington, Maggie Prestridge (WF, A/M GA), and Marcus Hannah (BM, Team Relations). From the statements given by all those present except the accused, Scott opened the meeting and stated that HMMA had a zero tolerance for aggressive, disrespectful behavior towards Team Members and don't follow the T/L's instruction. It was then that the accused, Larry Smith, in a raised voice and agitated state, said is there zero tolerance for

| ⬡ HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

tolerance for stealing Scott replied yes. Then Larry said, "I have a zero tolerance for stealing, people who bring their cars in her and put parts on them and drive them out" Scott Weddington reminded Larry that the issue at hand was his behavior. Scott felt the meeting was not progressing and dismissed Larry beck to the line so he and the Team Reps could speak to other individuals

On November 28, 2005 another conversation was schedule with Larry to further discuss the situation. Before that conversation took place Scott was given a written statement from Lisa Chumney (WF, 40+) regarding an alleged incident she had just had with Larry Smith in the break area prior to shift start. The complaint was that when she asked Larry if he was ok today. He replied, I heard you think I should be fired. She claims he stepped towards her and said, I believe the person who told me. She then made a complaint to her G/L, Michael Campbell (BM) and wrote out her statement. The written statement was given to Scott by Michael Campbell

Scott Weddington placed Larry in another area for the beginning of the shift. Larry stated he did not want to work for Reggie (T/L) any more because he was a liar. Scott asked Larry not to refer to other Team Members in this way and asked him to put the incident behind him so we could move forward. A short time later another meeting was held with Larry Smith to further discuss the previous issue and investigate the most current allegation. Larry Smith, Scott Weddington, Marcus Hannah, and Karin Carter (WF, Team Relations) met to discuss the situation. Scott opened the conversation and Larry became agitated similar to the 11/21 meeting. He was disrespectful and insubordinate to Scott Weddington making comments regarding him personally. He was loud and not acting in a controlled and calm manner. This was confirmed by the Team Relations reps attending. Several times during the meeting the Team Reps told Larry he must calm down and this was a discussion to gain the facts. He then accused Marcus and Karin of not doing their jobs and helping him. Mr. Smith was suspended at this time pending investigation

There was a discussion prior to the meeting in which Marcus Hannah, Karin Carter and Scott Weddington agreed that if Mr. Smith acted in a loud or uncontrolled manner he would be suspended pending investigation.

**Statements:**

**Larry Smith (BM, 40+)** - I was scheduled off on 11/17 I noticed in October that Friday November 18 was open on the schedule. I asked the T/L Reggie Johnson if I could move the 11/17 vacation day to 11/18. He said he didn't see any problem. I followed up with him the week of 11/14 to and told him that I noticed my day had not been moved. Reggie said, oh its taken Claude already has it I was upset about this because no one had it when I asked for it.

I talked to Marcus Hannah about it. He spoke to Reggie and Reggie told Marcus that I he told me to fill out paperwork to move the day. Reggie never told me to fill anything out. Mike Lashley, G/L,

| ⬡ HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

came to me and told me that since it was their mistake he would give me Friday off. I respect Mike because he didn't cause this but he took responsibility and solved it

Monday 11/21 I came in and was sick. In fact my whole family was sick all weekend. I asked to leave early because and was allowed to leave at around 8:45pm. On Tuesday 11/22 I came back and was at the end of the line adjusting doors (not pre-adjust). Bobby was adjusting the doors RH back down line. The lady down line (Lisa Chumney) from quality came up to me and was puzzled She asked why was Bobby pre-adjusting doors. She said I should be there because they have less problems when I do it.

At about 8:30pm Reggie walks up and said Larry get that tail light repaired. I told Reggie I didn't have the tools. He said I'll get you some. Reggie brought me a phillips screw driver. I told him I thought I would need a rachet and an extention also. Another Team Member went to look for them, and brought those to me. We all don't have the tools for each job. Some carry them in their pouches but whatever job you do is what tools you have. I didn't get the repair done before drive off so the driver told me he would pull it around and put it line side for me to finish. I told Reggie he was going to bring it around. Reggie told me to practice on another unit he pointed out until it came around. I said to Reggie, here it comes now

Reggie then came back up to me and said he had called Scott Weddington and he wants to talk to me in the office. Scott arrived on a bike. He jumped off the bike and was huffing and puffing. He yelled at me and told me to get into the office. Scott was irate. We went into the office and I said, why don't you calm down Maggie is not acting that way and Team Relations is not acting that way Why are you disrespecting me and yelling at me. We sat down and Scott said, I have zero tolerance for people who don't follow their T/L's instructions. I then said, I have zero tolerance for stealing, like people who bring their cars in and put parts on them and drive them out. We stopped the meeting and he sent me back out to the line

On Monday (11/28) I went to Hank Bausch (WM, G/L) and asked to see Maggie. I was told she was off. I then asked for Mike Lashley. I went to the break area and get my gloves and wait for Mike Lashley. Then this quality lady (Lisa Chumney) walked up to me and said, what are they going to do with you? I said, I heard you think I should be fired. I told her she didn't know the story and she needed to stay out of my business. Then she started to cry and said she never said anything to anybody. I turned and walked away. I think she was faking, setting me up.

Later I was taken to meet with Scott Weddington to settle the situation from last week. When I got in there Scott came at me hard and yelled at me. He was disrespecting me. He was throwing his arms out and huffin and puffin, yelling at me. Scott said I got a lady who says you spoke to her in an angry way and stepped towards her. I told Scott I didn't step to her she came towards me. I thought she was fake. I turned and walked away. We were going back and forth (yelling) both of us. I said you tryin to make me be someone I'm not. He said, you sayin she's lyin?

| ![Hyundai logo] HYUNDAI Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date: 9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

Then the Team Relations lady said you need to stop we aren't accomplishing anything. I had no representation in there She couldn't answer my question when I asked her if "the lady would be dealt with for gettin in my business." They were all about what Larry was being accused of and everybody was attacking me.

Then he (Scott) said why'd you go to Team Relations, you could have come to me. You didn't need to go to Team Relations (referring to the Friday vacation request from 11/18) I think that's why he was yelling at me. He then stood up and called security Team Relations didn't feel security should be called they didn't suggest that

Scott doesn't give you a chance he comes at you in an angry manner. He was yelling and angry. They are trying to paint a picture of me that's not true. You have opened my eyes to something Rumors got to go I should have known better than to listen to rumors, God speaks to that

They are trying to paint a picture of me that's not true. You have come down on me hard but you have been respectful.

**Scott Weddington** (WM, mgr)- On 11/22/2005 Reggie Johnson, Team Leader PDI, called me on my cell phone and asked me to come to PDI. I responded that I was on my way. Reggie called back less than 1 minute later and said "You might have to bring security. He is looking like he is going to get on me. I am backing up and he keeps coming at me!" At this point I took off on a full sprint to get to the end of the line By the time I arrived, Larry was still visibly agitated. I spoke to him out of breath and said "Go to the PDI office. I will be in to speak with you in a moment." I was attempting to catch my breath. I then went and took statements from some witnesses that saw the occurrence first hand. I talked to each person one on one. I then called team relations and had Maggie Prestridge with me in the PDI office to address Larry. I informed him that this was the second occurrence I had with him disrespecting his team leaders And that insubordination was a serious infraction that I had zero tolerance for Larry then responded "Do you have zero tolerance for stealing?" I informed him that "Yes sir we certainly do." Larry responded "Well I heard this manager did some things to his car What about that?" I informed Larry that the issue we were here to discuss had nothing to do with that issue. That was a separate matter that did not concern him From that moment on the conversation was heading nowhere I then recommended to team relations that we temporarily re-assign Larry until we had time to sort this all out and interview all parties involved.

On 11/28/2005 Larry reported back to PDI. Hank Bausch called me to let me know Larry wanted to speak with Mike Lashley, his G/L I asked Mike to take Larry into the PDI office while I contacted Team Relations. While trying to contact team relations, another issue arrived with Larry. A QC team member, Lisa Chumney, asked Larry how he was doing at the start of the shift. Larry made

| ![Hyundai logo] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

you to treat your fellow team members with courtesy and respect, and I want us to move forward All we initially wanted was his side of the story." Larry continued to rant saying that I was garbage and so was this case against him This case wasn't going to stick He knew his rights. At this point security showed up to remove Larry from the premises and Marcus then called Rob. Marcus and I then spoke with Rob on this issue

**Reginald Johnson** TL (BM) # 100514
I asked TM Larry to repair a tail light, Larry said he has not done this job in a while  I said I will show you how. At that time Larry said he did not have the tools to do that job  I said I will get the tools for you  After I showed him how to do the job he still did not complete the task before the car lined off  After the job was not finish at the end of the line the car was pull off line to finish the repair  I showed Larry how to complete the job  Larry became upset with me when I started to show him again how to do the job. I said that's why I am here, to help you. That's when Larry started saying things like "you are crazy", and "that's why nobody on this line likes you." That's when I called Mgr  Scott Weddington to come and talk with the TM Larry. Larry said, why do you have to call Scott? Larry said you are a "Nappy Head Nigger". I called Scott again and said you need to get down here fast and you might need security. While I was talking to Scott on the phone Larry started walking towards me  I started walking away from Larry and Larry kept following me around the car  Scott told me to ask Larry to go into the PDI room and wait until he gets there  Larry did not go into the PDI room until Scott arrived

**Karl Tyus** TM (BM) # 101134
Reginald was just trying to show Larry the process and Larry felt embarrassed  Reginald was just standing beside Larry to see if he was doing the process the right way, after he showed Larry how to do the job  Reginald walked away and Larry called him crazy  Reginald was very calm

**Mahershal Johnson** TEMP (BM)
When I was getting out of the car I heard Larry say something, his voice went real low but I good see Larry still saying something to Reginald. I also saw Larry walk up to Reginald and Reginald started to walk away. Larry seemed upset and Reginald was very cool

**Gray Myers** (WM) # 101559
I over heard Larry say that "man nobody likes you on this line and who do you think you are" and Larry walked right into Reginald's face when saying this  Reginald was calm and Larry was very upset

| ![HYUNDAI] Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

Past Practice Regarding Insubordination/ Inappropriate Behavior-

| 102005 | Marsh | Bradford | Involuntary | 11-Aug-05 | Unsatisfactory performance |
| 102083 | Wright | David | Involuntary | 11-Aug-05 | Unsatisfactory performance |
| 102122 | Craig | Cornelius | Involuntary | 14-Sep-05 | Unsatisfactory performance |

There have not been any cases of insubordination which resulted in termination at this time.

advances is a condition of getting or keeping one's job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis. Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager.

EXHIBIT

6

## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members.

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring, training and education, promotions, corrective action, layoffs, terminations, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act.

HMMA's team relations manager has the appropriate authority and the responsibility to administer the EEO programs with regard to employment and promotional opportunities. Any Team Member who feels he/she has been discriminated against may express such concerns to his/her group leader/manager, the team relations representative, and/or the Human Resources Director. HMMA's team relations manager will be responsible for administering HMMA's EEO policy and insuring that any reported EEO violations are investigated promptly and handled according to all federal and state laws as well as HMMA's policies and procedures.

## UNLAWFUL HARASSMENT

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, no Team Member - male or female - should be subject to unsolicited and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implied. This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact. Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment. It is also unlawful sexual harassment when submission to sexual

 **HYUNDAI**
Hyundai Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard. Montgomery, AL 36105
TEL: 334-387-8000
www.hmmausa.com

 COPY

January 17, 2006

Mr. Larry Smith
5675 Valleybrook Lane
Montgomery, Al 36117

Dear Larry:

As we discussed earlier, I have investigated your concerns regarding your termination for insubordination and conduct. I wanted to follow up with this letter to make you aware of my findings.

I spoke to all that were involved in the incident that lead to you termination. The facts don't seem to be as you had presented them to me. The accounts of all those who witnessed the events reflect that it was you, who was being loud and disrespectful.

I further learned that there have been some other occasions recently where you had issues with your management group and following their instructions when asked.

I want to assure you these decisions are never made lightly and much research and investigation is done. I have determined that your status will remain termination for insubordination.

Sincerely,

*Greg Kimble*

Greg Kimble
Director of Human Resources
Hyundai Motor Manufacturing Alabama, LLC

**EXHIBIT**
**7**

# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY SMITH

      Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING,
INC.

      Defendants.

CIVIL ACTION NO.:

2:06-cv-966-ID-SRW

## DECLARATION OF MARCUS HANNAH

1.    My name is Marcus Hannah. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration.

2.    I am a Team Relations Representative at Hyundai Motor Manufacturing Alabama, LLC. I have held this position since June 6, 2005.

3.    I was contacted by Scott Weddington on November 22, 2005, and asked to investigate a complaint made by Team Leader Reggie Johnson against Team Member Larry Smith. When I arrived on the scene in the PDI Department, I met with Mr. Smith, Maggie Prestridge, and Scott Weddington. Mr. Smith was very confrontational when we spoke to him. Mr. Weddington discussed with Mr. Smith the fact that the company had a zero tolerance policy toward aggressive or potentially violent behavior. Mr. Smith said in a sarcastic tone that he wondered if there was a zero tolerance policy toward stealing from the company. This was a "cheap shot" toward Mr. Weddington, who had been the subject of an investigation in August 2005, regarding the placement of parts on his company assigned car. I made clear that Mr. Smith should understand that the point of this investigation was the complaint made by Mr. Johnson and not any prior investigations. Attached to this Declaration as Exhibit 1 is a true and correct

copy of the memorandum that I submitted to Team Relations Manager Audie Swegman regarding my investigation on November 22.

4.    On November 28, 2005, I was advised that Team Member Lisa Chumney had complained about Mr. Smith. I spoke to Ms. Chumney and she told me that Larry Smith had approached her in the break area and accused her of telling other Team Members that Smith should be fired. Chumney said that she denied making the statement, and Smith said he believed the other employee in a very angry manner as he walked close to her. Karin Carter and I spoke with Chumney and Chumney verified what she stated in her hand-written statement, and also said that she was scared and intimidated by Mr. Smith's actions.

5.    At approximately 9:00 p.m., Scott Weddington, Karin Carter, and I met with Mr. Smith to get his side of the story. When Mr. Weddington asked Mr. Smith about the incident, he immediately blew up and began verbally attacking Scott Weddington. He claimed Mr. Weddington was out to get him, and that Mr. Weddington had Satan running through his body. I told Mr. Smith that Mr. Weddington had nothing to do with Ms. Chumney's complaint, and that we were just trying to find out what happened. Mr. Weddington then called security because Mr. Smith was acting belligerent. Mr. Smith was very disrespectful and unprofessional in both meetings that I attended on November 20 and 28, and obviously had tremendous problems controlling his temper. He never offered any real explanation for his actions as to both the Reggie Johnson and Lisa Chumney incidents, other than to claim that they were liars. Attached to this Declaration as Exhibit 2 is a true and correct copy of the memorandum that I submitted to Team Relations Manager Audie Swegman regarding my investigation on November 28.

6.    I reported the findings of my investigation to Rob Clevenger and Audie Swegman in Team Relations.

2

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications or deletions have been made and initialed by me.

Executed on this the 23rd day of October, 2007.

_Marcus Hannah_

MARCUS HANNAH



3

| ![HYUNDAI] **HYUNDAI** <br> Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

**TO:**      Audie Swegman

**FROM:**    Marcus Hannah

**DATE:**    11/22/05

**SUBJECT:**  Work Place Violence TM's Involved TL Reginald Johnson & Larry Smith


CC: Rob Clevenger & Shawn Flate

On 11/22/05 about 8:30pm in Trim Repair TL Reginald Johnson (BM) made a complaint to his Mgr. Scott Weddington that TM Larry Smith was very aggressive towards him and called him a (nappy head nigger). I was contacted by Scott Weddington about the issue; there were two TM's and one temp as witnesses. TM's are Gray Myers and Karl Tyus, Temp Mahershal Johnson

INVESTIGATOR: Marcus Hannah & TEAM REP: EURAL MADRY

Statement from TM's

Reginald Johnson TL (BM) # 100514
        Reginald asked TM Larry to repair a tail light, Larry said he has not done this job in a while, in which Reginald said I will show you how, at that time Larry said he did not have the tools to do that job, Reginald said I will get the tools for you. Reginald said after he showed him how to do the job he still did not complete the task. After the job was not finish at the end of the line the car was pull off line to finish the repair and to show Larry how to complete the job. Reginald said Larry became upset with him when he started to show him again how to do the job. Reginald said that's why I am here to help you that when Larry started say things like you are crazy and that's why nobody on this line likes you. Reginald said at time that's when he called Mgr. Scott Weddington to come and talk with the TM Larry, at time Larry said why do you

EXHIBIT

**1**

| HYUNDAI Hyundai Motor Manufacturing Alabama | Team Relations Memo | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

have to Scott , and that's  when Larry said you are a "Nappy Head Nigger".
Reginald called Scott again and said you need to get down here fast and you
might need security, while Reginald was talk to Scott on the phone Larry
started walking towards him and Reginald said he started walking away from
Larry and Larry kept following him around the car. Scott told Reginald to ask
Larry to go into the PDI room and wait until he gets there. TM Larry did not go
into the PDI room until Scott arrived.

Larry Smith TM # 101800 (BM)
        Larry said Reginald doesn't like him because he stays to himself and
reads his bible. Larry said he did everything Reginald told him to do and he
did not say anything to him on the line but he did not have any tools and he
did not know the job that well. Larry said Reginald is always trying to
embarrass his TM's in front of other TM's. Note: Larry told me to ask TM Karl
Tyus about the incident.

        Note: When Scott Weddington came and down and talked with Larry,
Larry had a bad attitude. Scott said he will have zero tolerance for any TM to
talked in an aggressive manner are say any racial remarks to another TM. At
that time Larry said zero tolerance ha!!! Is there zero tolerance for stilling and
Scott said yes, then Larry said so a person can take company property and
Scott asked Larry what did he mean about that and Larry said taking parts and
putting on a car. At that time I told Larry that does not have anything to with
this Issue.

**WITNESS**

Karl Tyus TM (BM) # 101134
        Karl states that Reginald was just trying to show Larry the process and
Larry felted embarrassed. Karl said Reginald was just standing beside Larry to
see if he was doing the process the right way after he showed Larry how to do
the job. Karl said when Reginald walked away Larry called him crazy. I asked
Karl how was Reginald attitude he said he was very calm. Karl also said Larry
from time to time will have a bad attitude, and I asked did he hear Larry call
Reginald a nappy head nigger and Karl said that was at the end of final and he
was not around .

| ![HYUNDAI logo] **HYUNDAI** Hyundai Motor Manufacturing Alabama | **Team Relations Memo** | HR-AL-HR-TR-F-00002 |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level: 00 |

Mahershal Johnson TEMP (BM)

Mahershal said when he was getting out of the car he herd Larry say nappy head and his voice went real low but he good she Larry still saying something to Reginald. Mahershal also said Larry walked up to Reginald and Reginald started to walk away. I asked how were their attitudes and Mahershal said Larry seamed upset and Reginald was very cool.

Gray Myers (WM) # 101559

Gray said he over herd Larry say that "man nobody like you on this line and who do you think you are" and Larry walked right into Reginald face when saying this. I asked how was their attitude and Gray said Reginald was calm and Larry was very upset.

Management Team what is your advice. Does this look like serious misconduct?

| ⬭ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Team Relations Memo** | **HR-AL-HR-TR-F-00002** |
|---|---|---|
| Revision Date:  9-Sept-04 | Owner: Team Relations | Revision Level:<br>00 |

**TO:**       **Audie Swegman**

**FROM:**    **Marcus Hannah**

**DATE:**    **11/28/05**

**SUBJECT:**  **Larry Smith TM Trim Final (Conduct)**


**CC:**       **Rob Clevenger** & Shawn Flate

On 11/28/05 about 8:30pm Mgr. Scott Weddington came to the TR office and showed a statement that was written by a TM named Lisa Chumney. In her statement she said she asked TM Larry Smith who is presently involved in a WPV investigation did he have a good holiday and he did not reply at time. The TM Larry walked to the break area to put his things down and turn towards her like he was very upset and said do not asked me anything because you told other TM's that I should be fired and she said  I did not say anything to anyone. At that time he walked up to her and said I believed them. Lisa said he seemed very angry at her and she did not say anything to him at that time. About 20 minutes later she asked him would he tell her who told him that? He said he couldn't tell her and walked away. Krin and I called Lisa in to the office to verify her statement, in which she did.

Around 9:00pm Mgr. Scott Weddington called Larry into the team relation office to ask him about the complaint made buy TM Lisa Chumney, Karin and I set with Larry as Team Reps. while Scott asked him what happen between him and TM Lisa Chumney, at that time TM Larry became very defensive and verbally attacking Mgr. Scott Weddington. TM Larry started say things like "you just out to get me," "I know your kind," "I am going to file a law suit and add you (Scott) into it," "I want to file and complaint, that white lady has no right to be in my business," if they did fire you for what you did I they can't fire me. At that time I told the TM Larry Scott has noting to do with this TM complaint he was just asked you what happen and he cut me off and started verbally attacking Scott again saying he had Satan running thru his body and I am not going to kiss nobody butt to keep a job, at that time Scott

**EXHIBIT**

**2**

| ![HYUNDAI logo] **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Team Relations Memo** | HR-AL-HR-TR-<br>F-00002 |
|---|---|---|
| Revision Date:   9-<br>Sept-04 | Owner: Team Relations | Revision Level:<br>00 |

called security to come get this TM once security came in the TM came out the room and said take me now. TM Larry asked when he come back to work because he knows he will can he file a complaint on Scott for chewing tobacco? TM also asked for the numbers to HR and to John Kalson? TM Larry was escorted out the building by security around 9:30pm.

This TM is very disrespectful and he feels that he is the only one that is right and everybody else is wrong or a liar. Larry is the type of person that can cause problems for the TM's and HMMA he feels everyone is out to get him. He has a very bad temper

# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY SMITH

    Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING,
INC.

    Defendants.

CIVIL ACTION NO.:

2:06-cv-966-ID-SRW

## DECLARATION OF REGGIE JOHNSON

1      My name is Reggie Johnson. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration

2.     I am a Team Leader in the PDI (Pre-delivery Inspection) Department at Hyundai Motor Manufacturing Automotive, LLC. I have held this position since June 6, 2005 Larry Smith worked in my area in 2005, and, as a Team Leader, I would direct his work.

3.     On November 22, 2005, I asked Larry Smith to repair a tail light on one of the automobiles on the line. Mr Smith claimed he did not have the proper tools to perform the repair, and I tried to show him how to perform the repair. He then became very irate. He made comments to me like "you are crazy" and "nobody likes you on this line." As he made these comments, Mr. Smith became more agitated and kept invading my personal space. I became concerned that Mr. Smith might attempt to physically harm me, so I called General Assembly Manager Scott Weddington and asked for his assistance immediately. I told Mr. Weddington that I was concerned that Mr. Smith was going to try to physically harm me. Mr. Smith would not leave me alone. He became more and more belligerent. He even called me a "Nappy Head Nigger."



4        I reported all of this conduct to Scott Weddington on November 22, 2005. I also met with Marcus Hannah from Team Relations on that same day and told him what happened. I told them both that I felt that Mr. Smith was about to try to physically harm me. I reported this incident to Mr. Weddington because I was concerned for my safety.

5.       Joshua Groves worked in my area as a Team Member for a period of time. He was not insubordinate to me and never told me to "kiss his ass" or words to that effect. I never made any reports to Team Relations or my managers about Mr. Groves. Mr. Groves never yelled at me or lost his temper the way that Larry Smith did.



Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications or deletions have been made and initialed by me.

Executed on this the 23 day of October, 2007.

REGGIE JOHNSON

# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY SMITH

     Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING,
INC.

     Defendants.

CIVIL ACTION NO.:

2:06-cv-966-ID-SRW

## DECLARATION OF AUDIE SWEGMAN

1     My name is Audie Swegman. I am over the age of 18, and I have personal knowledge regarding the information contained in this Declaration

2     I work as a Manager in Team Relations at Hyundai Motor Manufacturing Alabama, LLC ("HMMA"). I have held this position since January 2, 2003.

3     In August of 2005, I conducted an investigation on behalf of Team Relations into an allegation that Scott Weddington had impermissibly placed upgraded parts on his company automobile in violation of HMMA policy I interviewed several persons, including Mr Weddington Mr Weddington admitted that he had upgraded parts placed on his car, but said that he had discussed the matter with his supervisor (Ashley Frye) and obtained permission to receive the upgraded parts

4     I spoke with Mr. Frye as part of my investigation and he advised me that he had, in fact, given Mr. Weddington permission to place upgraded parts on the car. Mr. Frye felt that this was an appropriate practice because he had allowed his subordinates similar perks when he worked at Nissan He further advised that all of the parts that were placed on the car were scrap parts and that he felt that it was alright to allow Mr. Weddington to place parts on the car because



he was not aware of any policy at HMMA that addressed the issue. This was, however, not an acceptable practice at HMMA.

5.     At the completion of the investigation, it was determined that Mr. Weddington should receive a suspension without pay for three weeks plus the loss of the use of the company car for a one year period. It was determined that, given that Mr. Weddington's supervisor admitted to giving him permission to obtain the parts upgrades that Mr. Weddington should not be terminated. Unlike the investigation that we conducted into the allegations levied against Larry Smith by Reggie Johnson and Lisa Chumney, there was never any suggestion that Scott Weddington had been insubordinate or disrespectful to his managers. To the contrary, our investigation into Mr. Weddington's actions showed that he was following the instructions of his manager and had received permission to place the parts on the car.

6.     I am not aware of any complaint against Scott Weddington in which it was contended that he lost his temper or engaged in threatening behavior as reported by Team Members Reggie Johnson and Lisa Chumney against Larry Smith. Both reported that they were concerned for their safety because Mr. Smith had lost his temper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications or deletions have been made and initialed by me.

Executed on this the 23rd day of October, 2007.

AUDIE SWEGMAN



# Exhibit I

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LARRY SMITH

     Plaintiff,

vs.

HYUNDAI MOTOR MANUFACTURING,
INC.

     Defendants.

CIVIL ACTION NO.:

2:06-cv-966-ID-SRW

## DECLARATION OF LISA CHUMNEY

1     My name is Lisa Chumney. I am over eighteen (18) years of age, and I have personal knowledge regarding the information contained in this Declaration

2.     I have worked as a Team Member for Hyundai Motor Manufacturing Alabama LLC from April 11, 2005, until the present I have worked in the Quality Control Department on Trim Line Inspection Team A in General Assembly with Larry Smith

3.     On November 28, 2005, I was preparing to go to work on the line for my shift when Larry Smith walked over to me and said that someone had told him that I had said that I felt he should be fired. I told him that I had not said any such thing. He then stepped closer to me and said in a very angry voice, "I believe that person." He appeared to be extremely angry at me, and I was very intimidated by his demeanor. I did not say anything in response to him because I was very scared. Mr. Smith's conduct scared me enough that it made me cry and I felt physically threatened by him.

4.     I reported this incident to Reggie Johnson and I also spoke with Group Leader Michael Campbell I told them both that I felt threatened by Mr Smith and that I did not want

*LC*

Mr. Smith to take anymore actions toward me. Attached to this Declaration as Exhibit 1 is a true and correct copy of the statement that I wrote on November 28, 2005.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information contained in this Declaration is true and correct and that any additions, modifications or deletions have been made and initialed by me.

Executed on this the 23 day of October, 2007.

LISA CHUMNEY

11-28-05

At around 6:19pm I got my glasses & pen out of my bag to go to the line. Larry walked by & I said hi Larry. He turned around & said someone told me you said I should get fired. Then he stepped closer to me & said & I believe that person. He seemed to be very angry at me just by his look. I didn't say anything I was just shocked. There was no one else around, as a witness. About 20 minutes later I passed him walking to the bathroom. I asked him if he would tell me who told him this. He said he couldn't tell me & he walked away.

*Jane Chumney*

EXHIBIT

I

# Exhibit J

MEMO 

Re.:        Duke Martin (race discrimination

Date:       March 15, 2007          from  Judy Benson

CRH North America Inc.

Participant:                    Distribution list:

---

On Thursday, March 15, 2007 I spoke to Brandon Silcox, temporary in the Logistics office
and questioned him about a meeting that was two weeks before in the logistics office with
Larry Smith and Duke Martin. I asked him what happened in that meeting. He said it was
himself, Duke Martin, a temp bailer and Larry Smith. He said Duke walked into the office
and said "Hello" and shook hands with everyone but Larry. He said that Duke has a funny
habit of blowing on his hand and saying to shake on it. He did this with Larry and Larry
would not shake his hand. He said it wasn't a big deal and nothing much was said except
that Larry mentioned he didn't like Duke to do that and he was spitting on his hand.
Brandon told him that he had done that with him several times before and didn't think
anything about it. It was a "seal it with a handshake kind of gesture". I asked Brandon had
anything else happened that he was aware of. He said that Larry had not mentioned it since
then and that it had been more like three weeks from then and he didn't mention race at that
time.  He began to tell me that Larry had not liked Duke since the beginning because he
wanted Duke's job. He told Brandon that he should have got the job and was more
qualified than Duke. Larry told Brandon that he also was racist and he knew Duke was.
Brandon also said that Larry had just said something now because Duke was trying to tell
him what he had done wrong, otherwise why did he wait two weeks to say anything if he
really offended him. Brandon said he had never seen Duke treat Larry racist. He
commented that Larry never helped him when he was caught up and that he always took a
nap 30 to 45 minutes before the end of his 2nd shift because he said it was dangerous driving
home late without a nap. He did this on the clock and in the logistics office.  Brandon had
taken a picture of Larry asleep on his camera phone but didn't know how to get it off. He
said since Larry was gone, he showed it to Duke to let him know that Larry had been
sleeping on the job. I informed him that in the future he must notify us if employees are
violating company policy.  I informed Ricky of what Larry had reported that Duke was
discriminating against him for his race because of the handshake gesture. Ricky confirmed
that Duke had done that with him as well as a friendly gesture. Matt, the other employee in
the meeting said Duke had done the same thing with him. In talking to other employees
throughout the plant, they too confirmed they had seen Duke do this as a normal practice. I
also spoke to another black employee Norman Laister in Duke's area and asked him how he
felt about working for Duke. I asked him if he had ever been offended in any way. He said
No. He said he enjoyed Duke being his supervisor.

I told Ricky Coburn, Duke's supervisor that we must notify Duke that this could be
offensive to employees and further disciplinary action would be taken if he continued this

D 00400  L Smith v Hyundai



habit and it became offensive to any employee.   This would be his verbal warning
regarding the habit of this type of handshake.   I also spoke to Duke and told him myself as
well.

*Judy Benson*

**Benson, Judy**

| | |
|---|---|
| **From:** | George, Sam |
| **Sent:** | Monday, March 26, 2007 7:48 AM |
| **To:** | Benson, Judy |
| **Subject:** | Larry Smith |

Hello Judy,

On February 19 I got a call from our customer at Lear (Duncan) that the Sunday night delivery had not arrived. I went to shipping to find out where the shipment was and they were in the process of loading the truck. I then got with Duke to find out what had happened. He said that Larry Smith was to load the truck but he had not received a call indicating there were any problems. He said he would check with Larry when he came in and find out what had happened. After checking with Larry he said he could not find the trailer. I informed Duke that he should discuss this with Larry and if there were any issues making shipments he had to inform his supervisor so we would not let our customer run out of parts.

Sam George
Logistics Manager
205-280-7909 Office
205-351-1710 Cell

1

## INCIDENT INVESTIGATION REPORT

COMPANY: CRH North America, Inc.                                                      (CASE I.D. No)
LOCATION:  Clanton, Alabama
REPORT BY: Judy Benson                        DEPT:                         DATE: March 14, 2007
RE: EMPLOYEE(S) NAME: Larry Smith

## BASIC INFORMATION

| WHERE IT HAPPENED | PEOPLE INTERVIEW (names) |
|---|---|
| DEPT: Production/Logistics | Kevin Conatser |
| | Duke Martin |
| SPECIFIC LOCATION:  Logistics office | Ricky Coburn |
| | Sam George |

WHERE IT HAPPENED

DEPT: Production/Logistics

SPECIFIC LOCATION:  Logistics office

WHEN IT HAPPENED

DATE:  March 12, 2007

TIME: second

SHIFT NO:  Second

PEOPLE INTERVIEW (names)

Kevin Conatser

Duke Martin

Ricky Coburn

Sam George

## DESCRIPTION OF INCIDENT

DESCRIBE WHAT HAPPENED: (summary of interviews and other findings)

On Monday, March 12, 2007 Duke Martin, 1st shift Logistics Supv. And Kevin Conatser, 2nd shift Logistics Supv was going over an employee discussion report and then a 60 day probationary period evaluation with Larry Smith, shipping coordinator.   As they were trying to point out issues needed for improvement with the discussion report, Larry became very upset and hostile. He was raising his voice and arguing with them about the discussion report and they were not able to go over the 60 day probationary evaluation.  They contacted their supervisor, Ricky Coburn, who had already left the facility and told him how upset Larry was and that they could not discuss anything with him.

He then asked the production supervisor on 2nd shift, Michael Ramsey, to join him and the 2nd shift logistics supervisor to continue the meeting with Larry.    They tried to calm him down and when they couldn't they sent him home and told him to report the next day.  They told him he would not be paid.

The next day when Larry arrived, he came to the HR office with Ricky Coburn.  I told him at that time that he would be paid for the previous evening a normal shift and we were sending him home today, 3/13/07, to look into the incident and he would be paid for that day as well.  I notified him that I had not had a chance to meet with 2nd shift and until I had I could not tell him what we needed to do to move forward but I could see he was still very upset. He began questioning why we hadn't looked into his race discrimination from Duke his supervisor.  I told him I wasn't aware that he had made a race discrimination with me.  He kept stating the March 8th incident when he came into the HR office.   I did not remember him saying the supervisor spit in his hand.  I only remembered him saying he would not shake his hand and I did not see this as a race discrimination claim at that time because he just said he didn't feel like Duke liked him.  He questioned that I didn't remember was a lie and tried to get me to pull the HR assistant in the office but because he was so upset, I told him I would look into that later but the question at hand was how upset he became the evening before and until we could determine a solution, he would be sent home with pay.  He still became argumentative and hostile.

We tried to calm him down but showing him flexibility in his work schedule, previous positive evaluations and the mistakes he had made recently.  We questioned "What had changed from his 30 day evaluation to his 60 day evaluation on performance.  I then asked for his badge because I became concerned for him to come back into the facility that evening due to his hostility.   He told us after the meeting he had taped this meeting,other ones and his first complaint.

We asked him to return on 3/14/07.  Ricky Coburn walked him out and came back and told me he threatened him having his job and calling him a heathen.  I spoke to the 2nd shift supervisors and got their statements (Michael Ramsey and Kevin Conatser).  I checked his e-time and the documentation given to me by his supervisor and the Logistics Manager regarding his poor performance.  His 60 day evaluation was on a scale of 1 to 5 a two which is unacceptable.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| EQUIPMENT/TOOLS INVOLVED (describe how) | | | PERSON(S) INVOLVED | | | | | | |
| | | | NA | | | | | | |
| IMMEDIATE CORRECTIVE ACTIONS | | | | | | | | | |
| The decision was made to not retain Larry due to his performance evaluation and his hostile reaction when he was corrected.  He could not accept his mistakes.   On 3/14/07 he was told he was not being retained during his 90 day probationary period per company policy.  He questioned the reason and we told him that his 60 day evaluation which we could not present to him was not acceptable and it was reviewed by Duke Martin, the supervisor, Ricky Coburn, his supervisor and Sam George the Logistics Manager.  The termination meeting consists of the Plant Manager John Anderson (in Sam George absence), H.R. Manager and Supervisor, Ricky Coburn. At this time, Larry was told that we would look into his allegation of race discrimination against Duke Martin. | | | | | | | | | |
| | | | | | | | | | |
| MANAGEMENT REVIEW | | | | | | | | | |
| | | | | | | | | | |
| *[signature]* 3/14/07 | | | | | | | | | |
| Human Resources/Date | | Production Supv/Date | | | | Plant Manager/Date | | | |

D 00404  L Smith v Hyundai

During the meeting Judy and I had Larry he said that I had discriminated against him because I had hired Duke as the shipping supervisor and not him. Larry also said that Duke had only managed a small town hardware store. During the meeting Larry accused CRH of lying and discriminating against him. The more Judy tried to explain to Larry that CRH does not tolerate discrimination and would look into the accusation in order to take appropriate actions, the more angry Larry became. But being so upset was not in his or the company's best interest. I told Larry during the meeting that I had helped him by allowing him to come in at 4:30pm instead of 3:30pm so that he could get his children to or from daycare each day . I also ask him that if I was a racist would I have helped him? During the meeting Judy informed Larry that that he would be paid for going home early the night prior and that she was sending him home with pay tonight in order to give her time to speak to all parties involved. Judy ask me to escort Larry to his car and we left Judy's office. Larry stated that he could turn his recorder now that he had taped the meeting  and we were in big trouble. When Larry and I left Judy's office he told me that he did not have a problem with me. But when we got to the shop door he started telling me that I was in big trouble and that within thirty days I would be unemployed then he changed his mind and said no within 10 days he would have my job. He stated that I had made a big mistake by messing with him. He also said that I should be ashamed of myself for firing all those people and that it would come back around to me. During this entire time I kept telling him just to go to his car but he kept saying that I was in trouble. When we got outside close to his car he said that he had gone to Birmingham and reported me to the EECO, again I told him to just get in his car and leave. Larry said that I was not a Christian, that I was a heathen and that I needed to get on my knees and ask God to forgive me for doing what I had done. When he finally got to his car he reached in his car and I told him if he did not leave now that I would have him escorted off the premises, he then pulled out a piece of paper and waved it at me repeating that I was in big trouble and that he would have my job. Larry then got into his car and as he was pulling off he was waving his hands and yelling something but I could not understand what he was yelling.

## MEMO



CRH North America Inc.

Re.:        Brandon Silcox

Date:       March 9, 2007        from  Judy Benson

Participant:                    Distribution list:

On Thursday, March 8, 2007 I was leaving the HR office and spoke to Larry Smith.    When I spoke to him he was talking to Tammy Smith, HR Generalist and she said, "Larry needs to tell you some things, " and turned to Larry and said, " You need to talk to Judy". He began to tell me that he didn't feel his supervisor Duke liked him. I said really.  I thought you really got along.  He begin to mention that one day a week or so ago in the logistics office, Duke shook two other guys hands but pulled back and didn't shake his. I told him I would speak to Duke about his concern.  Then he began to tell me that Brandon Silcox, a temp in Logistics, smelled like gin and he thought he was using drugs as well. Larry said he had not reported anything because he didn't want to see Brandon lose his job.  I told Larry that he must always report any incident that violates company policy and I would look into this.  I told him that it was his responsibility to notify someone when he suspected any violation. He then said he had told Marcus Weaver when he came in the Logistics office and he smelled gin.  I questioned why Marcus would be in the Logistics office since he was in production.  He just stated he was looking for someone.

At that time, the supervisor Duke Martin came into our office while Larry was here and Larry left.   I told the supervisor that we would schedule a randon drug and alcohol for Brandon as soon as he arrived at work the next day per Larry's comments. I also mentioned to him that Larry had said he didn't think Duke liked him and questioned Duke why Larry would feel that way. I mentioned him not shaking Duke's hand and Duke said he couldn't remember deliberately not shaking Larry's hand and Larry had never mentioned anything about it. I told him it was a week or so prior and he still couldn't recall anything. The reason he had came to my office was he was instructing Larry about his work and correcting him on some issues and Larry just walked out saying he was coming to H.R. Duke did not know why.  Larry had not mentioned this to me that he had walked out on Duke.  He had also mentioned he was looking at the board and questioning the work load between 1st and second shift. He asked, " I can look at the board, can't I?" I said yes.  But nothing else was really discussed about the board.   I mentioned this to Duke as well in our conversation and he said that Larry was angry that he felt 1st shift wasn't having to do as much as 2nd shift.  Duke was trying to explain to him that it is different on 1st shift and a lot of issues come up during business hours and that is when Larry walked out.

I then told him we could work on this but my main concern was the drug screen incident that he had reported.  On March 9, 2007 Brandon Silcox was taken for an alcohol and drug screen by his supervisor, Duke Martin.  The results of the test were negative.  This was



communicated to Larry Smith.    We planned to have some discussions the next week between the supervisor and the employee.

*Judy Benz*

Page 1 of 1

## Benson, Judy

**From:**    Dianne Lee [dianne@walkerworkforce.com]
**Sent:**    Friday, March 23, 2007 1:51 PM
**To:**    Benson, Judy
**Subject:** Larry Smith

Please find attached a copy of the job offer for Larry Smith, after he interviewed with you he accepted the position of shipping coordinator at the pay rate of $13.00/hr.  Please let me know if you need anything else from me.

Thank you,
Dianne Lee
Manager
WorkForce of Montgomery, Inc./Walker Personnel
Office 334-365-5556

3/23/2007

Statement regarding Larry Smith, March 8, 2007

Larry Smith came in to the HR Office with Jimmy Simpler. Jimmy said that he needed to speak to someone in HR. Larry came in and said he had a problem with Duke Martin. The event had occurred on the Thursday before. He said that he and two others guys were sitting in the Shipping Office and Duke Martin came in and he shook hands with them and when he came to Larry he raised his hand up to his mouth as if to spit in it and then extended his hand to shake hands with Larry. Larry said that he had tried to forgive him for it but on the day that he was reporting it, Duke was questioning him about comparing the work of 1st and 2nd shift; this upset Larry and he left Duke and came to HR. I told Larry that I was very surprised at what he was telling me.

He went on to also tell that one of the temporary employees that he was working with, Brandon Silcox, was drinking on the job. He said that he was going out to his car several times a shift to drink. He said that another person had noticed the smell of alcohol in the Shipping Office. I asked him who this was and he said that he thought that he used to work in the Logistics Dept. He mentioned that he wore a hat turned to the side. I got out the Picture Roster and let him look to see if he could identify him. He identified Marcus Weaver.

I knew these were serious issues that would need to be handled, so as I was telling him that he would need to talk to the HR Manager, she came out of her office. I told her that Larry needed to talk to her. He then started to tell her what had happened. He described the incident with Duke in a similar way as he did with me. He then told her about the smelling alcohol in the shipping office and that it was Brandon Silcox. He elaborated more to Judy about this subject, he mentioned that Brandon also talked about taking drugs, and had had several car accidents. Larry was very concerned about the well being of others but did not want to get anyone in trouble or cause them to lose their job. Judy told him that he should always report this type of thing. Judy told him that she would look into the matter.

Duke came into the HR Office and Larry left right away.

*[signature]*

# Alcohol Testing Form (Non-DOT)

*(The instructions for completing this form are on the back of Copy 3)*

**STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

A: Employee Name    Brandon Silcox
(Print)    (First, M.I., Last)

B: SSN or Employee ID No.    ~~___~~ ~~___~~ -0990

C: Employer Name    CRH

Street

City, ST ZIP
DER Name and
Telephone No.
DER Name                    DER (Area Code & Phone Number)

D: Reason for Test: ☐Random ☐Reasonable Susp. ☐Post-Accident ☐Return to Duty ☐Follow-up ☐Pre-employment

**STEP 2: TO BE COMPLETED BY EMPLOYEE**

I certify that I am about to submit to alcohol testing and that the identifying information provided on the form is true and correct.

Brandon S. Shoal                    3-9-07
Signature of Employee              Date ▸ Month / Day / Year

**STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

(If the technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing on the above named individual, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☐BAT ☐STT    DEVICE: ☐SALIVA ☐BREATH*    15-Minute Wait: ☐Yes ☐No

SCREENING TEST: *(For BREATH DEVICE\* write in the space below only if the testing device is not designed to print.)*

| Test# | Testing Device Name | Device Serial # OR Lot # & Exp. Date | Activation Time | Reading Time | Result |
|-------|---------------------|--------------------------------------|-----------------|--------------|--------|
|       |                     |                                      |                 |              |        |

CONFIRMATION TEST: Results *MUST* be affixed to each copy of this form or printed directly onto the form.

REMARKS:

Alpha Service
Alcohol Technician's Company
Burdell
(PRINT) Alcohol Technician's Name (First, M.I., Last)

Burdell
Signature of Alcohol Technician

1008 Icy Dan Rd
Company Street Address
Clanton AL 35045
Company City, State, Zip
205-280-0174
Phone Number (Area Code & Number)
3 9 07
Date    Month / Day / Year

**STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS POSITIVE**

I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are positive.

Signature of Employee              Date    Month / Day / Year

471-FS-C3 (Rev. 6/01) 6363

# ONE-STEP  TESTING  FORM

## ALPHA SERVICES LLC

SITE LOCATION ___CEH___

.DONOR  SSN or EMPLOYEE I.D. NO. _____ - O9SO

Reason for test: ☐ Pre-employment ☐ Random ☐ Post-accident ☐ Follow-up
☐ Reasonable suspicion/Cause ☐ other (specify) _____

Specimen temperature within range ☐ Yes, 90* - 100*F / 32.5* - 37.7* c
☐ No, Record specimen temperature here _____

COLLECTOR:

ALPHA SERVICES LLC
1008 LAY DAM ROAD
CLANTON, AL  35045
205-280-0474

*I certify that the specimen identified on this form is the specimen presented to me by the donor, that it bears the last four numbers of the identification number as that set forth above, and that it was collected and interpreted in accordance with One-step Panel Assay procedures.*

X_BWendell_____  X_Bwendell_____  3.9.07
(PRINT) COLLECTOR'S NAME (FIRST, MI, LAST)    SIGNATURE OF COLLECTOR    DATE (MO/DAY/YR.)

*I certify that I provided my urine specimen to the collector and that I have not adulterated it in any manner. At that time, a screening test was conducted and the results were shown to me as* NEGATIVE *for cocaine, marijuana, amphetamines, barbiturates, opiates, benzodiazepines, and pcp.*

Brandon S. Silcox____  X_Brandon S. Sleep_  3.9.07
(PRINT) DONOR'S NAME (FIRST, MI, LAST)    SIGNATURE OF DONOR    DATE (MO/DAY/YR.)

## Timecard
### Smith, Larry Darnell 1/01/2007-3/23/2007

| Date | Pay Code | Amount | In | Transfer | Out | In | Transfer | Out | Shift | Daily | Cum... |
|------|----------|--------|-----|----------|-----|-----|----------|-----|-------|-------|--------|
| Mon 1/01 | | | | | | | | | | | |
| Tue 1/02 | | | | | | | | | | | |
| Wed 1/03 | | | | | | | | | | | |
| Thu 1/04 | | | | | | | | | | | |
| Fri 1/05 | | | | | | | | | | | |
| Sat 1/06 | | | | | | | | | | | |
| Sun 1/07 | | | | | | | | | | | |
| Mon 1/08 | | | 8:00AM | | 4:30PM | | | | 8:00 | 8:00 | 8:00 |
| Tue 1/09 | | | 5:00AM | | 3:30PM | | | | 10:00 | 10:00 | 18:00 |
| Wed 1/10 | | | 5:00AM | | 3:30PM | | | | 10:00 | 10:00 | 28:00 |
| Thu 1/11 | | | 5:00AM | | 3:00PM | | | | 9:30 | 9:30 | 37:30 |
| Fri 1/12 | | | 4:50AM | | 3:00PM | | | | 9:40 | 9:40 | 47:10 |
| Sat 1/13 | | | 5:50AM | | 1:31PM | | | | 7:10 | 7:10 | 54:20 |
| Sun 1/14 | | | | | | | | | | | 54:20 |
| Mon 1/15 | | | 4:55AM | | 3:30PM | | | | 10:00 | 10:00 | 64:20 |
| Tue 1/16 | | | 4:59AM | | 3:30PM | | | | 10:00 | 10:00 | 74:20 |
| Wed 1/17 | | | 4:58AM | | 3:31PM | | | | 10:00 | 10:00 | 84:20 |
| Thu 1/18 | | | 4:54AM | | 3:32PM | | | | 10:00 | 10:00 | 94:20 |
| Fri 1/19 | | | 10:23AM | | 3:33PM | | | | 4:40 | 4:40 | 99:00 |
| Sat 1/20 | | | 7:56AM | | 4:41PM | | | | 8:15 | 8:15 | 107:.. |
| Sun 1/21 | | | | | | | | | | | 107:.. |
| Mon 1/22 | | | 4:17PM | ..;$.25 -2nd Shift | 2:02AM | | | | 9:15 | 9:15 | 116:.. |
| Tue 1/23 | | | 3:20PM | ..;$.25 -2nd Shift | 1:01AM | | | | 9:00 | 9:00 | 125:.. |
| Wed 1/24 | | | 4:24PM | ..;$.25 -2nd Shift | 1:02AM | | | | 8:05 | 8:05 | 133:.. |
| Thu 1/25 | | | 4:24PM | ..;$.25 -2nd Shift | 1:33AM | | | | 8:40 | 8:40 | 142:.. |
| Fri 1/26 | | | 3:24PM | ..;$.25 -2nd Shift | 12:05AM | | | | 8:10 | 8:10 | 150:.. |
| Sat 1/27 | | | 10:08AM | ..;$.25 -2nd Shift | 2:00PM | | | | 3:50 | 3:50 | 154:.. |
| Sun 1/28 | | | 7:00AM | | 11:00AM | | | | 4:00 | 4:00 | 158:.. |
| Mon 1/29 | | | 3:21PM | | 12:39AM | | | | 8:30 | 8:30 | 166:.. |
| Tue 1/30 | | | 4:26PM | | 1:02AM | | | | 8:00 | 8:00 | 174:.. |
| Wed 1/31 | | | 4:31PM | | 2:19AM | | | | 9:15 | 9:15 | 184:.. |
| Thu 2/01 | | | 4:23PM | | 1:21AM | | | | 8:15 | 8:15 | 192:.. |
| Fri 2/02 | | | 4:26PM | | 8:03PM | | | ✓ | 3:30 | 3:30 | 195:.. |
| Sat 2/03 | | | | | | | | | | | 195:.. |
| Sun 2/04 | | | 3:58PM | | 5:23PM | | | | 1:25 | 1:25 | 197:.. |
| Mon 2/05 | | | 4:25PM | | 1:05AM | | | | 8:00 | 8:00 | 205:.. |
| Tue 2/06 | | | 4:23PM | | 1:00AM | | | | 8:00 | 8:00 | 213:.. |
| Wed 2/07 | | | 4:25PM | | 1:33AM | | | | 8:30 | 8:30 | 221:.. |
| Thu 2/08 | | | 4:27PM | | 1:01AM | | | | 8:00 | 8:00 | 229:.. |
| Fri 2/09 | | | 4:26PM | | 1:34AM | | | | 8:30 | 8:30 | 238:.. |
| Sat 2/10 | | | | | | | | | | | 238:.. |
| Sun 2/11 | | | | | | | | | | | 238:.. |
| Mon 2/12 | | | 3:23PM | | 12:01AM | | | | 8:00 | 8:00 | 246:.. |
| Tue 2/13 | | | 4:24PM | | 1:00AM | | | | 8:05 | 8:05 | 254:.. |
| Wed 2/14 | | | 4:34PM | | 1:05AM | | | | 8:00 | 8:00 | 262:.. |
| Thu 2/15 | | | 4:22PM | | 1:01AM | | | | 8:10 | 8:10 | 270:.. |
| Fri 2/16 | | | 4:22PM | | 1:07AM | | | | 8:15 | 8:15 | 278:.. |
| Sat 2/17 | | | | | | | | | | | 278:.. |
| Sun 2/18 | | | | | | | | | | | 278:.. |
| Mon 2/19 | | | 3:29PM | | 2:41AM | | | | 10:40 | 10:40 | 289:.. |
| Tue 2/20 | | | 4:26PM | | 1:03AM | | | | 8:10 | 8:10 | 297:.. |
| Wed 2/21 | | | 4:17PM | | 1:01AM | | | | 8:15 | 8:15 | 305:.. |

Page: 1

D 00412  L Smith v Hvundai

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Thu 2/22 | | 4:22PM | | 6:26PM | 6:43PM | | 1:00AM | 8:10 | 8:10 | 313:... |
| | Fri 2/23 | | 4:17PM | | 12:59AM | | | | 8:15 | 8:15 | 322:... |
| | Sat 2/24 | | | | | | | | | | 322:... |
| | Sun 2/25 | | | | | | | | | | 322:... |
| | Mon 2/26 | | 4:18PM | | 8:19PM | 8:32PM | | 1:00AM | 8:10 | 8:10 | 330:... |
| | Tue 2/27 | | 4:27PM | | 8:39PM | | | | 4:15 | 4:15 | 334:... |
| | Wed 2/28 | | 4:27PM | | 1:00AM | | | | 8:05 | 8:05 | 342:... |
| | Thu 3/01 | | 3:41PM | | 12:30AM | | | | 8:20 | 8:20 | 351:... |
| | Fri 3/02 | | 4:35PM | | 1:00AM | | | | 7:45 | 7:45 | 358:... |
| | Sat 3/03 | | | | | | | | | | 358:... |
| | Sun 3/04 | | | | | | | | | | 358:... |
| | Mon 3/05 | | 4:27PM | | 1:01AM | | | | 8:05 | 8:05 | 366:... |
| | Tue 3/06 | | 4:17PM | | 1:00AM | | | | 8:15 | 8:15 | 375:... |
| | Wed 3/07 | | 4:24PM | | 1:00AM | | | | 8:05 | 8:05 | 383:... |
| | Thu 3/08 | | 4:23PM | | 1:02AM | | | | 8:05 | 8:05 | 391:... |
| | Fri 3/09 | | 4:32PM | | 1:00AM | | | | 8:00 | 8:00 | 399:... |
| | Sat 3/10 | | | | | | | | | | 399:... |
| | Sun 3/11 | | | | | | | | | | 399:... |
| | Mon 3/12 | | 4:24PM | | 7:20PM | | | | 2:50 | 2:50 | 402:... |
| | Tue 3/13 | | 4:21PM | | 1:00AM | | | | 8:00 | 8:00 | 410:... |
| | Wed 3/14 | | | | | | | | | | 410:... |
| | Thu 3/15 | | | | | | | | | | 410:... |
| | Fri 3/16 | | | | | | | | | | 410:... |
| | Sat 3/17 | | | | | | | | | | 410:... |
| | Sun 3/18 | | | | | | | | | | 410:... |
| | Mon 3/19 | | | | | | | | | | 410:... |
| | Tue 3/20 | | | | | | | | | | 410:... |
| | Wed 3/21 | | | | | | | | | | 410:... |
| | Thu 3/22 | | | | | | | | | | 410:... |
| | Fri 3/23 | | | | | | | | | | 410:... |

## Totals

| Account | Pay Code | Amount |
|---|---|---|
| 1/2/330/1/0/0/0 | 2nd Regular | 40:00 |
| 1/2/330/2/0/0/0 | 2nd Regular | 246:20 |
| 1/2/330/2/0/0/0 | 2nd OT | 5:30 |
| 1/2/330/1/0/0/0 | 2nd OT | 7:00 |
| 1/2/330/1/0/0/0 | OT | 31:15 |
| 1/2/330/1/0/0/0 | Regular | 80:00 |

## Accruals

| Accrual Code | Bal. on Selec... | Units |
|---|---|---|
| Dr Excused | 0:00 | Hour |
| Points | 0:00 | Hour |
| Vacation | 0:00 | Hour |
| Vacation Accru... | 0:00 | Hour |

## Schedule

| Date | Start Time | End Time | Pay Code | Amount |
|---|---|---|---|---|
| Mon 1/01 | | | | |
| Tue 1/02 | | | | |

Page: 2

D 00413  J. Smith v Hyundai

| | | | |
|---|---|---|---|
| Wed 1/03 | | | |
| Thu 1/04 | | | |
| Fri 1/05 | | | |
| Sat 1/06 | | | |
| Sun 1/07 | | | |
| Mon 1/08 | 5:00AM | 3:30PM | |
| Tue 1/09 | 5:00AM | 3:30PM | |
| Wed 1/10 | 5:00AM | 3:30PM | |
| Thu 1/11 | 5:00AM | 3:30PM | |
| Fri 1/12 | | | |
| Sat 1/13 | | | |
| Sun 1/14 | | | |
| Mon 1/15 | 5:00AM | 3:30PM | |
| Tue 1/16 | 5:00AM | 3:30PM | |
| Wed 1/17 | 5:00AM | 3:30PM | |
| Thu 1/18 | 5:00AM | 3:30PM | |
| Fri 1/19 | | | |
| Sat 1/20 | | | |
| Sun 1/21 | | | |
| Mon 1/22 | 3:30PM | 2:00AM | |
| Tue 1/23 | 3:30PM | 2:00AM | |
| Wed 1/24 | 3:30PM | 2:00AM | |
| Thu 1/25 | 3:30PM | 2:00AM | |
| Fri 1/26 | | | |
| Sat 1/27 | | | |
| Sun 1/28 | | | |
| Mon 1/29 | 3:30PM | 12:30AM | |
| Tue 1/30 | 4:30PM | 1:00AM | |
| Wed 1/31 | 4:30PM | 2:15AM | |
| Thu 2/01 | 4:30PM | 1:15AM | |
| Fri 2/02 | 4:30PM | 8:00PM | |
| Sat 2/03 | | | |
| Sun 2/04 | | | |
| Mon 2/05 | 4:30PM | 1:00AM | |
| Tue 2/06 | 4:30PM | 1:00AM | |
| Wed 2/07 | 4:30PM | 1:30AM | |
| Thu 2/08 | 4:30PM | 1:00AM | |
| Fri 2/09 | 4:30PM | 1:30AM | |
| Sat 2/10 | | | |
| Sun 2/11 | | | |
| Mon 2/12 | 3:30PM | 2:00AM | |
| Tue 2/13 | 3:30PM | 2:00AM | |
| Wed 2/14 | 3:30PM | 2:00AM | |
| Thu 2/15 | 3:30PM | 2:00AM | |
| Fri 2/16 | | | |
| Sat 2/17 | | | |
| Sun 2/18 | | | |
| Mon 2/19 | 3:30PM | 2:00AM | |
| Tue 2/20 | 3:30PM | 2:00AM | |
| Wed 2/21 | 3:30PM | 2:00AM | |
| Thu 2/22 | 3:30PM | 2:00AM | |
| Fri 2/23 | | | |
| Sat 2/24 | | | |
| Sun 2/25 | | | |
| Mon 2/26 | 3:30PM | 2:00AM | |
| Tue 2/27 | 3:30PM | 2:00AM | |
| Wed 2/28 | 3:30PM | 2:00AM | |
| Thu 3/01 | 3:30PM | 2:00AM | |

Page: 3

D 00414  L Smith v Hvundai

| | | | | |
|---|---|---|---|---|
| Fri 3/02 | 4:45PM | 1:00AM | | |
| Sat 3/03 | | | | |
| Sun 3/04 | | | | |
| Mon 3/05 | 3:30PM | 2:00AM | | |
| Tue 3/06 | 3:30PM | 2:00AM | | |
| Wed 3/07 | 3:30PM | 2:00AM | | |
| Thu 3/08 | 3:30PM | 2:00AM | | |
| Fri 3/09 | 4:45PM | 1:00AM | | |
| Sat 3/10 | | | | |
| Sun 3/11 | | | | |
| Mon 3/12 | 4:30PM | 1:00AM | | |
| Tue 3/13 | 4:30PM | 1:00AM | | |
| Wed 3/14 | | | | |
| Thu 3/15 | | | | |
| Fri 3/16 | | | | |
| Sat 3/17 | | | | |
| Sun 3/18 | | | | |
| Mon 3/19 | | | | |
| Tue 3/20 | | | | |
| Wed 3/21 | | | | |
| Thu 3/22 | | | | |
| Fri 3/23 | | | | |

Page: 4

D 00415  L Smith v Hyundai

According to e-time Rafael came to first shift on Jan 24, 2007.
Larry's start date was Jan 8, 2007 and he was on first shift thru Jan 20, 2007. During his
time on first shift Herb helped train Larry. On Jan 22, 2007 Larry went to second shift
which means he worked with Rafael on the same shift about two days. Maybe the
training  Larry referred to was the couple of days they worked together on second shift.

*Ricky Coburn*
3/14/07



**Date** *(Datum)* 3-12-07

Vendor CRH          Number 20045
*(Lieferant)*              *(Nummer)*

Attention: _____
*(Zuhänden)*

Fax number: _____
*(Faxnummer)*

☑ Receiving Discrepancy
*(Empfangende Unstimmigkeit)*

☐ Other *(anderes)*
_____

Packing List Number / Lieferscheinnummer

80221132

1825 E. Main Street
Duncan, SC 29334
USA

Please contact your designated planner if
you have any questions. *(Melden Sie
Sich bitte bei Ihr Material Planner wenn
Sie Fragen Haben).*

Kevin Oshields
864-337-8970        5
Koshields@lear.com
Mark Schmidt 864-433-6616
Mschmidt@lear.com

Fax – 864-433-6614

**Receiving Discrepancy Details** *(Empfangende Unstimmigkeit detail)*

Judy.

This the Discrepancy
sheet Lear sent for
the shipment in question.
It only shows qty Errors
not matl left off
completely. maybe this
need to go with the
discussion Report. ℗

| Lear Part N̲̲ ̲ (Lear Teilnun | | Variance (+ or -) Uneinigkeit (+ oder -) |
|---|---|---|
| 7111887 | | - 28 |
| 7111890 | | + 29 |
| 7918343 | | + 32 |

B. Locklair

On March 12, 2007, Ricky Coburn prepared a discussion report for me to give to Larry Smith with some concerns about a shipment to Lear in Duncan, South Carolina. He acknowledged that he failed to ship two boxes of parts that were available for shipment. There were also some issues about the quantities of some other parts. When I questioned him about the quantities, he got mad and stated he knew what I was trying to do and I just got myself and this company in a lot of trouble. He demanded copies of all the paperwork and said he had already contacted a lawyer and I was in big trouble. I gave him the copies of what he asked for. He stated that I did not give him a load sheet that he had checked when he loaded the truck. I told him he was free to have any and all paperwork he wanted. He started to raise his voice and said I was trying to hide it from him. He said I was in Big trouble and this was going to cost CRH a lot of money. I proceeded to try to calm him down with no success. Kevin Conatser was present and asked Larry to settle down on several occasions with no success. Larry stated the reason for me questioning him was because he as black and I was a Racist toward him. After several attempts to talk to Larry I ended the discussion. Ricky Coburn will then talk to him the next day concerning this matter.


*Charles N. Martin*

Charles N. Martin
Shipping Supervisor

North America, Inc.

**..itial Probationary Period Evaluation**

30 Day Period Ends on : _2|8|07_

Employee's Name: _Larry Q. Smith_

Clock Number: _2827_

Job Title: _Shipping Coordinator_

If job titles changed during this 30-day period specify job change and when:
_____

The employee has performed the following activities during this evaluation:
_Operate Forklift to Load/unload Trucks, Complete Shipping Paperwork_
_To include BOL's, Customs And Packing Sheets. Housekeeping_

Rate the employee based on this job performance (check one): 1 being the lowest and 5 being the highest: ☐1 ☐2 ☐3 ☒4 ☐5

What duties does the employee need to improve on? _Attention To Detial, on all paperwork_

What duties does the employee perform best? _Being Aware of the importance of_
_Timley Shipments, Operate Forklift._

During this 30 day rating period, how many occurrences of absence or tardiness has occurred?
_____

If unexcused or excessive, please explain: _None_

Rate the employee on the following:

Does the employee work well with fellow employees? ☐1 ☐2 ☒3 ☐4 ☐5
Comments: _____

Does the employee work well without supervision? ☐1 ☐2 ☐3 ☒4 ☐5
Comments: _____

Does the employee do a thorough job? Are they a team player by maintaining good housekeeping, helpful to co-workers, willing to learn new things? ☐1 ☐2 ☒3 ☐4 ☐5
Comments: _____

Overall Rating: ☐1 ☐2 ☐3 ☒4 ☐5

Employee Signature: _Larry Smith_          Date: _9 Feb 07_

If you disagree, please state why: _____

Appraising Supervisor Signature: _Charl N Mart_      Date: _9 Feb 07_

H.R. Manager Supervisor: _Judy Burt_          Date: _2/13/07_

Production Manager Signature: _Sam Diop_       Date: _2/13/07_

D 00419  L Smith v Hyundai

North America, Inc.

## Initial Probationary Period Evaluation

60 Day Period Ends on : _3|8|07_

Employee's Name: _Larry D. Smith_

Clock Number: _2824_

Job Title: _Shipping Coordinator_

If job titles changed during this 60-day period specify job change and when: _ND_

The employee has performed the following activities during this evaluation:
_Operate Forklift  load Trucks for Shipment, Complete All Paperwork_
_Check for Accuracy,  Ensure All trucks ARE loaded And_
_Depart on time._

Rate the employee based on this job performance (check one):  1 being the lowest and 5 being the highest:  ☐1 ☒2 ☐3 ☐4 ☐5

What duties does the employee need to improve on? _Accuracy  of paperwork_
_Making sure to Contact supervisors when trucks do Not Arrive._

What duties does the employee perform best? _Operate Forklift_

During this 60 day rating period, how many occurrences of absence or tardiness has occurred? _____

If unexcused or excessive, please explain: _____

Rate the employee on the following:

Does the employee work well with fellow employees?  ☐1 ☒2 ☐3 ☐4 ☐5
Comments: _____

Does the employee work well without supervision?  ☐1 ☒2 ☐3 ☐4 ☐5
Comments: _____

Does the employee do a thorough job?  Are they a team player by maintaining good housekeeping, helpful to co-workers, willing to learn new things?  ☐1 ☒2 ☐3 ☐4 ☐5
Comments: _____

Overall Rating: ☐1 ☒2 ☐3 ☐4 ☐5

Employee Signature: _____  Date: _9 Mar 07_

If you disagree, please state why: _____

Appraising Supervisor Signature: _Chal N Mail_  Date: _9 Mar 07_

H.R. Manager Supervisor: _____  Date: _____

Production Manager Signature: _____  Date: _____

January 4, 2007

Re: Larry D. Smith

Dear Larry,

CRH would like to make a job offer for the position of Shipping Coordinator on January 8, 2007, for a rate of 13.00/hr. This position requires a successful completion of your 90 day probationary period. We ask that you report to work at 8:00 a.m. on your first day to main lobby. You will have an employee orientation that day.    You will be assigned to second shift after you are trained on first shift.

Employment offer is conditioned on prior to your hire date a drug screen, criminal background check, and pre-employment physical.  Please make preparations to make this prior to employment.   Our company doctor is Chilton Family Medicine.  The telephone number is (205) 280-1010.   You will need to come by the H.R. office to pick up your form for the physician and complete your criminal background check.  If you wear prescription eyeglasses you will need to make an appointment with Dr. Lyn and Lyn to get your eyeglasses with riveted side shields (205) 755-1351.

Dress code is jeans or pants and uniform shirts.  CRH will provide six polo shirts following employment.  They offer other services but you will be responsible if you elect these services.  During the interim time of waiting on your shirts you will need to wear a short or long sleeve (sleeveless is not permitted according to OSHA guidelines).   You will need to wear steel-toe shoes in designated areas.  Please have this prior to your employment.  We reimburse up to $50.00 per calendar year.

Please bring with you on the day you begin work the following for identification purposes:

Driver's License
Birth Certificate or Social Security Card
Voided Check


Sincerely,


Judy Benson
H.R. Manager
(205) 755-9994 Ext 1903

Fax:                Jan  3 2007 08:33am  P002/002

WALKER PERSONNEL
1300-A E. MAIN ST.
PRATTVILLE, AL 36066
(334) 365-5556  FAX (334) 365-4442

# LARRY D SMITH

| 5675 Valley Brook Lane | Montgomery, AL 36117 | (334) 213-7320 |

Education

Sylacauga High School 1983

Work History and Experience

2005-2006 Hyundai Motor Manufacturing Alabama
  **PDI Light Repair**
- Flushed and gapped front and rear doors
- Replaced damaged and defective parts in interior
- Assessed damage and appropriated materials for rework

1998-2005 Rheem Manufacturing
  **Lead Man**
- Assembled water heaters
- Fork Lift Operator loading & unloading heaters
- Operated a Machine Arc Welder to weld bottoms

1995-1998 Trentech
  **Assistant Warehouse Manager**
- Training new employees
- Ensure all freight is shipped properly via truck line, ups, fed-x, dhl
- Maintained inventory control
- Fabricate steel and aluminum
- Built computerized control cabinets, etc.

1984-1995 Russell Corporation
  **Stenciler Fork Lift operator**
- Operated stenciler to apply numbers and names to sports wear
- Loaded and unloaded truck loads of yarn

References available upon request



North America, Inc.

## Employee Discussion Report

| | |
|---|---|
| **To:** Larry Smith | **Date:** 3/12/2007 |
| *(employee's name)* | *(date employee signed)* |

**Subject:** Shipping errors

*(nature of the performance problem/behavior)*

**Detailed description of the performance problem / behavior (attach additional paper if necessary:**
Larry made a shipment for Duncan S.C. and did not ship everything on the load plan. The tracks (888's) were availible and Larry had them checked off the load plan but were not shipped. There were also discrepencies on what actually shipped (887's). The paperwork had one qty (76pcs) and the customer actually received something different (48pc). This is not the first time this has happened.

**Has employee received previous feedback concerning this issue?** ☒ yes ☐ no

**Supporting information:**
The customer was ask to check again and they confirmed the discrepency.

**NOTE:** Attach any documentation or copies from training verifications, employee file, etc.

**List the negative consequences of this problem / behavior to the employee:**
Due to the shipping errors we had to expedite the tracks to the customer which is very expensive. It also causes the customer to doubt our process and procedures.
If this continues further actions will be taken by CRH in order to prevent shipping discrepencies.

**Employee's response to the performance problems / behavior:**

Your continued failure to follow the working guidelines of this plant may be cause for future disciplinary action. It is hoped and expected that you will correct your problem / behavior and no further action will be necessary. If you have a problem that is affecting your work and would like to receive additional assistance from your supervisor or the Human Resources Office, you should make your request known.

This Discussion Report will be placed in your personnel file.

*would not sign*

_____              _____
Supervisor                           Employee

_____              _____
Production Manager                   Date

**Sent:** Monday, March 12, 2007 9:09 AM
**To:** OShields, Kevin
**Cc:** Coburn, Ricky
**Subject:** 7111887

Kevin,

Ricky wanted me to find out if you can get by with what was sent this weekend of the 7111887 to last you till the Tuesday night shipment.

Thanks,

Leigh *Cisco*
**Customer Release Coordinator**
**CRH North America, Inc.**
**2541 7th Street South**
**Clanton, AL 35046**
**(205) 280-7917**
**(205) 755-2274 fax**
**l.cisco@crh-group.com**

*********************
** LEGAL DISCLAIMER **
*********************

This E-mail message and any attachments may contain

legally privileged, confidential or proprietary information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this E-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this E-mail message from your computer.

D 00424  L Smith v Hvundai

**Coburn, Ricky**

| | |
|---|---|
| **From:** | OShields, Kevin [KOShields@lear.com] |
| **Sent:** | Monday, March 12, 2007 1:13 PM |
| **To:** | Cisco, Leigh |
| **Cc:** | Coburn, Ricky |
| **Subject:** | RE: 7111887 |
| **Importance:** | High |

There seems to be another problem. The packing list quantity for the 7111887's said we were getting 76 pieces, but we only actually unloaded 48 pieces. I was called down to the dock when they unloaded them, so I am sure that we only got 48 pieces. This puts us in even worse shape than expected.

]

*Kevin OShields*
**Materials Planner**
**Lear Duncan**
**Phone : (864) 486 - 1427**
**Cell : (864) 357 - 8570**
**Fax : (864) 433 - 6614**
**E-Mail : koshields@lear.com**

**From:** Cisco, Leigh [mailto:L.Cisco@crh-group.com]
**Sent:** Monday, March 12, 2007 9:30 AM
**To:** OShields, Kevin
**Subject:** RE: 7111887

OK  I will check on those two now and see what is going on.

Leigh

-----Original Message-----
**From:** OShields, Kevin [mailto:KOShields@lear.com]
**Sent:** Monday, March 12, 2007 8:28 AM
**To:** Cisco, Leigh
**Cc:** Coburn, Ricky
**Subject:** RE: 7111887

I will have to get a good count, and get back to you. I am most concerned right now about the 7111888, because I ordered 2 and got 0, and the 7053942, I ordered 3 and got 1.

]

*Kevin OShields*
**Materials Planner**
**Lear Duncan**
**Phone : (864) 486 - 1427**
**Cell : (864) 357 - 8570**
**Fax : (864) 433 - 6614**
**E-Mail : koshields@lear.com**

**From:** Cisco, Leigh [mailto:L.Cisco@crh-group.com]

D 00425  L Smith v Hvundai

CRH North America Inc.

2541 7th Street South
Clanton, AL 35045
U.S.A.                          WWW.CRH-GROUP.COM

**CRH**

| (5) account number at recipient | (2) notices of receipt and processing | | **Bill Of Lading** |
|---|---|---|---|

(3) no.
80221132

| | | | (4) dispatch date |
| LEAR CORP SSD - DUNCAN | | | 03/10/2007 |
| 1825 East Main Street | Page 1 / 2 | | |
| Duncan SC 29334 | | | |

| (6) freight | | (7) inbound delivery | | invoice |
|---|---|---|---|---|
| free | not f. | waggon | carrier | (8) no. |
| unit DM | | freight | oth. vehicl. | |
| | | express | own vehicle | (9) from |
| | | Mail | | |
| | | air freight | | |

| customer number at vendor | | | | | |
|---|---|---|---|---|---|
| 12100 | | | | | |

| (10)  shipment | (11)  order No. | date | (12) our department | (13) direct dial (205-755-9994) | (14)  our order number |
|---|---|---|---|---|---|
| 81217 | P1-00065-02-00 (948) | | 00000000 | | 30000855 |

| (18)  add. data of the orderer | (19)  disp. type | free (20) not f. | (21)  packing type | (23)  disp.character | (23)  gross   total weight lbs | (24)  net |
|---|---|---|---|---|---|---|
| Free on board | | | | | 20,042.8 | 20,042.8 |
| | | | | | lbs | lbs |

| (25)  ship-to-address | (26)  receiving-/unloading pt |
|---|---|
| LEAR CORP SSD - DUNCAN   29334 Duncan | |

| (27) Pos. | (28)  order No./suppl. ref. No. | (29)  order description (21)  packing type (details) | (30)  quantity | UM | notes of recipient |
|---|---|---|---|---|---|
| 010 | 7053948 | E85 RH Manual Seat Adjuster | 112 | PC | |
| | CRH-No.: P1-00065-02-00 | | | | |
| 020 | 7053947 | E85 LH Manual Seat Adjuster | 160 | PC | |
| | CRH-No.: P1-00065-01-00 | | | | |
| 030 | 7111887 | E85 LH Electric Seat Adjuster w/Memory | 76 | PC | |
| | CRH-No.: P0-92440-03-00 | | | | |
| 040 | 7111885 | E85 LH Electric Seat Adjuster w/o Memory | 32 | PC | |
| | CRH-No.: P0-92440-01-00 | | | | |
| 050 | 7111889 | E85 ele.Seat adjuster ISOFIX | 16 | PC | |
| | CRH-No.: P0-92316-01-00 | | | | |
| 060 | 7111890 | E85 RH EL Seat Adjuster ISOFIX | 51 | PC | |
| | CRH-No.: P0-92316-02-00 | | | | |
| 070 | 7918343 | E85 LH Motorsport Manual Seat Adjuster | 16 | PC | |
| | CRH-No.: P1-00129-01-00 | | | | |
| 080 | 7918344 | E85 RH Motorsport Manual Seat Adjuster | 48 | PC | |
| | CRH-No.: P1-00129-02-00 | | | | |
| 090 | 7053942 | E85 man. Seat adjuster ISOFIX | 16 | PC | |
| | CRH-No.: P0-92050-02-00 | | | | |
| 100 | 7111886 | E85 RH Electric Seat Adjuster w/o Memory | 48 | PC | |
| | CRH-No.: P0-92440-02-00 | | | | |
| 110 | 7111878 | E85 Tilt adjuster | 270 | PC | |
| | CRH-No.: P0-92314-02-00 | | | | |

Signature: _____
Print Name: _____
Date: 3/14/07
Time: _____

| date | notices of receipt | quantity check | quality check/test report | recipient | invoice verific. |
|---|---|---|---|---|---|
| name no. | | | | | |

D 00426  L Smith v Hyundai

CRH North America Inc.

2541 7th Street South
Clanton, AL  35045
U.S.A.                          WWW.CRH-GROUP.COM

**CRH**

| (5) account number at recipient | (2) notices of receipt and processing | **Bill Of Lading** |
|---|---|---|

| | | (3) no. |
|---|---|---|
| LEAR CORP SSD - DUNCAN | Page 2 / 2 | 80221132 |
| 1825 East Main Street | | (4) dispatch date |
| Duncan SC  29334 | | 03/10/2007 |

| | (6) freight | | (7) inbound delivery | | invoice |
|---|---|---|---|---|---|
| | free | not f. | waggon | carrier | |
| | unit DM | | freight | oth. vehicl. | (8) no. |
| | | | express | own vehicle | |
| customer number at vendor | | | Mail | | (9) from |
| 12100 | | | air freight | | |

| (10) shipment | (11) order No. | date | (12) our department | (13) direct dial (205-755-9994) | (14) our order number |
|---|---|---|---|---|---|
| 81217 | P1-00065-02-00 (948) | | 00000000 | | 30000855 |

| (15) add. data of the orderer | (19) disp. type | free (20) not f. | (21) packing type | (23) disp. character | (23) gross  total (24) net weight lbs |
|---|---|---|---|---|---|
| Free on board | | | | | 20,042.8  20,042.8 |

| (25) ship-to-address | | (26) receiving/unloading pt |
|---|---|---|
| LEAR CORP SSD - DUNCAN   29334 Duncan | | |

| (27) Pos. | (28) order No./suppl. ref. No. | (29) order description (21) packing type (details) | (30) quantity | UM | notes of recipient |
|---|---|---|---|---|---|
| 120 | 7111879 | E85 Tilt adjuster | 270 | PC | |
| | CRH-No.: P0-92314-03-00 | | | | |
| 019 | E2-30001 | BMW ROPAK | 38 | PC | |
| 020 | E2-30002 | BMW TOTE | 6 | PC | |

| date | notices of receipt | quantity check | quality check/test report | recipient | invoice verific. |
|---|---|---|---|---|---|
| name no. | | | | | |



D 00428  L Smith v Hvundai

*to R. Coburn 3/7/07*

North America, Inc.

## Initial Probationary Period Evaluation

60 Day Period Ends on : _3|8|07_

Employee's Name: _Larry D. Smith_
Clock Number: _2824_
Job Title: _Shipping Coordinator_
If job titles changed during this 60-day period specify job change and when:
_____

The employee has performed the following activities during this evaluation:
_____
_____
_____

Rate the employee based on this job performance (check one):  1 being the lowest and 5 being the highest:  ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5
What duties does the employee need to improve on? _____
_____

What duties does the employee perform best? _____
_____

During this 60 day rating period, how many occurrences of absence or tardiness has occurred?
_____

If unexcused or excessive, please explain: _____
_____

Rate the employee on the following:

Does the employee work well with fellow employees?  ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5
Comments: _____

Does the employee work well without supervision?  ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5
Comments: _____

Does the employee do a thorough job?  Are they a team player by maintaining good housekeeping, helpful to co-workers, willing to learn new things?  ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5
Comments: _____

**Overall Rating:** ☐ 1  ☐ 2  ☐ 3  ☐ 4  ☐ 5

Employee Signature: _____  Date: _____
If you disagree, please state why: _____
_____
_____

Appraising Supervisor Signature: _____  Date: _____
H.R. Manager Supervisor: _____  Date: _____
Production Manager Signature: _____  Date: _____

_**CRH Quality Management**_                              Job Description

**Function:**                                            Shipping Coordinator

**Name of Employee:**                                    _Larry Smith_

**1.0  Hierarchy**

1.1  This position reports to:                           Materials Supervisor

1.2  Positions reporting to this position:               N/A

1.3  Interfaces:                                         Production, Quality, Human Resources

**2.0  Responsibilities and duties:**

- Support Shipping schedules as required from schedulers.
- Prepare shipping documents and packaging as required.
- Process any return materials as needed.
- Maintain a clean and organized work area.
- Operate material handling safely and make daily maintenance checks.
- Load and unload material as needed.
- All other duties as assigned.

2.1  Specific function related duties:
- Coordinate with schedulers the required items to be shipped.
- Stage and verify that items shipped are correct.
- Prepare and process to completion all shipping documents in SAP needed to complete receipts.
- Notify schedulers immediate of any short shipments.
- Load and unload material as needed.
- Break down boxes and bundle for shipment.
- All other duties as assigned.

**3.0  Authority:**

Portions of the job may not be standardized or completely described in the job description and may require some independent action and thinking by the employee.

**4.0  Qualifications**

- Ability to operate a forklift after completing appropriate training and obtaining Forklift license.
- Possess ability to process and verify numerical data.
- Inventory control experience preferred.

1/2

D 00430  L Smith v Hyundai

- Shipping and Receiving knowledge preferred.
- Ability to safely lift up to 50 lbs ongoing during daily job performance.
- Ability to work ongoing with other departments.

4.1  Application Process:

- All candidates may submit a resume to CRH North America, Inc. at 2541 7th Street South, Clanton, AL  35045.
- If candidate is already employed, please follow CRH company policy for internal transfers or promotions.
- All candidates must be a permanent resident of the United States or an alien authorized to work in the United States and provide two types of identification.
- All candidates must be 18 years of age or older.
- All candidates must be able to meet criteria specified in job description for the applicable position.

Date: _____1│8│07_____

Employee Signature _____

Dept. Manager Signature _____

Created by H.R. Dept. _____

2/2

Pg. 11

He Took 5 minutes of making copies of shipments & copies of the Discussion Report that he refused to sign. Then he agreed to sit still & let Duke go over the evaluation. Duke said because of all that had happened he did not see the point in going over anything else I said that was fine & our meeting was over. As Duke & I left the shipping office Larry continued to say "Brother Duke you're messed now & got this company in a lot of trouble" Kevin Cardisee

Pg. 1

Kevin Cardisee

3-12-07 1st meeting

I was in shipping office with Duke Martin and Larry Smith. While Duke tried to talk with Larry Smith about some shipping errors he had made & to go over them in a discussion report. Larry said he was not going to take this & he would not sign anything. He said several times that Duke & had messed up now & was going to get Larry in a lot of trouble. I asked Larry several times to calm down & let us go over the discussion report he continued to refuse.

2nd meeting
Michael Ramsey, Kevin Conatser
3-12-07    Ricky Coburn

I was asked by Ricky Coburn to bring Larry Smith to the Logistics Office so he could go over the Discussion Report with Larry.

At 7:00 PM Ricky Coburn asked Mike Ramsey & myself to be Present during this discussion, I went to shipping & got Larry & brought him into the Logistics Office where Mike & Ricky were already there. Ricky explained the Focus of the Report was about shipping errors that he. Ricky Coburn had filled out himself.

Larry stated that there were a lot of shortages on that truck in Question Other than the ones he left off of the shipment. Ricky agreed with him & said that was beside the Point, we here to talk about mistakes that need to be corrected so we don't continue to have shipping issues. At this Point Larry said "I know what yall are trying to do & it ain't going to happen". Then Larry began asking Ricky Questions about Duke Martin, why he brought him in as shipping Supervisor when he (Duke) did not have a much experience as Larry did. Larry instantly said that man disrespected me by spitting in his hand "before he offered to shake my hand" don't you think that is disrespecting me? Ricky said I don't see that as disrespecting you.

At this point Larry Turned & looked at Mike Ramsey & said "there is the plant manager what Do you think" As Larry was looking at Mike. Ricky said "It Dosent matter what Mike thinks he is here As a witness & he is not the plant manager".

At this point Larry stood up & said "I know what yall trying to Do, but you've got the wrong one". Ricky then said "I can see your upset & I Don't think you need to be here So I'm going to send you home for the rest of Tonight Just come back Tomorrow on your Regular schedule". Larry Replied "without pay". Ricky said "yes without pay". Larry started walking away toward the door & said "this is not over I've got A Lawyer you've done made a big mistake Mr. Coburn". Ricky said "that will be all thank you & Kevin please make sure he gets any personal Items he has & Leaves". So I got up & followed Larry to shipping where he showed me some paperwork that needed to be completed & said I needed to get with Ricky Coburn about the details of Finishing it. I then followed Larry to his car & watched him leave CRH parking Lot.

Page 1 of 1

## Benson, Judy

| | |
|---|---|
| **From:** | Ramsey, Michael |
| **Sent:** | Wednesday, March 14, 2007 2:35 AM |
| **To:** | Benson, Judy |
| **Subject:** | Larry Smith |

Judy,

    I would like to respectively submit the following statement as to the events involving the meeting between Larry Smith and Ricky Coburn....

       Ricky attempted to present a discussion report and evaluation to Larry on 3-12-2007. Larry became very disruptive and hostile towards Ricky, claiming that Ricky was biased and unfair. The discussion became so heated that Ricky had no choice but to send Larry home, hoping that this would calm him down for a meeting the next day. Upon leaving, Larry made statements saying that Ricky would be sorry, that Ricky had cost the company a whole lot of money, and that he would lose his job for being biased and unfair towards him.

3/14/2007

Earlier on 3/12/2007 I had written a "Discussion Report" on Larry Smith for a shipping discrepancy going to Lear Duncan. I went over the report with Duke Martin and we both agreed with the report, Duke and Kevin were to go over the report with Larry when he came in on second shift. I had left for the day when Duke called and said that Larry had gotten very upset and would not sign the report. Duke was on the way home so I told him I would go by and talk to Larry.

When I got to CRH I ask Michael Ramsey and Kevin Conatser to be present when I spoke with Larry.

Kevin brought Larry to the Logistics office,  I shook his hand and he had a seat. I proceeded to explain to Larry that I had written the report and went over it with Duke and that Duke was to administer the report. Larry had questions about the report and I explained that he had forgotten to ship a track that was on the load plan and he acknowledged that he had. Also in the report it stated that there was a discrepancy and Larry did not understand why, but the paperwork and e-mail correspondence backed it up. It was during this time that Larry became offensive and felt that I was discriminating against him. He then began to bring up issues he had with Duke previously about how he had shown prejudices against him because he was a Black American.  It was during this time I told Larry that he had to go home because it was in the best interest of him and CRH due to how angry he had gotten. He then said that he was recruited by work force for a supervisors position and I had given him the shipping coordinator's job on second and that I had given Duke the shipping supervisors job even though he had no shipping experience and had only been the manager of a small store. I told him that he had not seen Duke's resume so he really had no idea what qualifications Duke had and this seem to have made him even more angry. I then told him again that he had to go home, he then ask Michael about the situation and I told him that Michael had nothing to do with the decision that as his supervisor he was to go home. He then made the remark that Michael was the Plant Manager and he wanted to know what he thought about the situation, I informed Larry that Michael was not the Plant Manager and that he had to go home. He ask if he was going to be paid for the rest of the night and I told him no and he began to get even more angry. Larry then told me that he had an attorney in Birmingham and that he was going to see him in the morning and that I would regret making this decision and I told him he needed to do what he thought he had to. Also during the conversation I told Larry he had the right to do what ever was necessary but he should not threaten people with it. At the end of the conversation I told Larry to go home and to come in at his regular shift on tues and that Judy and I would discuss it and give him a decision then. Kevin then escorted him to the door.

3/12/07

Ricky Coburn



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Birmingham District Office

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

Ms. Judy Benson
CRH
2541 – 7th Street South
Clanton, AL 35046

Reference:     Larry D. Smith v. CRH
Charge Number 420 2007 02147

Dear Ms. Benson:

The above-referenced charge of discrimination is assigned to me for investigation. If you wish to contact me, my office hours are Tuesday through Thursday 7:30 a.m. to 6:00 p.m. My telephone number is 205/212-2147. If you call and do not speak with me, please leave a message and allow me two business days to return your call.

Please note that anytime prior to the conclusion of the investigation of this charge, we can engage in the negotiated settlement process to resolve the allegations of this charge. Please contact me if you wish to engage in the negotiated settlement process.

Sincerely,

_____
Date                              3 APR 2007

_____
Julia Hodge/Investigator

EEOC FORM 131 (5/01)

## U. S. Equal Employment Opportunity Commission

| | PERSON FILING CHARGE |
|---|---|
| Judy Benson<br>Human Resources Manager<br>CRH<br>2541 - 7th Street, South<br>Clanton, AL 35046 | Larry D. Smith |
| | THIS PERSON *(check one or both)*<br>[X] Claims To Be Aggrieved<br>[ ] Is Filing on Behalf of Other(s) |
| | EEOC CHARGE NO.<br>420-2007-02147 |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act      [ ] The Americans with Disabilities Act

[ ] The Age Discrimination in Employment Act      [ ] The Equal Pay Act

The boxes checked below apply to our handling of this charge:

1. [ ] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [X] Please provide by   **20-APR-07**   a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by      to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Booker T. Lewis,
Enforcement Supervisor

*EEOC Representative*

Telephone:   (205) 212-2115

Birmingham District Office
Ridge Park Place
1130 22nd Street, South
Birmingham, AL 35205

Enclosure(s): [X] Copy of Charge

### CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN   [ ] AGE   [ ] DISABILITY   [X] RETALIATION   [ ] OTHER

See enclosed copy of amended charge of discrimination.

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| April 2, 2007 | Delner Franklin-Thomas,<br>District Director | *Delner Franklin Thomas* |

*Enclosure with EEOC*
*Form 131 (5/01)*

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge -- the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods -- generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

Section 1602.14  Preservation of records made or kept. . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | AMENDED  420-2007-02147 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Mr. Larry D. Smith | (334) 213-7320 | ██-██-1965 |

| Street Address | City, State and ZIP Code |
|---|---|
| 5675 Valleybrook Lane, Montgomery, AL 36117 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| CRH | 500 or More | (205) 755-9994 |

RECEIVED EEOC

| Street Address | City, State and ZIP Code |
|---|---|
| 2541 - 7th Street, South, Clanton, AL 35046 | APR - 2 2007 |

BIRMINGHAM DISTRICT OFFICE

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE    ☐ COLOR    ☐ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN
☒ RETALIATION    ☐ AGE    ☐ DISABILITY    ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 01-05-2007    Latest: 03-14-2007

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I submitted my resume to a temporary agency who presented it to the above employer for a position as a Supervisor. The Department Manager hired me on January 5, 2007 as a Shipping Coordinator rather than giving me the day shift Supervisor's position I had been offered by the Human Resources Manager, stating that this was the only position available. I accepted the position. In the latter part of January 2007, a White male, with less experience, was given the supervisory position I originally sought. Since that supervisor was brought aboard, I have been subjected to disparate terms and conditions with respect to a racially hostile work environment. On March 1, 2007, the supervisor came into the office where two White employees and I were working. He shook both their hands and spat into his hand before offering to shake my hand. I refused to shake his hand because I found this action to be very demeaning and degrading. On March 8, 2007, he counseled me about performing the duties of my job because I noticed and mentioned to a co-worker that the second shift with fewer employees was producing more work than the first shift with more employees. I reported these actions to upper management but no action was taken. On March 12, 2007, I was called in by the supervisor and given a written warning on my first error which was made on March 8, 2007 because of errors that had been made by White employees. None of these employees were disciplined. While meeting with the supervisor, he decided to give me my sixty day evaluation, to which I objected to because of its time to the disciplinary action. Later during the shift, I was called into another meeting with the Department Manager and several other management officials where I was counseled about the disciplinary action. When I brought up my objections and questioned whether the White employees who made errors that day had been disciplined or the person who spat in his hand offering to shake mine had been disciplined, I was suspended for the rest of the day. White employees who have committed far greater violations on the job have not been disciplined as I. On March 12, 2007, I informed my supervisor that I was going to EEOC. On March 14, 2007, I was discharged.

The reason given for the suspension was because the Department Manager did not like my attitude. No reason has been given for the other actions. I was told that my discharge was per my 90-day probationary period.

I believe I am being discriminated against because of my race, Black, and in retaliation for having complained of the discriminatory treatment I was experiencing in violation of Title VII of the Civil Rights Act of 1964, as amended.
Amended charge – original charge filed March 13, 2007

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.  SIGNATURE OF COMPLAINANT |
| Apr 2, 2007    _Larry D. Smith_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |