RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORHTERN DIVISION 2007 NOV 27 ⊡ 4: 12

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| LARRY SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO.: |
| v. | § | 2:06-cv-966-ID-SRW |
| HYUNDAI MOTOR | § | |
| MANUFACTURING, INC. | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In response to the Motion by HYUNDAI MOTOR MANUFACTURING, INC

(HMMA) for summary judgment, this Court issued an order on November 6, 2007,

requiring that the Plaintiff file his Opposition Response to said Motion on or before

November 27, 2007. Therefore, this Opposition Response is submitted, together with

supporting brief, affidavits, deposition pages, and exhibits.

### INTRODUCTION

This is a meritorious claim of Title VII discrimination, namely race discrimination

and retaliation, filed by Larry Smith. Plaintiff filed a charge of race and retaliation

discrimination with the Equal Employment Opportunity Commission (EEOC) on or about

February 24, 2006, following his termination from HMMA on December 8, 2005.

Following an investigation by the EEOC, a right-to-sue was issued on July 28, 2006.

The Defendant has introduced evidence from previous jobs held by the Plaintiff and one job he held subsequent to his termination at Hyundai. Whether Larry Smith ever lost his temper on another job is not relevant to this lawsuit. Evidence from this lawsuit suggests that it was common for employees, including management, at Hyundai to lose their tempers and for verbal altercations to occur from time to time.

The complaint filed by the Plaintiff, Larry Smith, is against the Defendant, Hyundai Motor Manufacturing of Alabama (HMMA) and only this one Defendant. Therefore, this opposition brief along with supporting affidavits, deposition excerpt, and exhibits show that Larry Smith was a victim of race and retaliation discrimination in violation of Title VII by the HMMA. All undisputed facts by Defendant are denied.

According to every Declaration submitted by HMMA in support of its motion for summary judgment, only two incidences were investigated and used as reasons for Smith's termination: November 22, 2005 and November 28, 2005. Nothing else should be considered as a basis for Smith's termination.

There are many discrepancies between deposition testimony and the Declarations submitted by Defendant, indicating genuine issues of material facts in dispute in this case. Some of the genuine issues of material facts are: Whether the Defendant shows preferential treatment to Caucasian employees; Whether Joshua Groves was a comparator under Title VII; Whether management at HMMA was aware of Smith's allegations of race discrimination when the decision was made to terminate his employment; Whether the reason for the adverse action taken against Plaintiff was pretext; Whether Smith's termination was in retaliation for alleging that Hyundai

discriminatorily applied its rules and regulations.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is only entered if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Fed. R. Civ. P. 56c. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corporation v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986), 91 L.Ed. 2d. 265 (1986), citing, Fed. Rules Civ. Proc. Rule 56(c).

At the summary judgment stage, the court assumes that the evidence of the non-movant is true and draws all justifiable inferences in the light most favorable to the party opposing the motion. At this stage, the court does not weigh the evidence and determine the truth of the matter. The court only decides whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 249, 250, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d. 202 (1986). It is genuine if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. Tipton v. Bergrohr GMBH-Siegen, 965 F. 2d 994, 998 (11th Cir. 1992). This Court considers the evidence and all inferences drawn in the light most favorable to the non-moving party. Hairston v. Gainesville Sun Publishing Co., 9 F. 3d 913 (11th Cir. 1993).

## STATEMENT OF FACTS

Larry Smith began his employment with Hyundai on April 11, 2005, as a PDI light repair. According to pages four (4) and five (5) of the Team Member Handbook, there is a ninety (90) day probationary period, during which time the team member receives a thirty (30) day, a sixty (60) day and a ninety (90) day evaluation. (Plaintiff's Exhibit 1) Smith successfully completed his probationary period and remained in the PDI light repair position throughout his employment at Hyundai. His immediate supervisor was Reggie Johnson. Johnson was the team leader. Johnson reported to Scott Weddington, group leader, until Weddington's promotion to plant manager. Smith had no problems until November 2005 when he expressed his belief that Caucasians received preferential treatment over African-American employees at HMMA. (Plaintiff's Exhibit 3, Smith dep. p. 47, lines 21-23; p. 88, lines 16-22, p. 89; p. 106-107; p. 112;).

Joshua Groves, Caucasian, was employed by Hyundai in November of 2005, during the same time that Larry Smith was employed by Hyundai. Groves was initially hired as a parts runner in PDI, but he was moved just three months later to a position on the same assembly line as Larry Smith. Reggie Johnson was his immediate supervisor. (Plaintiff's Exhibit 3, Smith dep. p. 90, lines 1-8; Smith dep. p. 142, lines 7-18; Plaintiff's Exhibit 2, Groves dep. pp. 7-8).

Both Smith and Groves reported to Reggie Johnson, team leader. Johnson reported to Scott Weddington, until his promotion to a plant manager. Marcus Hannah was the Team Relations investigator. (Plaintiff's Exhibit 3, Smith dep. pp. 88-89; p. 132, lines 1-5).

Prior to November 2005, Smith witnessed Joshua Groves and Reggie Johnson engage in an altercation that involved yelling and cursing.  Smith personally witnessed Groves tell Johnson to "kiss his a-s-s" and that "he wasn't going to do anything that Reggie didn't know how to do".  According to the Team Member Handbook, insubordination, including "refusing to perform a work assignment" is an example of activities that constitute serious misconduct at HMMA.  (Plaintiff's Exhibit 2, Groves dep. p. 12, lines 9-19; Plaintiff's Exhibit 1).

Johnson as the Team Leader reported Groves to Weddington.  Contrary to the Defendant's contention that management knew nothing of the actions of Grove or of Smith's allegations of race discrimination, is not supported by the evidence.  The truth is Scott Weddington was very aware of all it.  Weddington' race is Caucasion. Weddington is the Production Manager in the General Assembly Department. (Plaintiff's Exhibit 4, Weddington dep. p. 7, lines 12-17).  Weddington knew of Groves' insubordination conduct towards his supervisor, Reggie Johnson.  In spite of that knowledge, Groves was only given a verbal warning for this conduct.  Groves provided a written statement.  (Plaintiff's Exhibit 3, Smith dep. p 142, lines 22-23; p. 143, lines 1-17; Plaintiff's Exhibit 2, Groves dep. p. 12, lines 9-23).  Contrary to the Defendant's contention that Groves denied that he told his supervisor, Reggie Johnson, to "kiss his ass", he did tell him "to kiss his rear end" and he did admit that he and Reggie Johnson argued a lot:

Q:    Did you ever tell Reggie Johnson to kiss your ass?

A:    I wouldn't use profanity but, you know, nothing to that extent.  You know, I pretty much argued with him a lot because me and him had a disagreement about certain things, and I pretty much told him to kiss my rear end, ma'am.  That I can tell you I told him to do, but I didn't say no kiss my, you know, A-S-S because, you know, profanity wasn't used out there. (Plaintiff's Exhibit 2, Groves dep. p. 9, lines 7-23)  Even though Joshua Groves admits in his deposition that he and Reggie Johnson argued and that he (Groves) told Johnson to kiss his rear end, Johnson denies that Joshua Groves ever told him to "kiss his ass" or "words to that effect" in his Declaration.  (Exhibit G to Defendant's Evidentiary Submissions).  With these inconsistencies and contradictions, there surely exists genuine issues of material facts to defeat summary judgment.

Scott Weddington had Groves write down what he had said to Reggie Johnson, sign and date it.  No disciplinary action was taken against Groves for arguing with his supervisor, Reggie Johnson.   Defendant also erroneously contends that Joshua Groves denies having an altercation with Michael Harris.  Prior to November 2005, Joshua Groves and Michael Harris had an altercation at work.  (Plaintiff's Exhibit 3, Smith dep. p. 239, lines 21-23).  Groves admitted under oath during his deposition that he and Michael Harris had an altercation at work.  Groves defines "altercation" as "to the point of almost physical contact".  The altercation was reported by Groves to Johnson, Team Leader.  Groves never heard anything else about the altercation. (Plaintiff's Exhibit 2, Groves dep. p. 9, lines 7-23; p. 11, lines 3-20; p. 12, lines 11-23; p. 13, lines 1-13).

Smith had requested a vacation day from his supervisor Reggie Johnson for November 17, 2005. According to the Team Member Handbook, page nineteen (19) the supervisor is required to approve or deny the request within forty-eight (48) hours. (Plaintiff's Exhibit 1). Johnson did not provide the approval or denial within forty-eight hours of the request from Smith.

### Events of Nov. 22, 2005

On November 22, 2005, when Larry Smith reported to work, he was told by his immediate supervisor, Reggie Johnson, that a co-worker, Bobby, was doing Smith's job, flushing the right side doors. Johnson told Smith that he wanted him as "back up". Any doors that were not properly fixed, Smith was to correct. The tools used for flushing the doors are a hammer and a striker. (Plaintiff's Exhibit 3, Smith dep. p. 152, lines 4-16).

Johnson then asked Smith to repair a taillight. Smith explained to Johnson that he did not have the appropriate tool to repair a taillight. Johnson then retrieved a Phillips screwdriver for Smith to use. In order to repair a taillight, a Phillips screwdriver, ratchet, and a socket are needed. Another co-worker, Gary, told Smith that he was doing that job, that he had the tools, and asked why he was repairing the taillight. Smith explained to Gary that Johnson had asked him to repair the taillight, but that he did not have all the tools that he needed. Gary then told Johnson that he was doing that job and that he had the tools. Johnson replied in a loud voice that he wanted Smith to do it. Smith never received the tools that he needed for that job. (Plaintiff's Exhibit 3, Smith dep. p. 152, lines 17-23; p. 153, lines1-18, p. 155, lines 20-23).

Weddington rode up on his bike and yelled at Smith.  He approached Smith with clinched fists.  Weddington told Smith to go to his office.  (Plaintiff's Exhibit 3, Smith dep. p. 156, lines 11-23).  During a discussion in the office, Weddington told Smith that on his last job a white supervisor was shot by a black man.  (Plaintiff's Exhibit 3, Smith dep. p. 157, lines 13-23).  Smith told Weddington that he did not appreciate him coming to him with clinched fists and yelling at me in front of my co-workers.  Weddington apologized for approaching him in that way.  (Plaintiff's Exhibit 3, Smith dep. p. 158, lines 1-9).

Weddington told Smith that Hyundai had a zero tolerance policy for "talking in an aggressive manner" and "name calling".  (Plaintiff's Exhibit 3, Smith dep. p. 161, lines 18-21).  Smith responded that if Hyundai had expressed a zero tolerance policy when he (Weddington) stole company parts for his company issued car, he wouldn't have been there to talk with him on that day.  (Plaintiff's Exhibit 3, Smith dep. p. 162, lines 6-14; p. 164, lines 13-22).

Weddington told Smith he had four witnesses.  (Plaintiff's Exhibit 3, Smith p. 169, lines 1-2).  At some point during the discussion in Weddington's office, Marcus Hannah and Maggie Prestridge joined them.  Marcus Hannah conducted an investigation while Smith waited alone in Weddington's office.  (Plaintiff's Exhibit 3, Smith dep. p. 170, lines 1-17).  Weddington asked Smith if he could go back to work with Reggie Johnson.  Smith said he did not want to work under Reggie Johnson's supervision.  Smith is moved to the paint department for three days and is asked to report back to Weddington on Monday morning.  (Plaintiff's Exhibit 3, Smith dep. p. 173, lines 2-17).

Joshua Groves witnessed the November 22, 2005, incident. Groves testified that Johnson and Smith had a discussion "about a procedure". Groves witnessed the discussion between Johnson and Smith from about four to five feet away. Groves did not hear Smith use profanity. Nor did he hear Smith make any racial comments to Johnson. (Plaintiff's Exhibit 2, Groves dep. p. 24, lines 6-21). Groves was present when Weddington rode up on his bike, but could not hear Scott Weddington nor Larry Smitheven though he was only four to five feet away. (Plaintiff's Exhibit 2, Groves dep. p. 15, lines 18-23; p. 16, line 1).

Groves testified that he lost his temper while employed at Hyundai and that "people lose their temper all the time". (Plaintiff's Exhibit 2, Groves dep. p. 16, lines 17-19). Groves admits that he was not suspended nor terminated for his altercations on the job. He was eventually suspended and subsequently terminated for excessive absences. Groves is Caucasian. (Plaintiff's Exhibit 2, Groves dep. pp. 18-20).

Events of Nov. 28, 2005

Following the three days in the paint department Smith returned to PDI. He was to work on line three. On his way to get his gloves, Lisa Chumney approached him and asked what "they" were getting ready to do to him. Smith ignored her. (Plaintiff's Exhibit 3, Smith dep. p. 181, lines 6-23).

Chumney followed Smith into the break room. Smith told Chumney that he had been told that she said he should have been fired. Chumney continued to try to talk with Smith, so he told her he did not want to talk with her and for her to just leave him alone. The two went their separate ways. Apparently, Chumney was not intimidated by

Smith because she returned about twenty minutes later to pursue further questioning of Smith. Karin Carter's summary of the events states that Chumney returned to Smith an hour later. Surely Chumney was not afraid or intimidated by Smith, if she continued to try to talk with him. (Lisa Chumney's Declaration and Exhibit 1 of Defendant's Evidentiary Submissions).

Smith repeated that he did not want to talk with her and he walked away. Smith was called into Weddington's office. Also present were Marcus Hannah and Karen Carter. Weddington had a piece of paper in his hand that he said was a statement from Lisa Chumney reporting that Smith had "made a threatening move toward her". Smith denies the allegations made by Chumney. Smith reminded Weddington that he was not to talk about the meeting in his office on November 22, 2007. In Defendant's Exhibit 3, Team Relations Memo written on November 28, 2005, by Karin Carter, she states that Chumney said "Larry made her feel very uncomfortable", but she approached him again in "about an hour". (Plaintiff's Exhibit 3, Smith dep. p. 182; pp. 183-184; p. 197, lines 5-23; p. 199, lines 17-21; Defendant's Exhibit 3).

Weddington was yelling at Smith, so he asked Marcus and Karen to get Weddington under control. Rather than Weddington gaining control, he called for security and Smith was escorted out of the building. (Plaintiff's Exhibit 3, Smith dep. p. 201, lines 3-23).

<u>Events after the Nov. 22 and Nov. 28 incidents</u>

According to Rob Clevenger's Declaration, one of the attachments to Defendant's brief, he called Larry Smith the next morning (Nov. 29, 2005) and asked

him to come in about ten o'clock.  Also present in the meeting was Audie Swegman.
They wanted to hear Smith's side of the story.  In Clevenger's Declaration he states that
Smith denied that he was confrontational with Reggie Johnson or Lisa Chumney.
(Clevenger Declaration of Defendant's Evidentiary Submissions).

During this November 29, 2005, meeting Smith wrote a statement that it was
wrong for Weddington to talk to him about a zero tolerance policy when he had stolen
from the company.  There is a zero tolerance policy regarding stealing, but Weddington
was not terminated.  Smith gave the statement to Audie Swegman.   Swegman told
Smith not to talk to his wife about this, because he was recommending probation before
the committee that was to meet the next day and that he would be back to work
tomorrow.  He told Smith to keep his badge and gave him his personal card.  Smith
received a telephone call from Swegman the next day informing him that he was
terminated.  (Plaintiff's Exhibit 3,Smith dep. pp. 202-203; p. 206-207; Clevenger
Declaration).

Plaintiff Expresses Belief of Race Discrimination Prior to Notice of Termination

Smith had told Karin Carter on or before November 28, 2005, that he believed he
was being harassed by Scott Weddington and that he believed Weddington "did not like
his kind".  (Defendant's Exhibit  3, Team Relations Memo dated Nov. 28, 2005).

During the meeting with Swagman and Clevenger, Smith expressed to them that
he believed he was being discriminated against because of his race.  Smith believed
this because he had observed Joshua Groves' insubordinate conduct with Reggie
Johnson, but Groves, who is Caucasian, was never suspended nor terminated for his

insubordination. Smith expressed his belief that he thought this difference in treatment was because of his race.   (Plaintiff's Exhibit 3, Smith dep. p. 239-240).

Smith and other employees knew that Scott Weddington, Caucasian, had been accused of stealing parts from the company and saw him promoted to plant manager. Smith's letter of termination is dated December 6, 2005. (Affidavit of Sims, Exhibit 5; Affidavit of Golden, Exhibit 6).

Evidence of Racial Bias of Scott Weddington and Temper Outbursts at HMMA

During the time that Smith was employed by Hyundai and working on the assembly line, he heard Scott Weddington use derogatory language to describe the Koreans, specifically, "slant eyes", "dumb" and "stupid". Weddington said to Reggie Johnson, "Why are ya'll standing around here with your thumbs up your ass for?" (Plaintiff's Exhibit 3, Smith dep. pp. 117-118).

Audie Swegman's Declaration addresses the allegations of theft of HMMA parts by Scott Weddington.  He states in paragraph five (5) that "it was determined that Mr. Weddington should receive a suspension without pay for three weeks plus the loss of the use of the company car for a one year period".  Swegman also denies in paragraph six (6) of having knowledge of Weddington's temper outbursts at work.

Darnell Simms, former HMMA employee, states in her affidavit, paragraph ten (10) that she observed Scott Weddington showing preferential treatment towards Caucasians and being much harder on African-American employees.  Sims was accused of damaging a DC tool and was terminated.  That tool had been broken many times and nobody else was terminated.  Sims' immediate supervisor was Gaylyn Davis,

Caucasian Team Leader, who showed preferential treatment to Caucasian employees.

Aubrey Knoll, Caucasian, was her Group Leader.  Scott Weddington was the manager

over general assembly.  Sims further states that Weddington was not the only one in

management to show preferential treatment towards Caucasians. Sims also observed

Scott Weddington use HMMA parts to upgrade his company issued automobile without

the consequence of termination. Deric Golden has observed the preferential treatment

towards Caucasians while employed at HMMA.  Sims and Golden also observed

Weddington's temper outbursts. (Audie Swegman Declaration, Exhibit H of Defendant's

Evidentiary Submissions; Sims Affidavit, Plaintiff's Exhibit 5; Golden affidavit, Plaintiff

's Exhibit 6).

## PRIMA FACIE CASE

### Race Discrimination

Under Title VII, it is illegal for an employer "to fail or refuse to hire or to discharge

any individual, or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex or national origin." **42 U.S.C.A. 200e-2(a)(1)**.

Plaintiff's claims against the Defendant arise under Title VII (race and retaliation).

The principal, though not exclusive, means by which a plaintiff may prove discrimination

was set out in **McDonnell Douglas Corp. v. Green**, **411 U.S. 792, 803 (1973)**.  Under

**McDonnell Douglas** a plaintiff claiming a discriminatory discharge may establish a

*prima facie* case if he proves that (1) he was a member of a protected class, (2) he was

qualified for the job held, (3) he was discharged from employment, and (4) he was replaced by someone outside the protected group, or a showing that preferential treatment is afforded to those outside the protected group.  **Coutu v. Martin County Bd. County Comm., 47 F.3d 1068, 1073 (11th Cir. 1995; Wilson v. AAA Plumbing Pottery Corp., 34 F.3d 1024, 1027 (11th Cir. 1994); Conner v. Fort Gordon Bus Co., 761 F.2d 1495, 1499 (11th Cir. 1985).**  Additionally, evidence of preferential treatment of someone who is outside the protected class of the plaintiff, but similarly situated, will satisfy that fourth prong.

The elements of a *prima facie* case may vary depending upon the facts in each case. *McDonnell Douglas*, **supra** at 802, n. 13.  The United States Supreme Court has explained that the analytical framework "is not inflexible" and that "the facts necessarily will vary in Title VII cases".  **Texas Department of Community Affairs v. Burdine, 450 U.S. 253, n. 6.**

Weddington, who is a Caucasian manager who was in Smith's line of supervision at HMMA, admits in his deposition that he was suspended three weeks for "serious misconduct".  Weddington was hired in January 2004 as an assistant manager.  He was promoted to Production Manager in July 2005. In November he was in Smith's line of supervision.   (Plaintiff's Exhibit 4, Weddington dep. p. 7, lines 1-18; p. 12, lines 1-21; p. 39, lines 9-23).

### Retaliation

A Plaintiff establishes a *prima facie* case by showing:  (1) the plaintiff engaged in a statutorily protected activity; (2) the plaintiff suffered adverse employment action; and

(3) some causal connection exists between participation in the protected activity and the adverse employment action. **Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1202 (11th Cir. 2001)**. "Statutorily protected expression includes internal complaints of racial harassment to superiors as well as complaints lodged with the EEOC." **Id.** The plaintiff is not required to prove the underlying claim of discrimination that led to the protest. **Holifield v. Reno, 115 F.3d. 1555, 1566 (11th Cir. 1997)**.

A plaintiff may establish the defendant's awareness of the protected activity by circumstantial evidence. **Goldsmith v. City of Atmore, 996 F.2d 1155, 1163**   A plaintiff must demonstrate that there was close proximity between this awareness and the adverse employment action. **Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322 (11th Cir. 1999)**.

Plaintiff can establish that Smith's expressing his belief that he was being discriminated against and the decision to terminate his employment are in very close proximity.  In the November 28, 2005 Team Relations Memo to Audie Swegman and Rob Clevenger written by Karin Carter,  about Larry Smith, she states the following: "Larry went on to say that he did not like **his kind** and did not know how he has even got hired on with Hyundai.  Again he told Scott that he was tired of being harassed and he will do whatever he has to in order to keep his job and see justice done and he will take this matter into his own hands.  Larry said he will take it to the top and sue HMMA for harassment if he had to."  Carter states that Smith said he was tired of "being harassed".  (Exhibit 3 of Defendant's brief).

Additionally, Karin Carter states that her recommendation for Decision day is for "repetitive behavior". There were only two incidents with very different versions and contradictions of what really happened. Defendant does not offer into evidence any supporting documents that Smith was counseled or warned repeatedly during his employment with HMMA. Carter states that "there seems to be a pattern with this individual from my understanding", implying that her recommendation is based upon what someone else told her. (Exhibit 3 of Defendant's brief).

After receiving Carter's Team Relations Memo written on November 28, 2005, Smith met with Audie Swegman and Rob Clevenger on November 29, 2005 to discuss the November 22 and 28th incidents with him. During that meeting Smith again expressed his belief that he was being mistreated because of his race. Smith was sent home after this meeting and was terminated by letter dated December 6, 2005. (Plaintiff's Exhibit 7).

## **PRETEXT**

Since Plaintiff has successfully established a *prima facie* case of discrimination, under the McDonnell Douglas test, the burden shifts to the Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's termination. Bass v. Board of County Commissioners, 256 F. 3d 1095, 1104 (11th Cir. 2001). If an employer meets that burden then the plaintiff must establish that defendant's proffered reasons are pretextual. Id. In order to show pretext, a plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. The plaintiff may succeed in doing this either directly, by persuading the Court that a discriminatory reason more

likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. <u>Texas Dept. Of Community Affairs v. Burdine</u>, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981). Plaintiff may defeat summary judgment concerning the issue of pretext if he has demonstrated such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the defendant's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence." <u>Combs v. Plantation Patterns</u>, 106 F. 3d 1519, 1538 (11th Cir. 1997). There is substantial evidence which would lead a reasonable jury to conclude that Defendant's proffered "legitimate" reasons for terminating Plaintiff are not worthy of credence.

There are discrepancies between the November 30, 2005 Team Relations Memo written to Audie Swegman from Rob Clevenger about Larry Smith and the November 22, 2005, Team Relations Memo to Audie Swegman from Marcus Hannah. In the memo written by Rob Clevenger he states under the "Allegations" section that the alleged racial comment made by Smith "was not confirmed by witnesses". Clevenger further states that two witnesses said Smith was "agitated", not that he was "aggressive" towards Reggie Johnson. Clevenger states that Smith's alleged aggressiveness towards Lisa Chumney was not confirmed by witnesses. EEOC never saw the November 30, 2005, document providing the allegations that were not confirmed by witnesses.

Hyundai's Declarations contradict the sworn testimony of Joshua Groves and the affidavits of Sims and Golden. Such contradictions and inconsistencies are sufficient to

establish pretext so as to preclude summary judgment.  Hurlbert v. St. Mary's

Healthcare Systems, Inc., 439 F.3d 1286, 1298-1299 (11th Cir. 2006).  As discussed in

the paragraph above, documents presented to EEOC by Hyundai are significantly

different than the statements collected during the investigation of the November 22,

2005, incident.

Additionally, Scott Weddington does not recall if there was a Workplace Violence

Investigation involved with Smith's termination.  (Plaintiff's Exhibit 4, Weddington dep.

p.16, lines 22-23; p. 17, lines 1-3).  Weddington does recall that in June 2005 he asked

Smith to go to the back of the shop when there were no cars to work.  Weddington

testified that Smith did not argue with him.  (Plaintiff's Exhibit 4, Weddington dep. p. 20,

lines 14-16).


## CONCLUSION

Because Plaintiff has produced substantial evidence establishing a *prima facie*

case and a showing that Defendant's reasons for terminating Plaintiff were pretextual,

Defendant's Motion for Summary Judgment is due to be denied.

Submitted this 27th day of November, 2007.

Kathryn Dickey
Law Office of Kathryn Dickey, L.L.C.
322 Alabama Street
Montgomery, AL 36104
(334) 262-0728
(334) 265-7696  facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2007, I sent a copy of the foregoing document by placing a copy of same in the United States Mail, with postage prepaid, and properly addressed:

Honorable Brian Bostick
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Federal Building
1819 Fifth Avenue North
Birmingham, AL 35203

OF COUNSEL

# Team Member Handbook





**Hyundai Motor Manufacturing Alabama, LLC.**

1st Edition



Plaintiff EXHIBIT

1

**CONTENTS**

HMMA History....................................................................................Page 1
HMMA Vision Statement ...................................................................Page 1
HMMA Mission Statement..................................................................Page 1
HMMA's Team Values and Standards ...............................................Page 1
    Safety
    Quality
    Team Diversity
    Efficiency
    Stewardship
Equal Employment Opportunity...........................................................Page 2
Unlawful Harassment ...........................................................................Page 2
HMMA's Position on Unions ................................................................Page 3
Purpose of the Handbook ......................................................................Page 3
Employment Statement..........................................................................Page 3
Team Member Records...........................................................................Page 4
Probation Period ....................................................................................Page 4
Length of Service....................................................................................Page 5
Employment of Relatives .......................................................................Page 6
Temporary Workers and Replacement Workers ....................................Page 6
Team Member Orientation......................................................................Page 6
Hours of Work........................................................................................Page 6
Breaks/Communication Period ..............................................................Page 7
    Break Periods
    Communication Period
Attendance .............................................................................................Pages 7-10
Work Week.............................................................................................Page 10
Overtime .................................................................................................Page 10
    Non-Exempt Team Members
    Exempt Team Members
Pay..........................................................................................................Page 11
Payday.....................................................................................................Page 11
Direct Deposit .........................................................................................Page 11
Questions Regarding Pay........................................................................Page 11
"Call In" Pay...........................................................................................Page 11
"Report In" Pay.......................................................................................Page 11
Statement of Earnings.............................................................................Page 12
Garnishments ..........................................................................................Page 12
Benefits ...................................................................................................Pages 12-20
    Attendance Incentive Program
    Family and Medical Act (FMLA)
    Holidays
    Vacation Non-Exempt/Exempt Team Members
    Scheduling Vacation
    Summer Shutdown
        Soliciting Volunteers
        Required Work
        Medical Leave

i

Canceling Vacation
    Personal Days
    Scheduled Personal Days
    Unscheduled Personal Days
    Transfers
    Unscheduled Vacation
    Vacation Eligibility
    Unused Vacation Time
    Personal Leave
Bereavement Leave ................................................................ Page 20-22
Jury Duty........................................................................................Page 22
Military Leave.................................................................................Page 22
Team Wear ...............................................................................Pages 22-24
Safety ....................................................................................... Page 24-25
    Safety Committees
    Safety Wear
    Hard Hats and Bump Caps
    Shoes
    Safety Glasses
    Personal Protective Equipment (PPE)
    Housekeeping
    Lock Out/Tag Out Procedures
Special Authorization Permits .........................................................Page 26
Confined Space Entry Permits
    Hot Work
    Area Specific Safety Rules
Security ................................................................................... Page 26 -27
    Foreign Trade Zone (FTZ)
    Video Surveillance
    HMMA Identification Badges (ID)
    Parking/Traffic Control
Career Opportunity Program ..................................................... Page 27-28
Transfers ................................................................................. Page 28-29
Solicitation, Distribution, and Postings ................................... Page 29-30
Team Member Work Conduct.................................................... Page 30-31
Corrective Action..................................................................... Page 31-33
Discussion Planner
    Informal Discussion
    Formal Discussion
    Commitment Discussion
    Decision Leave
    Termination
Serious Misconduct.................................................................. Page 34-35
Workplace Threats and Violence .............................................. Page 35-36
Team Member Resolution Program and Procedure................Pages 36-38
    Step 1: Supervisory Level
    Step 2: Resolution Request
    Step 3: Resolution Appeal
    Step 4: Resolution Final Appeal

Team Member Review Board............................. ...................Page 38
Drugs, Alcohol and Weapons........................................... Page 38-40
For Cause Testing and Random Testing ........................... Page 40-41
Public Relations .............................................................................Page 41
Internal Communications...........................................................Pages 42-44
Open-Door Policy
    Bulletin Board
    President's Roundtable
    Group Leader/Manager One-on-Ones
    Manager's Lunches
    Team Advisor
    Hyundai Communication System (HCS)
    HMMA Closed Circuit Television System
    HMMA Weekly News
    Hyundai Insights
    Five Minute Communication Meetings
Community Relations .............................................................. Page 44-45
    Speeches
    Tours
General Information................................................................. Page 45-46
    Electronic Devices
    Camera/Video Camera
    Cell Phones/Pagers
    Audio Tape Recorders
HMMA Tools ...................................................................................Page 46
Lockers ................................................................................... Page 46-47
Cafeteria..........................................................................................Page 47
Smoking...........................................................................................Page 47
Telephone Calls................................................................................Page 47

## HMMA HISTORY

Hyundai Motor Company (HMC) was established in 1967. By 1974, HMC produced the Pony as their first independently designed and manufactured model.

In 1985 HMC established Hyundai Motor America (HMA) and launched the Excel which was the best selling import sub-compact in the US for three years. Eight years later Hyundai launched the Sonata II and started assembly of the Excel in Thailand.

Over the last 35 years Hyundai has established its place in a global marketplace. On April 2, 2002, Hyundai announced it had chosen Montgomery, Alabama to build its first U. S. manufacturing facility which will produce the next generation Sonata and Santa Fe.

### HMMA's VISION STATEMENT

Our Team provides value for your future

### HMMA's MISSON STATEMENT

To create exceptional automotive value for our customers by harmoniously blending safety, quality, and efficiency. With our diverse team, we will provide responsible stewardship to our community and environment while achieving stability and security now and for future generations.

### HMMA's TEAM VALUES

**SAFETY:** HMMA is committed to providing a safe working environment to preserve and enhance the health and personal safety of our Team Members. We will achieve this through the implementation of safety policies, safe work practices, a drug free workplace, and by daily commitment of all Team Members.

**QUALITY:** HMMA's commitment to Quality begins with its ability to achieve continuous improvement in its product by always listening to our customers. HMMA works with its suppliers to ensure high standards are continually maintained. All HMMA Team Members have an active role in maintaining and improving both the manufacturing process and quality.

**TEAM DIVERSITY:** HMMA's success depends on treating each Team Member with dignity and respect and utilizing our Team's diversity to its maximum potential. HMMA's definition of Team Diversity is accepting our differences and learning from each Team Member's unique perspective in order to achieve a new standard of excellence in society, at home and at work. We must all work as a Team, practicing integrity as we deal with our customers while listening and learning from one another, sharing in our successes, and helping one another succeed.

**EFFICIENCY:** In order to provide job stability and maintain profitability to HMMA we must all act effectively to minimize all aspects of waste.

1

To achieve continuous growth and ... ation, each Team Member has the responsibility to find more efficient ways to produce our products for our internal and external customers.

**STEWARDSHIP:** At HMMA we are committed to the stewardship of our environment and our community. Stewardship simply means managing responsibly. We are committed to conserving energy, recycling, and eliminating elements that could cause harm to the environment. HMMA is also committed to being actively involved in our community in order that it may grow for the benefit of our Team Members and their families.

## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members.

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring, training and education, promotions, corrective action, layoffs, terminations, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act.

HMMA's team relations manager has the appropriate authority and the responsibility to administer the EEO programs with regard to employment and promotional opportunities. Any Team Member who feels he/she has been discriminated against may express such concerns to his/her group leader/manager, the team relations representative, and/or the Human Resources Director. HMMA's team relations manager will be responsible for administering HMMA's EEO policy and insuring that any reported EEO violations are investigated promptly and handled according to all federal and state laws as well as HMMA's policies and procedures.

## UNLAWFUL HARASSMENT

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, no Team Member - male or female - should be subject to unsolicited and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implied. This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact. Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment. It is also unlawful sexual harassment when submission to sexual

2

advances is a condition of getting or keeping a ... job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis. Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager.

## HMMA's POSITION ON UNIONS

HMMA's team concept and creating a team environment is based on faith in each Team Member and recognizes our commitment to ensure a positive working environment. HMMA has developed its policies, wage structure and benefits plans with our Team Members' best interests in mind. Additionally, HMMA is committed to providing all Team Members with a safe place to work by utilizing state of the art equipment, technologies, as well as work practices to ensure safety.

By joining together as a team, we can accomplish our mutual goals assuring the success of Hyundai Motor Manufacturing Alabama, LLC and providing greater opportunities and job security for all Team Members and their families. Because of HMMA's commitment to every Team Member we do not believe that a third party such as a union is necessary at HMMA.

## PURPOSE OF THE HANDBOOK

HMMA's handbook is intended as a summary of HMMA's policies and procedures. We ask each Team Member to read the handbook and familiarize themselves with HMMA's policies and procedures in order for you to understand HMMA's responsibilities to you and your responsibilities to HMMA.

This handbook is not a contract. We ask each Team Member to understand that in order for HMMA to remain competitive in a global market there may be times when changes are necessary. HMMA reserves the right to change policies and procedures when it becomes necessary, either in whole or in part, with or without notice. When it is determined that a policy or procedure needs to be changed, all Team Members will be notified by their manager and/or a video or other printed material to communicate such changes.

If Team Members have any questions concerning these policies and procedures they should ask their group leader/manager. If the Team Member is still unclear about the policies and procedures they should contact their team relations representative for clarification.

## EMPLOYMENT STATEMENT

**Every Team Member's employment with HMMA is a voluntary one and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this**

3

handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA Team Members.

This policy of employment-at-will may not be modified by any officer or Team Member and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the president or the board of directors, whichever is applicable.

This handbook or any policies or procedures are not contracts of employment.

## TEAM MEMBER RECORDS

Team Member records will be kept for information and business purposes only. Any of the following changes to your status must be reported to Human Resources:

- Name, address, or telephone number
- Marital Status
- Birth date, total number of dependents, their relationship to you
- Citizenship status
- Benefit - plan beneficiary designation
- Person(s) to be notified in case of emergency
- Formal education, courses completed, other training or professional skills acquired

Upon request, you may examine your own personnel file and indicate to Human Resouces any information you think is inaccurate. Any Team Member wishing to view his/her personnel file must make a written request specifically stating what he/she wants to review and why they want to review the record on file. All personnel files are confidential information and can only be accessed by HMMA Team Members who have authorization. All personnel folders are located in Human Resources.

## PROBATION PERIOD

The probationary period is 90 calendar days. This probationary period is a time for evaluation, both by you and by HMMA. The probationary Team Member needs to evaluate HMMA's policies, procedures and overall working environment. The automotive industry is highly competitive. The work is fast-paced, physically demanding, high volume production which demands high standards of quality and safety. Learning to meet performance standards, working in a fast-paced manufacturing environment while meeting the guidelines which govern our conduct, and becoming acquainted with our team approach are also a part of the evaluation new Team Members need to make of HMMA.

HMMA needs to evaluate your progress during this period as well. Three performance evaluations are conducted during the probationary period.

4

These evaluations occur at the following interv.

| 1 | 30 days |
| 2 | 60 days |
| 3 | 85 days |

If any new Team Member is off due to an approved leave of absence, the number of days absent will be added to the probation period.

Your overall progress is evaluated during the probation period. Strengths and weaknesses are discussed and helpful feedback regarding your development and progress is given during each of the aforementioned reviews.

In the event progress is less than acceptable or violations of standards of conduct occur, a probationary Team Member's employment may be terminated prior to the end of the 90 day period.

Before any new Team Member is terminated, a review of the facts and approvals by the department manager, team relations manager, director of human resources are required.

Once the probationary period is completed, the new Team Member becomes eligible for the following programs:

Equal Treatment Procedure
Peer Review Panel
Corrective Action Program
Attendance Incentive

## LENGTH OF SERVICE

HMMA considers "length of service" (LOS) as the period of continuous employment, starting from your date-of-hire and applies to all full-time Team Members. Length of service will be broken when a Team Member:

- resigns from employment (leaving the plant without proper authorization is considered voluntary resignation)
- is terminated from employment
- fails to return to work on the day following the end of a personal, medical, military, or other leave of absence, unless unusual conditions or circumstances exist that would prevent the Team Member from returning on the scheduled day
- retires
- fails to communicate with HMMA regarding an absence of three (3) consecutive days or longer (subject to the Family and Medical Leave Act and regulations)
- is not actively employed with HMMA for 12 consecutive months or length of service, whichever is the lesser.

A Team Member who voluntarily terminated his/her employment, and who is rehired, will not have any prior service restored. The date of rehire

5

will become the new service date until ation of service, for retirement purposes and the effect of breaks in service for retirement rights, however, will be determined in accordance with the Employee Retirement Income Security Act of 1974 (ERISA).

Transfer opportunities will be awarded based on LOS. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

Position Advancement Opportunities will be based on qualifications. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

## EMPLOYMENT OF RELATIVES

Relatives of Team Members may be employed at HMMA; however, they may not work or come under the direct supervision of another relative. Relatives are defined as those people who are related either by birth, adoption, or marriage.

The employment of relatives at certain levels of HMMA in positions where one might have influence over another will not be allowed.

## TEMPORARY WORKERS AND REPLACEMENT WORKERS

HMMA intends to utilize temporary and replacement workers to reduce temporary peaks of excess overtime, perform special projects, and fill vacancies while Team Members are on military leave, personal leave, or medical leave of absence. Use of temporary replacement workers also helps HMMA avoid potential layoffs.

## TEAM MEMBER ORIENTATION

HMMA will provide every Team Member with the training needed to understand HMMA's philosophies. Each Team Member will receive an orientation outlining HMMA team concepts, policies, benefits, and all other aspects related to their employment at HMMA.

## HOURS OF WORK

### Hours of Work

HMMA's normal work week for all production and administrative (non-exempt) Team Members consists of forty (40) hours per week based on an 8 hour work day five days per week. HMMA's normal work week for all administrative exempt Team Members consists of forty-five (45) per week based on an 8 hour work day and 5 hours of casual time per week. All production and maintenance Team Members will rotate shifts every 4 months. Production, maintenance, and administrative shift hours will

6

be as follows:

| SHIFT | SHIFT START TIME | SHIFT END TIME |
|---|---|---|
| **Production** | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 a.m. |
| **Maintenance** | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 a.m. |
| 3rd Shift | 10:00 p.m. | 6:45 a.m. |
| **Administration** | | |
| 1st Shift | 8:00 a.m. | 4:45 p.m. |

There may be times when Team Members will be asked to work irregular hours due to production requirements. Any deviation in HMMA's weekly scheduled hours must be reviewed and approved by the payroll and benefits manager or his/her designee prior to any change in HMMA's normal work schedule. Any permanent adjustment to any HMMA Team Members regularly scheduled work hours must have approval by the director of Human Resources.

## BREAKS AND COMMUNICATION PERIODS

### Break Periods

HMMA provides all Team Members with two (2) ten (10) minute paid break periods per day. The first break period will be given in the first half of the Team Members shift; the second break period will be given in the second half of the Team Members shift. All Production Team Members will be provided specific time for each of the described breaks. Due to the nature of Maintenance Team Members responsibilities their breaks will be given at their convenience. In order to allow Administrative Team Members the ability to maintain the continuity of their responsibilities they may take their breaks at their convenience.

There will be times when HMMA schedules overtime. In these situations the Team Member will be given a 5 minute break for every hour of scheduled overtime. These breaks must be given at the end of the eighth hour of work.

### Communication Period

Each Team will have a five minute paid communication meeting at the beginning of each shift. This meeting is for the manager, group leader, or team leader to communicate important information to the team.

## ATTENDANCE

Regular attendance is the cornerstone for the success of HMMA. A Team Member's absenteeism can reduce the quality and effect of the overall efficiency of HMMA's operations, as well as cause hardship on fellow Team Members who report to work regularly. Regular attendance

7

It is every Team Member's responsibility; every Team Member is expected to be on the job, on time, every scheduled workday.

The minimum acceptable standard of attendance is 98%.

Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, short-term disability, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

If a Team Member is absent due to a catastrophic event that results in a legally declared emergency which results in the closure of all major roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will not count against the Team Member's attendance for the purpose of calculating the acceptable standard of attendance, nor be cause for corrective action. Final approval as to the declaration of a "Catastrophic Event" shall be made by the director of Human Resources.

Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which result in Team Members being tardy will be evaluated on a case by case basis. If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early. A leave early will be considered as one-half day of absence for purposes of attendance calculation.

Any situation where a Team Member leaves the facility during scheduled work time (including overtime whether scheduled or voluntary) **without** their group leader, manager, senior manager, or any other member of management's **authorization**, the Team Member **will be considered to have voluntarily resigned** from his/her employment at HMMA.

Attendance will be calculated using a rolling calendar year using the following formula:

- Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.
- Calculate the number of unexcused workdays.
- Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

8

o Example:

237 Scheduled workdays
- 5   unexcused workdays
232/237 = 97.9%

When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve- month period, corrective action will be considered. The rolling twelve-month period is a 365-day period.

Every Team Member is expected to notify his/her group leader and/or manager, in advance, of any known absence or future absence. When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift.

Failure to notify within 30 min. at start of the shift may result in corrective action up to and including termination.

Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

The following will be considered:

- Cause
- Frequency
- Patterns
- Failure to report
- Time pattern of reporting

A Team Member that **does not communicate** to his/her group leader and/ or manager regarding his/her absence **for a period of three (3) consecutive days** or longer is **considered to have voluntarily resigned** his/her employment at HMMA.

HMMA will maintain appropriate attendance records. Any corrective action necessary is taken by the group leader and/or the manager. The appropriate team relations representative will be in attendance.

The corrective action process is intended to help Team Members correct any attendance problems. However, if the Team Member's attendance continues to be unacceptable it could result in further corrective action up to and including termination.

When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when corrective action is taken, the following steps must be followed:

| 1 | Informal Discussion |
| 2 | Formal Discussion |
| 3 | Commitment Discussion |

9

The team relations representative will be consulted for guidance at each step of the aforementioned corrective action steps. The team relations representative will also attend each step as it occurs.

When corrective action is required beyond the four steps above, the Team Member's group leader and/or manager will contact the team relations manager and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and director of Human Resources.

## WORK WEEK

HMMA's work week begins at 12:01 a.m. Monday and ends on Sunday at 11:59 p.m.

## OVERTIME

### Non-exempt Team Members

Due to the nature of the automotive industry there will be times when we will be required to work overtime in order to meet our customer's needs. Overtime will be paid in one-tenth hour increments; any overtime worked will be paid during the normal pay cycle and included in the regular payroll check.

Overtime is calculated using the base rate of pay plus shift premium and team leader premium, if applicable. Overtime will be paid at 1.5 times the Team Member's regular rate of pay for any time worked in excess of eight hours during the normally scheduled work day as long as 40 hours of work has been achieved for that work week. Team Members will be paid at 1.5 times their regular rate of pay for time worked on Saturday or the sixth work day. Additionally, Team Members will be paid 2 times their regular rate of pay for time worked on Sunday or the seventh day of continuous work. Team Members who work on an approved HMMA holiday will be paid at 2 times their rate of pay. Vacation time will count as hours worked when calculating overtime.

### Exempt Team Members

Assistant managers and specialist Team Members wages are based on a 40 hour work week and 5 hours of casual overtime. Casual overtime is time that is worked without approval. Assistant managers and specialists will be paid at 1.5 times their calculated regular hourly rate for all pre-approved overtime.

In situations where the assistant manager and/or specialist Team Member is required to work because of scheduled production overtime they will be paid at 1.5 times their calculated hourly rate. Due to the fact that production overtime is scheduled and the assistant manager and/or specialist is required to work in order to support production needs the overtime will

10

be considered as pre-approved. Additionally, the ____ al overtime rule will not apply in this situation.

## PAY

HMMA reviews wages each year and makes appropriates changes to the wage scale based on several factors, such as: automotive industry, HMMA's performance, and the cost of living. Each Production and Maintenance Team Member will receive a base rate when joining the HMMA family and will receive a rate increase periodically over a 24 month period until they reach the top pay rate.

## PAYDAY

All Team Members will be paid on Tuesday on a biweekly basis.

## DIRECT DEPOSIT

All HMMA Team Members are required to use direct deposit. Each Team Member will receive an advice stub which will itemize pay and deductions in detail. Any questions regarding direct deposit should be directed to the Payroll and Benefits Department.

## QUESTIONS REGARDING PAY

If any Team Member has a question regarding pay, they are to contact their manager/assistant manager/group leader. The manager/assistant manager/group leader will notify the payroll department of any issues concerning pay and report back to the Team Member or arrange a meeting with the payroll department for the Team Member.

## "CALL IN" PAY

HMMA will pay for a minimum of four hours work at the regular straight time hourly rate for those Team Members who are called to work at a time other than their regularly scheduled work hours (before or after, but not continuous with their regularly scheduled shift). If there is at least four hours work available and the Team Members are given the option to work less hours, they will be paid only for the hours worked if they exercise the option to leave early.

## "REPORT IN" PAY

If the scheduled production is canceled due to any emergency, prior to the start of the shift and at least one hour of notification has been provided to the Team Members, no work will be available and no pay made to the Team Members.

If the scheduled production is canceled due to any emergency and less than one hour of notification is provided, Team Members will have the option of leaving and receiving pay only for the time worked or staying for a total of four hours. If the Team Member elects to remain at work, he or she must leave the plant at the end of this period.

11

If the notification of canceled production is made after four hours of work from the normal scheduled starting time of the shift have been completed, Team Members will have the option of leaving and receiving pay only for the time worked or staying until the end of the regular shift. Team Members that have not been given their options and have been forced to leave will be paid for 8 hours.

Anytime a Team Member volunteers to go home early or is required to go home early, the Team Member may elect to use any available vacation time to make up for lost income. This time will always be excused and the lost time will not count against the Team Member's attendance.

## STATEMENT OF EARNINGS

Each Team Member will receive a yearly statement of earnings. The yearly statement of earnings is known as a W-2 Withholding Statement which provides the amount earned and the taxes that have been withheld. The W-2 will be issued in January each year for use in filing income tax forms.

## GARNISHMENTS

HMMA respects every Team Member's right to privacy with regard to personal and confidential information. However, HMMA may be required, by law, to withhold a portion of your pay if served with a court notice of a garnishment, wage assignment, wage deduction, or government levy. When situations such as this occur HMMA's payroll department will notify you of any pending action involving such matter that requires a wage withholding situation.

## BENEFITS

HMMA benefits are described in the Summary Description Plan.

## ATTENDANCE INCENTIVE PROGRAM

HMMA will pay a premium of $100.00 to non-exempt and exempt Team Member's up to assistant manager for perfect attendance for each 4-week period. All regular, full-time, non-exempt and exempt Team Members up to assistant manager are eligible to participate in the Attendance Incentive Program.

During the probationary period, a Team Member is not eligible to participate in the Attendance Incentive Program. A Team Member becomes eligible the first full 4-week attendance period following the end of his/her probation period.

The Team Member must maintain a perfect attendance record for a four (4) week attendance period to receive an attendance incentive. Perfect attendance is defined as **no absences**, including tardiness, early leave, lost time including scheduled overtime, or personal leaves.

12

The only exceptions to this policy are:

- HMMA observed holiday, unless the Team Member is scheduled to work on the holiday
- Scheduled Vacation
- Personal Days (HMMA may require documentation)
- Jury Duty
- Military Leave. Military leave shall be considered in accordance with applicable law.
- Bereavement Leave
- The balance of a shift lost due to an occupational illness/injury.
- Workers Compensation related doctor appointments. (When a Team Member misses part of a day due to a workrelated injury/illness doctor appointment **scheduled** by the HMMA Medical Clinic.)
- Any work-related activities away from the plant
- Any medical leave, either work-related or non-work related that is determined to be FMLA
- Any leave that is determined to be FMLA

## FMLA

### General Provisions

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12 month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be unpaid, paid, or a combination of unpaid and paid leave, depending on the circumstances of the leave and as specified in the policy.

A Team Member must have worked for HMMA for 12 months, or 52 weeks. In addition a Team Member must have worked at least 1250 hours during the 12 month period immediately before the date when the leave is requested to commence.

In order for the leave to qualify under the policy, the Team Member must be taking leave for one of the reasons listed:

- The birth of a child and in order to care for that child;
- The placement of a child for adoption or foster care, and to care for the newly placed child;
- The care of a spouse, child, or parent with a serious health condition; or
- The serious health condition of the Team Member.

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the medical certification form. Request for medical certification must be made in writing as part of

13

HMMA's response to the Team Member's request for leave.

All Team Members requesting leave under the policy must provide verbal notice with an explanation of reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reason(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

## HOLIDAYS

HMMA observes paid holidays each calendar year. HMMA will review the holiday schedule each year and communicate to all Team Members the holiday schedule for the coming year in November. All full time Team Members and team leaders are eligible for holiday pay, which includes shift premium if applicable. All full time Team Members will be eligible for holiday pay as of their first day of employment.

All Team members must work his/her last full scheduled workday before the holiday and the first full scheduled workday following the holiday in order to receive holiday pay.

All non-exempt Team Members and exempt Team Members up to assistant manager will be paid double time for hours worked on a designated HMMA holiday.

## VACATION NON-EXEMPT/EXEMPT TEAM MEMBERS

HMMA realizes that vacation is an important benefit for all Team Members. HMMA's intention is to provide Team Members with a means to take a scheduled vacation without loss of pay. Vacation does not apply to holidays, bereavement leave, jury duty or military leave pay. The vacation allowance is granted for the calendar year only. Once it is used for the year, it is not renewed until January 1st of the next calendar year.

A Team Member's vacation eligibility is determined based on his/her length of service with HMMA and is to be used during the calendar year January 1st through December 31st. Any Team Member that has not worked hours for the year in which the vacation is scheduled will not be paid until at least one day has been worked in the qualifying year. Although Team Members must actually perform work in a new calendar year before qualifying for vacation, Team Members may use their vacation in January if it is connected with vacation or a holiday from the previous year. Five vacation days are reserved and must be used during HMMA's summer shutdown. However, a Team Member may use these days prior to shutdown for Family Medical Leave or if the Team Member is scheduled to work the vacation days that are reserved for the summer shutdown period. Anticipated unused shutdown vacation days may not be scheduled for dates before the actual shutdown occurs.

Starting the year of the Team Member's second anniversary, the Team

14

Member is eligible for vacation according to th... ...owing schedule. (The Team Member's vacation allowance is available as of January 1st each year)

Team Members with:

- Less than one year will receive a prorated vacation based on the following
  - January – 10 days vacation
  - February – 9 days vacation
  - March – 8 days vacation
  - April – 7 days vacation
  - May – 6 days vacation
  - June – 5 days vacation
  - July – 4 days vacation
  - August – 3 days vacation
  - September – 2 days vacation
  - October – 1 day vacation
  - November & December – 0 days vacation

- Beginning January of the next year Team Members will receive:
  - 1st year – 10 days vacation
  - 2nd year – 11 days vacation
  - 3rd year – 12 days vacation
  - 4th year – 13 days vacation
  - 5th year – 14 days vacation
  - 6th year – 15 days vacation
  - 7th year – 16 days vacation
  - 8th year – 17 days vacation
  - 9th year – 18 days vacation
  - 10th year – 19 days vacation
  - 11th year – 20 days vacation
  - 12th year – 21 days vacation
  - 13th year – 22 days vacation
  - 14th year – 23 days vacation
  - 15th year – 25 days vacation

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

## SCHEDULING VACATION

In order for HMMA to plan proper coverage for Team Member vacations, the scheduling period for the subsequent year's vacations will be during November and December as follows:

- Full week and single days of vacation for January and/or February must be scheduled between November 1 and

15

November 30 of the preceding y...
- Full weeks and single days of vacation for the remainder of the year - March through December - must be scheduled between December 1 and December 22 of the preceding year.
- Full weeks take precedence over single day vacation requests.
- Single days take precedence over 1/2 day vacation requests.
- When two (2) or more Team Members with the same length of service request the same dates for time off, the last letter of the Team Members' names will be used to determine who has first preference.

## SUMMER SHUTDOWN

HMMA reserves the right to schedule a plant shutdown each year. When a plant shutdown is planned, HMMA will inform Team Members of the planned shutdown by the end of December the prior year. HMMA reserves the right to require the Team Members to use up to 5 days of his or her vacation if needed during the shutdown period.

There may be occasions when it is necessary to schedule work during HMMA's summer shutdown period. When it is necessary to schedule work, each department will notify Team Members 30 days prior to the planned summer shutdown, which they will be required to work.

### Procedure

The manager and/or group leader will solicit volunteers and/or require Team Members to work during the shutdown period using the following criteria:

- **Soliciting Volunteers:**
  - Solicit volunteers based on length of service for shut down days that are not holidays. The Team Member volunteering with the longest length of service will be awarded the work. If two or more Team Members volunteer with the same length of service, the first letter of their last names will determine which Team Member is awarded the work.
  - If the voluntary work being offered is an HMMA holiday, the manager and/or group leader will use the overtime equalization chart to determine which Team Member will be awarded the overtime, as stated in the Equalization of Overtime Policy.
- **Required Work:**
  - When requiring Team Members to work on shutdown days that are not holidays, start from the bottom of the length of service list until the required manning is obtained.
  - All Team Members who volunteer or that are required to work during an HMMA shutdown that involves reserved vacation days will be eligible to reschedule

the vacation days.
- **Skills Requirement**
  - In overtime situations that require a specific skill and or qualifications to accomplish this job task. Skill will take precedence over length of service.
  - If more than one Team Member has the skill and qualifications, overtime equalization should be used as a determining factor and then length of service if applicable.

### Medical Leaves During Shutdown Periods

All Team Members that are on an approved medical leave, or personal leave during the shutdown period will be paid for any vacation reserved for the shutdown period, and will not be eligible to reschedule vacation days reserved for the shutdown period.

### Canceling Vacation

Team Members who choose to cancel their scheduled vacation must notify their manager and/or group leader as soon as possible. Team Members may only cancel a scheduled vacation one time per scheduled year.

When a Team Member cancels a scheduled vacation week or day, he/she may reschedule the canceled vacation to any open block of available vacation time. The opportunity for the canceled week or day will be posted in a central area for the entire group or department, whichever is applicable, for 48 hours following the cancellation.

### Personal Days

All Team Members will be given three Personal Days each year. HMMA encourages its Team Members to schedule their Personal Days in advance if possible. However a Team Member may use Personal Days at their discretion for emergency situations or unforeseen circumstances (HMMA may require documentation) that prevent them from reporting to work, leaving early, or reporting late to work.

If a Team Member is already at work and needs to leave, the Team Member must contact his/her manager and/or group leader and get approval before leaving the plant. If the Team Member does not contact his/her manager and/or group leader or another member of management and leaves without proper authorization, he/she will be considered to have voluntarily resigned.

Personal Day Limitations

- Personal Days were not developed to extend vacation periods or to be utilized in lieu of vacation

- Personal Days were not intended to be used to extend a holiday period, however if a verifiable unforeseen circumstance were to arise the Team Member would be

16

17

allowed to utilize a personal ... cover his/her absence.

- Can not be used during the New Hire 90 day probation period.

- If a Team Member uses a Personal Day on a Saturday or Sunday for a verifiable emergency he/she will not be eligible for compensation at a premium rate, but will be compensated at a straight time rate and may be required to provide documentation.

## Scheduled Personal Days

- Must be scheduled in advance of the day taken (before close of previous shift).

- Must be approved in advance by immediate supervisor (may also be denied by immediate supervisor if manning not sufficient).

- Does not require documentation or explanation.

- Scheduled Personal Day will not effect attendance percentage.

- Scheduled Personal Day will remain eligible for attendance bonus.

- Scheduled Personal Day before a holiday will not disqualify holiday pay.

- Scheduled Personal Day before "scheduled Saturday/ Sunday" does not allow for missing Saturday/Sunday if scheduled.

- Scheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Scheduled Personal Day will be paid at straight time (regardless of day requested).

## Unscheduled Personal Days

- Must only be used for emergency purposes.

- Emergency reason may be required to be documented.

- Documented emergency will still be eligible for attendance bonus.

- Un-documented emergency will disqualify for attendance bonus.

18

Non-emergency use will disqualify for ... .ance bonus.

- Un-documented/non-emergency use before a holiday will disqualify holiday pay.

- Un-documented/non-emergency use will not count against attendance percentage.

- Un-documented/non-emergency use to cover tardy will disqualify attendance bonus.

- Utilizing to cover tardy will not count against attendance percentage.

- Unscheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Unscheduled Personal Day will be paid at straight time (regardless of day requested).

## Transfers

If a Team Member transfers to a new Team, the Team Member will be required to reschedule his or her vacation.

## Unscheduled Vacation

A Team Member's vacation allowance does not accumulate and must be taken in the calendar year in which it is earned. Team Members will be paid for any unscheduled vacation on the first pay period in February of the following year.

## Vacation Eligibility

All regular, full time, exempt Team Members are eligible for vacation.

Vacation is earned by the Team Member each January. In order for the Team Member to be eligible for vacation he/she must have reported for work in the year of eligibility.

Requests for vacation days must be submitted to the supervisor one week in advance. The supervisor is required to approve or deny the request within 48 hours.

## Unused Vacation Time

A Team Member will not be allowed to carry over unused vacation into the next year. Team Members that have vacation days remaining after the close of the calendar year (December) will be paid for any remaining vacation time by the first pay period in February.

Upon separation from employment with HMMA, the Team Member's vacation will be prorated and the Team Member will receive pay for any unused vacation during the year in which the termination occurs. If a

19

vacation will be paid in a lump sum to the Team Member's beneficiary (as designated for retirement plan).

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

## Personal Leave

In an effort to recognize the need of Team Members who require time off in addition to personal days or vacation, HMMA may consider a personal leave of absence without pay for up to a maximum of thirty (30) days.

All regular permanent, full time Team Members employed by HMMA for a minimum of ninety (90) days are eligible to apply for an unpaid personal leave of absence. Departmental requirements will all be taken into consideration before a request is approved. Requests for unpaid personal leave may be denied or granted by HMMA. Approvals of the immediate supervisor, department director, and Director of Human Resources are required. All personal leaves are unpaid leaves.

An eligible Team Member should submit a request in writing to his/her immediate supervisor.

A Team Member is required to return from the unpaid personal leave on the originally scheduled return date. If the Team Member is unable to return, he/she must request in writing the extension of the leave.

If HMMA does not extend the leave, the Team Member must then return to work on the originally scheduled return date or be **considered to have voluntarily resigned** from his or her employment. Extensions of leave will be considered on a case-by-case basis.

## BEREAVEMENT LEAVE

The bereavement leave policy was developed to provide Team Members with a suitable period of time away from work, with pay, in order to properly attend to the arrangements required when a death in the Team Member's family occurs.

The Team Member's group leader or management Team Member should be immediately notified when such leave is needed.

A bereavement leave of absence, with pay, for a period not to exceed five workdays shall be granted to a Team Member when death occurs to the Team Member's:

- parent
- stepparent
- spouse

20

- child or stepchild

A bereavement leave of absence, with pay, for a period not to exceed three workdays shall be granted to a Team Member when death occurs to a member of a Team Member's family.

For the purpose of this policy, the Team Member's family shall be defined as follows:

- In the event of a miscarriage, if a death certificate is issued, then the above policy will apply
- Mother-In-Law/Father-In-Law
- Sister/Brother
- Grandparent/Grandchildren
- Stepsister/Stepbrother
- Grandparent-In-Law
- Half-sister/Half-brother
- Great Grandparents
- Son-In-Law/Daughter-In-Law

Exceptions may be made to the "Team Member's family" provisions if the deceased was a relative or foster parent and the Team Member resided with or was reared by the deceased.

In the event of the death of a Team Member's relative not mentioned above the Team Member will be excused, with pay, for up to one day (8 hours). This applies to the following family members only:

- Aunts
- Uncles
- First cousins
- Nephews
- Nieces
- Brother-In-Law and Sister-In-Law

When a Team Member is on vacation and a member of the Team Member's family dies, the time off will be considered as bereavement leave. Vacation time missed because of the death may be utilized at a later time. If an official HMMA holiday occurs during time considered as bereavement leave, the Team Member's bereavement will begin the day following the holiday. In addition, Saturdays, Sundays and holidays are not considered as bereavement. Any Team Member who is off on a Friday for an approved bereavement leave will not be expected to work on the Saturday or Sunday after the approved bereavement leave.

All bereavement leaves of more than one day must be taken on consecutive work days. (For example: Tuesday, Wednesday, Thursday, or Friday, Monday, Tuesday).

A Team Member who leaves during his or her shift due to the death of a family member that qualifies for bereavement leave will receive eight hours of total pay for that day. By leaving during the shift, the Team

21

Member has started his/her bereavement leave and the partial day will count as a full day of the allowable bereavement leave.

HMMA may request documentation for verification to be retained with the leave of absence request.

## JURY DUTY

HMMA will provide income protection while a Team Member carries out his/her civic responsibility regarding jury duty.

Upon receipt of notification from the state or federal courts of an obligation to serve on a jury, the Team Member should notify his/her supervisor. The Team Member is required to provide copies of the jury subpoena or jury summons to his/her supervisor and to the Payroll Department.

Any Team Member appearing as a plaintiff, defendant, and/or witness in any legal proceeding, or for other appearances related to legal proceedings or court cases (e.g. deposition testimony), whether or not pursuant to a court-issued subpoena will not receive paid time off. Vacation, personal time, or unpaid time should be used for these instances.

## MILITARY LEAVE

Team Members who are inducted into the U.S. Armed Forces or who are reserve members of the U.S. Armed Forces or state militia groups will be granted leaves of absence for military service, training, or other obligations in compliance with state and federal laws. These Team Members may use accrued vacation leave but are not required to do so. At the conclusion of the leave, Team Members generally have the right to return to the same position they held prior to the leave or to a position with equivalent seniority, pay and benefits. HMMA will pay the difference between military pay and regular wages/salary for up to one month. Team Members are requested to notify their supervisor as soon as they are aware of the military obligation. Questions regarding HMMA military leave policy, applicable state and federal laws, and continuation of benefits should contact the Human Resources Department.

## TEAM WEAR

The purpose of *Team Wear* is to support the spirit of team work, build open communication, ensure safety for Team Members, protect product finish, ensure proper security and identify visitors.

*Team Wear* will be worn by all Team Members in a neat and appropriate manner during normal business hours, except when a special business meeting requires other clothing. *Team Wear* may be worn to and from work. The *Team Wear* concept also applies to interns & co-op Team Member who are issued *Team Wear* by HMMA.

Other HMMA apparel is not considered *Team Wear* and should not be worn during normal working hours. Likewise, jackets, sweaters and

sweatshirts not issued or purchased through the *Near Collection* should not be worn over *Team Wear* during business hours.

The color choices at the present time are:

- pants/skirts in khaki, navy, grey, olive and black
- shirts in tan, white, blue & blue/white, herringbone, green, slate blue, denim, khaki, and black.

Team Members will also have choices of sweatshirts and sweaters which are also embroidered with the company logo.

Skirts may be hemmed to no more than 3 inches above the top of the knee.

All alterations will be done at Team Member expense. Safety issues and mutilation hazards for clothing should be kept in mind when altering clothes.

Team Wear is provided to Team Members once each 18 months. During orientation each Team Member will order his/her initial set of:

- 5 pants/skirts
- 5 tops
- 1 hat
- 1 belt

Every 18 months Team Members will receive a full replacement set of *Team Wear* due to wear and tear. Team Members will also have the option to purchase, at their own expense, pants/skirts in the same approved colors as those provided by HMMA.

Jeans (blue, black or any other color) are not considered appropriate for work at HMMA and are not to be worn during normal working hours. All items must conform to the Team Wear concept. Safety issues and protecting the finish of the vehicle should be taken into consideration when choosing Team Wear (100% cotton clothing is required in some areas and loose clothing is not allowed on production lines).

Team Wear which is damaged during work hours at HMMA will be replaced.

Maternity wear is available upon request. The choices will include a navy jumper, navy slacks and a white blouse. The jumper must be dry cleaned at the Team Member's expense. Due to changes in sizes, maternity clothing may be requested twice during pregnancy. Team Members may choose to wear maternity clothing of their own choosing (and expense) if the colors match those outlined above.

Additional HMMA apparel from the HMMA Team Wear Collection may be purchased by the Team Member through the supplier for Team Member use only. Team Wear may not be purchased for family members, however, Hyundai logo items may be purchased through the HMMA

Car Shop. Team Members will each pay the use of tax and shipping for individual purchases.

Note: No pins, buttons, or other items may be worn on HMMA Team Wear unless it is issued by HMMA. Furthermore, only HMMA issued hats may be worn at HMMA. All HMMA head wear must be worn as issued and may not be altered. The only acceptable alteration is the addition of the Team Members name.

## SAFETY

HMMA's goal is to eliminate potential hazards before they become an accident. Every Team Member is responsible for safety not only for themselves but for others. We can all prevent incidents by avoiding unsafe acts, reporting unsafe acts and conditions and by learning and following the policies and procedures that have been developed to keep our facility safe.

### Safety Committees

HMMA's safety committees provide Team Members an opportunity to participate in safety improvements in their areas. The safety committees will conduct area audits, identify safety training needs and support safety awareness programs in the facility.

### Safety Wear

As part of HMMA's total Team Member safety program, special clothing and other apparel designated by department managers and the Safety/Environmental Department must be worn by Team Members, when and where required, to help guarantee your personal safety.

### Hard Hats and Bump Caps

Hard hats (heavy-duty, impact-resistant hats) must be worn in work areas where there is danger of falling objects or hazardous conditions. Bump caps (lighter weight hats) may be required in some areas as an additional means of protection. Team Members are reminded to obey signs or directions in areas where such protective devices must be worn.

HMMA will issue all bump caps and hard hats. Only HMMA-issued hats may be worn. Additionally, safety caps may not be altered in any way. The only exception is the addition of the Team Members name.

### Shoes

HMMA safety-approved shoes are required in many areas of the plant and are necessary to safeguard your health. HMMA has established a specified dollar amount it will pay toward the purchase of safety shoes. Contact the safety department for the exact amount.

### Safety Glasses

All Team Members, vendors and visitors at HMMA are required to

24

wear OSHA-approved safety glasses in the production areas. Safety glasses are provided by HMMA and can be ordered through the Safety Department. Eye examination charges are not covered under this program. Safety glasses do not have to be worn when entering, exiting, or during breaks and lunch.

### Personal Protective Equipment (PPE)

When it is required, use of special safety equipment by Team Members shall be regarded as a condition of employment. Further information will be given to you during your training regarding equipment needed for your job. If you are not sure of the PPE required in your work area, please contact your group leader.

### Housekeeping

Good housekeeping habits allow all HMMA Team Members to be safe in their work areas as well as the ability to work more efficiently. Each Team Member is responsible for maintaining their work area. If we allow dust and dirt to accumulate or if we do not regularly maintain the work area safety hazards may occur. Team Member is responsible for disposing of trash both inside and out into the proper receptacle. Failure to adhere to the aforementioned is considered to be a performance issue and could result in corrective action.

### Lock-out/ Tag-out Procedures

The safety of all HMMA Team Members is a primary concern. In order to protect all Team Members from danger, we have established a Lock-out/Tag-out procedure to protect all those who enter machinery, work within machinery, or use machinery as part of their job duties at HMMA. Only authorized Team Members who have completed lock-out/tag-out training may work within machine guarding or enter machinery. Strict compliance with the lock-out/tag-out procedures and rules are required from all HMMA Team Members and contractors at all times.

HMMA will issue each trained and authorized Team Member a personal safety lock along with an identification tag. The Team Members lock and tag is required to be properly attached to the lock-out devices located on each piece of machineries control panel before entering. In situations where multiple persons must enter a piece of machinery requiring lock-out/tag-out, each person must attach his/her lock and tag to the lock-out device with a multi-lock hasp. All locks and tags must be removed before the equipment is restarted. 

Because of the differences in each machine or piece of equipment, the Team Member should learn the proper method of locking and tagging each piece of equipment they operate, repair or maintain. If a Team Member is unsure about the procedures for locking out the equipment, the Team Member must ask their manager and/or call the Safety Department for assistance.

25

## SPECIAL AUTHORIZATION PERMIT

Because of the varied types of work required, certain types of work require special authorization and/or training. Areas designated as confined space or certain welding operations require a permit prior to beginning work.

### Confined Space Entry Permits

When a location is designated a "confined space" it requires specialized training before a Team Member can work in the designated area. Confined spaces present characteristics of an atmosphere or have the potential for serious safety and/or health hazards.

Lack of oxygen or contamination of the air is possible in confined spaces. No Team Member or contractor is allowed to enter a "permit required" confined space unless they have received the proper training and the area has been adequately tested and a confined space entry permit has been issued. When training and/or a permit is needed contact the Safety Department to obtain training and/or a permit.

### Hot Work

There are areas within our facility that are susceptible to fire and explosions. Because of these dangers Team Members planning to do "hot work" in these areas must obtain a hot work permit before performing cutting, welding and/or spark producing work. Hot work being done on welding lines and in authorized maintenance areas does not require a hot work permit unless otherwise posted. All hot work permits must be obtained from the Safety Department.

### Area Specific Safety Rules

Individual areas within our facility will have area specific safety requirements. These include but are not limited to:

- Rules for the proper use of different kinds of tools and equipment
- Rules for performing different kinds of operations
- Proper techniques for lifting or performing other physical activity

Each department will be responsible for communicating the safety rules that apply to your particular job function. If a Team Member is unsure of the safety requirements for their work area they are to contact the manager for the department or the Safety Department.

## SECURITY

### Foreign Trade Zone (FTZ)

HMMA is designated as a FTZ under the Foreign Trade Zone Act of 1934.

26

The FTZ makes it possible for HMMA to receive pa... from other countries without paying the required duty tax until the parts leave the FTZ as part of a completed vehicle. Operation of the FTZ is under the supervision of U.S. Customs Service and therefore HMMA is required to operate under stricter security than you may be accustomed.

### Video Surveillance

At HMMA the security of our Team Members as well as our product is important to us.

In order to ensure our Team Member's safety, protect our product, and maintain the FTZ zone, HMMA uses video surveillance throughout our facilities.

### HMMA Identification Badges

HMMA identification ("ID") badges are issued on the first day of employment. All HMMA Team Members are required to wear their ID badges, and have them visible when entering and exiting HMMA. Team Members do not have to have their badges visible when they are in their assigned work area. However, the Team Member must wear, and have their badge visible when traveling between HMMA facilities. Personal identification from your ID badge is an FTZ requirement. Security personnel may periodically inspect badges. All Team Members will be required to return his/her badge to security on their last day of employment. If any Team Member loses their identification badge, the Team Member is to notify Security immediately so that a new badge can be issued and activated.

### Parking/Traffic Control

The ability to park on HMMA premises is allowed during scheduled work times. At HMMA we have reserved parking spaces for visitors as well as for the disabled. Here at HMMA, all other Team Members have equal access to parking and parking spaces on a first come first serve basis. All Team Members are responsible for parking in the proper parking spaces and for respecting the visitors and disabled parking areas.

Additionally, HMMA has a posted speed limit as well as designated lanes which allow for smooth traffic flow in and out of the facility. All Team Members are required to follow all posted limits, as well as safe driving habits, to ensure the safety of all HMMA Team Members and visitors. Any Team Member found in violation of these rules is subject to corrective action up to and including termination.

## CAREER OPPORTUNITY PROGRAM

The purpose of the HMMA Career Opportunity Program (COP) is to encourage promotion from within HMMA and to ensure that all qualified Team Members have an equal opportunity for job advancement. This program is designed to provide an effective means of communication to Team Members of specific job vacancies within HMMA. This policy will

27

be administered by the Employment Depar...

It is the intent of HMMA to fill job vacancies from within the organization when Team Members with the skills and qualifications for the positions are available. In the event a posted position cannot be filled from within HMMA due to a lack of qualified Team Members external sources can and will be utilized to fill the position. Job advancement and transfers will be made without regard to race, color, religion, sex, age, national origin, veteran status, or disability.

This program will be used for exempt and non-exempt positions excluding the following: production Team Member, team leader, entry level support staff Team Member, management Team Member and above.

A manager may fill a vacancy internally within his/her section and within the same salary classification without posting the position by realigning a Team Member into the position. The position vacated will then be posted.

All full-time Team Members who have completed the probationary period at HMMA are eligible to apply for vacancies posted under this policy. In the interest of stability and continuity, a Team Member who accepts a promotion will be expected to remain in the new position for a period of twenty-four (24) months and will be prohibited from applying for another promotional opportunity during that twenty-four (24) month period.

A Team Member will be disqualified from consideration for any Career Opportunity Posting if he/she has active corrective actions at the Formal Discussion level or above. Any conflict with the Employment of Relatives Policy may also prohibit a Team Member from being considered eligible for the posted position.

Vacancies to be filled by the Career Opportunity Program will be announced via closed circuit television and/or on the Career Opportunity Bulletin Boards. Vacancies will remain posted for five (5) working days following the first date of the announcement.

All Team Members who have filed a Career Opportunity Application but do not meet the minimum eligibility requirements will be notified in writing by the Employment Department. Candidates may be contacted for a screening interview to verify and/or clarify experience. Applicants not selected will be notified of their status, in writing, by the Employment Department.

A Team Member who has been awarded job advancement will be transferred within thirty (30) days of the selection decision. The Director of Human Resources must authorize any decision to delay the transfer.

## TRANSFERS

HMMA wants all of its Team Members to become multi-talented. In order to achieve this goal HMMA Team Members will have the ability to request a assignment to another work area of their ch... Not only does this allow the Team Members to gain important job experience but it also helps HMMA to develop Team Members for other responsibilities.

Team Members with permanent medical restrictions, either off work or on a temporary work assignment, will be considered for placement, with or without accommodation, as required by the Americans with Disabilities Act. Placements of Team Members with permanent medical restrictions will take priority over transfer requests.

When a vacancy is declared, it shall be posted for department or group transfer, provided the position cannot be filled by a Team Member with permanent medical restrictions. This vacancy will be posted plant wide denoting the department and group. The requesting eligible Team Member with the longest length of HMMA service shall be placed in the open position. The job posting will be posted in designated areas of the facility for a period of three (3) working days, excluding weekends and holidays. All requests received by the end of the posting period shall be reviewed to determine which candidate has the longest length of service and is eligible for transfer.

The requesting Team Member must be a full-time, non-probationary Team Member with at least 12 months of HMMA service as of the date of the posting. The Team Member requesting transfer must not have transferred within the last twelve (24) months.

Any corrective action at the Commitment Discussion level or above will result in the denial of a Team Member's transfer request or promotional request. When two or more Team Members have identical length of service dates, the Team Member identification number will be used as the tie breaker. The Team Member with the lowest length of service identification number will be awarded the transfer. Team Members will not be considered for any transfer that would result in conflict with the HMMA Employment of Relatives Policy.

To assure that adequate skill levels are maintained in each department, all transfer requests will be evaluated based on operational viability.

Any Team Member who submits and is awarded a transfer request must accept the transfer. The Team Member who receives a transfer shall be prohibited from another transfer for a period of twenty-four (24) calendar months. This period shall begin as of the actual date the award of transfer notification is given. A Team Member who transfers will be required to reschedule vacation time previously approved. A Team Member who transfers to a new department will assume high overtime hours on that team for overtime equalization purposes.

## SOLICITATION, DISTRIBUTION, & POSTINGS

HMMA prohibits the solicitation, distribution and posting of materials on or at HMMA property by any Team Member or non-HMMA Team Members, except as may be permitted by this policy. The sole excep-

ions to this policy are charitable and communi activities supported by HMMA and HMMA-sponsored programs d to HMMA products and services.

Non-HMMA Team Members may not solicit Team Members or distribute literature of any kind on HMMA premises at any time. Team Members may only admit non-HMMA Team Members to work areas with HMMA approval or as part of a HMMA-sponsored program. These visits should not disrupt workflow. The HMMA Team Member must accompany the non-HMMA Team Member at all times. Former Team Members are not permitted onto HMMA property except for official company business. Team Members may not solicit other Team Members during work times, except in connection with a HMMA-approved or sponsored event. Team Members may not distribute literature of any kind during work times, or in any work area at any time, except in connection with a HMMA-sponsored event

The posting of materials or electronic announcements are permitted with approval from the Director of Human Resources. All team communication boards located in team areas are intended for team related instruction and production-related materials only. Violations of this policy should be reported to the Director of Human Resources.

## TEAM MEMBER WORK CONDUCT

It is the policy of HMMA that Team Members maintain a working environment that encourages mutual respect, maintains fellow Team Members dignity, promotes civil and congenial relationships among Team Members and is free from all forms of harassment and violence.

Team Members are expected to conduct themselves in an appropriate manner as judged by a reasonable person at work, at all HMMA functions, and also in the community. Team Members have the right to conduct their work without disorderly or undue interference from other Team Members. HMMA prohibits Team Members from violating the rights of their co-workers.

HMMA encourages a congenial work environment of dignity and respect as well as professionalism. Therefore, HMMA prohibits Team Members from intentionally harming or threatening to harm other Team Members, clients, vendors, visitors or property belonging to any of these parties.

Team Members are responsible for maintaining their work area in a neat and professional manner.

Team Members are responsible for assuring the security of HMMA confidential/proprietary material in their possession and similarly maintaining the security of HMMA provided equipment. Team Members concerned for the security of their work area or equipment must inform their supervisor of such concerns.

HMMA reserves the right to search locked, unlocked and/or publicly

30

---

sed HMMA property at any time without consent. HM may request a search of personal property at the worksite or locked HMMA property assigned to an individual if there is reasonable suspicion that evidence of illegal or prohibited activities resides therein. Refusal of such a request may result in corrective action up to and including termination.

## CORRECTIVE ACTION

The intent of corrective action is to provide a consistent way to address unacceptable attendance, performance, or conduct. Corrective action is designed to allow Team Members formal notice and the opportunity to correct any performance deviations from HMMA's acceptable standards.

The following corrective action procedures will be taken by HMMA's management in order to address a Team Members' inability to meet HMMA's standards regarding attendance, performance, or conduct. Corrective action applies to exempt Team Members at the specialist level and below, non-exempt administrative Team Members and all production Team Members, including maintenance Team Members. A team relations representative will be available and must attend each phase of the corrective action procedure. The steps are as follows:

### Discussion Planner

Once it has come to the group leader and/or manager's attention that a Team Member's performance does not meet HMMA's performance standards, the group leader and/or manager will meet with the Team Member. This discussion is designed to gather facts about the performance issue and is to be a two-way conversation. The group leader and/or manager is to explore whether the performance issue is failure in the process, equipment, or with the Team Member.

- Equipment Problem. The group leader and/or manager will investigate and seek help in resolving any equipment problems.
- Process Problem. The group leader and/or manager will investigate and seek help in resolving any process problems.
- Team Member's Performance. Inform the Team Member of performance expectations and explain potential ramifications if the poor performance continues.

### Informal Discussion – Phase I

Phase I of corrective action is to address minor performance problems. The intent of Phase I is to bring the performance problem to the Team Member's attention through an Informal Discussion. The group leader and/or manager is responsible for conducting the Informal Discussion. The team relations representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion between the Team Member and the group leader and/or manager that identifies the nature of the problem and the possible solution.

31

If the performance problem is corrected and no additional problems develop during the following twelve months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

### Formal Discussion – Phase II

The Formal Discussion is the 2nd phase of corrective action and is to be used for more serious performance issues, or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of corrective action. The Team Member will be given a Formal Discussion letter. Attendees at the Formal Discussion phase are the group leader and/or a member of management, team relations representative and the Team Member. The group leader and/or production management Team Member will prepare a Formal Discussion document addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion letter will be removed from the Team Member's file and will not be used for any future corrective action.

### Commitment Discussion – Phase III

The Commitment Discussion is the 3rd phase of corrective action. This phase will be used if a Team Member's performance continues to be unacceptable or the Team Member commits a serious action that requires a higher level of corrective action.

A Commitment Discussion is a formal meeting, which is conducted with the affected Team Member; his/her group leader and/or manager, team relations representative, the team relations manager, and the appropriate production management Team Member. The purpose of this phase of corrective action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's performance problem. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem.

The Commitment Discussion letter and the Team Member's commitment letter will remain in the Team Member's personnel file for a period of 24 months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion letter and the Team Member's action letter will be removed from the Team Member's personnel file and will not be used for any future corrective action.

### Decision Leave – Phase IV

The Decision Leave is the 4th phase of corrective action. This phase may be taken if the Team Member fails to correct the performance problem after the Commitment Discussion or if it is determined that the Team Member's performance is serious enough to warrant action beyond a

32

Commitment Discussion.

The affected Team Member will meet with his/her group leader and/or manager, team relations representative, team relations manager and the appropriate production management Team Member for a formal meeting. The Team Member will be given the following day off with pay. The Team Member will be asked to use this time to make a final decision whether or not he/she wants to remain employed by HMMA.

If the Team Member decides to return to work and commit to correcting his/her performance, the day off will be excused with pay.

Information regarding a decision leave will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem, and no additional performance problems develop, it will be removed from the Team Member's personnel file and will not be used for any future corrective action.

Corrective action will be administered sequentially with regard to all attendance performance situations. Specific performance-related issues regarding performance, quality, and conduct will be evaluated on a case-by-case basis, and corrective action may be applied based on the severity of the performance issue. Any Team Member whose employment is terminated by HMMA may be entitled to request a Peer Review Panel Hearing.

### Termination

HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we never have to terminate a Team Member's employment. However, in situations where a Team Member **refuses** to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member will be terminated. Every termination decision will be reviewed by the team relations manager, the Team Member's manager, and the Director of Human Resources to review all facts and information before a termination decision is made.

Notwithstanding anything to the contrary contained in this handbook, every Team Member's employment with HMMA is voluntary and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA.

### SERIOUS MISCONDUCT

33

HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment immediately.

In serious misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Letter of Conditional Employment which will remain in the Team Member's file for 36 months. Upon issuance of a letter of conditional employment, the affected Team Member, group leader, team relations representative, team relations manager and the appropriate management Team Member will have a formal meeting. Following this meeting, the Team Member will develop an action plan and make a written commitment to successfully implement that plan.

Listed below are some examples of activities that constitute serious misconduct at HMMA:

- Serious and/or excessive violations of HMMA's attendance program.
- Serious and/or excessive violations of HMMA's performance standards.
- Threatening or fighting on HMMA's premises, at HMMA sponsored functions, or while conducting business away from the plant.
- Disclosing, misusing or removing from the premises any HMMA or fellow Team Member's property unless authorized.
- Use, possession, sale, transfer of or being under the influence of illegal drugs, alcohol or any other intoxicating substance at any time on HMMA property. Gifts of alcohol and/or coolers containing alcohol are also prohibited at HMMA.
- Deliberate damage to HMMA property or the property of a fellow Team Member.
- Intentionally misrepresenting or falsifying any information concerning employment or any report or HMMA record.
- Engaging in any form of discrimination in the workplace, including racial or sexual harassment of a fellow Team Member or harassment by a person in a supervisory position of a Team Member under the supervisor's authority.
- Insubordination, including refusing to perform a work assignment or refusing to follow direction of HMMA security or safety personnel.
- Deliberately trying to conceal serious quality problems in HMMA products.
- Deliberately using unsafe work practices that might seriously jeopardize the health or safety of the Team Member or a fellow Team Member.

- Use, possession, sale or transfer of a weapon at any time on HMMA property.
- Engaging in illegal activities such as gambling or trafficking stolen goods.
- Deliberately violating HMMA's Solicitation and Distribution Policy.
- Deliberately spreading false or malicious rumors or slandering or libeling a fellow Team Member, HMMA or an HMMA product.
- Leaving the plant without proper authorization (note: this is also considered a voluntary resignation).
- Chronic violations of HMMA's Safety Rules or Procedures.
- Willful violations of HMMA's Lockout/Tag out, Confined Space Procedures or other situations where the violation places the Team Member or others in immediate danger.

The aforementioned list is not all inclusive.

## WORKPLACE THREATS AND VIOLENCE

This policy applies to any Team Member and/or person that make substantial threats, exhibits threatening behavior, or engages in violent acts on HMMA property or makes threats, exhibits threatening behavior, or engages in violent acts relating directly or indirectly to any work activities.

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors, or other individuals by anyone on HMMA property will not be tolerated (zero tolerance).

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors or other individuals relating directly or indirectly to work activities including phone calls, written materials, behavior at HMMA-sponsored activities will not be tolerated. Firearms, ammunitions, knives, bows or any other types of weapons are not permitted on HMMA property which includes the parking area(s).

In the event that violations of this policy are substantiated, HMMA will initiate a decisive and appropriate response. This response may include, but is not limited to: suspension or termination of any business relationship, reassignment of job duties, suspension or termination of employment, and/or seeking arrest and prosecution of the person or persons involved. Any violation of this policy will be considered serious misconduct. Any Team Member terminated pursuant to violations of this policy shall not be subject to the Team Member Review Board process.

Any Team Member that has knowledge of or witnesses threats, threatening behavior or an actual incident or violations of this policy is required to report the information to his/her immediate supervisor and/or the manager of security and/or his/her Team Member relations representative.

## TEAM MEMBER RESOLUTION PROGRAM AND

## PROCEDURE

In any organization there can be differences of opinion about working conditions, work rules and policies, and other work-related issues. To resolve these differences effectively, communication is essential. This program is designed to enhance communication by providing a formal process to resolve legitimate disputes. HMMA will provide a prompt, orderly means of receiving and responding to Team Members' concerns. This program and procedure is intended to supplement, rather than discourage or replace, informal discussions between supervisors and Team Members. A supervisor should make every reasonable effort to resolve Team Members' concerns outside the formal Team Member Resolution Procedure.

The Team Member Resolution Program and Procedure is available to all full-time Team Members who have successfully completed their probation period. The Team Member Resolution Program and Procedure is not available to individuals employed in a temporary status or to employees of any contracted services provided to HMMA. The initiation of the Team Member Resolution Procedure in good faith by Team Members shall not adversely affect their standing as Team Members.

The Team Member Resolution Program consists of **four steps**, which are outlined below.

Outside counsel will not be permitted to attend any of the meetings. However, appropriate witnesses may be permitted to attend with approval from the manager of team relations.

### Step 1: Supervisory Level

#### Team Member's Role

The Team Member should contact the team relations representative to coordinate a meeting in order for the Team Member to verbally present the concern to his/her supervisor within five (5) working days of the original cause for the appeal, or from the date the Team Member learned the cause for the appeal.

#### Supervisor's Role

The supervisor will meet with the Team Member and the team relations representative and respond verbally to the concerned Team Member within five (5) working days.

### Step 2: Resolution Request

#### Team Member's Role

36

If a Team Member does not agree with the supervisor's verbal response, he/she should contact a team relations representative for a Resolution Request Form. The team relations representative will give the Team Member the form and assist the Team Member in filing the form if necessary. The team relations representative will forward the Resolution Request form to the Team Member's section manager and coordinate within five (5) working days of receiving the answer to Step 1. The team relations representative will attend the meeting.

#### Section Manager's Role

The section manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The department manager will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the department manager will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 3: Resolution Appeal

#### Team Member's Role

If a Team Member does not agree with the department manager's response, he/she should contact a team relations representative. The Team Member must make a written request stating he/she does not agree with the department manager's response and request to go to the next step. The team relations representative will forward the request to the team relations manager and coordinate a meeting within five (5) working days of receiving the answer to Step 2. The team relations representative will attend the meeting.

#### Manager of Team Relations Role

The team relations manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The manager of team relations will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the manager of team relations will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 4: Resolution Final Appeal

The Resolution Final Appeal is the last step of the process. The committee's written response is the final decision and cannot be appealed. The committee cannot change or alter any approved policy.

37

## Team Member's Role

If the Team Member is not satisfied with the decision of the team relations manager, he/she will give written notice, within five (5) working days of receipt of the Step 3 written response, to the team relations representative stating his/her wish to initiate the final step of the Resolution Appeal Process.

## Top Management's Role

The manager of team relations will coordinate and facilitate a meeting consisting of three of HMMA's top management within 10 days of the request. HMMA's top management representatives will meet with the Team Member and allow the Team Member to present his/her facts to the final appeal committee.

The committee may ask questions and/or speak to any witnesses as they feel may be necessary to reach a final decision. The Team Member filing will be notified of the committee's final decision in writing within 5 business days of the resolution meeting.

A Team Member may withdraw an appeal at any time. Once withdrawn, however, it may not be reinstituted. If the Team Member does not meet the time constraints outlined in this policy, Team Member Resolution request decisions will remain as defined by prior actions.

The procedure as outlined describes the normal course in which resolution requests are resolved. Team Members should note that the Team Relations Department is available to provide Team Member consultation on a problem and any other assistance at any time prior to or during the Team Member Resolution Procedure.

**Team Members cannot file a Team Member Resolution Request against a policy they feel is unfair. However, a Team Member may file a Team Member Resolution Request regarding a policy that is not implemented properly.**

## TEAM MEMBER REVIEW BOARD

The Team Member Review board is to allow those Team Members who feel they have been wrongfully terminated to request a review of that termination by a random selection of trained and qualified fellow Team Members. Any Team Member terminated for any reason except for violations of HMMA's policy on workplace threats and violence, drugs and alcohol, and the anti-harassment policy will have the right to appeal the termination to a Team Member Review Board.

## DRUGS, ALCOHOL AND WEAPONS PROHIBITED

HMMA is committed to maintaining a drug, alcohol and weapon free workplace for all Team Members in order to ensure the safety of all those working at our facility and at all HMMA sponsored events. The illegal

38

use, sale or possession of narcotics or illegal drugs, alcohol or controlled substances while on the job or on HMMA property (which includes parking areas) is prohibited and is a dischargeable offense. Any illegal substance will be turned over to the appropriate law enforcement agency and criminal prosecution may result. HMMA also considers off-the-job illegal drug use as proper cause for disciplinary action up to and including termination of employment.

Any Team Member convicted of driving under the influence which results in the suspension or revocation of his/her driving privileges and who, in the course of his/her job duties, is required to operate a motorized vehicle, including fork lifts, must notify the manager of the department. The suspension or revocation of a driver license will result in a job reassignment either temporarily or permanently. Any job reassignment will be to an open position only.

HMMA's business involves manufacturing, use of powered equipment, engineering, procurement, and project management. Therefore, the safety of our Team Members and facilities, as well as the safety of the general public and our ability to fulfill our obligations under the Drug-Free Work Place Act of 1988, are of paramount concern.

While HMMA has no intention of intruding into the private lives of its Team Members, HMMA does expect Team Members to report for work in a condition that allows them to perform their duties without jeopardizing their own safety or the safety of other Team Members. HMMA recognizes that Team Members' off-the-job, as well as on-the-job, involvement with drugs and/or alcohol can have an impact on the workplace and on our ability to accomplish our goal of a drug and alcohol-free work environment.

HMMA will take steps to prevent and discourage the use, possession, sale, or distribution of stated contraband at any time by any HMMA Team Members or contracted vendors. In accordance with this policy, periodic searches, random or annual urinalysis, drug screening or blood testing may be conducted. Such searches and testing will be performed by HMMA using qualified contracted agents or qualified management Team Members.

Any Team Member who is taking medication prescribed by a physician must be able to provide a record of the prescription, including the name of the medication, the prescribing physician's name, and any limitations the prescription may place on the Team Member's ability to perform assigned duties. Furthermore, Team Members taking prescription or non-prescription medication are responsible for being aware of any potential effect such drugs may have on their reactions, judgment, or ability to perform their duties, and if impairment is possible, to report such use to their group leader/manager or HMMA's medical clinic prior to reporting to work.

Any refusal by a Team Member to submit to a search or testing procedure may, however, constitute grounds for termination. The primary

39

purpose of this policy is to promote the safety and well-being of all Team Members. It would be inconsistent to promote a strong safety effort while allowing the use of drugs and alcohol or the possession of drugs, alcohol and/or weapons on HMMA property to undermine the safe and effective performance of Team Members on the job.

Each applicant for employment will be required, as a condition of employment, to undergo a urine drug screen/hair analysis. Applicants will be asked to read the policy and sign the post offer employment offer and Team Member consent to alcohol and drug screening. If an applicant tests positive and is determined to be in violation of this policy, applicant will be ineligible for employment.

## FOR CAUSE TESTING AND RANDOM TESTING

Each Team Member, as a condition of continued employment, is subject to medical or physical examination or tests, including urine drug screen and/or a drug screen using hair, at the determination of the responsible group leader, department manager and concurrence of the HMMA team relations manager and/or his/her designee, providing the following conditions are met:

- If the Team Member's group leader and/or manager has reasonable cause to suspect that the Team Member is in violation of this policy; or
- If the Team Member's job performance is deficient in a manner which suggests a possible violation of this policy; or
- If the position is designated as a safety sensitive and/or high risk occupation; or
- If the Team Member is selected at random for testing in order to monitor and ensure compliance by all Team Members with this policy. The random selection will be done centrally by HMMA's medical facility. Team Members will be asked to sign the Pre-Employment Offer and Team Member Consent to Alcohol and Drug Screening form.

If a Team Member tests positive for a random and/or for-cause testing and is determined to be in violation of this policy, the Team Member will be required to:

- attend a substance abuse program
- follow the attending physician and/or a qualified substance abuse counselor's guidance
- agree to random testing over the next 12 months
- supply HMMA's medical clinic with documentation of treatment and/or documentation that no further treatment is necessary
- agree to remain substance free as a condition of employment
- be responsible for any cost incurred that is not covered by HMMA's medical plan for treatment
- voluntarily resign if the Team Member subsequently tests

40

positive for any subsequent illegal or un-prescribed substance and or being under the influence of alcohol.

Any adulterated specimen will be viewed as falsification and will result in immediate termination.

Any Team Member requesting rehabilitation assistance will be referred to the Team Member Assistance Program (TMAP) provider for assessment and treatment recommendations. The TMAP provider will monitor the program and advise HMMA of the Team Member's progress. Should the Team Member fail to maintain satisfactory progress or discontinue the program, the Team Member will be subject to termination.

Any Team Member who refuses to submit to drug testing will be considered to be insubordinate and will be terminated. Additionally, if a Team Member refuses to submit to or cooperate with a post-accident blood or urine test, he/she may forfeit his/her right to recover workers' compensation benefits.

HMMA recognizes that drug abuse and/or dependency are medical/behavioral conditions that can be successfully treated. Team Members with drug problems are encouraged to request assistance from the Team Member Assistance Program. Participation in TMAP is totally voluntary and completely confidential; however, a request for assistance or participation in a TMAP does not excuse a Team Member from violation of this policy.

HMMA reserves the right to conduct unannounced searches of its property, vehicles, and facilities, including Team Member's vehicles, work areas, desks and lockers assigned to Team Members, at any time. No Team Member has the right to interfere with or object to such searches of HMMA property based on expectations of privacy or otherwise. HMMA reserves the right to search personal property belonging to its Team Members, such as, but not limited to, lunch boxes or bags, pocketbooks or briefcases if such property is brought onto HMMA premises or into HMMA vehicles.

All Team Members will be required to sign a statement acknowledging their understanding of and compliance with HMMA policy.

## PUBLIC RELATIONS

To ensure that all information given to the public and the media is consistent, beneficial and accurate, it is important that the Public Relations Department coordinates and controls all information going out externally. If you are contacted by the news media and asked for information about HMMA or if you are asked to comment about HMMA, you are to refer the interviewer to the Public Relations Department. You may not release any information about HMMA business or activities unless you have been specifically authorized by the Public Relations Department.
## INTERNAL COMMUNICATIONS

41

Communication at HMMA is a key factor to our success. In order to maintain good communications, HMMA has established various avenues of communicating information to the Team Members. Additionally, and just as important, are the avenues that have been created to allow you, the Team Member, to communicate to HMMA. It is important to keep the avenues of communication open. By communicating we can all be successful. Even though we have many avenues for communication at HMMA all Team Members are encouraged to communicate with their group leaders and managers. Some of those methods are:

**Open-Door Policy**

HMMA believes that each Team Members should have the ability to address problems as they arise personally. As with all companies, misunderstandings, differences of opinions and disagreements occur. If issues and concerns are not addressed in a timely manner those issues of concern can damage your relationships and affect all the parties involved. HMMA wants, and encourages all Team Members to openly communicate with one another to resolve misunderstandings, differences of opinion and disagreements. One way that we can resolve these issues is by having open communications with one another and the ability to discuss issues and concerns openly.

Unfortunately, there may be times when an agreement cannot be reached. In these situations HMMA wants every Team Member to know that through the Open-Door Policy they can address these issues in order to achieve a fair and practical solution.

Any member of the team relations department will assist you should a concern or issue were to arise.

Again, HMMA encourages all Team Members to discuss the situation in a respectful manner with the party involved. If a resolution is not reached, discuss the situation with the next level of management. The Open-Door Policy is meant to be used in a systematic fashion and may be pursued to the top levels of HMMA's management.

**Bulletin Board**

HMMA has bulletin boards at all entrances and exits. These bulletin boards are for communicating work related information, information required by law, and job postings. Additionally, each team will have a bulletin board; these boards are for work related communications only. Team Members are prohibited from posting any information or notices directly on any bulletin board at HMMA.

**President's Roundtables**

42

The President's Roundtables provide HMMA's Team Members an opportunity to meet and talk with HMMA's President as well as our Executive Vice Presidents. Team Members will be selected randomly on a bi-monthly basis and sent invitations to attend the meetings. Participation is voluntary; however each Team Member is encouraged to attend so that they can communicate directly with the President.

**Group Leader/Managers One-on-Ones**

Each group leader/manager will meet with each Team Member twice a year. In a company the size of HMMA it is difficult at times for the two to get together and have a casual conversation. HMMA feels that developing these relationships is important and helps foster open communication. These meetings will be held away from the production work areas and are meant to be an opportunity for The Team Member and group leader/manager to have a 15 minute casual conversation.

**Manager Lunches**

The managers lunches are another opportunity for a team to get together in a casual setting were the manager/assistant manager of the department meets with each team in their department every six months and provides lunch. Participation is voluntary. The purpose of these meetings is to continue to foster open communication, and promote a team spirit as well a felling of family within the department. The meeting is held during the normal lunch period and is unpaid time.

**Team Advisor**

The Team Advisor is a bulletin that will be issued to the team to communicate important information to the teams. The Team Advisor will be issued on an as needed basis to each team leader so they can read the information during the Five Minute Communication meeting. Once the bulletin has been read it will be posted for a specified time in order to allow Team Members to read it at their leisure.

**Hyundai Communication System (HCS)**
**334-387-8008**

HMMA has established the HCS in order to allow Team Members an opportunity to ask questions in the event their group leader, team relations representative or another member of management has been unable to answer your question or concern. This means of communication is done anonymously, by calling the HCS. The HCS does not record the extension or phone number from which the call came. HMMA encourages Team Members to talk with their managers first, but in the event you need to ask a question, make a comment, or voice a concern on a confidential basis, we also encourage you to call the HCS.

The HCS will be available 24 hours a day, seven days a week. Your call will be directed to the Director of Human Resources and or his designee.

43

The Director of Human Resources will review the question and/or comment and direct them to the most qualified person. If you leave your name and want a personal response, a meeting will be scheduled if you request one. Every effort will be made to make sure all replies are given within ten working days of receiving the call.

Anonymous calls will be posted with the answeres on the HCS boards for a period of five days. We also ask everyone to be patient. Some calls may contain complex issues that require more time in order to answer them accurately.

### HMMA Closed Circuit Television System (CCTV)

HMMA CCTV System is an internal video system that will be used to broadcast HMMA information to all Team Members daily.

### HMMA Weekly News

HMMA Weekly News is a weekly summary of company-related information. The HMMA Weekly News will be distributed every Monday on a weekly basis.

### HYUNDAI Insights

Hyundai Insights is a newsletter that will be sent to the Team Members home on a biweekly basis. This news letter will keep you and your family informed about what is going on at HMMA as well as what is going on at HMC and HMA.

### Five Minute Communication Meetings

Each team will have a five minute communication meeting at the start of each shift. The purpose of this meeting is to provide the Team Members with information pertaining to production, quality, or safety. These meetings may also be used to discuss sales, benefits, policy updates, or other pertinent information the team may need to know. All Team Members must be in their assigned meeting area ready for work at the start of their shift.

## COMMUNITY RELATIONS

### Speeches

HMMA receives many requests for speeches about our company from a variety of groups. If your organization is not-for-profit and would like a representative from HMMA to speak to a group, you or your organization needs to submit in writing the following information: All requests must be on the group's letterhead.

- Requested date of speech
- Time
- Location
- Name of Group

44

- Topic you would like covered
- Background information on the organization
- Person to contact with their phone number or email address

All requests must be turned in at least one month prior to the requested date for the speech and should be addressed to the manager of public relations.

### Tours

All family and public tours must be scheduled through the Public Relations Department.

## GENERAL INFORMATION

### Electronic Devices

HMMA has a responsibility to protect every Team Member as well as to protect HMMA assets. The automotive industry is a very competitive industry, and in order to protect its Team Members and proprietary information, HMMA must control what types of electronic devices are allowed in the workplace.

In order to ensure the health and safety of all Team Members, personal radios, televisions, tape recorders, and tape/CD/mp3 players are not permitted anywhere in the facility.

### Camera/Video Camera

In situations where a department uses a camera/video camera in order to conduct investigations, the department must have approval by the Security Department and must have a camera/video camera pass attached to the camera/video camera at all times. If a supplier has a need that requires the use of a camera/video camera in order to conduct an investigation or to assist in the function of their job duties, he/she must gain written approval from the responsible department. The written approval must be submitted to the Security Department for approval and verification from the responsible department. Once the Security Department has approved the use of a camera/video camera, Security personnel will issue a temporary camera/video camera pass. The camera/video camera pass must be attached to the camera/video camera.

Any camera/video camera without a camera/video camera pass will be confiscated, held in security and returned to the owner as they exit HMMA's premises, minus its film.

Personal camera/video cameras and camera/video phones are not permitted within the plant, nor will pictures be allowed during general tours. Business situations may require photos to be taken in the plant, but when these situations occur, only Team Members with an approved camera/video camera pass using a HMMA-owned camera/video camera will be

45

**Cell Phones/Pagers**

HMMA reserves the right to issue cell phones and/or pagers for business reasons to those individuals that have been approved in order to conduct HMMA business matters.

Personal cell phones and pagers will be allowed in the facility. However, cell phones and pagers must be kept in the Team Member's locker or desk during work times. In addition, the devices must have the volume muted while being stored. Team Members may use their cell phones and/or pagers during breaks and lunch periods only, and the Team Member must be in a designated break area.

**Audio Tape Recorders**

Audio tape recorders are prohibited on HMMA premises. In situations where an audio tape recorder is needed a request for approval must be submitted to and approved by the Director of Human Resources or his/her designee.

Any violation of the aforementioned could result in corrective action up to and including termination. Any violation by a non-HMMA Team Member could result in their being asked to leave the premises and the film, tape, disk, and/or any other type of device capable of storing audio or video information will be confiscated and/or memory erased.

**HMMA TOOLS**

HMMA has supplied each Team Member with the tools as well as state of the art equipment needed to perform their daily job functions. Each Team Member is responsible for the care and upkeep, and inventory of tools and other equipment issued by HMMA. These tools and equipment are not to be removed from the appropriate HMMA work area. Personal tools must not be brought into HMMA.

Intentional damage to any HMMA tooling or equipment is subject to corrective action up to and including termination.

**LOCKERS**

HMMA will provide each Team Member with a locker so that they may store personal items. However, these lockers should not be used to store money or valuables. HMMA will not be responsible for anything that is destroyed, lost or stolen from any locker.

Lockers will remain the property of HMMA at all times. HMMA maintains the right to inspect any locker and its contents at any time with or without notice if it is believed the locker (s) contain items contrary to HMMA policy. This includes but is not limited to items such as firearms, explosives, dangerous or lethal weapons, alcohol, illegal drugs, or missing HMMA property.

**CAFETERIA**

HMMA provides two dining facilities for our Team Member's convenience. HMMA has designed each of our dining facilities so that you can experience a clean and pleasant area while dinning. Prepared meals will be served daily. However if you choose to bring your own meal our dining facilities have ample seating for everyone. Team Members will also find vending machines located throughout the facility if you wish to purchase food or drink.

**SMOKING**

In an effort to provide safe and comfortable work conditions, HMMA prohibits smoking and/or the use of smokeless tobacco products in all production facilities and administrative areas. Team Members who use tobacco products should respect all areas designated as "no smoking," limit their tobacco use to those areas where and when smoking is permitted (outside of the facility and only during breaks and dinner/lunch), and dispose of all smoking materials/smokeless tobacco products in proper containers.

Smoking or the use of smokeless tobacco is only permitted during non-work times. This is outlined as follows: one 10-minute paid rest period in the first half of the shift, one 10-minute paid rest period in the second half of the shift and during the unpaid lunch period. In case of overtime work, an additional 5-minute rest period for each full hour (60 minutes) of overtime can be taken. There are some jobs where there are no set scheduled break times, such as maintenance, administration, etc. It is understood that these Team Members still fall with the guidelines of taking only a 10-minute break in the first half of the shift, and a 10-minute break in the second half of the shift.

HMMA intends to consistently enforce the smoke free environment policy described in this document. Any HMMA Team Member violating this policy is subject to corrective action up to and including termination.

**TELEPHONE CALLS**

All HMMA phones are for business purposes only. Team Members are not allowed to use HMMA phones for personal business. However, if an emergency situation should arise, the Team Member is to contact their group leader/manager and/or another member of management in order to use a HMMA phone.

All emergency phone calls into HMMA will be forwarded to the appropriate area. HMMA's Team Members and their families are very important and considered HMMA's extended family. Each Team Member should supply their family members with an emergency contact number for their work area, as well as the department they work in, the group leader/ manager's name, and make sure their family knows that the contact information is for emergencies only.

46

47

# EXHIBIT  2
# JOSHUA GROVES DEPOSITION EXCERPTS

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3      NORTHERN DIVISION

4

5 LARRY SMITH,

6    Plaintiff,
         CIVIL ACTION

7   VS.
         FILE NO. 2:06-CV-966-ID-SRW

8

9 HYUNDAI MOTOR MANUFACTURING
  OF ALABAMA, LLC,

10

11    Defendant.

12            **ORIGINAL**

13    *  *  *  *  *

14

15   TELEPHONIC DEPOSITION OF JOSHUA GROVES,

16 taken on behalf of the Plaintiff, pursuant to the

17 stipulations set forth herein, before Jeana S.

18 Boggs, Certified Court Reporter and Notary Public,

19 at the apartment of Joshua Groves, 400 Park Avenue,

20 Park Place, Apartment 601, Foley, Alabama,

21 commencing at approximately 10:00 a.m., Wednesday,

22 September 26, 2007.

23

```
1        November 22nd, 2005.  Do you remember that
2        discussion?
3    A   No, ma'am.  Maybe you need to refresh my
4        memory.
5    Q   Okay.  Do you remember when Mr. Smith and I
6        came to Wal-Mart here in Montgomery and
7        talked with you?
8    A   Yeah.  I remember you-all coming to
9        Wal-Mart, but I don't remember what we
10       discussed.
11   Q   Okay.  All right.  Let me ask you this:
12       When you were first hired, what was your
13       position at Hyundai?
14   A   At Hyundai?
15   Q   Right.
16   A   PDI parts.
17   Q   Okay.  And what did you do?
18   A   Rode around on a cart delivering parts and
19       taking inventory of scrap parts.  And
20       immediate supervisor had been Reggie
21       Johnson.
22   Q   I didn't hear that last part.
23   A   And my immediate supervisor was Reggie
```

```
 1       Johnson.

 2  Q    Okay.  All right.  And how long did you do

 3       that?

 4  A    I would say three months.

 5  Q    Okay.  And were you transferred to another

 6       department?

 7  A    Not at that time I wasn't.  I was moved into

 8       onto the line -- onto the assembly line from

 9       there, and they let a Robert Churchwell take

10       over the parts part of it.

11  Q    Okay.  Is there a reason why you changed

12       positions?

13  A    Yes, ma'am.  First, I changed to the line

14       because I wanted to -- I wanted to learn how

15       to do the assembly part of it.

16  Q    Okay.  And that's the only reason?

17  A    Yes, ma'am.  As far as I know.  Yeah, that's

18       the only reason I moved to the line is I

19       wanted to learn how to put gas caps on and

20       all the other stuff.

21  Q    Now, when you were working on the line, was

22       Larry Smith on the line as well?

23  A    Yes, ma'am.
```

```
 1   A    Well, I am sure it was, but I can't remember

 2        exactly when or how or whatever.

 3                    (At which time there was a

 4                    brief interruption.)

 5        THE WITNESS:  Hello?

 6        MRS. DICKEY:  I'm sorry.  My cell phone

 7             went off.

 8        THE WITNESS:  Okay.  We back?

 9   Q    Did you ever tell Reggie Johnson to kiss

10        your ass?

11   A    I wouldn't use profanity but, you know,

12        nothing to that extent.  You know, I pretty

13        much argued with him a lot because me and

14        him had a disagreement about certain things,

15        and I pretty much told him to kiss my rear

16        end, yes, ma'am.  That I can tell you I told

17        him to do, but I didn't say no kiss my, you

18        know, A-S-S because, you know, profanity

19        wasn't used out there.

20   Q    Okay.  Did Scott Whettington have you go

21        into his office and write down what you had

22        told to Reggie?

23   A    Yes, ma'am.
```

```
 1   Q    Okay.  Did you talk with him?

 2   A    Yes, ma'am.

 3   Q    Okay.  How many others were on that line?

 4   A    Oh, boy, I would say 20 or more.

 5   Q    Okay.

 6   A    Quite a bit.

 7   Q    Was Michael Harris on that line?

 8   A    Off and on, yes, ma'am.

 9   Q    Okay.  Did you and Michael Harris have an

10        altercation at work one day?

11   A    As far as altercation like exchange of

12        words, yes, ma'am.

13   Q    Okay.  Can you tell me about that?

14   A    Well, I'll just tell you we had an

15        altercation.  I don't know exactly what it

16        was about or how it ended or whatever, you

17        know, because that was like, what, four

18        years ago, three years ago.  Yeah, but I can

19        tell you we had an altercation.

20   Q    All right.  And describe to me what do you

21        think an altercation is.

22   A    Well, to the point of almost physical

23        contact is an altercation.
```

```
1              MR. BOSTICK:  Thank you.

2    BY MRS. DICKEY:

3    Q    Okay.  Explain who you reported it to.

4    A    Reggie Johnson.

5    Q    All right.  And what's the procedure when

6         something like that occurs and you report to

7         Reggie Johnson?  What happens?

8    A    I don't know.  I have no idea.

9    Q    So, when you reported it to Reggie Johnson,

10        you never heard anything else about it?

11   A    No.

12   Q    Who is Reggie Johnson's supervisor?

13   A    Reggie Johnson?  That would be -- what's

14        that guy's name -- Michael Lashley I

15        believe.

16   Q    Okay.  Okay.  And did you -- Were you in the

17        same line of supervision with Scott

18        Whettington?

19   A    Yeah.  Scott Whettington was over the whole

20        PDI department.

21   Q    Okay.  Did you at any time -- or was there

22        an occasion when you and Reggie Johnson

23        exchanged words?
```

1   Q   Okay.  Do you know what he did with that

2       writing?

3   A   I have no idea.

4   Q   Did you sign it and date it?

5   A   Yes, ma'am.

6   Q   Okay.  And as far as you know, you left it

7       with Scott Whettington, but you don't know

8       what he did with it after that?

9   A   Right.

10  Q   Okay.  Was there any disciplinary action

11      taken for you arguing with your superior?

12      That superior is Reggie Johnson.

13  A   No.  No.  Not that I know of, no, ma'am.

14  Q   Okay.  Was that something that happened a

15      lot?  I mean, did you and Reggie disagree a

16      lot?

17          MR. BOSTICK:  Object to the form.

18          THE REPORTER:  Noted.

19  A   No.

20  Q   Okay.  All right.  Now, on November 22nd,

21      there was an incident involving Reggie

22      Johnson and Larry Smith.  On that day, you

23      were on the line.  Do you remember observing

```
 1        from the line.  I don't know what that is in

 2        there, where you go and you would request

 3        days off and stuff like that.  I don't know

 4        if that's Scott's office or not, but it says

 5        "PDI" on the door.

 6   Q    And my understanding is that you were in the

 7        general vicinity when Larry Smith and Reggie

 8        Johnson had this discussion, whatever it is;

 9        is that right?

10   A    Right.

11   Q    But you didn't hear, or did you, any

12        specific words that were said by either of

13        them to the other?

14   A    No specific words, sir.

15   Q    Do you know -- I would have to use the word.

16        Did you hear Mr. Smith use the word "nigger"

17        during that argument?

18   A    No, sir.

19   Q    Did you hear him the phrase "nappy-headed

20        nigger"?

21   A    No, sir.

22   Q    Okay.  Regardless of what was actually in

23        the statement was basically what you said
```

| | | |
|---|---|---|
| 1 | | both of them having an argument about it, |
| 2 | | but I don't know exactly what words was said |
| 3 | | because I wasn't close enough to hear it. |
| 4 | | So -- and I know after that, you know, it |
| 5 | | was, like, maybe that same day he got |
| 6 | | removed from the line -- Larry Smith did. |
| 7 | Q | Okay.  Did anyone call you -- or let's say, |
| 8 | | did Scott Whettington call you into his |
| 9 | | office and ask you questions about what you |
| 10 | | observed? |
| 11 | A | Not to my knowledge. |
| 12 | Q | Okay.  So, you didn't talk to anybody about |
| 13 | | that? |
| 14 | A | No, ma'am. |
| 15 | | MR. BOSTICK:  Object to the form. |
| 16 | | THE REPORTER:  Noted. |
| 17 | A | No. |
| 18 | Q | Okay.  How far away were you from Larry |
| 19 | | Smith when this occurred? |
| 20 | A | Well, I don't know.  I don't know what the |
| 21 | | distance is between the moving part of the |
| 22 | | line and the metal grade that connects into |
| 23 | | the concrete is, but I would say a good four |

```
 1        or five feet.

 2   Q    Okay.  And from that distance, could you

 3        hear either Scott Whettington or Larry

 4        Smith?

 5             MR. BOSTICK:  Object to the form.

 6   A    No.

 7             THE REPORTER:  Noted.

 8   Q    Okay.  Thank you.  Joshua Groves, did you

 9        ever see or observe Scott Whettington's

10        temper?

11   A    What?  Say that again.

12   Q    Did you ever observe Scott Whettington

13        losing his temper?

14             MR. BOSTICK:  Object to the form.

15   A    Losing his temper?

16   Q    Yes.

17   A    Well, you know, people lose their temper all

18        the time, so, I mean, I am pretty sure I

19        did.  But, you know, I can't remember

20        anything, like, anything that would, like,

21        stick out like a sore thumb as far as losing

22        your temper, you know?

23   Q    Are you saying that people or employees lose
```

| | | |
|---|---|---|
| 1 | | THE REPORTER:  Noted. |
| 2 | A | Not to my knowledge, ma'am. |
| 3 | Q | Okay.  All right.  Now, going back, you told |
| 4 | | me earlier that you reported to Reggie |
| 5 | | Johnson this incident between you and |
| 6 | | Michael Harris? |
| 7 | A | As far as I can remember, yes, ma'am. |
| 8 | Q | Okay.  What did you tell Reggie? |
| 9 | A | That Michael Harris was talking to me all |
| 10 | | kind of different ways I believe.  You know, |
| 11 | | there's a lot of that I don't remember.  You |
| 12 | | know, I do remember talking to him.  I don't |
| 13 | | remember exactly what all was discussed |
| 14 | | because it was, like, three years ago. |
| 15 | Q | Right.  I understand that.  But it was |
| 16 | | important enough to you that you wanted to |
| 17 | | report it? |
| 18 | A | Right.  Right.  Because it upset me.  I do |
| 19 | | know that.  So... |
| 20 | Q | All right.  Did you and Michael Harris get a |
| 21 | | three-day suspension? |
| 22 | A | Not -- not to my knowledge -- not to my |
| 23 | | memory.  I don't know.  You know, I honestly |

```
 1        don't know if we did or didn't, you know.
 2   Q    Did you ever get suspended while you were at
 3        Hyundai?
 4   A    Yes, ma'am.
 5   Q    All right.  Can you tell me when you were
 6        suspended and the reason?
 7   A    Not exact days I can't, but I can tell you
 8        why I was suspended.
 9   Q    Okay.
10   A    That was, you know, attendance.
11   Q    Okay.  How many times were you suspended for
12        attendance?
13   A    Once as far as I can remember, but it may
14        have been twice.  I am not for sure.
15   Q    Okay.  All right.  I have no other
16        questions, Joshua.  Thank you.
17   A    Thank you, ma'am.
18                  CROSS-EXAMINATION
19   BY MR. BOSTICK:
20   Q    I have a few for you, Joshua.  This is Brian
21        Bostick.  I am an attorney for Hyundai.
22   A    Yes, sir.
23   Q    How are you doing?
```

| | | |
|---|---|---|
| 1 | A | Doing all right, sir. |
| 2 | Q | Can you tell me what your race is, just |
| 3 | | because we need that for the record. |
| 4 | A | You need my race for your record?  That's |
| 5 | | fine.  I am a Caucasian male, sir. |
| 6 | Q | Okay.  And let me ask you about this:  When |
| 7 | | you were talking earlier about a situation |
| 8 | | where you were asked to give a statement, a |
| 9 | | written statement -- |
| 10 | A | Okay. |
| 11 | Q | -- did you say Scott Whettington asked you |
| 12 | | to do that? |
| 13 | A | Yes. |
| 14 | Q | Who else was present when you were asked to |
| 15 | | do that? |
| 16 | A | As far as my memory serves me, it would be |
| 17 | | Reggie Johnson. |
| 18 | Q | Anybody else? |
| 19 | A | Maybe Mike Lashley.  You know, man, all this |
| 20 | | stuff happened, like, years ago, dude.  My |
| 21 | | memory is not that good. |
| 22 | Q | You know, I am not asking you to guess.  The |
| 23 | | only thing, if you don't know, that's fine. |

1    Division of Alabama; that the foregoing colloquies,

2    statements, questions and answers thereto were

3    reduced to 33 typewritten pages under my direction

4    and supervision; that the deposition is a true and

5    accurate transcription of the testimony/evidence of

6    the examination of said witness by counsel for the

7    parties set out herein; that the reading and signing

8    of said deposition was waived by witness and counsel

9    for the parties.

10           I further certify that I am neither of

11   relative, employee, attorney or counsel of any of

12   the parties, nor am I a relative or employee of such

13   attorney or counsel, nor am I financially interested

14   in the results thereof.  All rates charged are usual

15   and customary.

16           This the 5th day of October, 2007.

17

18

19

20   Jean S. Boggs, CCR
     ACCR NO. 7
21   Certified Court Reporter and
     Notary Public
22   Commission expires: 8/7/2010

23

# EXHIBIT 3
# LARRY SMITH DEPOSITION EXCERPTS

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.



1     IN THE UNITED STATES DISTRICT COURT

2         MIDDLE DISTRICT OF ALABAMA

3             NORTHERN DIVISION

4

5   CIVIL ACTION NO. 2:06-CV-966-ID-SRW

6

7   LARRY SMITH,

8             Plaintiff,

9   vs.

10  HYUNDAI MOTOR MANUFACTURING, INC.,

11            Defendants.

12

13

14

15             DEPOSITION

16                OF

17           LARRY SMITH

18           May 22, 2007

19

20  REPORTED BY:   Gail B. Pritchett

21                 Certified Realtime Reporter,

22                 Registered Professional

23                 Reporter and Notary Public

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203

(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1    paperwork from him -- some paperwork from

2    him, but I didn't get it.  And I asked him

3    was there any other witnesses that -- was

4    there some witnesses that I could put

5    their names down to help me and to prove

6    that this fight took place between me and

7    him.  And he said I could tell you some

8    people, but it wouldn't do you any good,

9    they wouldn't help you.

10        Q.    He didn't give you any names?

11        A.       He wouldn't give -- he said it

12   wouldn't do any good to give me names,

13   they are not going to help you.

14        Q.    What was your job title at

15   Hyundai?

16        A.       PDI light repair.

17        Q.    Did you have a -- were you a

18   team member, was that your --

19        A.       Yes.

20        Q.    Okay.  Who was your immediate

21   supervisor?

22        A.       Reggie Johnson.

23        Q.    What was his title?
```

89

**TE** TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       A.      Team leader.

2       Q.      And who did he report to?

3       A.      At first it was I think

4    Michael Ashley, he is the group leader.

5    And then Scott was the manager. Scott

6    used to be group leader, but he got

7    promoted. So I think Reggie started off

8    reporting to Scott and then Scott got

9    promoted to plant manager, I guess that's

10   what it is.

11      Q.      Okay. And so when Scott was

12   plant manager --

13      A.      Uh-huh.

14      Q.      -- is there someone between

15   Reggie and him?

16      A.      Yes. Michael Ashley. He is

17   group leader.

18      Q.      What is Reggie Johnson's

19   title?

20      A.      Team leader.

21      Q.      And then what was your title?

22      A.      Team member.

23      Q.      Okay. Do you know what Joshua

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1       A.      Yes.  Looks like an
2   introductory to a new job, introduction to
3   new job and how much I will be making.
4   And I signed and dated it.
5       Q.      Is that your signature date of
6   April 11th of '05?
7       A.      Yes, it is.
8       Q.      Okay.  It says start date of
9   April 11th, 2005.  Is that consistent with
10  your recollection?
11      A.      That's exactly right.
12      Q.      Was that your starting salary,
13  fourteen forty-six?
14      A.      Yes, it was.
15      Q.      Okay.  When you started
16  working, was there a period of time where
17  you were being trained or -- tell me about
18  kind of your job assignments throughout
19  the --
20      A.      Well, when I first got there,
21  we wasn't making cars, so we had -- we
22  were practicing on dummy cars, so that was
23  our training right there.

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1   Q.     Okay.  And then what was your

2   -- what area were you initially assigned

3   to?

4   A.     PDI light repair.

5   Q.     Was that the same area you

6   were assigned to throughout the time you

7   worked there?

8   A.     Yes, I worked in the same

9   department the whole time.

10   Q.     Okay.  What does PDI light

11   repair do, if you are explaining it to a

12   lay person?

13   A.     Okay.  They make repairs on

14   the car while the line is moving.  When

15   the production line is in the process of

16   moving, you are -- every day when you come

17   to work, your team leader will assign you

18   to a specific duty, and that's what you

19   do.  And I was assigned to flushing and

20   gapping the right side doors on the cars.

21   When I got there, there was a

22   board that had one through ten.  Number

23   one means that -- number one meant that

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    Who were the people who were
2  doing that?
3    A.    One guy was Fonzy.  One of
4  them was Gary Myers.  And Bobby, Travis
5  and -- there was about four guys, but they
6  never bothered me.  They let me stay on
7  that one side because I was good at what I
8  did.
9    Q.    Okay.  And then Reggie Johnson
10  was your team leader, right?
11    A.    Yes, he was.
12    Q.    Was he your team leader
13  throughout the time you worked at Hyundai?
14    A.    When I first came there, I
15  believe Patrick was my team leader for a
16  short while, and he went -- got promoted
17  to group leader.  Then they moved Reggie
18  Johnson up.  Reggie was in the process of
19  being trained by -- Patrick was my first
20  team leader, I believe, and then he got
21  promoted to group leader.  And then Reggie
22  Johnson became team leader.  But I was
23  under Reggie for -- I mean Patrick for a

# ⅢE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Groves' job title was?

2         A.    He was a parts runner in PDI.

3    He would go back and forth on the orange

4    cart to get parts that we needed to put on

5    the cars that was damaged or needed to be

6    replaced.

7         Q.    Who was his team leader?

8         A.    Reggie Johnson.

9         Q.    Did Mr. Groves tell you he had

10   been terminated from Hyundai?

11        A.    I don't think we ever asked

12   that question.  I never asked that

13   question.

14        Q.    What paperwork were you trying

15   to get from him?

16        A.    I wasn't trying to get any

17   paperwork.  I was trying to get an answer

18   on a question from him, was he going to --

19   what was the question?  I want to make

20   sure before I -- to get it right.  Sign an

21   affidavit.

22        Q.    Did he sign it?

23        A.    No.

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1    A.    I got a letter from Wendy
2    Warner, and that's what he said.
3    Q.    Okay.  And then you say, "It
4    happened to a white coworker and he was
5    not fired, he was given a different job."
6    What is that referring to?
7    A.    Okay.  I probably didn't word
8    it -- well, it's worded, but -- that's
9    referring to Joshua Groves.
10   Q.    Okay.  Was he given a
11   different job?
12   A.    Yeah, he was transferred from
13   his normal job as a parts man because he
14   was being nonproductive, and he was put on
15   the line with me.  As torquing the doors
16   after I adjusted them, he was tightening
17   up the screws after I hit down and strike
18   them.
19   Q.    Okay.  And then are you saying
20   that he engaged in insubordination and
21   that that was a result of his move?
22   A.    No.  Insubordination took
23   place first when he cursed Reggie and told

**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   I told him about the vacation day.  He

2   went and got Reggie.

3       Q.     Tell me what Marcus Hannah --

4       A.     Marcus Hannah is the Team

5   Relations investigator.

6       Q.     Okay.

7       A.     He went and got Reggie and

8   brought him down there.  And Reggie told

9   me that I was supposed to have filled out

10  a swap, a half a day's swap.  And I knew

11  in order to get a vacation day, you have

12  to fill out a request form.  They have to

13  approve it.  Okay, I didn't know you have

14  to fill one out in order to get a day

15  moved.  I thought it went by seniority,

16  you know, whatever.  But he reassured me

17  that I had it anyway.  So I --

18      Q.     Who reassured you?

19      A.     Reggie Johnson.

20      Q.     Okay.

21      A.     And so I told -- when I asked

22  him about it, he said someone else had

23  gotten that day.  And I said well, you

## TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

 1      A.      Right.

 2      Q.      Okay.  Did Audie Swagman tell

 3 you -- what did he tell you about this

 4 committee?

 5      A.      He said it was made up of

 6 eight people, eight managers.

 7      Q.      Eight managers?

 8      A.      Uh-huh.

 9      Q.      Did he give you any particular

10 names?

11      A.      No.

12      Q.      Do you know what the name of

13 the committee was?

14      A.      No.

15      Q.      As you sit here today, do you

16 know who any of the people on that

17 committee were?

18      A.      Have no idea.

19      Q.      Okay.  You put on here you

20 were -- it says what reasons were given

21 for the actions taken, and you say,

22 "insubordinate and disrespectful."  Who

23 told you that?

# TE TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1   Reggie to kiss his a-s-s, he wasn't going
2   to do anything that Reggie didn't know how
3   to do.  And Reggie called Scott
4   Weddington, and Scott took Joshua in the
5   office and had him write out a statement
6   stating that he did tell Reggie to kiss
7   his a-s-s and he wasn't going to do
8   anything he didn't know how to do.  And he
9   gave him a verbal warning for that.
10          And then, I don't know, several
11  weeks later he was transferred off of his
12  parts running job and put on a line with
13  me because he was being nonproductive.
14          Q.    Okay.  And so did you
15  personally witness Joshua telling Reggie
16  to kiss his ass?
17          A.    Yes, I heard him say that.
18          Q.    Did you report that to
19  Weddington?
20          A.    No, I didn't have anything to
21  do with it.  Reggie reported it to
22  Weddington.
23          Q.    Did you observe any
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   what I feel.  That's what I believe.

2        Q.    Did you tell Audie Swagman or

3   Rob Clevenger -- during your meeting with

4   them, were you making any accusations of

5   race discrimination at that time?

6        A.    I'm trying to see if we got

7   into that fact.  Yeah, I told him.  I sure

8   did.

9        Q.    What did he say?

10       A.    Yes, I did.  I told Swagman

11  and Clevenger that Scott had stole that

12  car and he sent me home like that.  And I

13  told him about Joshua and what Joshua had

14  done, and he didn't do Joshua like he had

15  done me.  And I told him that was

16  discriminatory the way he treated me.  And

17  Joshua cursed his team leader out and was

18  transferred to another job for not being

19  productive.  And he didn't get the

20  treatment I got.

21            And also, you know, Joshua told

22  me he got into a fight with another

23  coworker, and they both got three days.

152

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      Q.    It says you had the flu and

2   went home early on the 21st.

3      A.    Uh-huh.

4      Q.    And the 22nd you have this

5   second -- this issue with Reggie.  Tell me

6   about what happened on that day.

7      A.    Okay.  When I came in that

8   day, I went to the doors -- well, Reggie

9   told me he was going to put Bobby doing my

10  job, flushing the right side doors.  He

11  wanted me to back him up.  Any doors that

12  was not fixed properly, he wanted me to go

13  behind him and correct him on both sides

14  of the car.  Okay, so I was -- I had a

15  hammer and a striker, those are the tools

16  you use.  So as the cars was coming down,

17  Reggie walked up behind me and told me,

18  Larry, repair that taillight right there.

19  And I said I don't have the tools to

20  repair the taillight with, and he knew

21  that.  And he said well, hold on a minute,

22  I will get you the tools.

23              So he brought me back a

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   Phillips screwdriver.  In order to change
2   a taillight, you have to have a Phillips
3   screwdriver, a ratchet and a socket.  All
4   the Phillips screwdriver will do is take
5   off the plastic panel, you know, the trunk
6   line.  But when you get ready to
7   physically take the light out, you have to
8   have a ratchet and extension.  Okay, he
9   didn't provide me with that.
10          And so Gary came up and said
11  hey, I have the tools to do this with, why
12  are you doing this?  And I said Reggie
13  told me to take the taillight out, and I
14  don't have the tools.  And then he says --
15  and then Gary tells Reggie, you know, I'm
16  doing this job, you know.  And he said no,
17  I want Larry to do it, I want Larry to do
18  it.  He said it in a loud way.
19          By that time I still don't have
20  the tools.  And then Carl walks up and
21  says, you know, why is he asking you to do
22  this taillight?  I said man, I don't know,
23  I don't have any tools.  And then Carl

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          A.      I guess.

2          Q.      Did you raise your voice with

3    Reggie?

4          A.      No, I did not.

5          Q.      Did you tell him that he was

6    -- did you call him crazy during your

7    conversation?

8          A.      No, I did not.

9          Q.      Did you tell him that nobody

10   likes you on this line?

11         A.      No, I did not.

12         Q.      Did you call him a liar or

13   back-stabber?

14         A.      No, I did not.

15         Q.      Did you call him a

16   nappy-headed nigger?

17         A.      No, I did not.

18         Q.      Okay.  What did you tell him

19   during that conversation?

20         A.      I told him I can't repair the

21   car because I don't have the tools to do

22   it with.  And he never brought me the

23   tools.  Never got them.

156

# ⅢE TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    So you never raised your voice
2    at him, is that your testimony?
3    A.    No.
4    Q.    Never used any words that were
5    inappropriate?
6    A.    No.
7    Q.    Never did anything
8    disrespectful is your testimony?
9    A.    No.
10   Q.    Tell me about what you recall
11   about Scott Weddington arriving on the
12   scene.
13   A.    Well, Scott came up -- well, I
14   was -- had my back turned, I was standing
15   at the car.  Scott rode up on a bike and
16   -- well, first of all, I heard yelling and
17   screaming behind me.  And I turned around
18   and it was him, and he was breathing heavy
19   and he had his hands made in a fist.  And
20   he said you get in that office right now.
21   And I looked at him and I said are you
22   talking to me?  And he said yeah, you get
23   in this office right now.

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          So I went in the office.  And

2     he said you sit down right there.  So I

3     sat down.  And he was outside.  Then he

4     came back in.  And he said I got four

5     witnesses that heard you call Reggie a

6     name -- something like that, calling him a

7     name.  And I said I haven't called Reggie

8     anything.  And then he said -- what did he

9     say after that?  He said -- I said you got

10    four people not telling you the truth.

11         And he said -- what did he say

12    after that?  He said something to the

13    effect that -- he said on my last job, I

14    had a supervisor get shot by a black man.

15    That's what he told me.  I said what?  And

16    then he said -- I said -- he said I had a

17    supervisor get shot on my last job by a

18    black man.  And then he said -- I said

19    what color was the man that got shot?  He

20    said white.  I said what does this have to

21    do with me?  He didn't say nothing.  I

22    said that doesn't have nothing to do with

23    me.  I never shot anybody in my life.  And

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1    then he said -- and I said --
2            Then I said furthermore, I
3    don't appreciate you disrespecting and
4    yelling at me and coming at me with
5    clinched fists in front of other
6    employees, my coworkers.  I said I have
7    never done anything wrong since I have
8    been here.  And then he apologized for
9    approaching me that way.
10           Q.     Now, he -- before Weddington
11   had gotten there, had Reggie asked you to
12   go in the office to wait for Weddington to
13   get there?
14           A.     No, no.
15           Q.     Had anybody asked you to go
16   sit in the office?
17           A.     No.
18           Q.     Were you -- how far were you
19   standing away from Reggie when Weddington
20   arrived?
21           A.     All I know -- I don't know.
22   Reggie went to the back.  He went to the
23   back.  He said stand right here until they
```

# ⅡE TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    turned in to the EEOC that says that.

2        Q.    Did he specifically say shot

3    by a black man?

4        A.    That's exactly what he said.

5        Q.    Was he telling you this in the

6    context that they had zero tolerance

7    policy for workplace violence?

8        A.    No.  He said that in front of

9    Reggie and -- in front of Marcus Hannah

10   and Maggie.  Nobody was in the office but

11   me and him when this occurred.

12       Q.    Was there some discussion

13   where he used the phrase zero tolerance?

14       A.    Yes, in the presence of Marcus

15   Hannah and Maggie Prestridge.

16       Q.    What did he say zero tolerance

17   for?

18       A.    He said zero tolerance for

19   talking in an aggressive manner to -- at

20   your supervisor and -- what else did he

21   say?  Name calling.

22       Q.    Or workplace violence, did he

23   say that?

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.      He didn't say anything about
2  being violent, not that I recall.
3      Q.      What else was said between you
4  and Scott in this conversation in the
5  office when nobody else was there?
6      A.      And I told him, I said how can
7  you talk to me about zero tolerance when I
8  haven't done anything wrong?  I have been
9  lied on.  And I said you supposed to
10  investigate something before you accuse
11  anybody of anything.  And I said if this
12  company had expressed zero tolerance when
13  you stole that car -- those car parts, you
14  never would be here to talk to me today.
15      Q.      Well, what is that in
16  reference to?
17      A.      He stole -- he stole parts to
18  the car that he -- the company gave him.
19  I saw him do it.  He complained that he
20  wanted leather seats instead of cloth
21  seats.  He said he wanted seventeen-inch
22  tires and rims.  He wanted a six-disc CD
23  player.  So he took the car and took it

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
 1    no -- it's like they gave him a chance to
 2    correct something wrong that he did.  And
 3    he was coming down on me like -- you know,
 4    just coming down on me really hard with
 5    the accusation that was made against me
 6    and forgot all about what he had done, you
 7    know.  You know, it's like he is perfect
 8    or something, like he never did anything
 9    wrong.
10         Q.    So you were going to point out
11    his flaws in this conversation is what
12    you're --
13         A.    No, I told the truth of what
14    he did.  And if they were to exercise --
15    when he mentioned zero tolerance to me
16    after what he had done, that was wrong.
17    Because if the company had demonstrated
18    zero tolerance and used zero tolerance
19    policy against theft, he would not have
20    been in there to talk to me and have that
21    conversation, because he would have been
22    terminated like he should have been.
23         Q.    You said you told him you have
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

```
1        A.     Other than he said he had four
2   witnesses.
3        Q.     Okay.  What do you recall
4   being said when Maggie and Marcus came
5   there?
6        A.     That's when he said about the
7   zero tolerance, and I told him that zero
8   tolerance -- how can you talk to me about
9   zero tolerance when you stole from the
10  company?  And then Marcus and Maggie said
11  oh, no, no, no, like that, and I said it's
12  true, you know.  And I said he needs to be
13  more humble than what he is.  You know,
14  they gave him a second chance and he's
15  going to come at me like that, I never
16  done anything wrong, haven't done anything
17  wrong today.  He needs to be more humble
18  and appreciative of what these people did
19  for him when he is trying to give
20  disciplinary action towards somebody else
21  that's not even been proven guilty on
22  anything when accusation has been made
23  against them.
```

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    Does Marcus -- and does he go

2    out and talk to the people in the plant?

3    A.    Yes, he does.

4    Q.    Okay.  Do you know who he

5    talked to?

6    A.    I saw him talking to -- I

7    didn't see him talking to anybody that I

8    can remember.  I was in the office and he

9    went outside and conducted that.

10    Q.    Okay.  And you say in here

11    that he was gone about an hour and

12    forty-five minutes?

13    A.    Yes, uh-huh.

14    Q.    What was -- was anybody in the

15    office with you during that time?

16    A.    I was by myself the entire

17    time.

18    Q.    What did Maggie do during that

19    time?

20    A.    Maggie listened and she didn't

21    say anything.  She was in there during the

22    meeting.  But on my way to going -- on my

23    way to the paint shop, when I asked not to

# TYLER EATON
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1      A.      Uh-huh.

2      Q.      What's the next thing that

3 happened?

4      A.      The next thing that happened

5 was Scott comes in and asked me can you go

6 back to work with Reggie?  I said I don't

7 want to work for Reggie anymore, can I be

8 transferred?  And he said okay, I will

9 find you a place to work.  And he left me

10 in there again and came back and told me

11 to go in the paint department for three

12 days and report back to him Monday

13 morning.  And they was trying to find me

14 another position somewhere in the plant

15 where I would not have to work for Reggie

16 anymore.  That was the process that was

17 going on to move me.

18      Q.      Okay.  And Marcus is the one

19 that tells you this, is that right?

20      A.      No, Scott is the one that told

21 me that.

22      Q.      Okay.  Scott is the one that

23 told you that?

One Federal Place  •  Suite 1020  •  1819 Fifth Avenue North  •  Birmingham, Alabama 35203
(205) 252-9152  •  Toll-Free (800) 458-6031  •  Fax (205) 252-0196  •  www.TylerEaton.com

1  didn't want me to infect everybody.  So I

2  went home and came back the next day.

3         I was told to report to the PDI

4  office -- wait a minute, now, let me make

5  sure.  Let me get this right now, hold on.

6  Yeah, that's right.  And I was told by

7  Scott to report to him in the PDI office,

8  and I did.  He told me that I was going to

9  be working on the other line adjacent to

10  our normal line.  This is our trim line

11  four, I believe, and they put me on three,

12  putting me on screws on a battery or

13  something.

14         But before I went there, he

15  told me where I was going to be working,

16  he told me to go get your stuff.  So I

17  went and got my gloves.  On the way to get

18  my gloves, Lisa Chumney approached me.  I

19  was going this way to the break area and

20  she was going this way (indicating).  And

21  she said Larry, what are they getting

22  ready to do to you?  And I just kept

23  going, I ignored her, you know, I didn't

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1   say anything to her.  And then when I got

2   to the break area, I turned around and she

3   walked up on me again, and she said what

4   are they getting ready to do to you?  I

5   said Lisa, I said, leave me alone, and I

6   said I heard what you said about me that I

7   should be fired, a friend of mine that was

8   concerned told me what you said about me,

9   and I said leave me alone.  She said I

10  didn't say anything about you.  I said

11  well, I believe him.  And I told her I

12  believed him, and then I walked away from

13  her.

14          And then she went back on the

15  line and -- I think she went back on the

16  line and worked a few minutes, because I

17  was standing over there getting my stuff

18  and just waiting.  And then she came back

19  a few minutes later and approached me

20  again, asked me who told me that.  And I

21  told her I'm not going to tell you.  And I

22  turned and walked away from her.  And then

23  all of a sudden I get called to the office

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1          A.      First meeting?

2          Q.      Yes, when he said here is your

3    new assignment.

4          A.      No.

5          Q.      Okay.  Tell me about the

6    second meeting where Lisa Chumney is

7    discussed.

8          A.      I was escorted by the new team

9    leader into the office with -- Marcus

10   Hannah was in there and Karen was in there

11   and Scott was in there.  And Scott had a

12   piece of paper in his hand, and he looked

13   at it and he said that Lisa Chumney said

14   you stepped toward her.  And I said what

15   do you mean stepped toward her?  And he

16   said you made a threatening move or

17   something like that, he said.  And I said

18   I haven't threatened Lisa Chumney

19   whatsoever.  I said Lisa Chumney was

20   pursuing me.

21              And I told him that Marcus

22   Hannah told me not to report anything that

23   went on in that office in there when we

201

# TYLER EATON

### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    Q.    What do you contend that you
2  told Scott Weddington during that meeting?
3    A.    I told him to stop screaming
4  and yelling at me.  And I asked Karen and
5  Marcus would they get -- would they ask
6  him to get himself under control.  And he
7  was -- and then Karen said you all need to
8  stop going back and forth.  I said I'm not
9  going back and forth with him, I'm just
10 asking you all to tell him to stop
11 screaming and yelling.  And he stood up
12 over the table -- he was sitting like we
13 are sitting right now, and he stood up
14 over the table and he grabbed his radio
15 off of his hip and he called security.
16          Team Relations didn't see the
17 need for security.  They are the ones that
18 are supposed to give out the disciplinary
19 action.
20    Q.    So security comes and gets
21 you?  Tell me about that walk to the front
22 door.
23    A.    I just walked to the car.

# TYLER EATON
**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

```
 1        Q.    What was your next contact
 2   with somebody from --
 3        A.    Audie Swagman called me the
 4   next morning and asked could I come in
 5   about 10 or 11 a.m., and I told him I
 6   would be there.  And when I got there, Rod
 7   Clevenger was in there with him.  And they
 8   asked me what took place, and I told them
 9   everything.  And Rod Clevenger said that
10   that was no way for Scott Weddington to
11   talk or treat anybody in the plant.  And I
12   wrote a statement that -- in the office
13   that I told Scott that he stole from the
14   company and it was wrong for him to talk
15   to me about zero tolerance when he had
16   stole from the company and wasn't
17   terminated for it.  And I signed it in the
18   presence of Audie Swagman and Rod
19   Clevenger.
20        Q.    Tell me about this statement.
21   Is it in your handwriting?
22        A.    Yes, it's in my handwriting,
23   and I signed it.  They didn't turn that in
```

# ℡ TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1  to the EEOC.

2      Q.    Who did you give that to?

3      A.    Audie Swagman. And then after

4  the meeting was adjourned, Audie Swagman

5  stood up and shook my hand and hugged me

6  and said you go home, don't tell your wife

7  and kids anything, I'm going to recommend

8  probation before the committee tomorrow,

9  you will be back to work tomorrow. And he

10  said keep your badge, here is my personal

11  card, if you have any trouble out of Scott

12  Weddington or Reggie Johnson, you

13  personally call me. And here is the card

14  that he gave. I have had -- and there is

15  my badge, still got it. And there is his

16  personal card he gave me right there.

17      Q.    Okay.

18      MR. BOSTICK: We will want

19  copies.

20      Q.    What did you have written on

21  the back of the statement --

22      A.    Just phone numbers. Probably

23  from jobs and stuff, trying to get jobs.

# ⅡΕ TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  anybody in the plant.

2      Q.    So I guess just -- I think we

3  talked about this earlier.  Did Swagman

4  tell you anything about the committee or

5  how that process would work.

6      A.    He said we will meet with the

7  committee in the morning and he would call

8  me in on second shift and I would be

9  coming to work, and recommending that I be

10 put on some type of probation.  He said it

11 would be probation.

12     Q.    But I gather from that he did

13 say it would be a recommendation?

14     A.    No.  He said I would be back

15 to work tomorrow and I will put you on

16 some type of probation, I will meet with

17 the committee in the morning.

18     Q.    He said I'm going to recommend

19 probation is what you put in your

20 statement.

21     A.    That's exactly what he said.

22 I will recommend probation.  I will meet

23 with the committee in the morning and get

# TYLER EATON

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  you back to work in the evening. See, I

2  worked in the evening. I was on the

3  evening shift. He was going to take care

4  of it the next morning and call me in to

5  work at 6. He was going to meet with the

6  committee that next morning.

7        Q.    Okay. Did you hear from him

8  that next day?

9        A.    No.

10        Q.    Did you go into the plant that

11  day?

12        A.    I wasn't allowed -- I didn't

13  go back, no.

14        Q.    Okay. Then you say eight days

15  later he called. This is Swagman, I

16  guess?

17        A.    Yes. I received a letter in

18  the mail and then he called.

19        Q.    Okay. What did Swagman tell

20  you during the telephone conversation?

21        A.    He said that I was terminated.

22        Q.    I mean, he said that -- your

23  statement says he said the committee voted

# ⅡⅬ TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  And also he got wrote up several times for

2  being tardy, and then eventually

3  terminated a few more times -- he was

4  written up twice, put on corrective phase

5  two.  And then a couple more instances of

6  being late, he was terminated.

7           They didn't give me one chance.

8  I didn't have a write-up in my file, no

9  verbal warnings, anything.  They treated

10 me less than a human being.  I didn't get

11 the treatment that he got.  And I wasn't

12 found guilty of doing anything wrong.  He

13 was.

14     Q.    Again, you don't have any

15 personal knowledge of what investigation

16 was conducted into Weddington or the car,

17 right?

18     A.    Audie Swagman told me when we

19 discussed it that Scott had received

20 disciplinary action for what he had done.

21     Q.    One of the allegations that's

22 in your complaint is hostile work

23 environment, which is saying that you have

**TYLER EATON**
TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1    telling the other manager that after the

2    heated argument.  And I was working on the

3    car as both of them was walking by.  And

4    he said let's go to the office and I will

5    buy you a soda.  The other one told Scott

6    he would buy him a drink.

7        Q.    Who was the manager?

8        A.    You know, I have his name

9    probably somewhere at home.  But he is

10   still there now.  He is a blond-haired

11   guy.  What is his name?  Craig something.

12   It's Craig something.  He got into a

13   heated argument with that tall dark-haired

14   Korean.  And that Korean is a plant

15   manager also.

16       Q.    Do you know what that person's

17   name is?

18       A.    I forgot.  I used to know it.

19   He is a real nice gentleman.

20       Q.    Is it your testimony today

21   that you heard Scott use the word

22   slant-eyes?

23       A.    Yes, uh-huh.  He said they

# TYLER EATON
### TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

1  need to get out of the plant. And also he

2  said they were dumb and stupid.

3      Q.    Did you ever see any other

4  interaction with Scott Weddington where he

5  said or did something that you contend was

6  racist or derogatory? I understand --

7  other than your particular incident that

8  we will talk about --

9      A.    Well, I heard him tell Reggie

10  one day when everybody was on the line

11  working what are y'all standing around

12  here with your thumbs up your a-s-s for?

13  And I thought that was, you know, uncalled

14  for.

15      Q.    Who would have heard that

16  statement?

17      A.    Well, he told Reggie Johnson

18  -- he told Reggie Johnson that, he got on

19  to him and told him -- told him what are

20  y'all standing around here with your

21  thumbs up your A for, like that. And I

22  overheard it, I was on the line working.

23      Q.    Who else was there?

One Federal Place • Suite 1020 • 1819 Fifth Avenue North • Birmingham, Alabama 35203
(205) 252-9152 • Toll-Free (800) 458-6031 • Fax (205) 252-0196 • www.TylerEaton.com

259

# TYLER EATON

**TYLER EATON MORGAN NICHOLS & PRITCHETT INC.**

1         C E R T I F I C A T E

2

3

4    STATE OF ALABAMA)

5    JEFFERSON COUNTY)

6

7         I hereby certify that the

8    above and foregoing deposition was taken

9    down by me in stenotypy, and the questions

10   and answers thereto were reduced to

11   typewriting under my supervision, and that

12   the foregoing represents a true and

13   correct transcript of the deposition given

14   by said witness upon said hearing.

15        I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action, nor am I in anywise

18   interested in the result of said cause.

19

20

21

22

23   COMMISSIONER - NOTARY PUBLIC

# EXHIBIT 4
# SCOTT WEDDINGTON DEPOSITION
# EXCERPTS

IN THE CIRCUIT COURT FOR THE

COUNTY OF MONTGOMERY

STATE OF ALABAMA


LARRY SMITH,

      Plaintiff,

   VS.


HYUNDAI MOTOR MANUFACTURING

of ALABAMA,

       Defendant.


\*        \*        \*

     DEPOSITION OF PAUL SCOTT WEDDINGTON, taken
on behalf of the Plaintiff, pursuant to the
stipulations set forth herein, before Talitha B.
Lovin, Certified Court Reporter and Notary Public,
at the offices of Alabama State Bar Association,
commencing at approximately 9:30, Wednesday, May
23rd, 2007.

7

1    questions about your department at Hyundai

2    and different positions.  Since I'm not

3    familiar with those I may mess up a few

4    questions.

5         State your name for the record,

6    please, sir.

7  A  Paul Scott Weddington.

8  Q  Mr. Weddington, have you given a deposition

9    before?

10  A  No, ma'am.

11  Q  And for the record, what is your race?

12  A  I am Caucasian.

13  Q  Are you still employed by Hyundai?

14  A  Yes, ma'am.

15  Q  What is your position?

16  A  Production manager, general assembly.

17  Q  How long have you had that position?

18  A  About 1.7 years, so since July of 2005.

19  Q  And what are your responsibilities as

20    production manager?

21  A  I'm responsible for the productivity of

22    manufacturing 73 units per hour. I'm

23    responsible for line balancing, which is

12

| | | |
|---|---|---|
| 1 | A | No ma'am, I was hired in January of 2004. |
| 2 | Q | And January 2004 you were hired into what |
| 3 | | position? |
| 4 | A | I was hired into the position of assistant |
| 5 | | manager, final PDI. |
| 6 | Q | What were your responsibilities as a PDI |
| 7 | | final assistant? |
| 8 | A | I was over the final assembly of the car. I |
| 9 | | had a group leader in the final area.  And |
| 10 | | I had a group leader in pre-delivery.  And |
| 11 | | I was over final assembly in the final |
| 12 | | area.  And I was over repair in the PDI |
| 13 | | area. |
| 14 | Q | In November of 2005, were you in Larry |
| 15 | | Smith's line of supervision? |
| 16 | A | Larry Smith reported to -- down the line, |
| 17 | | yes, but way down the line. |
| 18 | Q | Can you tell me where you were in that |
| 19 | | line? |
| 20 | A | Larry Smith reported to Reginold Johnson, |
| 21 | | who was a team leader. |
| 22 | Q | And then did Mr. Johnson report to you? |
| 23 | A | No, Mr. Johnson reported to Michael |

39

 1          they were not, no, ma'am.

 2    Q     Do you know how soon after that incident

 3          there was a termination?

 4    A     I don't know how soon, no, ma'am.  There

 5          was some time that went by.  I know it was

 6          greater than a week.

 7    Q     Have you ever been arrested?

 8    A     No, ma'am.

 9    Q     During your employment with Hyundai, have

10          you ever been suspended?

11    A     Yes, ma'am.

12    Q     When was that?

13    A     It was August -- end of August, beginning

14          of September 2005.

15    Q     And what was the reason for that

16          suspension?

17    A     Serious misconduct.

18    Q     What was the serious misconduct?

19    A     I followed an order from my senior manager

20          to put change parts out on my car; to put

21          scrap parts on a company car.

22    Q     How long was your suspension?

23    A     Three weeks.

16

```
 1          terminated in your department for serious

 2          misconduct?

 3    A     For serious misconduct --

 4               MR. BOSTICK:  Object to form.

 5    A     Prior to Larry?

 6    Q     (By Ms. Dickey) Well, the last time.  Was

 7          Larry the last time?

 8    A     No.  We had a workplace violence. I can't

 9          remember the exact date, but I think it was

10          back in December when we lost a team member

11          for a first time occurrence.

12    Q     What was the occurrence, what happened?

13    A     It was a Workplace Violence Investigation.

14          And I'm not on the investigative team or

15          the disciplinary team, so I don't know the

16          outcome.

17    Q     What triggers a Workplace Violence

18          Investigation?

19    A     Typically, it's a complaint to team

20          relations and then a team relations

21          investigation.

22    Q     Was there a Workplace Violence

23          Investigation involved with Mr. Smith?
```

17

```
 1    A    I'm not sure.  I mean, I don't instigate or

 2         take part in the Workplace Violence

 3         Investigations.

 4    Q    Who does that?

 5    A    Team relations.

 6    Q    And who is in charge of team relations?

 7    A    Rob Clevenger.

 8              COURT REPORTER:  Can you spell

 9         his last name, please?

10    A    Clevenger; C-L-E-V-E-N-G-E-R.

11    Q    (By Ms. Dickey) Was Reggie Johnson a team

12         leader in November of '05?

13    A    Yes, ma'am.

14    Q    Did you recommend him for that position?

15    A    No, ma'am.  Our promotion policy doesn't go

16         off recommendations.

17    Q    How does it work?

18    A    Team members apply to an open posting.

19         There's a posting made and team members

20         apply to a posting.  And after they apply

21         to a posting, they are given a peer review

22         by their fellow team members within their

23         team.  And they take a written assessment
```

20

1    refused and was very argumentative about

2    going to the back of the shop.

3         So Dan asked to tried to settle the

4    issue.  And he eventually called me and

5    said, "Can you come talk to this guy?"

6         So I stoped by, you know, and asked

7    Larry what was going on.  And said, "Hey,

8    can you help us out, make sure you go to

9    the back of the shop?  When we don't have

10   any cars to work on, on the line, we go to

11   the back of the shop and get rid of the

12   repair cars in the back."  And it was very

13   informal.

14   Q   When you had this informal discussion with

15       Mr. Smith, did he argue with you?

16   A   No, he didn't really argue with me.

17   Q   Is Dan Smith still employed at Hyundai?

18   A   Yes, ma'am.

19   Q   What is his position currently?

20   A   He is a team leader.

21   Q   In PDI?

22   A   In PDI.

23   Q   So he wasn't one of the three that got

# EXHIBIT 5
# AFFIDAVIT OF DARNELL SIMS

## AFFIDAVIT OF DARNELL SIMS

Before me, the undersigned notary public, appeared DERIC GOLDEN, who being by me first duly sworn, deposes and states as follows:

1.     My name is Darnell Sims, and I am over the age of nineteen years. I am a resident of the State of Alabama.

2.     I have personal knowledge of the facts contained in this Affidavit.

3.     If called as a witness, I could and would testify confidently to the matters set forth below.

4.     I was employed by Hyundai Motor Manufacturing of Alabama, as a assembly worker, from May 23, 2005 until I was unlawfully terminated on November 20, 2006.

5.     Gaylyn Davis, Caucasian, was my team leader. Aubrey Knoll, Caucasian, was my group leader. Scott Weddington, Caucasian, was manager over general assembly.

6.     I was accused of damaging a DC tool and terminated. That particular tool had been broken numerous times and nobody else was ever terminated.

7.     I was pulled off the line, taken to security and terminated without anyone ever discussing the broken tool with me. Reasons stated in a letter dated November 20, 2006, for my termination was that I allegedly damaged cabling on the DC tool on October 11, 2006 and October 23, 2006, and for allegedly being insubordinate. There was no discussion with me on either of these days for damaging the DC tool. This was a very common

occurrence.  Gaylyn Davis, Caucasian, broke various work tools and was never terminated.

8.     Gaylyn Davis showed preferential treatment to Caucasians.  Davis tried to hit me in my face.  I reported this, but nothing was ever done about it.  On another occasion when I was using the restroom, Davis went into the restroom, pulled on the stall door and threatened to bring team relations into the restroom.  A floater had taken my place to allow me time to use the restroom.  That was normal procedure.  I had just gotten into the restroom when Davis entered yelling at me.  I reported this incident to Aubrey Knoll, Caucasian manager, and he just said, "Darnell, what do you want me to do?"  I reported this incident to Scott Weddington. Weddington said he knew about it, but did not address the issue with me at all.

9.     Davis harassed me in this way on a daily basis.  She would look for any reason to yell at me.  On one occasion Davis would not give me safety gloves.  My fingers were sticking out of the gloves and I needed a new pair.  I observed Davis showing bias against African-American females.  I heard Davis on her radio (walkie-talkie) cursing.  Other employees who heard this.

10.    Scott Weddington allows Caucasian employees to break rules without consequences, but he is much harder on African-American employees. Weddington is not the only one in management to show preferential treatment towards Caucasian employees.

11.  Scott Weddington was issued a company car.  He upgraded this car with company materials and supplies, which was stealing from the company. He may have been suspended for a few days, but he was subsequently promoted to a management level position.

12.  In September of 2005 I was given a general, vague write-up.  I asked to have a copy of my file in order to understand this write-up, because I wanted to know what I had done.  Aubrey Knoll told me that it was confidential.  Five or six months later Davis allowed the person on day shift to take home the knee pads assigned to the station I worked, which left me without knee pads.  When I asked Davis why I had no knee pads, she said "because we don't have anything here at Hyundai for you" and walked away laughing.  I reported this to Aubrey Knoll and again his only response was "what do you want me to do?"  A few months later I reported it to Scott Weddington.  He didn't say anything.  I asked Weddington to move me to another station, but to no avail.

13.  I did not break rules at Hyundai.  I was never insubordinate to any of my supervisors.

14.  I declare under penalty of perjury pursuant to the laws of the State of Alabama the foregoing is true and correct to the best of my knowledge.

FURTHER, THE AFFIANT SAITH NOT.

Dated this the 24th day of September 2007.

Darnell Sims

STATE OF ALABAMA

COUNTY OF MONTGOMERY

On this the 24th day of September, 2007, before me, the undersigned Notary Public, in and for said State and County, personally appeared Darnell Sims, who is known to me, and states that the foregoing information is true and correct to the best of her information, belief and knowledge, and that she executed same voluntarily on the day the same bears date.

NOTARY PUBLIC

My Commission Expires: 06/28/2009

# EXHIBIT 6
# AFFIDAVIT OF DERIC GOLDEN

## AFFIDAVIT OF DERIC GOLDEN

Before me, the undersigned notary public, appeared DERIC GOLDEN, who being by me first duly sworn, deposes and states as follows:

1.     My name is Deric Golden, and I am over the age of nineteen years.  I am a resident of the State of Alabama.

2.     I have personal knowledge of the facts contained in this Affidavit.

3.     If called as a witness, I could and would testify confidently to the matters set forth below.

4.     I am currently employed by Hyundai Motor Manufacturing of Alabama, as a assembly worker.

5.     Darnell Sims and I worked on the same line for part of time she was employed by Hyndai.  Scott Weddington, Caucasian, was my immediate supervisor.  Weddington has been promoted to a management position and remains in my line of supervision.

6.     Darnell Sims was accused of damaging a DC tool and terminated.  That particular tool has been broken numerous times and nobody else terminated.  I witnessed Phil Rogers throwing the very same tool in the air.  It was hitting the ground hard.  I also observed Scott Weddington witness Phil Rogers throwing the tool in the air.  Weddington talked with Phil Rogers, but no disciplinary action was taken against him.

7.     Gaylyn Davis was the team leader for Darnell Sims' former line, and was mine prior to my move to another shift.  During the time that I was on the

same line, I observed Davis showing bias against African-American females. I heard Davis on her radio (walkie-talkie) cursing. Other employees who heard this. Weddington allows Caucasian employees to break rules without consequences, but he is much harder on African-American employees. Weddington is not the only one in management to show preferential treatment towards Caucasian employees.

8. Scott Weddington was issued a company car. He upgraded this car with company materials and supplies, which was stealing from the company. He may have been suspended for a few days, but he was subsequently promoted to a management level position.

9. I have observed Weddington lose his temper on more than one occasion. He gets very angry. His face gets red and he spits when he talks.

10. I declare under penalty of perjury pursuant to the laws of the State of Alabama the foregoing is true and correct to the best of my knowledge.

FURTHER, THE AFFIANT SAITH NOT.

Dated this the 26th day of April 2007.

_Deric Golden_

Deric Golden

STATE OF ALABAMA

COUNTY OF MONTGOMERY

On this the 26th day of April, 2007, before me, the undersigned Notary Public, in and for said State and County, personally appeared Deric Golden, who is known to me, and states that the foregoing information is true and correct to the best of her information, belief and knowledge, and that she executed same voluntarily on the day the same bears date.

NOTARY PUBLIC

My Commission Expires 6/28/09



**HYUNDAI**

Motor Manufacturing Alabama, LLC
700 Hyundai Blvd.
Montgomery, Al 36105



DEFENDANT'S
EXHIBIT

17
Smith

December 6, 2005

Larry Smith

5675 Valleybrook Ln.

Montgomery, Al 36117

Dear Larry:

It has been brought to my attention that on November 22, 2005 you conducted yourself in a disrespectful and insubordinate manner towards fellow Team Members and your management team. There was another incident of similar nature on November 28, 2005.

After thorough investigation it was determined that your actions are contrary to HMMA's serious misconduct policy and are considered insubordination.

HMMA policy states that insubordination is a serious misconduct violation. When a person commits an action such as this against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment.

Based on the aforementioned, I regret that I have no alternative but to terminate your employment, effective immediately. The benefits department will send COBRA information within the next two (2) weeks.

Sincerely,

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

Plaintiff EXHIBIT
7