IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:06cv966-ID |
| | ) | (WO) |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

In this lawsuit, Plaintiff Larry Smith ("Plaintiff"), an African-American male, brings race discrimination and retaliation claims against his former employer, Hyundai Motor Manufacturing Alabama, LLC ("Defendant"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII").  Plaintiff alleges that Defendant treated him differently than its Caucasian employees with regard to his termination and also that his termination was retaliatory.

Before the court is Defendant's motion for summary judgment which is accompanied by a brief and an evidentiary submission.  (Doc. Nos. 9-10.)  Plaintiff filed a response and evidence in opposition to the motion, and Defendant filed a reply.  (Doc. Nos. 13, 15.)  After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant's motion is due to be granted.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are adequately pleaded and not contested.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-

moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.


## IV.  FACTS[1]

Defendant operates an automobile assembly and manufacturing plant in Montgomery, Alabama.  Plaintiff, an African-American male, began working for Defendant on April 11, 2005, as a production team member in the Pre-Delivery Inspection ("PDI") area of the General Assembly Department.  He was an hourly-paid, non-supervisory employee.  Plaintiff's work on the production line involved primarily "flushing and gapping" the right side doors on the vehicles.  This job entailed using a rubber hammer and a striker to make the door flush with the rest of the car.  (Pl. Dep. at 88, 106-08, 110.)

The team leader in Plaintiff's area was Reggie Johnson ("Johnson"), an African-American male.  (Johnson Decl. ¶ 2.)  Although not a member of Defendant's

---

[1] The material facts are presented in the light most favorable to Plaintiff.

management team, a team leader is responsible for directing the activities and job assignments for the team members in his or her area.  In Defendant's supervisory hierarchy, a team leader reports directly to a group leader, who, in turn, answers to an assistant manager.  Each of these individuals works under a production manager.  At all pertinent times, Scott Weddington ("Weddington"), a Caucasian male, was the production manager in Defendant's General Assembly Department and, thus, was in Plaintiff's and Johnson's chain of command.  (Weddington Dep. at 7, 13); (Pl. Dep. at 112-13.)

On November 22, 2005, Weddington received a call from Johnson.  Johnson said, "I need you to get down here right now" because it "looks like" Plaintiff is "about to put his hands on me."  (Weddington Dep. at 23.)  At that time, Weddington was in a different area of the plant.  Believing that there was "a potential for a physical altercation," Weddington rushed to the production line.  (Id. at 24-25.)  When he arrived, Weddington observed Plaintiff and Johnson within "a few inches" of each other and saw Johnson "trying to back away."  (Id.)  Approaching with "clinched fists," Weddington screamed at Plaintiff and commanded him to go to the PDI office.  (Pl. Dep. at 156-58.)

Weddington, with assistance from Team Relations Representative Marcus Hannah ("Hannah"),[2] talked to Johnson and Plaintiff separately and received conflicting stories about the events which preceded Johnson's call to Weddington.  Johnson told Weddington that Plaintiff became agitated when he asked him to repair a tail light and

---

[2] As discussed below, Defendant's Team Relations Department is part of the Human Resources Division and investigates allegations of employee misconduct.

4

that Plaintiff lost his temper, yelled at him and called him a racially derogatory name. (Johnson Decl. ¶¶ 3-4); (Weddington Dep. at 21, 26-27); (Hannah Decl. ¶ 2.) Furthermore, Weddington said that, when he informed Plaintiff that Defendant had a "zero tolerance" for aggressive behavior, Plaintiff answered back, stating that Defendant did not have "zero tolerance" for stealing because Weddington stole company parts for his car, but was not fired. (Weddington Dep. at 27-28); (Ex. attached to Hannah Decl.) Plaintiff, on the other hand, denied that he raised his voice to Johnson or used any inappropriate words. (Hannah Decl. ¶ 3 & Ex. 1 attached thereto); (Pl. Dep. at 155-56, 164.) Hannah prepared a report summarizing his investigation of the November 22 incident. His investigation included not only interviews with Plaintiff and Johnson, but also interviews with several eyewitnesses. (Ex. 1 attached to Hannah Decl.) In his report, Hannah sought advice from the "Management Team" as to whether Plaintiff's behavior constituted "serious misconduct." (Hannah Team Relations Mem., dated Nov. 22, 2005.)

"Serious misconduct" is defined in Defendant's Team Member Handbook ("Handbook"). (Team Member Handbook at 33-35); (Def. Summ. J. Br. at 7.) The Handbook provides that

> [t]here are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against [Defendant] and/or his/her fellow Team Members, he/she may be terminated from employment immediately.

(Team Member Handbook at 34); (see also Pl. Dep. at 140-41); (Weddington Dep. at 42.)

The Handbook lists eighteen nonexclusive examples of "serious misconduct," including "[i]nsubordination."  (Team Member Handbook at 34-35.)

On disciplinary action was taken against Plaintiff as a result of the November 22 incident.  (Pl. Dep. at 148.)  Furthermore, at Plaintiff's request, Weddington moved Plaintiff temporarily to a different department.  (Id. at 173); (Weddington Dep. at 30-31.)

On November 28, 2005, when Plaintiff reported to work after the company-wide Thanksgiving break, Weddington informed Plaintiff that he was moving him permanently to the Trim Line 3 work area so that Plaintiff no longer would report to Johnson.  (Pl. Dep. at 180-81, 184.)  After his conversation with Weddington, Plaintiff went to retrieve his personal items to move them to his new work area.  Another team member, Lisa Chumney ("Chumney"), approached him, saying "Larry, what are they getting ready to do to you?"  (Pl. Dep. at 181); (Chumney Decl. ¶ 2.)  Having previously heard from another employee that Chumney thought that Plaintiff should have been fired as a result of the November 22 incident (discussed above), Plaintiff retorted, "I heard what you said about me that I should be fired."  (Pl. Dep. at 182, 187.)  When Chumney denied making the comment, Plaintiff indicated that he believed the co-worker, not Chumney.  (Id. at 181.)  Chumney left, but returned within the hour and began asking Plaintiff more questions.  (Carter Team Relations Mem., dated Nov. 28, 2005.)  Chumney also reported to Group Leader Michael Campbell and Johnson that Plaintiff had stepped toward her in an intimidating manner and that she felt physically threatened.  (Weddington Dep. at 47-48); (Chumney Decl. ¶¶ 3-4.)

6

The same day, Weddington was informed of Chumney's encounter with Plaintiff. Consequently, Weddington summoned Plaintiff to his office.  Hannah and Team Relations Specialist Karin Carter ("Carter") also were present.  (Pl. Dep. at 183); (Hannah Decl. ¶ 5.)  Plaintiff denied Chumney's report.  (Pl. Dep. at 183.)  During this meeting, Plaintiff stated that he believed that Weddington "harassed" him and that Weddington "did not like his kind."  (Carter Team Relations Mem., dated Nov. 28, 2005); (Pl. Dep. at 197-99.)  What transpired next is disputed.  Weddington, Hannah and Carter say that Plaintiff made several attacks against Weddington, at one point yelled, and in general acted disrespectfully.  As a result of Plaintiff's agitated behavior, Weddington requested security to escort Plaintiff out of the plant.  (Carter Team Relations Mem., dated Nov. 28, 2005); (Hannah Decl. ¶ 5.)  Plaintiff, though, says that Weddington yelled at him and, inexplicably, called security.  (Hannah Decl. ¶ 5); (Pl. Dep. at 201.)

Having been present during this meeting, Carter assessed that Plaintiff's behavior rose to the level of "serious misconduct."  (Carter Team Relations Mem., dated Nov. 28, 2005.)  From Carter's perspective, Plaintiff's conduct revealed a lack of "respect for [] leadership and peers," demonstrated a potential for "possible workplace violence in the future," and was "outside the boundaries violating [Defendant's] trust and respect policy." (Id.)  Based on her understanding that Plaintiff had engaged in "repetitive" conduct similar to that exhibited during the November 28 meeting, Carter recommended that Defendant's Termination Committee become involved.  (Id.)

Carter, as well as Hannah, is a member of the Team Relations Department which oversees investigations that involve "serious misconduct."  The employees in the Team Relations Department who participated in the investigation of Plaintiff's alleged misconduct included Hannah, Carter, Audie Swegman ("Swegman") and Assistant Manager Rob Clevenger ("Clevenger").  (Swegman Aff. ¶ 2); (Hannah Decl. ¶ 2); (Clevenger Decl. ¶ 2); (Def. Summ. J. Br. at 4, 8-9.)  Swegman, Clevenger and Carter are Caucasian; Hannah is African-American.

On November 29, 2005, having been apprised of Plaintiff's alleged inappropriate behavior on November 22 and November 28, Swegman and Clevenger telephoned Plaintiff and asked him to report to the plant to meet with them.  (Pl. Dep. at 202); (Clevenger Decl. ¶¶ 2-3.)  Plaintiff was given an opportunity to tell his side of the story. (Pl. Dep. at 205); (Clevenger Decl. ¶ 4.)  Plaintiff denied all accusations, cited some examples of what he described as preferential treatment of Caucasian employees, and stated that the "way" Weddington "treated" him "was discriminatory."  (Pl. Dep. at 239.) Swegman and Clevenger advised Plaintiff that they had to submit their findings to Defendant's Termination Committee, which would make a determination as to whether Plaintiff's actions constituted serious misconduct and whether termination was warranted. (Id. at 140); (Weddington Dep. at 36.)

8

The five-member Termination Committee reviewed the evidence gathered during the investigation.[3]  The Committee unanimously determined that Plaintiff's discharge was warranted on the following grounds:  (1) "[T]here were three incidents in a short period of time in which [Plaintiff] had lost his temper and acted unprofessionally and insubordinate";[4] (2) although Plaintiff had not "physically harm[ed]" anyone, Plaintiff "exhibited an inability to control his temper, which could only lead to trouble in the workplace"; and (3) Plaintiff "was insubordinate and disrespectful to his managers when they tried to talk to him" concerning the alleged misconduct.  (Clevenger Decl. ¶ 7.)

Swegman telephoned Plaintiff and advised him that the Committee had met and decided to terminate his employment.  (Pl. Dep. at 207.)  Plaintiff also received a letter dated December 6, 2005, from Warner, stating that he was being discharged.  (Pl. Ex. 7.) The letter explained, "[O]n November 22, 2005, you conducted yourself in a disrespectful and [an] insubordinate manner towards fellow Team Members and your management team.  There was another incident of similar nature on November 28, 2005."  Id.  The letter continues, "After thorough investigation[,] it was determined that your actions are

---

[3] The termination committee comprised the following individuals:  (1) John Kalson, director of manufacturing; (2) Wendy Warner ("Warner"), employment manager; (3) Greg Kimble, director of human resources; (4) Scott Gordy, employment assistant manager; and (5) Rick Neal, general counsel and legal director.  (Clevenger Decl. ¶ 6.)

[4] As stated, Plaintiff was cited with misconduct on November 22 and 28.  The third incident stems from Plaintiff's alleged behavior during the November 28 meeting in which Weddington, Hannah and Carter talked to Plaintiff about Chumney's report.

contrary to [Defendant's] serious misconduct policy and are considered insubordination. . . . I regret that I have no alternative but to terminate your employment."  (Id.)

On January 31, 2006, Plaintiff filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC").  He amended his charge on February 24, 2006.  The EEOC issued Plaintiff a right-to-sue letter on or about August 1, 2006.  On October 26, 2006, Plaintiff filed this lawsuit.  In Count One of his complaint, Plaintiff alleges race discrimination, asserting that Caucasian employees "committed offenses that violated company policies during the seven months . . . [Plaintiff] was employed by [Defendant], but were not terminated."  (Compl. ¶¶ 11, 15-16.)  In Count Two, Plaintiff alleges retaliation under Title VII.  (Id. ¶¶ 17-18.) Plaintiff requests reinstatement, compensatory damages, punitive damages and attorney's fees.  (Id. at 6.)

After Defendant filed its answer, it moved for summary judgment on all claims.  In its motion for summary judgment, Defendant argues, in part, that Plaintiff cannot establish a prima facie case of discrimination.  In response, Plaintiff points to Joshua Groves ("Groves"), a Caucasian male, and Weddington.  (See, e.g., Pl. Summ. J. Resp. at 2, 5-6.)

During his employment with Defendant, Plaintiff witnessed Groves, a "parts runner" and a fellow team member on the production line, tell Johnson that "he [Groves] wasn't going to do anything that [Johnson] didn't know how to do" and that Johnson could "kiss his a-s-s."  (Pl. Dep. at 142-43.)  Johnson reported Groves' conduct to

10

Weddington.  Weddington had Groves, who admitted making the remarks, write out a statement concerning exactly what he had said to Johnson.[5]  (Pl. Dep. at 143); (Pl. Summ. J. Resp. at 5); (see also Groves Dep. at 12 (confirming that Weddington required him to "write down what [he] had [said] to [Johnson]").  Plaintiff points out that the multifaceted definition of "serious misconduct," as set out in Defendant's Team Member Handbook, provides that "insubordination" includes an employee's "refus[al] to perform a work assignment" and that Groves' conduct fits this definition.  (Team Member Handbook at 34); (Pl. Summ. J. Resp. at 5.)  Plaintiff says, though, that Groves was not fired for his involvement in "serious misconduct," while Plaintiff was.  Groves merely received a verbal warning.  (Pl. Dep. at 143); (Groves Dep. at 12-13.)

Additionally, Plaintiff cites Groves' testimony that, while on the job, Groves had an "altercation" with Michael Harris ("Harris"), who was working on the production line.  (Groves Dep. at 9); (Pl. Summ. J. Resp. at 5.)  Groves said that the "altercation" stopped just short of "physical contact."  (Groves Dep. at 9.)  Groves reported this incident to Johnson, but Groves "never heard anything else about it."  (Id. at 10-11.)

---

[5] The court recognizes, as Plaintiff argues, that there are "inconsistencies and contradictions" as to the facts which the form the basis of this incident.  (Pl. Summ. J. Resp. at 6.)  In his declaration, for example, Johnson says that Groves never was "insubordinate" and never told him "to 'kiss his ass' or words to that effect."  (Johnson Decl. ¶ 5.)  Groves, in turn, testified that the words he used were "kiss my rear end."  (Groves Dep. at 12, 28.)  For present purposes, the court accepts Plaintiff's testimony concerning the content of Groves' statements and assumes also that Weddington was aware of the statements, see also infra footnote 9.

As stated, Plaintiff also compares himself to Weddington.  (Pl. Summ. J. Resp. at 14.)  In or around September 2005, Weddington was accused of placing upgraded scrap parts on his company car, a charge of "serious misconduct" under Defendant's Team Member Handbook.  (Weddington Dep. at 39.)  An investigation ensued.  Weddington was not discharged because Defendant determined that Weddington's supervisor had given Weddington permission to obtain and install the parts.  Weddington, however, received a written warning accompanied by a three-week suspension without pay, and he lost the use of his company car for one year.  (Weddington Dep. at 38-40); (Swegman Decl. ¶¶ 3-5.)

## V.  DISCUSSION

Defendant moves for summary judgment on Plaintiff's claims for race discrimination and retaliation under Title VII.[6]  Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race[.]"  42 U.S.C. § 2000e-2(a).  Title VII's anti-

---

[6] The complaint also contains a Title VII hostile work environment claim.  In his brief opposing summary judgment, Plaintiff fails to address Defendant's properly-supported motion as to this claim, and, accordingly, the court finds that Plaintiff has abandoned this claim and that the entry of summary judgment in Defendant's favor is appropriate.  See e.g., Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  The court also notes that, in the proposed pretrial order subsequently submitted to the court, Plaintiff stipulated that he was abandoning this claim.

retaliation provision, codified at 42 U.S.C. § 2000e-3, "forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge . . . in' a Title VII 'investigation, proceeding, or hearing.'" Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 126 S.Ct 2405, 2410 (2006) (quoting 42 U.S.C. § 2000e-3).

To survive summary judgment on his claims, Plaintiff must demonstrate that there is a genuine issue of material fact as to whether his former employer acted with discriminatory or retaliatory intent in terminating his employment. Hawkins v. Ceco Corp., 883 F.2d 977, 980-81 (11th Cir. 1989). Because this is not a direct evidence case, Plaintiff's Title VII race discrimination and retaliation claims are governed by the familiar McDonnell Douglas burden-shifting framework. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In the first McDonnell Douglas phase, the employee must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the employer unlawfully discriminated or retaliated against him in taking the alleged adverse employment action. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). Next, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason. St. Mary's Honor Ctr., 509 U.S. at 509. Finally, to avoid summary judgment, the employee must respond with evidence, which may include previously produced evidence establishing a prima facie case, which would allow a reasonable jury to conclude that the reason given by the employer was not the real reason

for the adverse employment decision.  See Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).

## A.  Race Discrimination

The parties proceed under the "similarly situated" comparator prima facie formulation applicable when an employee alleges that his discharge resulted from the employer's alleged racial animus in disciplining employees for violations of work rules. Under this formulation, an employee must show the following: (1) that he is a member of a protected class; (2) that he was qualified for the job; (3) that he suffered an adverse employment action; (4) that he "has engaged–either (a) disputedly or (b) admittedly–in misconduct similar to persons outside the protected class"; and (5) "that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment."  Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 n.6 (11th Cir.), modified on other grounds on denial of reh'rg, 151 F.3d 1321 (11th Cir. 1998); Lathem v. Department of Children & Youth Servs., 172 F.3d 786, 792 (11th Cir. 1999); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Attacking Plaintiff's prima facie case, Defendant asserts that Plaintiff has not demonstrated that a similarly-situated employee outside of his protected class engaged in

nearly identical conduct.[7]  Plaintiff disagrees, asserting that Groves and Weddington are proper comparators.  For the reasons to follow, the court agrees with Defendant.

Under the similarly-situated requirement of the prima facie case, Plaintiff bears the burden of demonstrating that Groves and Weddington are "similarly situated in all relevant respects."  Holifield, 115 F.3d at 1562.  "In determining whether employees are similarly situated . . ., it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  Id.  A "similarly-situated" employee is one who "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [his] conduct or the employer's treatment of [him] for it."  Anderson v. Twitchell, 76 F. Supp.2d 1279, 1286 (M.D. Ala. 1999) (citation omitted).  Although the comparator need not be identically situated to the plaintiff, the "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable

---

[7] For the purpose of the motion for summary judgment, Defendant has not challenged the other prima facie elements.

15

decisions and confusing apples with oranges."[8] Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999); see also Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001). For purposes of the prima facie showing, "[t]he most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Maniccia, 171 F.3d at 1368.

Moreover, in conducting the comparator analysis, a court must remain mindful that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules[.]" Maniccia, 171 F.3d at 1369 (internal quotations and citation omitted). For this reason, the employer's perception as to the severity of the employee's conduct is relevant in determining whether the employee and the comparator are similarly situated in all relevant respects. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1186 (11th Cir. 1984) (explaining that if an employer applies a rule differently to people it believes are differently situated, no discriminatory intent has been shown). When the plaintiff and the proposed comparator

_____

[8] In Burke-Fowler v. Orange County, Florida, the Eleventh Circuit observed that a prior panel "called into question" the "nearly identical" requirement. 447 F.3d 1319, 1323 n.2 (11th Cir. 2006) (citing Alexander v. Fulton County, 207 F.3d 1303, 1334 (11th Cir. 2000)). The Eleventh Circuit in Burke-Fowler, however, noted that it was "bound to follow Maniccia's 'nearly identical' standard rather than the standard articulated in Alexander because when a later panel decision contradicts an earlier one, the earlier panel decision controls." Id. (citing Walker v. Mortham, 158 F.3d 1177, 1188-89 (11th Cir. 1998)); see also Eggleston v. Bieluch, 203 Fed. Appx. 257, 264 n.5 (11th Cir. 2006) (holding that Burke-Fowler clarified the "confusion in the law of this circuit about the degree of similarity necessary for a valid comparator"). Herein, the court has applied the "nearly identical" standard, but notes that its findings would be the same even under the less stringent standard set forth in Alexander, *supra*.

are not similarly situated, the employer's decision to impose different punishment on each does not raise an inference of illegal discrimination.  See Lathem, 172 F.3d at 793.

### 1.  Groves

As stated, Plaintiff says Groves is a proper comparator, citing two instances of alleged misconduct by Groves.  First, Plaintiff points to Groves' testimony that Groves engaged in an exchange of heated words (described by Groves as an "altercation") with a fellow team member, Harris.  (Groves Dep. at 9.)  Second, Plaintiff says that he witnessed Groves tell Johnson that "he [Groves] wasn't going to do anything that [Johnson] didn't know how to do" and that Johnson could "kiss his a-s-s."  (Pl. Dep. at 142-43.)

Moving for summary judgment, Defendant argues that it is undisputed that Johnson "never reported any alleged misconduct by Groves" to management and that "'disparate discipline cannot be shown without first showing that the employer was aware of the comparator's misconduct.'"  (Def. Summ. J. Br. at 16 (quoting Vickers v. Federal Express Corp., 132 F. Supp.2d 1371, 1380 (S.D. Fla. 2000)).  Defendant also contends that, unlike Plaintiff, Groves did not "display[] multiple incidents of threatening behavior and insubordination within only a number of days[,]" and that, thus, Groves is not a proper comparator.  (Def. Summ. J. Br. at 1.)

Concerning the first incident, above, the evidence establishes that Groves reported his "altercation" with Harris to Johnson.  (Groves Dep. at 9-11.)  As Johnson is not a

17

member of management, and there is no evidence that Johnson reported this incident up

the line, Defendant is correct that evidence is lacking that a managerial decisionmaker

was aware of the altercation between Groves and Harris.  Weddington, though,

undisputedly is a member of management, and Groves testified that Weddington had him

write down a statement concerning the incident when Groves allegedly told Johnson to

"kiss" his derriere.[9]  (Groves Dep. at 12.)  Drawing the reasonable inferences in favor of

Plaintiff, see supra footnote 9, the court finds that there is evidence suggesting that

Groves' superior (Johnson) had knowledge of Groves' altercation with Harris and also

that Weddington was aware of Groves' subsequent run-in with Johnson.  For the reasons

to follow, though, the court finds that this evidence is insufficient to render Groves'

alleged misconduct sufficiently similar to Plaintiff's.

     There are critical distinctions between Plaintiff's misconduct and Groves'.  On

November 22 and November 28, Johnson and Chumney reported Plaintiff's conduct to

---

[9] Citing page twenty-three of the transcript of Groves' deposition testimony, Defendant says that Groves incorrectly testified (as transcribed on page twelve of the transcript) that he gave a statement to Weddington about the altercation with Harris and that Groves actually was referring to a written statement he provided concerning his observations of Plaintiff's and Johnson's encounter on November 22, 2005.  (See Def. Reply at 15 n.2.)  Construing the inferences from Groves' testimony in the light most favorable to Plaintiff, however, the court cannot rule out the inference that Weddington also had Groves write down a statement concerning Groves' altercation with Harris.  On page twelve, Groves expressly confirms that Weddington had him "go into his [Weddington's] office and write down what [he] had [said] to [Johnson]."  (Id. at 12.)  Because the topic of inquiry had changed by page twenty-three of the transcript of Groves' deposition testimony, the court finds that it is not as clear as Defendant says it is that Groves was recanting or clarifying his previous testimony (transcribed on page twelve).

superiors, claiming that they felt physically threatened by Plaintiff's behavior.  (Chumney Decl. ¶ 4, declaring that on November 28, 2005, she told Johnson and her group leader that she "felt threatened by [P]laintiff and that [she] did not want [Plaintiff] to take any more actions toward [her]"); (Weddington Dep. at 23, testifying that on November 22, 2005, Johnson exclaimed, "I need you [Weddington] to get down here right now" because it "looks like" Plaintiff is "about to put his hands on me.")  No similar such report was made concerning Groves.  Groves, not Harris, reported the "altercation" to Johnson. There is no evidence that Harris reported the incident at all, much less that he reported to anyone that he felt physically threatened by Groves as a result of the "altercation." Similarly, there is no evidence that Johnson informed any of his superiors that he believed that he was in physical danger when Groves confronted him on the day in question.

The evidence establishes that, at best, Defendant received information that Groves was involved in two nonphysically threatening conflicts, one with a co-employee (Harris) and one with a superior (Johnson).  On the other hand, Defendant received information that, on three occasions occurring within the time span of a week, Plaintiff's behavior was threatening and erratic.  Based on the foregoing facts, the court finds that Plaintiff's misconduct was worse than Groves' in both its nature and frequency.  Because Plaintiff

and Groves are not similarly situated, that Groves was not fired does not create an

inference of discrimination against Plaintiff.[10]


### 2. Weddington

Turning to Weddington, Plaintiff says that he and Weddington engaged in

"serious misconduct," as defined by the Team Member Handbook, yet Weddington was

not fired.  True, both Plaintiff and Defendant were accused of "serious misconduct" and,

consequently, were subject to immediate termination at Defendant's discretion, but, the

court finds that this is where the similarities end.  For the reasons to follow, the court

finds that Plaintiff makes the comparison in too general of terms for purposes of

demonstrating nearly identical misconduct.  See, e.g., Richardson v. Newburgh Enlarged

City Sch. Dist., 984 F. Supp. 735, 746 (S.D.N.Y. 1997) ("The level of generality at which

[plaintiff] attempts to compare the various instances of misconduct – i.e., 'poor

---

[10] The court is aware that Plaintiff vehemently denies that he engaged in the charged misconduct.  Even assuming that his accusers are lying through their teeth, however, this assumption does not help Plaintiff.  The incidents can be considered if Defendant "honestly believed they occurred."  Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1317 n.6 (11th Cir. 2003).  Stated slightly differently, to hurdle the similarly-situated prong of the prima facie case, Plaintiff must do more than deny the charges.  Cf. Jones, 137 F.3d at 1311 n.6 ("[N]o plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule.").  Plaintiff "must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better."  Id.  This Plaintiff has failed to do.

judgment'– is contrary to case law and would render disparate treatment analysis

meaningless.").

Initially, the court observes that the Handbook itself demonstrates that misconduct

which rises to the level of serious encompasses a broad range of activities.  Those

activities include excessive attendance violations, fighting, unauthorized "removal" of

Defendant's property "from the premises," illegal drug use, intoxication, concealment of

quality problems in Defendant's products, willful damage to property, improper

solicitation, deliberate use of unsafe work practices, possession of a weapon, gambling

and insubordination.  (Team Member Handbook at 34-35.)  The Handbook further

provides that the listed examples are "not all inclusive."  (Id. at 35.)

Here, Defendant investigated allegations of insubordination against Plaintiff

arising from what Defendant perceived as multiple, uncontrolled outbursts of temper,

physically threatening behavior and disrespect for coworkers and superiors.  Weddington

was not charged with multiple instances of insubordinate or threatening conduct.  Rather,

Defendant investigated allegations that, on a single occasion, Weddington used

Defendant's scrap parts to upgrade his company car and, thus, impermissibly removed

Defendant's property from the premises.  Although Defendant and Plaintiff were accused

of "serious misconduct," the court finds that the conduct underlying the accusations is

very different.

The court also has examined whether Weddington's offense was of comparable

seriousness with Plaintiff's offenses.  Defendant states that Weddington was not fired

because Weddington sought and obtained permission from his supervisor to install the parts on his company vehicle.  Although Defendant found that Weddington's supervisor should not have sanctioned Weddington's request and that Weddington's conduct warranted discipline, it concluded that Weddington's reliance on his boss' approval justified a sanction less severe than termination.  The evidence, thus, suggests that the conduct for which Weddington was disciplined presented a mitigating circumstance which the court finds further distinguishes Weddington's misconduct from Plaintiff's which Defendant believed presented a real potential for actual workplace violence.  Furthermore, Plaintiff's termination was predicated on three separate incidents of volatile behavior, while Weddington's discipline arose from one incident of misconduct.  There, thus, are not only stark differences in the nature of Plaintiff's and Weddington's conduct, but also in the number of infractions.  Accordingly, the court finds that Plaintiff cannot

establish a prima facie of race discrimination by pointing to Weddington as a

comparator.[11]

### 3. Summary

In sum, Plaintiff fails to make out a prima facie case of race discrimination

because he has not met his burden of showing that the "quantity and quality" of Groves'

and Weddington's misconduct were "nearly identical" to his.  Maniccia, 171 F.3d

at 1368.  The fact, therefore, that Defendant fired Plaintiff, but not Groves or

Weddington, does not give rise to an inference of race discrimination.  Unfair discipline,

absent any evidence from which racial animosity can be inferred, is not an unlawful

employment practice which violates Title VII.  As the Eleventh Circuit has stated on

---

[11] Even if Plaintiff had established a prima facie case, the court would find, for substantially the same reasons argued by Defendant (Def. Summ. J. Br. at 20-21; Def. Reply at 6-7), that Defendant's articulated nondiscriminatory reasons for Plaintiff's termination rebut any inference of discrimination presented by a prima facie case and that Plaintiff fails to show a genuine issue of material fact regarding pretext.  In particular, as stated above, Plaintiff contends that Johnson and Chumney were mistaken or lying about Plaintiff's conduct, but the truth or falsity of their accusations is not the focal point of the inquiry.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) ("That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question whether the employer believed the employee had done wrong.") (citation omitted); see also Holland v. Washington Homes, Inc., 487 F.3d 208, 220 (4th Cir. 2007) (affirming grant of summary judgment because employer submitted "uncontested evidence that it terminated [plaintiff] because its decisionmaker believed that [plaintiff] was making physical threats toward his supervisor.  Whether [plaintiff] actually made these threats is irrelevant . . . because it is uncontested that the decisionmaker believed that he did.").  Plaintiff has failed to present evidence from which it can be inferred that Defendant did not honestly believe that Plaintiff's termination was warranted for the charged misconduct.  (Pl. Summ. Resp. at 17-18.)

more than one occasion, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Abel v. Dubberly, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000) (per curiam) (quoting Nix, 738 F.2d at 1187). Accordingly, the court finds that Defendant's motion for summary judgment on Plaintiff's wrongful termination claim, brought pursuant to Title VII, is due to be granted.

### B. Retaliation

Plaintiff also brings a retaliation claim under Title VII. To prove a prima facie case of retaliation under Title VII, Plaintiff must demonstrate that (1) he "engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." Gregory v. Ga. Dep't. of Human Res., 355 F.3d 1277, 1279 (11th Cir. 2004) (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 959 (11th Cir. 1997)). The first and third prongs are at issue.

### 1. Protected Activity

Defendant contends that Plaintiff has not demonstrated that he engaged in protected activity because Plaintiff's complaints are too "vague" and do not refer to conduct which violates Title VII. (Def. Summ. J. Br. at 26.) In response, Plaintiff argues that he twice "express[ed] his belief that he was being discriminated against." (Pl. Summ.

24

J. Resp. at 15.)  First, Plaintiff points to the meeting which Weddington, Carter and Hannah initiated on November 28, 2005, after Chumney lodged her complaint against him.  (Id.)  During this meeting, Plaintiff said that Weddington "harassed" him and that Weddington "did not like his kind."  (Carter Team Relations Mem., dated Nov. 28, 2005); (Pl. Dep. at 197-99); (Pl. Summ. J. Resp. at 15.)  Second, Plaintiff says that the next day (November 29), when Swegman and Clevenger summoned him to a meeting to discuss the November 22 and November 28 incidents which were under investigation, he described to them instances of preferential treatment accorded Caucasian employees and stated that the "way" Weddington "treated" him "was discriminatory."  (Pl. Dep. at 239); (Pl. Summ. J. Resp. at 16.)

The issue is whether Plaintiff's statements on November 28 and November 29 are too ambiguous to qualify as protected expression under Title VII's opposition clause. "Under the opposition clause, an employer may not retaliate against an employee because the employee 'has opposed any practice made an unlawful employment practice by this subchapter.'"  EEOC v. Total Sys. Servs., 221 F.3d 1171, 1174 (11th Cir. 2000) (quoting 42 U.S.C. § 2000e-3(a)).  The Eleventh Circuit's decision in Brown v. City of Opelika is instructive concerning the level of specificity required to bring an informal expression within the protections of Title VII's opposition clause.  See 211 Fed. Appx. 862, 863 (11th Cir. 2006).  In Brown, the Eleventh Circuit affirmed the district court's summary judgment ruling on a Title VII retaliation claim in favor of the employer where the employee argued that her statement to a superior that she "wanted to make a complaint of

'harassment'" constituted protected activity.  See id. at 863-64; Brown v. City of Opelika,

No. 3:05-CV-236-W, 2006 WL 1515836, *4 (M.D. Ala. May 30, 2006).  Affirming the

judgment, the Eleventh Circuit explained that there was no evidence that, when making

her complaint, the employee referred to "racial discrimination or harassment" or

"mentioned the word 'race'" and that the employee "never voiced a complaint that the

City was engaged in an unlawful employment practice."  Brown, 211 Fed. Appx. at 211;

see also Jeronimus v. Polk County Opportunity Council, 145 Fed. Appx. 319, 326 (11th

Cir. 2005) (plaintiff did not engage in Title VII protected activity when he complained of

being "singled out" and being subjected to "harassment" and a "hostile environment"

because plaintiff did not "suggest[]" that his "treatment was in any way related to his race

or sex").

Here, the court finds that Plaintiff's accusations that Weddington "harassed" him

and "did not like his kind" fail based upon the reasoning in Brown and Jeronimus.  In

making these complaints on November 28, Plaintiff did not use the words "race" or

otherwise indicate that he believed he was the victim of any type of harassment made

unlawful by Title VII.  Put differently, Plaintiff's statement does not contain any

suggestion that Plaintiff believed Weddington harassed him and "did not like his kind"

based upon a criterion protected by Title VII.  The court assumes, without deciding, that

Plaintiff's comments to Clevenger and Swegman on November 29 – i.e., that Weddington

treated him less favorably than Caucasian employees – satisfies the first element, but, as

discussed below, Plaintiff fails to establish a prima facie case on the third element.

### 2. Causal Link

Defendant argues that, "[e]ven if Plaintiff could show that he engaged in protected activity, he cannot prove a causal connection between any complaint and his discharge." (Def. Summ. J. Br. at 27.)  Defendant acknowledges that Plaintiff's purported complaints of racial mistreatment on November 28 and 29 occurred "in very close proximity" with Plaintiff's termination, as argued by Plaintiff.  (Pl. Summ. J. Resp. at 15.)  Defendant, however, points out that the November 22 and 28 incidents which culminated in Plaintiff's termination "occurred <u>before</u>" Plaintiff made his purported complaints of discrimination and that Plaintiff cannot "create a retaliation claim by making complaints only in response to learning that his job is in jeopardy."  (Def. Summ. J. Br. at 27 (emphasis in brief).)  Based on the facts of this case, Defendant contends that temporal proximity alone will not suffice to establish the requisite causal link on Plaintiff's retaliation claim.  (<u>Id.</u>)  For the reasons to follow, the court agrees with Defendant.

To demonstrate that "the adverse action was causally related to the employee's protected expression, the plaintiff must prove 'that the protected activity and the adverse action are not completely unrelated.'"  <u>Davis v. Coca-Cola Bottling Co. Consol.</u>, 516 F.3d 955, 978 n.52 (11th Cir. 2008) (citation omitted).  "[A]t a minimum, [a plaintiff] must show that the adverse act followed the protected conduct."  <u>Griffin v. GTE Fla., Inc.</u>, 182 F.3d 1279, 1284 (11th Cir. 1999).  As elaborated upon in <u>Griffin</u>, "this minimum proof stems from the important requirement that 'the employer was actually aware of the

protected expression at the time it took adverse employment action.'"[12]  Id. (citation

omitted); see also Cobb v. TSI Telecoms. Servs., 172 Fed. Appx. 293, 294 (11th Cir.

2006) (holding that plaintiff failed to prove causal link on his retaliatory discharge claim,

in part, because it was undisputed that the plaintiff knew that his employer was

"contemplating eliminating [his] position" prior to the plaintiff filing his internal

complaint).

Here, Defendant's investigation into the alleged misconduct of Plaintiff arising

from the incidents of November 22 and 28 was underway when Plaintiff made his

internal complaint to Swegman and Clevenger on November 29.  Indeed, the evidence is

undisputed that on November 28 – the day prior to Plaintiff's complaint to Swegman and

Clevenger – Carter opined that Plaintiff had engaged in "serious misconduct" and

"recommend[ed]" that the Termination Committee take action.  (Carter Team Relations

---

[12]  The court notes that the court in Chen v. County of Orange provided a frank
discussion concerning one purpose of the causal link requirement:

> [T]he possibility of a retaliation claim creates the problem of conferring a
> de facto immunity on the complainant despite poor job performance or the
> meritlessness of any complaint.  Consider a hypothetical of a ne'er-do-well
> employee who wants to manipulate the system to his or her advantage:
> "Not doing your job well?  Ax about to fall?   Never fear: file a
> discrimination claim, no matter how meritless.  Your employer will be
> afraid to take any action because now you can sue for retaliation."

96 Cal. App. 4th 926, 948 (Cal. App. 4th Dist. 2002); see also Kiel v. Select Artificials,
Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) ("Although contesting an unlawful employment
practice is protected conduct, the anti-discrimination statutes do not insulate an employee
from discipline for violating the employer's rules or disrupting the workplace.").

Mem., dated Nov. 28, 2005.)  Not only did the alleged misconduct which resulted in Plaintiff's termination occur prior to Plaintiff's complaint, but also the wheels for Plaintiff's termination already had been set in motion by the time Plaintiff made his internal complaint on November 29.  The court finds that Defendant was not expected to halt or forego its disciplinary proceedings simply because, on the heels of Defendant's contemplated termination of Plaintiff, Plaintiff screamed retaliation.  Cf. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

The only basis upon which Plaintiff relies for inferring the causal link is the temporal proximity between the timing of his internal complaints and his termination. Under the circumstances of this case, as discussed above, the court finds that Plaintiff cannot raise a genuine issue of material fact as to causation based solely on temporal proximity.  Accordingly, the court finds that summary judgment is due to be entered in Defendant's favor on Plaintiff's Title VII retaliation claim because Plaintiff cannot establish a prima facie case.[13]

---

[13] Alternatively, having considered the record in its totality, as well as the parties' arguments, the court finds that Plaintiff has not presented any evidence which raises a genuine issue of material fact as to whether the real reason for Defendant's termination was retaliatory.

29

## VI.  CONCLUSION

Applying the summary judgment standard, the court finds that Plaintiff has not demonstrated a Title VII prima facie case of race discrimination or retaliation or shown that Defendant's legitimate, nondiscriminatory reason for Plaintiff's termination is a pretext for discrimination or retaliation.  Moreover, Plaintiff has abandoned his Title VII hostile work environment claim.  Defendant's motion for summary judgment, therefore, is due to be granted because there are no genuine issues of material fact so as to warrant a jury's consideration of Plaintiff's claims.

## VII.  ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendant's motion for summary judgment (Doc. No. 9) be and the same is hereby GRANTED.

A final judgment shall be entered separately.

Done this 9th day of April, 2008.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE